IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 7 |
| | ) | |
| INTEGRAMED HOLDING CORP., *et al.*,[1] | ) | Case No. 20-11169 (LSS) |
| | ) | |
| | ) | (Jointly Administered) |
| Debtors. | ) | |
| | ) | RE: Docket No. 35 |

**NOTICE OF FILING OF ASSET PURCHASE AGREEMENT
BETWEEN THE CHAPTER 7 TRUSTEE AND FERTILITY NEWCO, LLC**

Dated:  July 22, 2020

Mark E. Felger (DE 3919)
Simon E. Fraser (DE 5335)
Gregory F. Fischer (DE 5269)
Cozen O'Connor
1201 N. Market Street, Suite 1001
Wilmington, DE 19801-1147
Telephone (302) 295-2000; Facsimile (302) 295-2013
mfelger@cozen.com
sfraser@cozen.com
gfischer@cozen.com

-and-

Eric L. Scherling
1650 Market Street, Suite 2800
Philadelphia, PA 19103
Telephone: (215) 665-2042
escherling@cozen.com

*Counsel for Jeoffrey L. Burtch, Chapter 7 Trustee*

---

[1] The Debtors in these cases are the following entities (the respective case numbers for each estate follows in parentheses): IntegraMed Holding Corp. (20-11169 LSS), IntegraMed America, Inc. (20-11170 LSS), Trellis Health, LLC (20-11171 LSS), IntegraMed Fertility Holding Corp. (20-11172 LSS), Reproductive Partners, Inc. (20-11173 LSS), IntegraMed Management of Bridgeport, LLC (20-11175 LSS), IntegraMed Florida Holdings, LLC (20-11176 LSS), IntegraMed Management of Mobile, LLC (20-11179 LSS), IntegraMed Management, LLC (20-11181 LSS), and IntegraMed Medical Missouri, LLC (20-11184 LSS).

ASSET PURCHASE AGREEMENT

by and among

INTEGRAMED AMERICA INC.

and

FERTILITY NEWCO, LLC

Dated July __, 2020

DM_US 168011982-30.104127.0023

**TABLE OF CONTENTS**

ARTICLE 1 PURCHASE AND SALE ................................................................................. 2

    1.1       Purchase and Sale of Purchased Assets ................................................... 2

ARTICLE 2 ASSETS AND LIABILITIES ......................................................................... 2

    2.1       Excluded Assets. ...................................................................................... 2
    2.2       Assumption of Liabilities and Obligations .............................................. 2
    2.3       Excluded Liabilities ................................................................................. 2
    2.4       Non-Assignable Assets ............................................................................ 4
    2.5       Purchase Price .......................................................................................... 4

ARTICLE 3 THE CLOSING ............................................................................................... 4

    3.1       Closing ..................................................................................................... 5
    3.3       Closing Deliveries of Seller .................................................................... 5
    3.4       Closing Deliveries of Buyer .................................................................... 5

ARTICLE 4 REPRESENTATIONS AND WARRANTIES OF BUYER ................................. 5

    4.1       Organization of Buyer.............................................................................. 5
    4.2       Authorization of Transaction ................................................................... 6
    4.3       Non-contravention ................................................................................... 6

ARTICLE 5 REPRESENTATIONS AND WARRANTIES OF SELLER ............................... 6

    5.1       Authority .................................................................................................. 6

ARTICLE 6 SELLER BANKRUPTCY AND BANKRUPTCY COURT APPROVAL ............. 7

    6.1       Competing Transaction............................................................................. 7
    6.2       Bankruptcy Court Filings......................................................................... 7

ARTICLE 7 PRE-CLOSING COVENANTS ...................................................................... 8

    7.1       Closing Efforts......................................................................................... 8
    7.2       Access and Cooperation........................................................................... 8
    7.3       Notice of Developments .......................................................................... 9

ARTICLE 8 POST-CLOSING COVENANTS .................................................................... 9

    8.1       General ..................................................................................................... 9

ARTICLE 9 CLOSING CONDITIONS .............................................................................. 9

    9.1       Conditions to Obligation of Buyer........................................................... 9
    9.2       Conditions to Seller's Obligations ........................................................... 10

ARTICLE 10 SURVIVAL .................................................................................................. 10

    10.1    Survival.................................................................................................... 10

DM_US 168011982-30.104127.0023

# TABLE OF CONTENTS
(continued)

**Page**

ARTICLE 11 TAX MATTERS .................................................................................................. 10

    11.1    Cooperation on Tax Matters ................................................................................ 10

    11.2    Taxes ................................................................................................................... 11

    11.3    Allocation of Purchase Price .............................................................................. 11

    11.4    Withholding ........................................................................................................ 11

ARTICLE 12 TERMINATION .............................................................................................. 11

    12.1    Termination of Agreement .................................................................................. 11

    12.2    Procedure upon Termination .............................................................................. 12

ARTICLE 13 DEFINITIONS .................................................................................................. 12

ARTICLE 14 MISCELLANEOUS ......................................................................................... 15

    14.1    No Third-Party Beneficiaries ............................................................................. 15

    14.2    Entire Agreement ................................................................................................ 15

    14.3    Succession and Assignment ................................................................................ 15

    14.4    Counterparts ........................................................................................................ 15

    14.5    Titles and Headings ............................................................................................ 16

    14.6    Notices ................................................................................................................ 16

    14.7    Governing Law ................................................................................................... 16

    14.8    Amendments and Waivers .................................................................................. 16

    14.9    Specific Performance. ......................................................................................... 17

    14.10    Severability ........................................................................................................ 17

    14.11    Expenses ............................................................................................................ 17

    14.12    Construction ....................................................................................................... 17

    14.13    Incorporation of Exhibits .................................................................................. 17

    14.14    Schedules ........................................................................................................... 17

    14.15    Waiver of Jury Trial .......................................................................................... 18

    14.16    Exclusive Venue ................................................................................................ 18

EXHIBITS AND SCHEDULES

EXHIBITS

Exhibit A           Bidding Procedures Order

SCHEDULES

Schedule 1.1        Purchased Assets
Schedule 2.2        Assumed Liabilities
Schedule 2.3(g)     Debt
Schedule 3.4(a)     Wire Instructions
Schedule 12.1       Assigned Contracts
Schedule 12.2       Related Practices

DM_US 168011982-30.104127.0023

## ASSET PURCHASE AGREEMENT

This Asset Purchase Agreement (this "Agreement") is entered into on July ___, 2020, by and between Fertility NewCo, LLC, a Delaware limited liability company ("Buyer"), and Jeoffrey L. Burtch, solely in his capacity as Chapter 7 trustee on ("Trustee") behalf of IntegraMed America Inc. ("Seller"). Buyer and Seller are referred to collectively herein as the "Parties" and individually as a "Party." Capitalized terms used and not otherwise defined herein have the meanings set forth in Article 13 below.

### PRELIMINARY STATEMENTS

WHEREAS, on May 20, 2020 (the "Petition Date"), IntegraMed Holding Corp. and various of its Affiliates (each, a "Debtor" and collectively, the "Debtors") each filed a voluntary petition for relief under Chapter 7 of the Bankruptcy Code, as amended (the "Bankruptcy Code"), commencing Chapter 7 cases (each, a "Bankruptcy Case" and, collectively, the "Bankruptcy Cases") in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court"), and the Bankruptcy Cases are being jointly administered under Case No. 20-11169 (LSS);

WHEREAS, shortly after the Petition Date, Seller was appointed as the Chapter 7 Trustee for the Estates of the Debtors, and he continues to serve in such capacity;

WHEREAS, on June 1, 2020, Seller filed a *Motion for Entry of (I) an Order (A) Approving Bidding Procedures in Connection with Sale of Substantially All of the Estates' Assets, (B) Scheduling an Auction and Hearing to Consider the Proposed Sale, and (C) Approving the Form and Manner of Notice Thereof; and (II)* an *Order (A) Approving the Sale, (B) Authorizing the Assumption and Assignment of Executory Contracts and Unexpired Leases, and (C) Granting Certain Related Relief* (the "Sale Motion") [Docket No. 35];

WHEREAS, on June 8, 2020, the Bankruptcy Court entered the *Order Granting Trustee's Motion for Entry of an Order (A) Approving Bidding Procedures in Connection with Sale of Substantially All of the Estates' Assets, (B) Scheduling an Auction and Hearing to Consider the Proposed Sale, and (C) Approving the Form and Manner of Notice Thereof* (the "Bidding Procedures Order") [Docket No. 72] which, *inter alia*, approved the bid and auction procedures attached as Exhibit 1 thereto (the "Bidding Procedures");

WHEREAS, Buyer, as a Qualified Bidder (as defined in the Bidding Procedures);

WHEREAS, Buyer desires to purchase and assume and Seller desires to sell, convey, assign and transfer such assets and rights and such liabilities to Buyer in the manner and subject to the terms and conditions set forth herein and as authorized under, among other things, Sections 105 and 363 of the Bankruptcy Code;

WHEREAS, Seller's ability to consummate the transactions set forth in this Agreement is subject to, among other things, the entry of the Sale Order by the Bankruptcy Court; and

WHEREAS, the Seller has determined that it is advisable and in the Estates' best interests to enter into this Agreement and to consummate the transactions provided for herein, subject to entry of the Sale Order, and has approved the same.

### AGREEMENT

Now, therefore, in consideration of the premises and the mutual promises herein made, and in consideration of the representations, warranties, covenants and other valuable consideration herein contained, the receipt and sufficiency of which are hereby acknowledged, the Parties agree as follows:

DM_US 168011982-30.104127.0023

# ARTICLE 1

## PURCHASE AND SALE

1.1     Purchase and Sale of Purchased Assets.  On the terms and subject to the conditions set forth in this Agreement, at the Closing, Buyer shall purchase, acquire and accept from Seller, and Seller shall sell, transfer, assign, convey and deliver to Buyer, all right, title and interest in, to and under the Purchased Assets free and clear of any and all Liens or any other interest.  "Purchased Assets" means:

(a)     all of the assets set forth on Schedule 1.1;

(b)     all accounts receivable to Debtor attributable to services provided by each of the Related Practices listed on Schedule 12.2;

(c)     to the extent not purchased pursuant to that certain Asset Purchase Agreement between Buyer and Debtor dated May 11, 2020, all intellectual property related to the Attain Program; and

(d)     all claims resulting from any confidentiality, restrictive covenant, non-compete, non-solicit and non-disclosure agreements entered by Debtor with current or former employees at the Seller's corporate headquarters and the Related Practices, contingent workers or any third parties.

# ARTICLE 2

## ASSETS AND LIABILITIES

2.1     Excluded Assets.  Other than the Purchased Assets, the parties expressly agree that Buyer is not purchasing or acquiring any other assets or properties of Debtor and all such other assets and properties shall be excluded from the Purchased Assets (collectively, the "Excluded Assets").

2.2     Assumption of Liabilities and Obligations.  Except as otherwise provided in Schedule 2.2, upon the terms and subject to the conditions of this Agreement, at the Closing, Seller agrees to assign to Buyer, and Buyer agrees to assume from and after the Closing Date, in accordance with their respective terms, any performance obligations of Debtor under the Assigned Contracts first arising after the Closing Date to the extent relating to the period on or after the applicable Closing Date, and any Cure Payments related to such Assigned Contracts, and to the extent not otherwise included in the Cure Payments any and all Liabilities to patients of the Related Practices for services which patients have paid Debtor for or refund claims under the Attain program (in accordance with the Attain-related Contracts with the Related Practices) whether arising prior to or after the Closing Date (the "Assumed Liabilities"), and no other Liabilities.

2.3     Excluded Liabilities.  Notwithstanding any provision in this Agreement or any other writing to the contrary, Buyer is not assuming and shall not be responsible for, pay, perform or discharge, and shall not otherwise bear the economic burden of, any Liabilities of Debtor or its Affiliates of any kind or nature whatsoever other than the Assumed Liabilities (all such Liabilities other than the Assumed Liabilities being herein referred to as the "Excluded Liabilities"), which Excluded Liabilities shall be retained by and remain the responsibility of Debtor.  For the avoidance of doubt and without limiting the generality of the foregoing, the Excluded Liabilities shall include, but not be limited to, the following:

(a)     Debtor's costs and expenses incurred in connection with this Agreement and the transactions contemplated by this Agreement and the Ancillary Agreements;

(b)     Debtor's Liabilities and obligations arising under this Agreement or any of the Ancillary Agreements (including any amendment or supplement thereto);

-2-

DM_US 168011982-30.104127.0023

(c)    any Liabilities arising out of any Proceeding relating to the business of Debtor or the Purchased Assets before any Governmental Authority arising on or prior to the Closing Date or arising out of events, facts or circumstances occurring or existing on or prior to the Closing Date regardless of when such Proceeding is commenced;

(d)    any Liabilities under any Assigned Contracts that expire or are terminated on or prior to the Closing Date or are otherwise uncurable pursuant to Section 365 of the Bankruptcy Code;

(e)    any Liabilities related to, or arising from, Non-Assignable Assets until legal title is transferred to Buyer pursuant to Section 2.4(d);

(f)    any Liabilities of Debtor to the extent relating to assets other than the Purchased Assets and the ownership, operation and conduct of any business in connection therewith, including any amounts due from Debtor under or arising from any of the Affiliate Contracts;

(g)    all debt of Debtor, except such debt set forth on Schedule 2.3(g);

(h)    any Liabilities for (i) any Taxes for which Debtor is liable under Section 11.2, and (ii) Taxes imposed on Debtor or its Affiliates arising from the transactions contemplated by this Agreement;

(i)    all Liabilities of Debtor in connection with claims of professional malpractice or tort;

(j)    any Liability of Debtor, arising out of or relating to: (i) environmental, health, and safety requirements, (ii) claims relating to employee health and safety, including claims for injury, sickness, disease or death of any Person or (iii) compliance with any legal requirement relating to any of the foregoing;

(k)    any liability of Debtor or any ERISA Affiliate under Title IV of ERISA, including with respect to any single employer plan, multiemployer plan or multiple employer plan ever maintained or offered by Debtor to its employees, including any pension, retirement, or retiree health and welfare Liability to Debtor's current or former employees;

(l)    any Liability of Debtor under Part 6 of Subtitle B of Title I of ERISA and Code §4980B and of any similar state Law or similar state law;

(m)    any Liability of Debtor under the federal or state laws related to notice provided prior to the termination of employees;

(n)    all Liabilities owed by Debtor to Debtor's employees;

(o)    any Liability, known or unknown, fixed, contingent or otherwise, the existence of which is a breach of, or inconsistent with, any representation, warranty, covenant, obligation or agreement of Debtor set forth in this Agreement;

(p)    any Liability of Debtor under any collective bargaining agreements;

(q)    any Liability of Debtor on account of any private sector cost reimbursement programs or insurance coverage;

(r)    any experience ratings of Debtor maintained by taxing authorities such as unemployment boards;

(s)    any Liability of Debtor relating to or arising out of the ownership or operation of an Excluded Asset; including, without limitation, any Liability of Debtor with respect to any Lien affecting the leased, subleased, licensed or otherwise occupied by the Related Practices or which house the clinics and other facilities of the Related Practices; and

-3-

(t)      all Liabilities with respect to any past or present brokers, employees or agents of a Debtor, including all Liabilities arising under any employee plan or any previous similar plan maintained for the benefit of such employees, brokers or agents, and all Liabilities for commissions due and owing by Debtor to any brokers, agents or employees.

2.4      Non-Assignable Assets.  Notwithstanding anything in this Agreement to the contrary, to the extent that the assignment of all or any portion of any Purchased Assets shall be prohibited by Law (including by Order of a Governmental Authority), requires a Consent, or advance notice to, a counterparty (if any) or requires the consent of any other third party that has not been obtained as of the Closing, and which restriction, consent right or right to advance notice cannot be effectively overridden or canceled by any order of the Bankruptcy Court or any provision of the Bankruptcy Code (each, a "Non-Assignable Asset"):

(a)      this Agreement shall not constitute an assignment or transfer of title to any such Non-Assignable Asset, unless and until any applicable restrictions described above prohibiting the assignment of such Non-Assignable Asset are satisfied or waived, except to the extent set forth in this Section 2.4;

(b)      title to such Non-Assignable Asset shall not be transferred except and until provided in Section 2.4(d), and Debtor shall retain each such Non-Assignable Asset and all of the Liabilities of Debtor related to, or arising from, such Non-Assignable Asset accruing on and after the Closing, and such Liabilities shall not be considered Assumed Liabilities;

(c)      Buyer and Seller shall continue to use reasonable best efforts to address the applicable restriction, obtain the consents of the counter parties to Assigned Contracts prohibited by Law (including by Order of a Governmental Authority), requires a Consent, or advance notice to, a counterparty (if any) or requires the consent of any other third party that has not been obtained as of the Closing, and which restriction, consent right or right to advance notice cannot be effectively overridden or canceled by any order of the Bankruptcy Court or any provision of the Bankruptcy Code or obtain a waiver of the issue impacting the ability of Seller to assign such Non-Assignable Asset hereunder; and

(d)      title to each Non-Assignable Asset shall automatically and without further action of the Parties be assigned pursuant to this Agreement to Buyer upon satisfaction or waiver of the applicable restrictions affecting such Non-Assignable Asset, and all of the performance obligations of Debtor arising under such Non-Assignable Asset accruing after the date of such assignment shall constitute Assumed Liabilities as of such date other than any of such Liabilities that constitute Excluded Liabilities.

2.5      Purchase Price.  The purchase price ("Purchase Price")[1] (which shall be delivered at closing) is $10,500,000, which shall consist of $10,000,000 of debt forgiveness under that certain Amended and Restated Credit Agreement, dated as of May 9, 2018, among Debtor, the lenders parties thereto, Bank of Montreal, as administrative agent (or any successor agent appointed from time to time), and the other agents parties thereto (as amended, restated, modified or supplemented from time to time) and $500,000 in cash[2].

## ARTICLE 3

### THE CLOSING

---

[1] Note to Trustee: Purchase Price to be applicable to both the contested and non-contested assets.

[2] Note to Trustee: Buyer understands that an actual cash payment of $100,000 will be made at the Closing.  Discuss whether to include language memorializing this amount.

-4-

3.1     Closing.  The closing of the transactions contemplated by this Agreement (the "Closing") shall take place electronically by the mutual exchange of facsimile or portable document format (.PDF) signatures, (a) commencing at 10:00 a.m. eastern standard time on the second (2nd) Business Day following the satisfaction or waiver of all conditions to Closing set forth in Article 9 (other than those conditions that by their nature are to be satisfied by actions taken at the Closing), or (b) at such other place or time as may be mutually agreed to by the Parties (the date on which the Closing actually occurs, the "Closing Date"). All transactions contemplated herein to occur on and as of the Closing Date shall be deemed to have occurred simultaneously and to be effective as of 12:01 a.m. eastern standard time on the Closing Date.

3.2     Intentionally Omitted.

3.3     Closing Deliveries of Seller.  At or prior to the Closing, Seller shall deliver to Buyer:

(a)     a certificate, in form and substance reasonably satisfactory to Buyer confirming that each of the conditions contained in Sections 9.1(a)-(b) is satisfied;

(b)     a certified and docketed copy of the Sale Order;

(c)     an assignment of equity interest or stock power and, to the extent certificated, equity interest certificates, with respect to any equity interests that are included as part of the Purchased Assets or Assigned Contracts;

(d)     all other instruments and documents required by this Agreement to be delivered by Seller to Buyer (including, without limitation, those instruments and documents set forth in Section 9.1 below), and such other instruments and documents which Buyer or its counsel may reasonably request to effectuate the transactions contemplated hereby.

All such agreements, documents and other items shall be in form and substance satisfactory to Buyer.

3.4     Closing Deliveries of Buyer.  At or prior to the Closing, Buyer shall deliver to Seller:

(a)     the Purchase Price, the cash portion of which shall be delivered in accordance with the wire instructions set forth on Schedule  3.4(a);

(b)     a certificate, in form and substance reasonably satisfactory to Seller, confirming that each of the conditions specified below in Sections 9.2(a)-(b) is satisfied; and

(c)     all other instruments and documents required by this Agreement to be delivered by Buyer to Seller, and such other instruments and documents which Seller or their counsel may reasonably request to effectuate the transactions contemplated hereby.

All such agreements, documents and other items shall be in form and substance satisfactory to Seller.

# ARTICLE 4

## REPRESENTATIONS AND WARRANTIES OF BUYER

Buyer represents and warrants to Seller that the statements contained in this Article 4 are correct and complete as of the date of this Agreement and will be correct and complete as of the Closing Date (as though made then and as though the Closing Date were substituted for the date of this Agreement throughout this Article 4).

4.1     Organization of Buyer.  Buyer is a limited liability company duly formed, validly existing and in good standing under the Laws of the State of Delaware.

DM_US 168011982-30.104127.0023

4.2     Authorization of Transaction.  Buyer has full power and authority to execute and deliver this Agreement and the Ancillary Agreements to which Buyer is a party and to perform Buyer's obligations hereunder and thereunder.  The execution and delivery by Buyer of this Agreement and the Ancillary Agreements to which Buyer is a party and the performance by Buyer of the transactions contemplated hereby and thereby have been duly approved by all requisite action of Buyer.  Assuming the due authorization, execution and delivery of this Agreement and the Ancillary Agreements by the other parties thereto, this Agreement and each Ancillary Agreement to which Buyer is a party constitute the valid and legally binding obligation of Buyer, enforceable against Buyer in accordance with their terms, except as such enforceability may be limited by bankruptcy, insolvency, reorganization, moratorium and similar laws affecting creditors generally and by the availability of equitable remedies.  Except as required to comply with applicable federal and state securities Laws, Buyer is not required to give any notice to, make any filing with, or obtain any Consent of any Governmental Authority or any other Person in order to consummate the transactions contemplated by this Agreement or the Ancillary Agreements to which Buyer is a party.

4.3     Non-contravention.  Neither the execution and the delivery of this Agreement nor the Ancillary Agreements to which Buyer is a party, nor the consummation of the transactions contemplated hereby and thereby, will (i) violate or conflict with any Law or Order to which Buyer is subject, (ii) violate any provision of the Organizational Documents of Buyer, or (iii) conflict with, result in a breach of, constitute a default under, result in the acceleration of, create in any party the right to accelerate, terminate, modify, or cancel, or require any notice under any Contract to which Buyer is a party or by which it is bound or to which any of its assets is subject.

4.4     Ability to pay Purchase Price.  Buyer has, or will have at the Closing, sufficient liquid assets to enter into the transactions contemplated herein and to pay the cash portion of the  Purchase Price at the Closing.

4.5     Except for the representations and warranties set forth in this Article 4, Buyer nor any of its direct or indirect equityholders or their respective officers, directors, managers, or any of their respective representatives or agents has made or makes any other representations or warranties, written or oral, express or implied, with respect to Buyer.

## ARTICLE 5

### REPRESENTATIONS AND WARRANTIES OF SELLER

5.1     Authority.  Seller is the Chapter 7 trustee in the Bankruptcy Case. Subject to entry of the Sale Order, Seller has the authority to enter into this Agreement and to consummate the transactions contemplated hereby.

5.2     No Representations. EXCEPT AS EXPRESSLY PROVIDED HEREIN OR IN THE SALE ORDER, BUYER AGREES AND ACKNOWLEDGES THAT THE TRANSFER OF THE ASSETS IS MADE PURSUANT TO ORDER OF THE BANKRUPTCY COURT AND IS MADE "AS IS" AND "WHERE IS", AND ACKNOWLEDGES AND AGREES THAT. EXCEPT AS EXPRESSLY PROVIDED HEREIN, SELLER MAKES NO REPRESENTATION OR WARRANTY OF ANY KIND WHATSOEVER WITH RESPECT TO THE ASSETS OR OTHERWISE, EXPRESS OR IMPLIED, INCLUDING BUT NOT LIMITED TO ANY REPRESENTATION OR WARRANTY REGARDING THE TITLE OR CONDITION OF THE ASSETS OR THE FITNESS, DESIRABILITY, OR MERCHANTABILITY THEREOF OR SUITABILITY THEREOF FOR ANY PARTICULAR PURPOSE, OR ANY BUSINESS PROSPECTS, OR VALUATION OF THE ASSETS, OR THE COMPLIANCE OF THE ASSETS IN THEIR CURRENT OR FUTURE STATE WITH APPLICABLE LAWS OR ANY VIOLATIONS THEREOF. BUYER FURTHER ACKNOWLEDGES THAT SELLER SHALL DELIVER TO THE BUYER ALL ASSETS IN SELLER'S OR ITS COUNSEL'S POSSESSION;

-6-

DM_US 168011982-30.104127.0023

BUT THAT SELLER DOES NOT HAVE POSSESSION OF ALL OF THE ASSETS, AND THAT TO THE EXTENT THE SELLER IS NOT IN POSSESSION OF AN ASSET SOLD HEREUNDER, BUYER WILL HAVE SOLE RESPONSIBILITY TO OBTAIN POSSESSION OF THE ASSETS.

## ARTICLE 6

### SELLER BANKRUPTCY AND BANKRUPTCY COURT APPROVAL

6.1     Competing Transaction.

(a)     Seller and Buyer acknowledge that this Agreement (including the sale of the Purchased Assets and the assumption and assignment of the Assigned Contracts) is subject to approval by the Bankruptcy Court, and that this Agreement is subject to termination in the event Seller receives a better or higher offer for such Seller's Purchased Assets.

(b)     "Alternative Transaction" shall be defined as a transaction or series of related transactions pursuant to which Seller accepts a bid to acquire all or substantially all of the Purchased Assets or all or substantially all of the equity or membership interests of Seller or any of Seller's successors from a Person other than Buyer, in accordance with the Bidding Procedures Order or otherwise, but does not mean the sale of goods or services of Seller conducted in the ordinary course of business.

(c)     "Successful Bidder" shall have the definition provided in the Bidding Procedures with respect to the Purchased Assets.

(d)     A "Qualified Bidder" Buyer shall be deemed a Qualified Bidder, as defined in the Bidding Procedures, that has submitted a Qualified Bid, as defined in the Bidding Procedures, at all times.

6.2     Bankruptcy Court Filings.

(a)     Bidding Procedures Order.  The Bidding Procedures Order shall remain in full force and effect and shall not be amended without Buyer's consent, which consent shall not be unreasonably withheld.

(b)     Compliance with Agreement and the Bidding Procedures Order.  Seller shall not change or modify, or request that the Bankruptcy Court change or modify, any of the dates or procedures set forth in this Agreement (including the Sale Milestone), the terms of the Sale Order, or the Bidding Procedures Order set forth in this Agreement, including the dates of the hearing on the Sale Motion and Closing Date, without the prior written consent of Buyer, which consent shall not be unreasonably withheld. The purchase and sale of the Purchased Assets shall be in accordance with (and only in accordance with) the Bidding Procedures Order.

(c)     The "Sale Order" shall be an order of the Bankruptcy Court in a form reasonably acceptable to both Buyer and Seller.

(d)     Entry of Sale Order.  Subject to Buyer being designated as the Successful Bidder, Seller shall promptly obtain entry of the Sale Order approving this Agreement and authorizing the transactions contemplated herein in accordance with the Sale Milestone.

(e)     Other Filings in the Bankruptcy Cases.  Seller shall promptly, and in no event less than three (3) Business Days prior to making any of the following filings in connection with the Bankruptcy Cases, provide Buyer with the proposed final drafts of any and all motions (including the Sale Motion), applications, pleadings, schedules, statements, reports, proposed orders, and other papers (including exhibits and supporting documentation) filed by or on behalf of Seller in the Bankruptcy Court related to or that might have an effect upon the purchase of the Purchased Assets, the Assigned Contracts, this Agreement, or the consummation of the transactions or any provision thereof or herein, so as to provide Buyer and its counsel with a reasonable opportunity to review and comment on such motions, applications,

DM_US 168011982-30.104127.0023

pleadings, schedules, statements, reports, proposed orders, and other papers prior to filing with the Bankruptcy Court, and insomuch as is consistent with Seller's fiduciary duties, consider such comments in good faith.

(f)    Sale Milestone.  The following events must occur by the dates set forth below (collectively, the "Sale Milestone"), unless waived by written consent of Buyer in its sole discretion: on or before July 31, 2020, the Bankruptcy Court shall have entered the Sale Order.

(g)    Auction Procedures.  The Auction shall be conducted in accordance with the Bidding Procedures and the Bidding Procedures Order.

(h)    Notice of Sale.  Notice of the hearing on the Sale Motion, and request for entry of the Sale Order and the objection deadline has been served by Seller in accordance with the Bankruptcy Code and Bankruptcy Rules, including Bankruptcy Rules 2002, 6004, 6006 and 9014, any applicable local rules of the Bankruptcy Court and any orders of the Bankruptcy Court on all persons required to receive notice (collectively, the "Notice Parties").  Seller has provided notice to the Notice Parties that all responses or objections to the Sale Motion will be served on, among others, counsel to Buyer.

(i)    Appeal of Sale Order.  In the event an appeal is taken or a stay pending appeal is requested from the Sale Order, Seller shall immediately notify Buyer of such appeal or stay request and shall provide to Buyer promptly a copy of the related notice of appeal or order of stay.  Seller shall also provide Buyer with written notice of any motion or application filed in connection with any appeal from either of such orders.  In the event of an appeal of the Sale Order, Seller shall be primarily responsible for drafting pleadings and attending hearings as necessary to defend against the appeal.  An appeal, however, does not relieve or excuse Seller from their obligations to comply with the Sale Milestone.

(j)    Assignment and Assumption Procedures.  The Sale Motion included procedures for the assumption of and assignment to Buyer of the Assigned Contracts (the "Assignment and Assumption Procedures").  The Assumption and Assignment Procedures require Seller to serve on each non-debtor contract counterparty a notice specifically stating (a) that Seller may be seeking to assume and assign the Assigned Contracts, (b) the Cure Payments for each Assigned Contract, and (c) the deadline for objecting to the Cure Payments, which will be no later than ten (10) business days prior to the hearing to consider approval of the Sale Order.  The Assumption and Assignment Procedures will provide that upon objection by the non-debtor Assigned Contract counterparty to the Cure Payments asserted by Seller with regard to any Assigned Contract, Seller shall either settle the objection of such party or litigate such objection under procedures as the Bankruptcy Court will approve and prescribe.  In no event shall Seller settle a Cure Payments objection with regard to any Assigned Contract without the express written consent of Buyer (with an email consent being sufficient).

## ARTICLE 7

### PRE-CLOSING COVENANTS

7.1    Closing Efforts. Each of the Parties agree with respect to the period between the execution of this Agreement and the Closing: will use all commercially reasonable efforts to take all action and to do all things necessary, proper, or advisable in order to consummate and make effective the transactions contemplated by this Agreement (including satisfaction, but not waiver, of the closing conditions set forth in Article 9).

7.2    Access and Cooperation.

(a)    From the date hereof through the Closing Date, Seller shall respond to reasonable requests of Buyer and its representatives (including its legal advisors, financing sources, financial advisors and accountants) for access, during normal business hours and upon reasonable advance notice, to the

-8-

properties, books, records and personnel of such Seller related to the Purchased Assets or the Assumed Liabilities; provided, however, that in no event shall Seller be obligated to provide (i) access or information that would be in violation of applicable Law, (ii) bids, letters of intent, expressions of interest, or other proposals received from others in respect of the business of Debtor or in connection with the transactions contemplated hereby or otherwise, and information and analyses relating to such communications, (iii) any information that constitutes attorney work product or that would violate any legal privilege available to such Seller or any of its Affiliates relating to such information or would cause such Seller or any of its Affiliates to breach a confidentiality obligation to which it is bound; provided, however, that such Seller and its Affiliates have used reasonable best efforts to obtain any necessary third party consents to such inspection or disclosure, or (iv) personnel records of such Seller or any of its Affiliates relating to individual performance or evaluation records, medical histories or other information the disclosure of which is prohibited by applicable Law. In connection with such access, Buyer's representatives shall cooperate with Seller's representatives and shall use their reasonable best efforts to minimize any disruption of the Debtor's business.

7.3     Notice of Developments.  If Seller become aware prior to Closing of any event, fact or condition or nonoccurrence of any event, fact or condition that may constitute a breach of any representation, warranty, covenant or agreement of Seller or may constitute a breach of any representation or warranty of Seller if such representation or warranty were made on the date of the occurrence or discovery of such event, fact or condition or on the Closing Date, then Seller will promptly provide Buyer with a written description of such fact or condition.  From the date of this Agreement until the Closing.

## ARTICLE 8

### POST-CLOSING COVENANTS

8.1     General.  In case at any time after the Closing any further action is necessary to carry out the purposes of this Agreement, Seller will take such further action (including the execution and delivery of such further instruments and documents) as Buyer reasonably may request, all at the sole cost and expense of the Buyer.  Seller acknowledges and agrees that, from and after the Closing, Buyer will be entitled to possession of all documents, books, records (including Tax records), agreements and financial data of any sort relating to the business of Debtors.   Notwithstanding the foregoing, Buyer shall provide the Trustee with reasonable access to all documents, books, records (including Tax records), agreements and financial data of any sort relating to the business of Debtors as may be necessary for the Trustee's administration of the Debtors' bankruptcy estates until the Bankruptcy Cases are closed.   In addition, for a term beginning as of the Closing and expiring September 30, 2020, Buyer, for no additional consideration and without the need to execute any additional documentation, grants to the Trustee a non-exclusive, royalty-free, fully paid up, transitional license for use of all information technology assets included among the Purchased Assets.

## ARTICLE 9

### CLOSING CONDITIONS

9.1     Conditions to Obligation of Buyer.  The obligation of Buyer to consummate the transactions to be performed by Buyer in connection with the Closing is subject to satisfaction (or, in the sole discretion of Buyer, waiver in writing) of the following conditions:

(a)     Seller shall have performed and complied in all material respects with all of the covenants and agreements in this Agreement to be performed by Seller prior to or at the Closing;

DM_US 168011982-30.104127.0023

(b)      The satisfaction or occurrence of the Sale Milestone shall have occurred in accordance with the date set forth in the definition of Sale Milestone set forth in Section 6.2(f);

(c)      The Bankruptcy Court shall have approved and authorized the assumption and assignment of each Assigned Contract, free and clear of all liens, encumbrances, and pre-closing liabilities or obligations of any kind;

(d)      There shall not be any Order in effect preventing consummation of any of the transactions contemplated by this Agreement or any Proceeding seeking to restrain, prevent, change or delay the consummation of any of the transactions contemplated by this Agreement; and

(e)      Seller shall have made all of the deliveries contemplated by Section 3.3 of this Agreement.

9.2      Conditions to Seller's Obligations.  Seller's obligations to consummate the transactions to be performed by them in connection with the Closing are subject to satisfaction (or, in the sole discretion of Seller, waiver in writing) of the following conditions:

(a)      All of the representations and warranties concerning Buyer contained in Article 4 must have been true and correct in all material respects as of the date hereof and must be true and correct in all material respects on the Closing Date as if made on the Closing Date;

(b)      Buyer must have performed and complied in all material respects with all of its covenants and agreements in this Agreement to be performed prior to or at the Closing;

(c)      There shall not be any Order in effect preventing consummation of any of the transactions contemplated by this Agreement or any Proceeding seeking to restrain, prevent, change or delay the consummation of any of the transactions contemplated by this Agreement; and

(d)      Buyer shall have made all of the deliveries contemplated by Section 3.4 of this Agreement.

## ARTICLE 10

### SURVIVAL

10.1      Survival. Except as expressly set forth in this Agreement to the contrary, all representations and warranties of Buyer and Seller, respectively, contained in this Agreement or in any document delivered pursuant hereto shall be deemed to be material and to have been relied upon by Buyer and Seller, respectively, for purposes of Closing; provided, however, the Parties acknowledge and agree that all such representations and warranties shall expire, and be of no further force or effect upon the Closing, and neither Buyer nor Seller shall have any liability in respect of any breach thereof upon the Closing.

## ARTICLE 11

### TAX MATTERS

The following provisions will govern the allocation of responsibility as between Buyer and Seller for certain tax matters following the Closing Date:

11.1      Cooperation on Tax Matters.  Buyer and Seller will cooperate, as and to the extent reasonably requested by the other Party, in connection with the filing and preparation of Tax Returns pursuant to this Article 11 and any Proceeding related thereto.  Such cooperation will include the retention and (upon the other Party's request) the provision of records and information that are reasonably relevant to preparation of such Tax Returns and any such Proceeding and making employees available on a mutually convenient basis to provide additional information and explanation of any material provided hereunder.

DM_US 168011982-30.104127.0023

Without limiting the generality of the foregoing, Seller shall each retain, until thirty (30) days after the expiration of the applicable statute of limitations (including any extensions) has expired, copies of all Tax Returns relating to, or containing information concerning, the Purchased Assets, supporting work schedules, and other records or information that may be relevant to such Tax Returns for all tax periods or portions thereof ending on or before the Closing Date and shall not destroy or otherwise dispose of any such records without first providing the Buyer with a reasonable opportunity to review and copy the same.

11.2    Taxes.    Seller shall be responsible for every Tax liability of every kind or nature, including without limitation any federal, state or local income, franchise, sales and use, employment or property tax of Seller, known or unknown, resulting, arising from or related to (a) any transactions occurring on or before the Closing Date, (b) taxable periods (or portions thereof) ending on or before the Closing.

11.3    Allocation of Purchase Price.    The parties agree that the Purchase Price (and other relevant items) shall be allocated among the Purchased Assets in accordance with their relative fair market values as determined by Buyer in its sole discretion.  Buyer shall prepare and deliver to Seller within 45 Business Days after the Closing Date a schedule (the "Allocation Schedule") allocating the Purchase Price among the applicable assets as of the beginning of the day after the Closing Date.  The Allocation Schedule shall be binding on the parties hereto, and the parties hereto agree not to take (or permit any of their Affiliates to take) any position for any Tax purpose or on any Tax Return (including amended returns and claims for refund) or other information returns that is inconsistent with such Allocation Schedule.

11.4    Withholding.    Notwithstanding any other provision in this Agreement, Buyer shall have the right to deduct and withhold any required Taxes from any payments to be made hereunder.  To the extent that amounts are so withheld and paid to the appropriate taxing authority, such withheld amounts shall be treated for all purposes of this Agreement as having been delivered and paid to the Seller.

## ARTICLE 12

## TERMINATION

12.1    Termination of Agreement.    Certain of the Parties may terminate this Agreement as provided below:

(a)    Buyer and Seller may terminate this Agreement by mutual written consent at any time prior to the Closing.

(b)    Buyer may terminate this Agreement by giving written notice to Seller at any time prior to the Closing (i) in the event Seller have breached any representation, warranty, or covenant contained in this Agreement which individually, or in the aggregate, would reasonably be expected to result in a failure of the closing conditions set forth in Section 9.1(a) of this Agreement, and such breach remains uncured for a period of ten (10) Business Days following delivery of notice thereof by Buyer; provided, however, that no cure period will be required for any such breach that by its nature cannot be cured, or (ii) if the Closing shall not have occurred on or before December 31, 2020 (the "Outside Date") (unless the failure results primarily from Buyer itself breaching any representation, warranty, or covenant contained in this Agreement).

(c)    Seller may terminate this Agreement by giving written notice to Buyer at any time prior to the Closing (i) in the event Buyer has breached any representation, warranty, or covenant contained in this Agreement which individually, or in the aggregate, would reasonably be expected to result in a failure of the closing conditions set forth in Section 9.2(a) or 9.2(b) of this Agreement, and such breach remains uncured for a period of ten (10) Business Days following delivery of notice thereof by Buyer; provided, however, that no cure period will be required for any such breach that by its nature cannot be cured or (ii) if the Closing shall not have occurred on or before the Outside Date (unless the failure results primarily from Seller breaching any representation, warranty, or covenant contained in this Agreement).

-11-

(d)    Seller may terminate this Agreement by giving written notice to Buyer if (i) all of the conditions set forth in Sections 9.1 and 9.2 have been satisfied (other than those conditions that by their terms are to be satisfied by actions taken at the Closing, but such conditions must be capable of being satisfied if the Closing Date were the date valid notice of termination of this Agreement is delivered by Seller to Buyer), and (ii) Buyer fails to complete Closing within 3 Business Days of the time set forth in Section 3.1.

(e)    Buyer or Seller may terminate this Agreement by giving written notice to the other Party if the Bankruptcy Court enters an order dismissing the Bankruptcy Cases prior to the approval of the Sale Motion and entry of the Sale Order.

(f)    Buyer or Seller may terminate this Agreement by giving written notice to the other Party if there is in effect a final nonappealable order of a Governmental Authority of competent jurisdiction restraining, enjoining, or otherwise prohibiting the consummation of the transactions described in this Agreement.

(g)    Buyer or Seller may terminate this Agreement in the event that Buyer is not the Successful Bidder at the Auction, by giving written notice at any time to the other party after the conclusion of the Auction.

(h)    Buyer or Seller may terminate by giving written notice to the other party, if (a) (i) Seller enters into a definitive agreement with respect to an Alternative Transaction, (ii) the Bankruptcy Court enters an order approving an Alternative Transaction, and (iii) the Alternative Transaction is consummated, or (b) the Bankruptcy Court enters an order that precludes the consummation of the transactions contemplated hereby on the terms and conditions set forth in this Agreement.

(i)    Buyer may terminate by giving written notice to Seller in the event that Seller has failed to comply with the Sale Milestone, unless otherwise amended or agreed to by Buyer in its sole discretion.

12.2    Procedure upon Termination.  In the event of termination by Buyer or Seller, or both, pursuant to Section 12.1, written notice thereof will forthwith be given to the other Parties, and this Agreement will terminate, and the purchase of the Purchased Assets hereunder will be abandoned, without further action by Buyer or Seller.

# ARTICLE 13

## DEFINITIONS

"Affiliate" means, with respect to the Person to which it refers, (a) a Person that directly or indirectly, through one or more intermediaries, controls, is controlled by or is under common control with, such Person, (b) any officer, director or shareholder of such Person, (c) any parent, sibling, descendant or spouse of such Person or of any of the Persons referred to in clauses (a) and (b), and (d) any corporation, limited liability company, general or limited partnership, trust, association or other business or investment entity that directly or indirectly, through one or more intermediaries controls, is controlled by or is under common control with any of the foregoing individuals. For purposes of this definition, the term "control" of a Person shall mean the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies, whether through the ownership of voting securities, by contract or otherwise.

"Agreement" has the meaning set forth in the Preamble.

"Alternative Transaction" has the meaning set forth in Section 6.1(b).

"Ancillary Agreements" means all of the agreements being executed and delivered pursuant to this Agreement.

-12-

"Assigned Contracts" means the Contracts set forth on Schedule 12.1.

"Assumed Liabilities" has the meaning set forth in Section 2.2.

"Auction" has the meaning set forth in the Bidding Procedures.

"Bankruptcy Cases" has the meaning set forth in the Preliminary Statements.

"Bankruptcy Court" has the meaning set forth in the Preliminary Statements.

"Bidding Procedures Order" has the meaning set forth in the Preliminary Statements.

"BMO" has the meaning set forth in Section 2.5.

"Business Day" means any day that is not a Saturday, Sunday or any other day on which banks are required or authorized by Law to be closed in New York, New York.

"Buyer" has the meaning set forth in the Preamble.

"Claim" means any claim, demand, allegation, charge, dispute, complaint, or notice.

"Closing" has the meaning set forth in Section 3.1.

"Closing Date" has the meaning set forth in Section 3.1.

"Code" means the Internal Revenue Code of 1986, as amended, and any applicable rules and regulations thereunder, and any successor to such statute, rules or regulations.

"Consent" means, with respect to any Person, any consent, approval, authorization, permission or waiver of, or registration, declaration or other action or filing with or exemption by such Person.

"Contract" means any oral or written contract, obligation, understanding, commitment, lease, license, instrument, purchase order, bid or other agreement.

"Cure Payments" means the amount required to be paid with respect to each Assigned Contract to cure all defaults under such Assigned Contract through the Closing Date and to otherwise satisfy all requirements imposed by Section 365 of the Bankruptcy Code as determined by the Bankruptcy Court, in order to effectuate, pursuant to the Bankruptcy Code, the assumption by Seller and assignment to Buyer of each such Assigned Contract.

"Debtor" has the meaning set forth in the Preamble.

"Designated Courts" has the meaning set forth in Section 14.16.

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended.

"ERISA Affiliate" means any Person that, together with Debtor, would be treated as a single employer under Section 414 of the Code or Section 4001 of ERISA and the regulations thereunder.

"Excluded Assets" has the meaning set forth in Section 2.1

"Final Order" means an order or judgment of the Bankruptcy Court, or court of competent jurisdiction with respect to the subject matter, as entered on the docket in the applicable bankruptcy case or the docket of any court of competent jurisdiction, that has not been reversed, stayed, modified, or amended, and as to which the time to appeal, or seek certiorari or move for a new trial, reargument, or rehearing has expired and no appeal or petition for certiorari or other proceedings for a new trial, reargument, or rehearing has been timely taken, or as to which any appeal that has been taken or any petition for certiorari that has been or may be timely filed has been withdrawn or resolved by the highest court to which the order or judgment was appealed or from which certiorari was sought or the new trial, reargument, or rehearing shall have been denied, resulted in no modification of such order, or has otherwise been dismissed with prejudice; *provided however*, that the filing of a motion pursuant to section 502(j) or 1144 of the Bankruptcy Code or

DM_US 168011982-30.104127.0023

under Rule 60 of the Federal Rules of Civil Procedure, or any analogous rule under the Bankruptcy Rules, relating to such order shall not cause such order to not be a "Final Order."

"Governmental Authority" means any foreign or domestic federal, state or local government or quasi-governmental authority, political or economic union, or arbitration tribunal or any department, agency, subdivision, court, commission, or other tribunal of any of the foregoing.

"Law" means any foreign or domestic federal, state or local law, statute, code, ordinance, regulation, rule, directive, consent agreement, constitution or treaty of any Governmental Authority, including common law.

"Liability" means any liability, whether known or unknown, whether asserted or unasserted, whether absolute or contingent, whether accrued or unaccrued, whether liquidated or unliquidated, and whether due or to become due.

"Lien" means any lien, mortgage, pledge, encumbrance, charge, security interest, adverse claim, liability, interest, charge, preference, priority, proxy, transfer restriction (other than restrictions under the Securities Act and state securities laws), encroachment, Tax, order, community property interest, equitable interest, option, warrant, right of first refusal, easement, profit, license, servitude, right of way, covenant or zoning restriction.

"Non-Assignable Asset" has the meaning set forth in Section 2.4.

"Notice Parties" has the meaning set forth in Section 6.2(h).

"Order" means any order, award, decision, injunction, judgment, ruling, decree, charge, writ, subpoena or verdict entered, issued, made or rendered by any Governmental Authority or arbitrator, including the Bankruptcy Court.

"Organizational Documents" means (a) any certificate or articles of incorporation, bylaws, certificate or articles of formation, operating agreement or partnership agreement, (b) any documents comparable to those described in clause (a) as may be applicable pursuant to any Law and (c) any amendment or modification to any of the foregoing.

"Party" has the meaning set forth in the Preamble.

"Person" means any individual, corporation, partnership, limited liability company, firm, joint venture, association, joint-stock company, estate, trust, unincorporated organization, Governmental Authority or other entity, of whatever nature.

"Petition Date" has the meaning set forth in the Preliminary Statements.

"Proceeding" means any action, audit, lawsuit, litigation, proceeding, investigation, complaint, arbitration or mediation (in each case, whether civil, criminal or administrative), filed or initiated with or by, or pending by or before, any Governmental Authority, arbitrator or mediator.

"Purchase Price" has the meaning set forth in Section 1.6.

"Qualified Bid" has the meaning set forth in the Bidding Procedures.

"Qualified Bidder" has the meaning set forth in Section 6.1(d).

"Related Practices" means those physician groups set forth on Schedule 12.2.

"Sale Motion" has the meaning set forth in the Preamble.

"Sale Order" has the meaning set forth in Section 6.2(c).

"Securities Act" means the Securities Act of 1933, as amended, and any applicable rules and regulations thereunder, and any successor to such statute, rules or regulations.

-14-

DM_US 168011982-30.104127.0023

"Seller" or "Seller" has the meaning set forth in the Preamble.

"Successful Bidder" has the meaning set forth in Section 6.1(c).

"Tax" or "Taxes" means any federal, state, local and foreign net income, alternative or add-on minimum, estimated, gross income, gross receipts, sales, use, ad valorem, value added, transfer, franchise, capital profits, lease, service, license, withholding, payroll, employment, excise, severance, stamp, occupation, premium, property, abandoned property or escheat, environmental or windfall profit tax, customs duty or other tax of any kind whatsoever, governmental fee or other like assessment or charge (and any liability incurred or borne by virtue of the application of Treasury Regulation Section 1.1502-6 (or any similar or corresponding provision of state, local or foreign Law), as a transferee or successor, by contract or otherwise), together with all interest, penalties, additions to tax and additional amounts with respect thereto whether disputed or not and including any obligations to indemnify or otherwise assume or succeed to the Tax lability of any other Person.

"Tax Return" means any return, declaration, report, claim for refund, or information return or statement relating to Taxes, including any schedule or attachment thereto, and including any amendment thereof.

"Trustee" has the meaning set forth in the Preamble.

# ARTICLE 14

## MISCELLANEOUS

14.1    No Third-Party Beneficiaries.  Except as specifically provided in this Agreement, this Agreement shall not confer any rights or remedies upon any Person other than the Parties and their respective successors and permitted assigns.

14.2    Entire Agreement.  This Agreement (including the documents referred to herein) constitutes the entire agreement among the Parties and supersedes any prior understandings, agreements, or representations by or among the Parties, written or oral, to the extent they relate in any way to the subject matter hereof.

14.3    Succession and Assignment.  This Agreement shall be binding upon and inure to the benefit of the Parties named herein and their respective successors and permitted assigns.  No Party may assign either this Agreement or any of its rights, interests, or obligations hereunder without the prior written approval of Buyer and Seller; provided, however, that Buyer may (a) assign any or all of its rights and interests hereunder to one or more of its Affiliates and designate one or more of its Affiliates to perform its obligations hereunder (in any or all of which cases Buyer nonetheless shall remain responsible for the performance of all of its obligations hereunder), (b) assign its rights under this Agreement for collateral security purposes to any Person providing financing to Buyer, its subsidiaries or Affiliates (including by the granting of Liens in respect of its rights and interests hereunder to any such lenders (and any agent for such lenders)), and the Parties consent to any exercise by such lenders (and such agent) of their rights and remedies with respect to such collateral, or (c) assign its rights under this Agreement to any Person that acquires the Buyer or any of its assets.

14.4    Counterparts.  This Agreement may be executed in one or more counterparts, each of which shall be deemed an original but all of which together will constitute one and the same instrument, and shall become effective when one or more such counterparts has been signed by each of the Parties and delivered to the other Parties.  Counterparts may be delivered via facsimile, electronic mail (including portable document format (PDF)) or any electronic signature complying with the U.S. federal ESIGN Act of 2000, e.g., www.docusign.com.

DM_US 168011982-30.104127.0023

14.5    Titles and Headings.  Titles and section headings contained in this Agreement are inserted for convenience only and shall not affect in any way the meaning or interpretation of this Agreement.

14.6    Notices.  All notices, requests, demands, claims, and other communications hereunder will be in writing.  Any notice, request, demand, claim, or other communication hereunder shall be deemed duly given (a) when delivered personally to the recipient, (b) when sent by electronic mail or facsimile, on the date of transmission to such recipient, so long as a receipt of such electronic mail or facsimile is requested, (c) one Business Day after being sent to the recipient by reputable overnight courier service (charges prepaid), or (d) four Business Days after being mailed to the recipient by certified or registered mail, return receipt requested and postage prepaid, and addressed to the intended recipient as set forth below:

| | |
|---|---|
| If to Seller: | Jeoffrey L. Burtch, Chapter 7 Trustee<br>919 North Market Street, Suite 460<br>P.O. Box 549<br>Wilmington, DE 19801<br>Email: JBurtch@burtchtrustee.com |
| Copy to (which shall not constitute notice): | Mark E. Felger, Esq.<br>Cozen O'Connor<br>1201 N. Market St., Ste. 1001<br>Wilmington, DE 1980<br>Email: mfelger@cozen.com |
| If to Buyer: | Fertility NewCo, LLC<br>1 Lafayette Place<br>Suite 301<br>Greenwich, CT 06830<br>Attention: Jay Rose; Ramsey Frank<br>Email: jrose@amuletcapital.com; rfrank@amuletcapital.com |
| Copy to (which shall not constitute notice): | McDermott Will & Emery LLP<br>444 W. Lake Street, Suite 4000<br>Chicago, IL 60606<br>Attention:  Kristian Werling; Felicia Perlman<br>Email: kwerling@mwe.com; fperlman@mwe.com |

Any Party may change the address to which notices, requests, demands, claims, and other communications hereunder are to be delivered by giving the other Parties notice in the manner herein set forth.

14.7    Governing Law.  This Agreement and any claim, controversy or dispute arising out of or related to this Agreement, any of the transactions contemplated hereby, the relationship of the parties, and/or the interpretation and enforcement of the rights and duties of the parties, whether arising in contract, tort, equity or otherwise, shall be governed by and construed in accordance with the domestic Laws of the State of Delaware (including in respect of the statute of limitations or other limitations period applicable to any such claim, controversy or dispute), without giving effect to any choice or conflict of Law provision or rule (whether of the State of Delaware or any other jurisdiction) that would cause the application of the Laws of any jurisdiction other than the State of Delaware.

14.8    Amendments and Waivers.  No amendment of any provision of this Agreement shall be valid unless the same shall be in writing and signed by Buyer and Seller.  No waiver by any Party of any provision of this Agreement or any default, misrepresentation, or breach of warranty or covenant hereunder,

-16-

whether intentional or not, shall be valid unless the same shall be in writing and signed by the Party against whom the waiver is to be effective nor shall such waiver be deemed to extend to any prior or subsequent default, misrepresentation, or breach of warranty or covenant hereunder or affect in any way any rights arising by virtue of any prior or subsequent such occurrence.

14.9 <u>Specific Performance</u>. Each Party agrees that the other Parties will be entitled to obtain an injunction or injunctions to prevent breaches of the provisions of this Agreement and to enforce specifically this Agreement and its terms and provisions in any action instituted in the Bankruptcy Court or any other court specified in Section 14.16 without the need to post a bond or other security, subject to Section 14.7 and Section 14.15 in addition to any other remedy to which it may be entitled, at law or in equity.

14.10 <u>Severability</u>. The provisions of this Agreement will be deemed severable and the invalidity or unenforceability of any provision will not affect the validity or enforceability of the other provisions hereof; <u>provided</u>, <u>however</u>, that if any provision of this Agreement, as applied to any Party or to any circumstance, is adjudged by a Governmental Authority or arbitrator not to be enforceable in accordance with its terms, the Parties agree that such Governmental Authority or arbitrator making such determination will have the power to modify the provision in a manner consistent with its objectives such that it is enforceable, or to delete specific words or phrases, and in its reduced form, such provision will then be enforceable and will be enforced.

14.11 <u>Expenses</u>. Except as otherwise expressly provided in this Agreement, each Party will bear its own costs and expenses (including legal fees and expenses) incurred in connection with this Agreement and the transactions contemplated hereby.

14.12 <u>Construction</u>. The Parties have participated jointly in the negotiation and drafting of this Agreement. In the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as if drafted jointly by the Parties and no presumption or burden of proof shall arise favoring or disfavoring any Party by virtue of the authorship of any of the provisions of this Agreement. Any reference to any Law shall be deemed also to refer to all rules and regulations promulgated thereunder, unless the context requires otherwise. References in this Agreement to any gender include references to all genders, and references to the singular include references to the plural and vice versa. The words "include", "includes" and "including" when used in this Agreement shall be deemed to be followed by the phrase "without limitation" or "but not limited to". Unless the context otherwise requires, references in this Agreement to Articles, Sections, Schedules and Exhibits shall be deemed references to Articles and Sections of, and Schedules and Exhibits to, this Agreement. Unless the context otherwise requires, the words "hereof", "hereby" and "herein" and words of similar meaning when used in this Agreement refer to this Agreement in its entirety and not to any particular Article, Section or provision of this Agreement. When calculating the period of time before which, within which or following which any act is to be done or any step taken pursuant to this Agreement, the date that is the reference date in calculating such period shall not be calculated as the first day of such period of time. If the last day of such period is a non-Business Day, the period in question shall end on the next succeeding Business Day.

14.13 <u>Incorporation of Exhibits</u>. The Exhibits and Schedules identified in this Agreement are incorporated herein by reference and made a part hereof.

14.14 <u>Schedules</u>. Nothing in the schedules hereto shall be deemed adequate to disclose an exception to a representation or warranty made herein unless the schedule identifies the exception with reasonable particularity and describes the relevant facts in reasonable detail. Without limiting the generality of the foregoing, the mere listing (or inclusion of a copy) of a document or other item shall not be deemed adequate to disclose an exception to a representation or warranty made herein (unless the representation or warranty has to do with the existence of the document or other item itself). The Parties intend that each representation, warranty, and covenant contained herein shall have independent significance. If any Party has breached any representation, warranty or covenant contained herein in any respect, the fact that there

-17-

exists another representation, warranty or covenant relating to the same subject matter (regardless of the relative levels of specificity) which the Party has not breached shall not detract from or mitigate the fact that the Party is in breach of the first representation, warranty, or covenant.

14.15    Waiver of Jury Trial.    EACH OF THE PARTIES WAIVES THEIR RESPECTIVE RIGHTS TO A TRIAL BY JURY OF ANY CLAIM OR CAUSE OF ACTION BASED UPON OR ARISING OUT OR RELATED TO THIS AGREEMENT, OR THE TRANSACTIONS CONTEMPLATED HEREBY OR IN ANY ACTION, PROCEEDING OR OTHER LITIGATION OF ANY TYPE BROUGHT BY ANY OF THE PARTIES AGAINST ANY OTHER PARTY OR ANY AFFILIATE OF ANY OTHER SUCH PARTY, WHETHER WITH RESPECT TO CONTRACT CLAIMS, TORT CLAIMS OR OTHERWISE.    THE PARTIES AGREE THAT ANY SUCH CLAIM OR CAUSE OF ACTION SHALL BE TRIED BY A COURT TRIAL WITHOUT A JURY.    WITHOUT LIMITING THE FOREGOING, THE PARTIES FURTHER AGREE THAT THEIR RESPECTIVE RIGHT TO A TRIAL BY JURY IS WAIVED BY OPERATION OF THIS SECTION AS TO ANY ACTION, COUNTERCLAIM OR OTHER PROCEEDING WHICH SEEKS, IN WHOLE OR IN PART, TO CHALLENGE THE VALIDITY OR ENFORCEABILITY OF THIS AGREEMENT OR ANY PROVISION HEREOF.    THIS WAIVER SHALL APPLY TO ANY SUBSEQUENT AMENDMENTS, RENEWALS, SUPPLEMENTS OR MODIFICATIONS TO THIS AGREEMENT.

14.16    Exclusive Venue.  THE PARTIES AGREE THAT ALL DISPUTES, LEGAL ACTIONS, SUITS AND PROCEEDINGS ARISING OUT OF OR RELATING TO THIS AGREEMENT MUST BE BROUGHT EXCLUSIVELY IN A FEDERAL DISTRICT COURT LOCATED IN THE DISTRICT OF DELAWARE, THE BANKRUPTCY COURT OR THE DELAWARE CHANCERY COURT IN NEW CASTLE COUNTY, DELAWARE (COLLECTIVELY THE "DESIGNATED COURTS").    EACH PARTY HEREBY CONSENTS AND SUBMITS TO THE EXCLUSIVE JURISDICTION OF THE DESIGNATED COURTS. NO LEGAL ACTION, SUIT OR PROCEEDING WITH RESPECT TO THIS AGREEMENT MAY BE BROUGHT IN ANY OTHER FORUM.    EACH PARTY HEREBY IRREVOCABLY WAIVES ALL CLAIMS OF IMMUNITY FROM JURISDICTION AND ANY OBJECTION WHICH SUCH PARTY MAY NOW OR HEREAFTER HAVE TO THE LAYING OF VENUE OF ANY SUIT, ACTION OR PROCEEDING IN ANY DESIGNATED COURT, INCLUDING ANY RIGHT TO OBJECT ON THE BASIS THAT ANY DISPUTE, ACTION, SUIT OR PROCEEDING BROUGHT IN THE DESIGNATED COURTS HAS BEEN BROUGHT IN AN IMPROPER OR INCONVENIENT FORUM OR VENUE.  EACH OF THE PARTIES ALSO AGREES THAT DELIVERY OF ANY PROCESS, SUMMONS, NOTICE OR OTHER DOCUMENT TO A PARTY HEREOF IN COMPLIANCE WITH SECTION 14.6 OF THIS AGREEMENT SHALL BE EFFECTIVE SERVICE OF PROCESS FOR ANY ACTION, SUIT OR PROCEEDING IN A DESIGNATED COURT WITH RESPECT TO ANY MATTERS TO WHICH THE PARTIES HAVE SUBMITTED TO JURISDICTION AS SET FORTH ABOVE.

*[Remainder of Page Intentionally Left Blank]*

DM_US 168011982-30.104127.0023

IN WITNESS WHEREOF, the Parties hereto have executed this Asset Purchase Agreement as of the date first above written.

BUYER:

**FERTILITY NEWCO, LLC**

By: /s/ Jay Rose
Name: Jay Rose
Title: Manager

SELLER:

_____
Jeoffrey L. Burtch, solely in his capacity as Chapter 7 trustee on behalf of IntegraMed America Inc.

[SIGNATURE PAGE TO ASSET PURCHASE AGREEMENT]

## Schedule 1.1
## Purchased Assets

[see attached]

2-

DM_US 168011982-30.104127.0023

**Schedule 1.3**
**Assumed Liabilities**

None.

3-

DM_US 168011982-30.104127.0023

**Schedule 2.3(g)**
**Debt**

4-

DM_US 168011982-30.104127.0023

**Schedule 3.4**
**Wire Instructions**

5-

DM_US 168011982-30.104127.0023

**Schedule 12.1**
**Assigned Contracts[3]**

A.  PRACTICE-SPECIFIC AGREEMENTS

Northwest Center for Infertility and Reproductive Endocrinology (IVF FL)
- Service Agreements
  - Amended and Restated Service Agreement, dated December 31, 2015, by and between IntegraMed America, Inc. and Northwest Center for Infertility and Reproductive Endocrinology, LLP.
- Leases
  - Lease, dated December 13, 2002, by and between the Professional Centre at the Pembroke Lakes Mall, Ltd. And IntegraMed America, Inc., as amended
  - Office Lease, dated as of August 2015, by and between PRIM BAC Colonnade, LLC and IntegraMed America, Inc.
  - Standard Lease Agreement, dated March 4, 2016, by and between So-Flo Venture, LLC and IntegraMed America, Inc.
  - Lease Agreement, dated May 9, 2012, by and between Windrose Wellington Properties, Ltd. And IntegraMed America, Inc.
  - Lease Agreement, dated May 16, 2002, by and between WUP Partners, Ltd.(Montecito Medical – Northwest Medical Park LLC c/o LaSalle Investment Mgmt, Inc.) and Northwest Center for Infertility and Reproductive Endocrinology and IntegraMed America, Inc.
  - Lease Agreement, dated as of February 6, 2004, by and between Workplace Professional Center II, LTD (Windrose AWPC II Properties, LLC c/o Welltower Inc. as a successor to the foregoing) and Gene F. Manko, M.D., Inc., as amended, as assigned by that certain Assignment of Lease, dated April 2009, by and between Gene F. Manko, M.D., Inc. and IntegraMed
- Equipment Leases
  - Philips Healthcare Service Agreement Add Form, dated June 27, 2018, by and between IVF Florida Reproductive Associates and Philips Healthcare
  - Philips Healthcare Service Agreement Add Form, dated June 25, 2018, by and between IVF Florida Reproductive Associates and Philips Healthcare
  - Lease Agreement, dated June 27, 2016, by and between Philips Medical Care and IntegraMed America, Inc.
  - Multi-Site Service Agreement, dated September 30, 2016, by and between Stericycle and Northwest Center for Infertility
  - Master Lease Agreement, dated May 20, 2019, by and between Cisco Systems Capital and Northwest Center for Infertility and Reproductive Endocrinology
  - Lease Agreement, dated January 18, 2019, by and between Pitney Bowes and Northwest Center for Infertility
  - CPC Rental Agreement, dated January 20, 2016, by and between IVF Florida Reproductive Associates and Copysource, Inc.
  - Premier Advantage Agreement, dated March 1, 2018, by and between Konica Minolta and IVF Florida Reproductive Associates
  - KMBS Site Agreement, dated March 1, 2018, by and between Konica Minolta and IVF Florida Reproductive Associates

---

[3] **Note to Draft**: Leases removed per request of practices, subject to confirmation of Management.

DM_US 168011982-30.104127.0023

- Customer Agreement, dated February 27, 2017, by and between Konica Minolta and IVF Florida Reproductive Associates
- Contract # 9883470001, dated October 31, 2016, by and between IntegraMed America, Inc. and GE Capital
- Contract # 9885769001, dated September 6, 2016, by and between IntegraMed America, Inc. and GE Capital
- Other Material Agreements
  - Attain IVF Multi-cycle Programs: Partner Practice Fee Schedule, dated July 2, 2017, by and between IntegraMed America, Inc. and IVF Florida Reproductive Associates.
  - Amended and Restated Limited Liability Partnership Agreement, dated December 31, 2015, by and between Reproductive Endocrinology, LLP d/b/a IVF Florida Reproductive Associates, David Hoffman, MD, PA, Steven Ory, MD, PA, Marcelo Barrionuevo, MD, PA, Wayne Maxson, MD, PA, Vanessa Weitzman, MD, PA, Daniel Christie, MD, PA, and IntegraMed Florida Holdings, LLC.
  - Amended and Restated Security Agreement, dated December 31, 2015, by and between IntegraMed America, Inc. and Reproductive Endocrinology, LLP d/b/a IVF Florida Reproductive Associates.
  - Limited Liability Company Agreement, dated April 15, 2015, of IntegraMed Florida Holdings, LLC.
  - All Agreements between IntegraMed and patients of Northwest Center for Infertility and Reproductive Endocrinology, LLP related to the Attain IVF Program.

Fertility Centers of Illinois (FCI)
- Service Agreements
  - Administrative Services Agreement, dated February 15, 2017, as amended by that Amendment to Administrative Services Agreement, dated July 20, 2018, by and between IntegraMed America, Inc. and Fertility Centers of Illinois, S.C., as supplemented by that certain Business Associate Agreement, dated February 15, 2017.
- Leases
  - Agreement of Lease, dated April 29, 2003, by and between Eport 600 Property Owner, L.L.C. and IntegraMed America, Inc., as amended.
  - Letter Agreement, dated August 10, 2011, by and among 600 West Chicago Associates LLC, CW 600 West Chicago LLC, and U.S. Bank National Association.
  - Sublease, dated May 13, 2005, by and between Pulling Down the Moon and IntegraMed America, Inc.
  - Fifth Amendment to Lease, dated as of 2018, by and between Chicago Kingsbury, LLC and IntegraMed America, Inc.
  - Storage Letter Agreement, dated March 4, 2011, by and between IntegraMed America, Inc. and 600 West Chicago Associates LLC.
  - Lease Agreement with Chicago Kingsbury, LLC
  - Office Lease, dated May 1, 1998, by and between 3703 West Lake Street L.L.C. and IntegraMed America, Inc.
  - Office Lease Agreement, dated July 30, 1998, by and between HP-135 Arlington Heights Road Limited Partnership and IntegraMed America, Inc., as amended
  - Lease Agreement, dated August 23, 2017, by and between SDKM Glenview Lot 2A, LLC (GAHC4 Tinley Park IL MOB, LLC as a successor to the foregoing) and Fertility Centers of Illinois, S.C.

DM_US 168011982-30.104127.0023

- Highland Park Medical Office Building Lease, dated January 18, 1990, by and between HPMOB Limited Partnership and Lakeland Health Ventures, Inc., as amended
- Office Lease Agreement, dated August 22, 2012, by and between Boulder Real Estate Investments, LLC and Fertility Centers of Illinois, S.C., as amended
- Medical Office Lease, dated February 18, 2014, by and between Southwest Office Center, LLC (TST Chicago MOB, LLC c/o The Sanders Trust, LLC as a successor to the foregoing) and IntegraMed America, Inc.
- Multi-Tenant Office Building Lease, dated April 15, 2013, by and between ACC Governor's Place, LLC and IntegraMed America, Inc.
- Office Lease, dated June 15, 2016, by and between Salt Creek Campus LLC and IntegraMed America Inc., as amended
- Equipment Leases
  - Agreement, dated April 22, 2015, by and between Impact Networking, LLC and Fertility Centers of Illinois
  - Agreement, dated April 6, 2018, by and between Impact Networking, LLC and Fertility Centers of Illinois
  - Total Image Management Supplement, dated May 9, 2018, by and between Impact Networking, LLC and Fertility Centers of Illinois
  - Total Image Management Supplement, dated February 7, 2017, by and between Impact Networking, LLC and Fertility Centers of Illinois
  - Total Image Management Supplement, dated November 8, 2017, by and between Impact Networking, LLC and Fertility Centers of Illinois
  - Contract # 9898517001, dated October 26, 2016, by and between Fertility Centers of Illinois and GE Capital
  - Contract # 9933861001, dated January 18, 2018, by and between Fertility Centers of Illinois and GE Capital
  - Contract # 9933431001, dated December 8, 2017, by and between Fertility Centers of Illinois and GE Capital
  - Lease Agreement, dated May 15, 2017, by and between Leasing Associates of Barrington, Inc. and Fertility Centers of Illinois
  - Lease Agreement, dated March 24, 2017, by and between Pitney Bowes and Fertility Centers of Illinois
  - Equipment Lease Agreement, dated September 10, 2015, by and between Impact Networking, LLC and Fertility Centers of Illinois
  - Equipment Lease Agreement, dated January 9, 2018, by and between Impact Networking, LLC and Fertility Centers of Illinois
  - Total Image Management Supplement, dated January 17, 2018, by and between Impact Networking, LLC and Fertility Centers of Illinois
  - Agreement, dated April 20, 2018, by and between Impact Networking, LLC and Fertility Centers of Illinois
- Tax Indemnification Agreements
  - Indemnification Agreement dated February 16, 2017 among IntegraMed America, Inc., Fertility Centers of Illinois, S.C. and Myles Greenberg, M.D.
- Other Material Agreements
  - Amended and Restated Independent Consultant Agreement, dated March 15, 2017, as amended by that Amendment to the Amended and Restated Independent Consultant Agreement, dated February 1, 2020, by and between IntegraMed America, Inc. and Myles Greenberg.

8-

- Attain Program Memorandum of Understanding dated August 8, 2017 between IntegraMed Fertility and Fertility Centers of Illinois, as modified by the Attain IVF Multi-cycle Programs: Partner Practice Fee Schedule dated October 25, 2017.
- Loan and Security Agreement, dated February 16, 2017, by and between IntegraMed America, Inc. and Fertility Centers of Illinois, S.C.
- Term Note, dated February 16, 2017, by and between IntegraMed America, Inc. and Fertility Centers of Illinois, S.C.
- Revolving Loan and Security Agreement, dated July 20, 2018, by and between IntegraMed America, Inc. and Fertility Centers of Illinois, S.C.
- All Agreements between IntegraMed and patients of Fertility Centers of Illinois, S.C. related to the Attain IVF Program.
- [Securities Transfer Restriction Agreement, dated [•], by and between IntegraMed America, Inc. and Fertility Centers of Illinois, S.C. and Myles Greenberg, M.D.][4] Indemnification Agreement, dated February 16, 2017, by and between IntegraMed America, Inc. and Fertility Centers of Illinois, S.C. and Myles Greenberg, M.D.
- Restrictive Covenant Agreement dated February 16, 2017, by and among IntegraMed America, Inc., Fertility Centers of Illinois, S.C. and Edward L. Marut, M.D.
- Restrictive Covenant Agreement dated February 16, 2017, by and among IntegraMed America, Inc., Fertility Centers of Illinois, S.C. and Brian R. Kaplan, M.D.
- Restrictive Covenant Agreement dated February 16, 2017, by and among IntegraMed America, Inc., Fertility Centers of Illinois, S.C. and Laurence A. Jacobs, M.D.
- Restrictive Covenant Agreement dated February 16, 2017, by and among IntegraMed America, Inc., Fertility Centers of Illinois, S.C. and Jane M. Nani, M.D.
- Restrictive Covenant Agreement dated February 16, 2017, by and among IntegraMed America, Inc., Fertility Centers of Illinois, S.C. and John J. Rapisarda, M.D.
- Restrictive Covenant Agreement dated February 16, 2017, by and among IntegraMed America, Inc., Fertility Centers of Illinois, S.C. and Christopher S. Sipe, M.D.
- Restrictive Covenant Agreement dated February 16, 2017, by and among IntegraMed America, Inc., Fertility Centers of Illinois, S.C. and Meike L. Uhler, M.D.

Reproductive Science Center of the San Francisco Bay Area (Bay)
- Service Agreements
  - Management Agreement, dated January 7, 1997, as amended by that Amendment No. 1 to Management Agreement, dated April 5, 1998, that Amendment No. 2 to Management Agreement, dated July 21, 1998, that Amendment No. 3 to Management Agreement, dated April 1, 2000, that Amendment No. 4 to Management Agreement, dated January 1, 2001, that Amendment No. 5 to Management Agreement, dated September 19, 2001, that Amendment No. 6 to Service Agreement, dated December 15, 2003, that Amendment No. 7 to Service Agreement, dated October 12, 2010, that Amendment No. 8 to Service Agreement, dated February 27, 2012, that Ninth Amendment to Service Agreement, dated January 1, 2013, that Tenth Amendment to Service Agreement, dated August 4, 2014, and that Eleventh Amendment to Service Agreement, dated November 30, 2016, by and between IntegraMed America, Inc. and Reproductive Science Center of the San Francisco Bay Area, Inc.
- Leases
  - Retail Shop Lease, dated March 30, 2015, by and between ROIC California, LLC and IntegraMed America, Inc., as amended

---

[4] **NTD**: Buyer has not been provided with a copy of this agreement, but one should exist.

9-

- Office Lease Agreement, dated November 26, 2012, by and between Park Place Medical Building, LLC and IntegraMed America, Inc., as amended
- Standard Multi-Tenant Office Lease, dated January 3, 2017, by and between Barry Mirkin Family Trust dated 1979 and IntegraMed America, Inc.
- Lease Agreement, dated November 4, 2019, by and between Healthcare Realty Services incorporated and IntegraMed America, Inc.
- Equipment Leases
  - Roche Diagnostics Corporation Master Agreement, dated January 4, 2017, between Roche Diagnostics Corporation and Reproductive Science Center of the San Francisco Bay Area
  - Value Rental Lease Agreement, dated August 30, 2017, by and between Ray Morgan Company and Reproductive Science Center of the San Francisco Bay Area
  - Value Rental Lease Supplement, undated, by and between Ray Morgan Company and Reproductive Science Center of the San Francisco Bay Area
  - Value Rental Lease Agreement, dated January 18, 2019, by and between Ray Morgan Company and Reproductive Science Center of the San Francisco Bay Area
  - Product Lease Agreement, dated August 2, 2018, by and between MailFinance and Reproductive Science Center
- Other Material Agreements
  - Attain IVF Multi-cycle Programs: Partner Practice Fee Schedule, dated July 27, 2017, by and between IntegraMed America, Inc. and Reproductive Science Center of the Bay Area.
  - All Agreements between IntegraMed and patients of Reproductive Science Center of the San Francisco Bay Area, Inc. related to the Attain IVF Program.

Reproductive Endocrinology Associates of Charlotte (REACH)
- Service Agreements
  - Amended and Restated Administrative Services Agreement, dated September 22, 2015, by and between IntegraMed America, Inc. and Reproductive Endocrine Associates of Charlotte, P.C., supplemented by that certain Business Associate Agreement, dated September 22, 2015.
- Leases
  - Lease Agreement, dated June 1, 2004, by and between REACH Building Associates, LLC and Reproductive Endocrine Associates of Charlotte, PC, as amended
  - Lease, dated April 8, 2016, by and between Langtree Office Center, LLC and IntegraMed America, Inc.
- Equipment Leases
  - Roche Diagnostics Corporation Product Schedule, dated January 26, 2016, by and between REACH and Roche Diagnostics Corporation
  - Product Lease Agreement, dated November 12, 2014, by and between REACH and MailFinance
  - Contract # 9883535001, dated September 6, 2016, by and between IntegraMed and GE Capital
  - Lease Agreement, dated July 10, 2015, by and between IntegraMed and EverBank Commercial Finance, Inc.
  - Master Lease Agreement, dated January 29, 2019, by and between IntegraMed and Dell Financial Services L.L.C.
- Tax Indemnification Agreements

DM_US 168011982-30.104127.0023

- Indemnification Agreement dated January 30, 2020 among IntegraMed America, Inc., Reproductive Endocrine Associates of Charlotte, P.C. and Myles Greenberg
- Indemnification Agreement dated September 22, 2015 among IntegraMed America, Inc., Reproductive Endocrine Associates of Charlotte, P.C. and Anup Kumar Sharma, M.D.
- Compensation Side Letter dated December 6, 2019 among IntegraMed America, Inc., Reproductive Endocrine Associates of Charlotte P.C. and Anup Sharma, M.D.
- Other Material Agreements
  - Loan and Security Agreement, dated September 22, 2015, as amended by that First Amendment to Loan and Security Agreement, dated December 31, 2015, by and between IntegraMed America, Inc. and Reproductive Endocrine Associates of Charlotte, P.C.
  - Term Note, dated September 22, 2015, by and between IntegraMed America, Inc. and Reproductive Endocrine Associates of Charlotte, P.C.
  - Securities Transfer Restriction Agreement, dated September 22, 2015, by and between IntegraMed America, Inc. and Reproductive Endocrine Associates of Charlotte, P.C. and Anup Kumar Sharma, M.D.
  - Infertility Participating Provider Agreement, dated June 13, 2002, by and between IntegraMed and Reproductive Endocrinology Associates of Charlotte, P.C.
  - All Agreements between IntegraMed and patients of Reproductive Endocrine Associates of Charlotte, P.C. related to the Attain IVF Program.
  - [Securities Transfer Restriction Agreement, dated [•], by and between IntegraMed America, Inc. and Reproductive Endocrine Associates of Charlotte, P.C. and Myles Greenberg, M.D.][5]

Shady Grove Fertility
- Service Agreements
  - Management Agreement, dated March 11, 1998, as amended by that Amendment No. 1 to Management Agreement, dated April 16, 1998, that Amendment No. 2 to Management Agreement, dated May 6, 1998, that Amendment No. 3 to Management Agreement, dated September 1, 1999, that Amendment No. 4 to Management Agreement, dated April 1, 2000, that Amendment No. 5 to Management Agreement, dated January 1, 2001, that Amendment No. 6 to Management Agreement, dated September 18, 2001, that Amendment No. 7 to Service Agreement, dated November 19, 2003, that Amendment No. 8 to Service Agreement, dated February 16, 2006, that Amendment No. 9 to Service Agreement, dated March 22, 2007, that Amendment No. 10 to Management Agreement, dated June 10, 2012, and that Eleventh Amendment to Service Agreement, dated January 1, 2013, by and between IntegraMed America, Inc. and Shady Grove Fertility Reproductive Science Center, P.C.
  - Letter Agreement, dated May 1, 2017, as amended by that Amendment Agreement, dated December 18, 2017, and that Amendment Agreement, dated June 27, 2018, by and between IntegraMed America, Inc. and Shady Grove Fertility, LLC.
- Leases
  - Office Building Lease, dated May 1, 2012, by and between Dulaney Center Business Trust and IntegraMed America, Inc.
  - Medical Office Building Lease Agreement, dated February 12, 2009, by and between Blue Building LLC and IntegraMed America, Inc., as amended

---

[5] **NTD**: Buyer has not been provided with a copy of this agreement, but one should exist.

-11-

- Deed of Lease, dated as of May 2006, by and between Oaks Associates Limited Partnership (Guardian Realty Management Inc c/o Oaks Associates LP as a successor the foregoing) and IntegraMed America, Inc., as amended
- Annapolis – Medical Office Building Lease Agreement, dated February 12, 2009, by and between Blue Building LLC and IntegraMed America, Inc., as amended by Addendum 1, dated February 12, 2009.
- Columbia – Lease Agreement, dated November 10, 2003, by and between BRIT Limited Partnership and IntegraMed America, Inc., as amended by First Amendment, dated March 22, 2010.
- Rockville Administrative Building – Office Lease, dated August 27, 2014, by and between GCCFC 2007-GG9 Office 9600, LLC (9600 Blackwell II c/o Royco Inc. as a successor to the foregoing) and IntegraMed America, Inc., as amended by First Amendment to Office Lease, dated August 24, 2014.
- Rockville Clinical Building – Office Lease, dated May 22, 2015, by and between Wellblack I, LLC (Caddis Management Company LLC as a successor to the foregoing) and IntegraMed America, Inc., as amended by First Amendment to Lease, dated June 1, 2016.
- Rockville Clinical Building – Commercial Sublease, dated August 1, 2018, by and between IntegraMed America, Inc. and GeneScreen Counseling, LLC
- Towson (Suite 616) – Office Building Lease, dated May 1, 2012, by and between Dulaney Center Business Trust (Guardian Realty Fund II Dulaney LLC as a successor to the foregoing) and IntegraMed America, Inc.
- Towson (Suite 100) – Office Building Lease, dated May 1, 2012, by and between Dulaney Center Business Trust (Guardian Realty Fund II Dulaney LLC as a successor to the foregoing) and IntegraMed America, Inc., as amended by First Amendment to Lease, dated September 30, 2012, and by Second Amendment, dated September 30, 2012.
- Baltimore Harbor East – Lease Agreement, dated September 30, 2011, by and between Inner Harbor East Garage, LLC and IntegraMed America, Inc.
- Baltimore Harbor East – Guaranteed Spaced Agreement, dated September 30, 2011, by and between Parking Management, Inc. and IntegraMed America, Inc.
- Frederick – Lease Agreement, dated November 24, 2015, by and between Aspen Ridge 165, LLC and IntegraMed America, Inc.
- Glen Burnie – Session Sublease, dated April 1, 2012, by and between BW Health Services, LLC and IntegraMed America, Inc.
- Hagerstown – Agreement of Lease, dated November 11, 2014, by and between Trilogy Enterprises, LLC and IntegraMed America, Inc.
- Waldorf – Commercial Lease, dated 2010, by and between TSG 301 Limited Liability Company (The Saba Group Inc. as a successor to the foregoing) and IntegraMed America, Inc.
- K Street – Medical Space Lease, dated July 22, 2005, by and between 2021 LaSalle Medical Office, L.L.C. (2021 K Leasehold L.L.C. as a successor to the foregoing) and IntegraMed America, Inc., as amended by First Amendment to Medical Space Lease, dated December 24, 2008, and Second Amendment to Medical Space Lease, dated June 5, 2014.
- Sibley – Lease, dated April 26, 2011, by and between Lucy Webb Hayes National Training School for Deaconesses and Missionaries d/b/a Sibley Memorial Hospital and IntegraMed America, Inc.
- Dulles – Medical Office Timeshare License Agreement, dated October 18, 2019, by and between Stone Springs Medical Office Building Property, LLC and IntegraMed America,

12-

Inc., as amended by First Amendment to Medical Office Timeshare License Agreement, dated October 18, 2019.

- Fair Oaks – Deed of Lease, dated May 31, 2006, by and between Oakes Associates Limited Partnership and IntegraMed America, Inc., as amended by First Amendment to Deed of Lease, dated November 2, 2006, and Second Amendment to Deed of Lease, dated October 10, 2012.
- Leesburg – Deed of Lease, dated August 27, 2010, by and between Washington Real Estate Investment Trust (HSRE Capmed LLC as a successor to the foregoing) and IntegraMed America, Inc. d/b/a Shady Grove Fertility Reproductive Science Center.
- Woodbridge – Deed of Lease, dated December 11, 2014, by and between Catons Ridge Office Park, L.L.C. (The Engineering Groupe, Inc. as a successor the foregoing) and IntegraMed America, Inc. f/b/o Shady Grove Fertility.
- Chesterbrook – Lease Agreement, dated January 1, 2013, by and between Valley Forge Center for Advanced Reproductive Technology, L.P. and IntegraMed America, Inc.

- Equipment Leases
  - Equipment Finance Agreement, dated October 12, 2017, by and between EverBank and IntegraMed
  - Premier Lease Agreement, dated August 21, 2015, by and between Konica Minolta and IntegraMed
  - Lease Agreement, dated May 19, 2019, by and between Summit Vendor Finance and IntegraMed
  - Lease Agreement, dated April 19, 2018, by and between Pitney Bowes and IntegraMed
  - Contract # 9843028001, dated November 18, 2015, by and between IntegraMed and GE Capital
  - Lease Agreement, dated June 27, 2018, by and between IntegraMed and Philips Medical Capital
  - Contract # 9827502001, dated August 5, 2015, by and between IntegraMed and GE Capital
  - Contract # 9845490001, dated December 18, 2015, by and between IntegraMed and GE Capital
  - Lease Agreement, dated October 30, 2017, by and between IntegraMed and U.S. Bank Equipment Finance
  - Contract # 8407688001, dated October 17, 2008, by and between IntegraMed and GE Capital
  - Installment Payment Agreement, dated February 22, 2019, by and between IntegraMed and Lenovo Financial Services
  - Lease Agreement, dated September 27, 2017, by and between Pitney Bowes and IntegraMed
  - Premier Lease Agreement, dated October 10, 2015, by and between Konica Minolta and IntegraMed
  - Premier Lease Agreement, dated July 13, 2015, by and between Konica Minolta and IntegraMed
  - Agreement, dated June 9, 2015, by and between GreatAmerica Leasing Corporation and IntegraMed
  - Agreement, dated June 17, 2015, by and between GreatAmerica Leasing Corporation and IntegraMed
  - Agreement, dated May 22, 2015, by and between Ricoh USA, Inc. and IntegraMed Management, LLC

13-

DM_US 168011982-30.104127.0023

- Contract # 9769424001, dated August 6, 2014, by and between IntegraMed Management, LLC and GE Capital
- Contract # 9769418001, dated August 6, 2014, by and between IntegraMed Management, LLC and GE Capital
- Contract # 9769410001, dated August 6, 2014, by and between IntegraMed Management, LLC and GE Capital
- Contract # 9801759001, dated March 12, 2015, by and between IntegraMed and GE Capital
- Contract # 9845404001 and 9845404002, dated December 18, 2015, by and between IntegraMed and GE Capital
- Contract # 9845488001 and 9845488002, dated March 28, 2016, by and between IntegraMed and GE Capital
- Contract # 9845596001 and 9845596002, dated March 28, 2016, by and between IntegraMed and GE Capital
- Contract # 9845792001 and 9845792002, dated March 30, 2016, by and between IntegraMed and GE Capital
- Contract # 9845793001 and 9845793002, dated March 28, 2016, by and between IntegraMed and GE Capital
- Contract # 9845794001 and 9845794002, dated December 31, 2015, by and between IntegraMed and GE Capital
- Contract # 9845795001 and 9845795002, dated March 28, 2016, by and between IntegraMed and GE Capital
- Contract # 9932593001, dated September 27, 2017, by and between IntegraMed and GE Capital
- Contract # 9845654001 and 9845654002, dated December 31, 2015, by and between IntegraMed and GE Capital
- Contract # 9845796001 and 9845796002, dated December 31, 2015, by and between IntegraMed and GE Capital
- Contract # 9845737001 and 9845737002, dated January 14, 2016, by and between IntegraMed and GE Capital
- Contract # 9845686001 and 9845686002, dated December 31, 2015, by and between IntegraMed and GE Capital
- Contract # 9845738001 and 9845738002, dated March 28, 2016, by and between IntegraMed and GE Capital
- Contract # 9845255001 and 9845255002, dated December 31, 2015, by and between IntegraMed and GE Capital
- Contract # 9845431001 and 9845431002, dated March 28, 2016, by and between IntegraMed and GE Capital
- Faxable Lease Agreement, dated July 18, 2015, by and between IntegraMed and Canon Financial Services, Inc.
- Faxable Lease Agreement, dated November 10, 2005, by and between IntegraMed and Canon Financial Services, Inc.
- Faxable Lease Agreement, dated August 15, 2016, by and between IntegraMed and Canon Financial Services, Inc.
- Other Material Agreements

Oral agreement between IntegraMed America, Inc. and Shady Grove Fertility to license the use of the Company's "Shared Risk" trademark

14-

DM_US 168011982-30.104127.0023

All other contracts between GE Capital and IntegraMed related to: (i) Reproductive Endocrine Associates of Charlotte, P.C., (ii) Shady Grove Fertility Reproductive Science Center, P.C., (iii) Fertility Centers of Illinois, S.C., (iv) Reproductive Science Center of the San Francisco Bay Area, Inc., (v) Northwest Center for Infertility and Reproductive Endocrinology (IVF FL).

## B.   INTEGRAMED OPERATIONAL AGREEMENTS & CERTAIN ASSETS

Operational Agreements

- Distribution Agreement, dated December 16, 2015, by and among IntegraMed Holding Corp., IntegraMed America, Inc., Vein Clinics of America, Inc., VCA Holding, LLC, IntegraMed Fertility Holding, LLC, and the stockholders of IntegraMed Holding Corp. listed on Exhibit A thereto. Relates to the contribution and distribution of various assets as part of a corporate reorganization.
- EDI Services Agreement, dated May 20, 2015, by and between IntegraMed and Laboratory Corporation of America Holdings, as amended. LabCorp is providing testing services to IntegraMed.
- Pharmacy Technology Services and Patient Management Agreement, dated January 1, 2020, by and between VFP Pharmacy Group and IntegraMed.  VFP is licensing IntegraMed's prescription management platform.
- Discount Agreement, dated February 26, 2018, by and between IntegraMed and South Miami Pharmacy II, Inc.  South Miami Pharmacy is providing fertility products to IntegraMed.
- Marketing Services Agreement, dated February 1, 2018, by and between South Miami Pharmacy II, Inc. and IntegraMed America, Inc., as amended by First Amendment to the Marketing Services Agreement, dated February 1, 2019 (unexecuted), as amended by Second Amendment to the Marketing Services Agreement, dated February 1, 2020. South Miami Pharmacy is providing IP for IntegraMed to use in its electronic portal.
- Confidentiality/Nondisclosure Agreement dated as of December 4, 2017, by and between IntegraMed America, Inc. and South Miami Pharmacy II, Inc.[6]
- Order Form, dated March 31, 2016, by and between IntegraMed and Quality Systems Inc. IntegraMed is leasing software from Quality Systems Inc.
- Software Integration License Agreement, dated October 1, 2019, by and between IntegraMed and RFS Pharmacy, Inc.
- Express Scripts Content License Agreement, dated February 1, 2019, by and between Lynnfield Drug, Inc. and IntegraMed
- PRN Client Service Agreement, dated January 24, 2018, by and between PRN Software LLC and IntegraMed
- License Agreement, dated April 30, 2019, by and between IntegraMed and PracticeMatch Corporation
- Agreement, dated June 3, 2019, by and between Professional Credential Verification Service, Inc. and IntegraMed
- Monitoring Services Agreement, dated May 1, 2019, by and between IntegraMed and ProviderTrust, Inc.
- Audio Podcast Platform Services Agreement, dated January 23, 2020, by and between RadioMD, LLC d/b/a DoctorPodcasting and IntegraMed Fertility
- SalesLoft Proposal, dated July 22, 2019, by and between SalesLoft and IntegraMed

---

[6] **NTD**: there are references to this agreement, but Buyer has not been provided with a copy.

15-

- Order Form, dated November 15, 2019, by and between SalesLoft and IntegraMed
- Master Subscription Agreement, undated, by and between SalesLoft and IntegraMed
- Order Form, dated October 12, 2018, by and between Salesforce.com, Inc. and IntegraMed
- Order Form, dated July 1, 2015, by and between Salesforce.com, Inc. and IntegraMed
- Saas Model Agreement, dated July 11, 2012, by and between Ultimate Software Group, Inc. and IntegraMed
- Saas Model Agreement, dated June 15, 2017, by and between The Ultimate Software Group, Inc. and IntegraMed
- Supplement, dated September 28, 2015, by and between The Ultimate Software Group, Inc. and IntegraMed
- Order Form, dated February 7, 2017, by and between Twilio Inc. and IntegraMed
- Broker Services Agreement, dated August 28, 2019, by and between IntegraMed and Alliant Insurance Services, Inc.
- Order Form and Agreement, dated June 1, 2019, by and between Adaptive Insights LLC and IntegraMed
- Identity Management Platform Subscription Agreement, dated January 14, 2019, by and between Auth0, Inc. and IntegraMed
- Sales Order, dated December 22, 2017, by and between Auth0, Inc. and IntegraMed
- Master Agreement, dated June 8, 2017, by and between AT&T Corp. and IntegraMed
- Contract, dated July 10, 2019, by and between IntegraMed and A.R.M. Solutions, Inc.
- Deposit Account Control Agreement, dated March 17, 2016, by and between IntegraMed and Bank of Montreal
- HSA Bank Services Agreement, dated January 1, 2020, by and between IntegraMed and HAS Bank
- Independent Consultant Agreement, dated March 15, 2017, by and between Myles Greenberg and IntegraMed
- Broker Services Agreement, dated January 1, 2014, by and between IntegraMed Fertility and Healthcare Insurance Professionals, Inc.
- Broker Services Agreement, dated January 1, 2019, by and between IntegraMed and Healthcare Insurance Professionals, Inc.
- Proposal for Intacct Software Renewal, dated December 12, 2019, by and between IntegraMed Fertility and BlumShapiro
- Clinical Network Channel Partner Agreement, dated December 19, 2017, by and between Change Healthcare Solutions, LLC and IntegraMed
- Sales Order Form, dated August 18, 2017, by and between Concur Technologies, Inc. and IntegraMed
- Master Services Agreement, dated September 7, 2017, by and between Cushman & Wakefield U.S., Inc. and IntegraMed
- Listing Agreement for Sublease, dated November 1, 2016, by and between Cushman & Wakefield of Connecticut, Inc. and IntegraMed
- Intellectual Property and Software Agreement, dated October 3, 2013, by and between IntegraMed and OnTarget Group, Inc.
- Services Agreement, dated October 1, 2013, by and between IntegraMed and OnTarget Group, Inc.
- Service Order, dated January 29, 2020, by and between Rackspace and IntegraMed
- Master Services Agreement, dated February 1, 2020, by and between Med-IQ, Inc. and IntegraMed
- Online Education Statement of Work #1, dated February 1, 2020, by and between IntegraMed and Med-IQ, Inc.
- Software License Terms and Conditions, dated August 2018, by and between MicroStrategy and IntegraMed

16-

DM_US 168011982-30.104127.0023

- Order Form 089737, dated October 11, 2005, by and between IntegraMed and Navex Global
- Installment Payment Agreement, dated February 6, 2019, by and between IntegraMed and Lenovo DRC PC Connection
- Amendment to Marketing Services Agreement, dated October 31, 2019, by and between IntegraMed and Lynnfield Compounding Center, Inc. d/b/a Freedom Fertility Pharmacy
- Renewal, dated September 1, 2018, by and between Marketo and IntegraMed
- Sales Order, dated August 30, 2018, by and between LeaseQuery, LLC and IntegraMed
- Data Use Agreement, dated September 17, 2014, by and between IntegraMed and EMD Serono, Inc., as amended by Amendment No. 01, dated December 12, 2015, as amended by Amendment No. 02, unknown date.
- Rebate Program Agreement, dated November 15, 2017, by and between IntegraMed America, Inc. and EMD Serono, Inc.
- Discount Agreement, dated February 26, 2018, by and between South Miami Pharmacy II, Inc. d/b/a SMP Pharmacy Solutions and IntegraMed America, Inc.
- Letter of Agreement, dated January 1, 2018, by and between South Miami Pharmacy II, Inc. d/b/a SMP Pharmacy Solutions and IntegraMed America, Inc.
- Software Integration License Agreement, dated October 1, 2019, by and between FSF Pharmacy, Inc. d/b/a Rancho Santa Fe Pharmacy & Spirit Shoppe and IntegraMed America, Inc.
- Software Integration License Agreement, dated May 1, 2019, by and between RSF Pharmacy, Inc. d/b/a Rancho Santa Fe Pharmacy & Spirit Shoppe and IntegraMed America, Inc.
- Pharmacy Interface System Agreement, dated March 26, 2014, by and between Rox San Pharmacy and IntegraMed America, Inc.
- Software Integration License Agreement, dated "Production Date" (the date on which the Platform Configuration is used in production following acceptance), signed June 20th and 21st, 2019, by and between ScriptDash Inc. d/b/a Alto Pharmacy and IntegraMed America, Inc.
- Software Integration License Agreement, dated February 1, 2019, by and between Mount Sinai Genomics, Inc. d/b/a Sema4 and IntegraMed America, Inc.
- Pharmacy Interface System Agreement, dated June 1, 2014, by and between Stroheckers Pharmacy and IntegraMed America, Inc.
- Software Integration License Agreement, dated January 16, 2019, by and between Unilab of Dade Inc. and IntegraMed America, Inc.
- Software Integration License Agreement, dated January 1, 2019, by and between Village Fertility Pharmacy, LLC; Healy Pharmacy, LLC d/b/a Village Fertility Pharmacy; Special Care, LLC; Integrity Rx Specialty Pharmacy, LLC; and Apothecary by Design Acquisition Co. LLC and IntegraMed America, Inc.
- Software Integration License Agreement, dated February 1, 2019, by and between Braun PharmaCare and IntegraMed America, Inc.
- Pharmacy Interface System Agreement, dated June 3, 2016, by and between Encompass Rx, LLC and IntegraMed America, Inc., as amended by Subcontractor Addendum to Service Agreement, dated June 3, 2016 (*not fully executed)
- Interface System Utility Program License, dated June 3, 2016, by and between Encompass Rx, LLC and IntegraMed America, Inc. (*not fully executed)
- Software Integration License Agreement, dated January 24, 2019, as amended by that First Amendment, dated February 1, 2020, by and between IntegraMed America, Inc. and Ocean Drugs, Inc.
- Pharmacy Interface System and License Agreement, dated July 30, 2018, by and between IntegraMed America, Inc. and RARX, LLC

17-

DM_US 168011982-30.104127.0023

- Software Integration License Agreement, dated March 1, 2019, by and between IntegraMed America, Inc. and New Era Pharmacy
- Confidentiality and Mutual Non-Disclosure Agreement, dated November 4, 2015, by and between IntegraMed America, Inc. and Natera, Inc.
- Test Services Agreement, dated May, 2016, by and between IntegraMed America, Inc. and Natera, Inc.
- Software Integration License Agreement, dated February 11, 2019, by and between IntegraMed America, Inc. and Myriad Women's Health, Inc.
- Statement of Work, dated February 11, 2019, by and between IntegraMed America, Inc. and Myriad Women's Health, Inc.
- Software Integration License Agreement, dated February 1, 2019, by and between IntegraMed America, Inc. and Mandell's Clinical Pharmacy
- Software Integration License Agreement, dated April 26, 2019, by and between IntegraMed America, Inc. and Invitae Corporation
- Express Scripts Content License Agreement, dated February 1, 2019, by and between Lynnfield Drug, Inc. and IntegraMed
- Marketing Services Agreement, dated January 1, 2018, as amended by that Amendment, dated January 3, 2019, and as further amended by that Amendment, dated October 31, 2019, by and between IntegraMed and Lynnfield Compounding Center, Inc. d/b/a Freedom Fertility Pharmacy
- Letter of Agreement, dated January 1, 2018, by and between IntegraMed and Lynnfield Compounding Center, Inc. d/b/a Freedom Fertility Pharmacy
- Pharmacy Interface System Agreement, dated February 18, 2010, by and between IntegraMed America, Inc. and Freedom Fertility Pharmacy, LLC
- Discount Agreement, dated February 26, 2018, by and between IntegraMed America, Inc. and Lynnfield Compounding Center, Inc. d/b/a Freedom Fertility Pharmacy.
- Shareholders Agreement, by and among Assisted Reproductive Technology Insurance Company, Ltd. and the shareholders set forth therein, dated October 15, 2005.
- Litigation and Claims Management Services Agreement between Western Litigation, a division of Gallagher Bassett Services, Inc., and Assisted Reproductive Technology Insurance Company, LTD, effective January 1, 2020
- EDI Services Agreement, dated May 20, 2015, by and between IntegraMed and Laboratory Corporation of America Holdings and its subsidiaries, as amended by that certain First Amendment dated May 31, 2019
- Pharmacy Technology Services and Patient Management Agreement, dated January 1, 2020, by and between VFP Pharmacy Group and IntegraMed America, Inc.

Fertility NewCo will take partial assignment of the following contracts solely with respect to services that are provided specifically to any of following practices: (i) Reproductive Endocrine Associates of Charlotte, P.C., (ii) Shady Grove Fertility Reproductive Science Center, P.C., (iii) Fertility Centers of Illinois, S.C., (iv) Reproductive Science Center of the San Francisco Bay Area, Inc., (v) Northwest Center for Infertility and Reproductive Endocrinology (IVF FL):

- Master Agreement, dated January 28, 2015, by and between IntegraMed and Roche Diagnostics Corporation
- Select Plus Affiliate Registration Form, dated January 28, 2011, by and between Microsoft and IntegraMed
- Master Lease Agreement, dated January 29, 2019, by and between IntegraMed and Dell Financial Services
- Prime Supply Agreement, dated March 1, 2014, by and between McKesson Medical-Surgical Inc. and IntegraMed

18-

- Agreement, dated November 21, 2014, by and between Ricoh USA, Inc. and IntegraMed Management, LLC

Pharmaceutical Contracting Alliance (PCA) Agreements

- Operating Agreement of Pharmaceutical Contracting Alliance, LLC, dated June 1, 2017.
- Operating Agreement of Pharmaceutical Contracting Alliance, LLC, dated October 1, 2018.
- Master Reimbursement Agreement, dated June 1, 2017, as amended by that First Amendment to Master Reimbursement Agreement, date unknown, as amended by that Second Amendment to Master Reimbursement Agreement, dated May 1, 2020, by and between EMD Serono Master, Inc. and Pharmaceutical Contracting Alliance, LLC.
- [Master Services Agreement, dated [•], by and between IntegraMed America, Inc. and Pharmaceutical Contracting Alliance, LLC][7]

CapexMD Agreements and Equity Interest

- Agreement, dated July 1, 2014 by and between IntegraMed and CapexMD LLC, as amended. CapexMD is offering financing options for IntegraMed's customers.
- Amended and Restated Operating Agreement of CapexMD, LLC, dated June 20, 2014.
- IntegraMed America, Inc.'s equity interest in CapexMD, LLC.

ARTIC Equity Interest

- IntegraMed America, Inc.'s equity interest in Assisted Reproductive Technology Insurance Company, Ltd.

Intellectual Property Assets

All Intellectual Property of the Debtors, including (a) all Intellectual Property owned by the Debtors, (b) all third party Intellectual Property licensed or used by the Debtors, and (c) all rights and obligations under any agreements that pertain to, affect ownership of, grant license rights to, or otherwise grant or limit rights to use or transfer any Intellectual Property to which the Debtor and/or any of its Affiliates are a party.

For the purposes of this provision, "Intellectual Property" includes all intellectual property rights and all proprietary rights of any type in any jurisdiction throughout the world, whether registered or unregistered, whether published or not published, including the following and all rights, title and interests pertaining to or deriving from:

(a) any and all patents and patent applications, including all reissuances, continuations, continuations-in-part, divisions, provisionals, non-provisionals, extensions, reexaminations, applications based on any inventions, all rights to claim priority to any such applications, and all certificates and patents issued from any of the foregoing;

(b) all trademarks, service marks, logos, slogans, trade dress, trade names, business names, social media identifiers and user credentials, and all other identifiers of source, together with all translations, adaptations, derivations and combinations of the foregoing, all goodwill of the business associated with each of the foregoing, all common law rights thereto, and all applications, registrations and renewals in connection therewith and the rights to claim priority thereto;

---

[7] **NTD**: there are references to this agreement, but Buyer has not been provided with a copy.

19-

DM_US 168011982-30.104127.0023

(c) all works of authorship, copyrightable subject matter, copyrights and database rights, together with all website content, source code, digital content, forms, manuals, reports, guidelines, documents, and marketing materials, all translations, derivative works, adaptations, compilations and combinations of the foregoing, and all applications and registrations in connection therewith;

(d) any and all trade secrets, know-how, confidential or proprietary information, any information that derives economic value from not being generally known, inventions, ideas, discoveries, research, development, improvements, processes, methods, formulas, compositions, substances, models, materials, parameters, procedures, techniques, technologies, devices, systems, modules, tests, test results, diagnoses, analyses, data, designs, drawings, specifications, customer and supplier lists, pricing and cost information, and technical, clinical, operational, financial and business information;

(e) all design rights, economic rights, moral rights, publicity rights, privacy rights and shop rights;

(f) all software, including (i) computer programs, applications, systems, code, data, databases, and information technology, including firmware, middleware, drivers, system monitoring software, algorithms, models, methodologies, program interfaces, source code, object code, html code, and executable code; (ii) Internet and intranet websites, domain names, databases and compilations, including data and collections of data, whether machine-readable or otherwise; (iii) development and design tools, utilities, and libraries; (iv) technology supporting websites, digital contents, user interfaces, and the contents and audiovisual displays of websites; (v) all versions, updates, corrections, enhancements, and modifications thereto; and (vi) media, documentation and other works of authorship, including forms, user manuals, developer notes, comments, support, maintenance and training materials, relating to or embodying any of the foregoing or on which any of the foregoing is recorded;

(g) all rights to assert, defend and recover title in connection with any of the foregoing; (i) all rights to sue and recover for any past, present and future infringement, misappropriation, violation, damages, lost profits, royalties, payments and proceeds in connection with any of the foregoing;

(h) all other intellectual property or proprietary rights; and

(i) all copies and tangible embodiments of any of the foregoing.

Notwithstanding transfer of the Intellectual Property hereby, those medical practices that, prior to the Closing, had the contractual or licensed right to utilize trade names and trademarks involving "SIRM" or "Sher" and marks and names related to "SIRM" or "Sher" (which, for clarity, in each case, exclude "Attain" and "IntegraMed"), shall continue to hold rights to use such marks and names in use prior to the Closing, unaffected by such transfer of the Intellectual Property.

Information Technology Assets

All information technology assets of the Debtors (excluding the Excluded IT Agreements), including:

(a) all hardware and other physical information technology assets owned, leased, or otherwise made available to the Debtors, including desktop, laptop, or server computers; routers, switches, modems, access points, and other network equipment; hard drives, optical storage media, flash storage media, and other computer storage media and equipment; and

(b) all rights and obligations under any agreements that grant rights to use any information technology resources, remote or cloud-based services and computing resources, network access, and telecommunications services, including telephone, internet access, email, and web hosting services (in each case other than the Excluded IT Agreements).

20-

DM_US 168011982-30.104127.0023

As used herein, the "Excluded IT Agreements" means any agreement between the Debtor sand any of the following counterparties:

1. Amazon Web Services
2. Century Link
3. Cyxtera
4. Citrix
5. Medallia
6. Oracle
7. Ring Central
8. Intacct

-21-

**Schedule 12.2**
**Related Practices**

(i) Reproductive Endocrine Associates of Charlotte, P.C.
(ii) Shady Grove Fertility Reproductive Science Center, P.C.
(iii) Fertility Centers of Illinois, S.C.
(iv) Reproductive Science Center of the San Francisco Bay Area, Inc.
(v) Northwest Center for Infertility and Reproductive Endocrinology (IVF FL)

LEGAL\47449479\5
DM_US 168011982-30.104127.0023