**ASSET AND EQUITY PURCHASE AGREEMENT**

**by and between**

**Jeoffrey L. Burtch, as Chapter 7 Trustee**

**for the Bankruptcy Estates of**

**IntegraMed Holding Corp. and Affiliates**

**and**

**STLFertility, LLC**

**Dated July __ 2020**

**ASSET AND EQUITY PURCHASE AGREEMENT**

THIS ASSET AND EQUITY PURCHASE AGREEMENT (this "***Agreement***") is entered into on July __, 2020, by and between STLFertility, LLC, a Missouri limited liability company ("***Buyer***") and Jeoffrey L. Burtch ("***Seller***") as Chapter 7 Trustee for the Bankruptcy Estates (the "***Estates***").  Buyer and Seller are referred to collectively herein as the "***Parties***" and individually as a "***Party***."  Capitalized terms used and not otherwise defined herein have the meanings set forth in Article 1 below.

**PRELIMINARY STATEMENTS**

WHEREAS, Seller is the holder of 100% of the outstanding equity interests of IntegraMed Medical Missouri, LLC, a Missouri limited liability company (the "***Company***");

WHEREAS, the Company operates a practice providing medical, gynecological, and fertility-related services in St. Louis, Missouri (the "***Practice***") to individual patients (collectively, such patients are the "***Practice Patients***");

WHEREAS, the Buyer provides medical treatments and other services to the Practice Patients;

WHEREAS, on May 20, 2020 (the "***Petition Date***"), Seller and various of its Affiliates (each a "***Debtor***" and collectively, "***Debtors***") each filed a voluntary petition for relief under Chapter 7 of the Bankruptcy Code, as amended (the "***Bankruptcy Code***"), commencing Chapter 7 cases (each a "***Bankruptcy Case***" and collectively, the "***Bankruptcy Cases***") in the United States Bankruptcy Court for the District of Delaware (the "***Bankruptcy Court***"), and the Bankruptcy Cases are being jointly administered under Case No. 20-11169 (LSS);

WHEREAS, shortly after the Petition Date, Seller was appointed as the Chapter 7 Trustee for the Estates of the Debtors, and he continues to serve in such capacity;

WHEREAS, on or about June 2, 2020, and as extended from time to time, Buyer, Seller and Fertility NewCo, LLC ("***FNC***") entered into that certain *Stipulation for Limited Relief for Medical Practices Pending Consummation of Prospective Sale Process* (the "***Stipulation***") in which Buyer, Seller and FNC agreed, among other things, for Buyer to continue the daily operations including, but not limited to, seeing fertility patients of Seller and to use certain pre and post-petition funds attributable to Seller for the operational expenses as further detailed in the Stipulation;

WHEREAS, on June 1, 2020, Seller filed a *Motion for Entry of (I) an Order (A) Approving Bidding Procedures in Connection with Sale of Substantially All of the Estates' Assets, (B) Scheduling an Auction and Hearing to Consider the Proposed Sale, and (C) Approving the Form and Manner of Notice Thereof; and (II) an Order (A) Approving the Sale, (B) Authorizing the Assumption and Assignment of Executory Contracts and Unexpired Leases, and (C) Granting Certain Related Relief* (the "***Sale Motion***") [Docket No. 35];

WHEREAS, on June 8, 2020, the Bankruptcy Court entered the *Order Granting Trustee's Motion for Entry of an Order (A) Approving Bidding Procedures in Connection with Sale of Substantially All of the Estates' Assets, (B) Scheduling an Auction and Hearing to Consider the Proposed Sale, and (C) Approving the Form and Manner of Notice Thereof* (the "***Bidding Procedures Order***") [Docket No. 72] which, *inter alia*, approved the bid and auction procedures;

WHEREAS, Buyer is a Qualified Bidder;

WHEREAS, certain Practice Patients have made cash deposits with certain of the Debtors, entitling the Practice Patients to receive certain services from the Practice, with the detail of such deposits attached hereto as Exhibit A (the "**Patient Deposits**");

WHEREAS, Debtors and Buyer have operated (through the Practice) a program known as the Attain IVF program (the "**Attain Program**");

WHEREAS, certain Practice Patients have also enrolled in the Attain Program (the "**Missouri Attain Patients**");

WHEREAS, under the terms of the Attain Program, the Missouri Attain Patients have contracted to receive certain services from the Practice at defined costs including, but not limited to, IVF treatment cycles and, under certain circumstances, may be entitled to cash refunds (the "**Attain Patient Benefits**");

WHEREAS, under the terms of the Attain Program, Debtors retained certain payment liabilities with respect to the Attain Patient Benefits, including to reimburse the Company for medical services it provided to the Missouri Attain Patients, and to pay any cash refunds owed to qualifying patients, with the detail of such liabilities attached hereto as Exhibit B (collectively, the "**Missouri Attain Financial Liabilities**");

WHEREAS, Buyer desires to purchase and assume and Seller desires to sell, convey, assign and transfer (i) 100% of the equity interest of the Company and (ii) such assets and rights and such liabilities to Buyer used in connection with the Practice such that Buyer's relationship (including that of Dayal and Schulte) with the Debtors is severed and Buyer is able to operate the Practice independently, all in the manner and subject to the terms and conditions set forth herein and as authorized under, among other things, Sections 105 and 363 of the Bankruptcy Code;

WHEREAS, Seller's ability to consummate the transactions set forth in this Agreement is subject to, among other things, the entry of the Sale Order by the Bankruptcy Court; and

WHEREAS, Seller has determined that it is advisable and in the Estates' best interests to enter into this Agreement and to consummate the transactions provided for herein, subject to entry of the Sale Order, and has approved the same.

## AGREEMENT

NOW, THEREFORE, in consideration of the premises and the mutual promises herein made, and in consideration of the representations, warranties, covenants and other valuable consideration herein contained, the receipt and sufficiency of which are hereby acknowledged, the Parties agree as follows:

## ARTICLE 1
## DEFINITIONS

"**Accounts Receivable**" means all accounts, notes, interest and other receivables of the Company, and all claims, rights, interests and proceeds related thereto, arising from the rendering of services to the Practice Patients, billed and unbilled, recorded and unrecorded (including any accounts previously written off or charged off as bad debts), for services provided at or by the Practice whether payable by private pay patients or Third Party Payors, or by any other source, including the right to receive an amount equal to the value of all accounts receivable arising from the rendering of services and provision of medicine, drugs and supplies to Practice Patients relating to Medicare, Medi-Cal, TRICARE, and other third party patient claims of Seller due from beneficiaries or governmental Third Party Payors.

"***Actions***" means any claim, cause of action, litigation, action, suit, arbitration, proceeding, hearing, audit or right in action.

"***Affiliate***" means, with respect to the Person to which it refers, (a) a Person that directly or indirectly, through one or more intermediaries, controls, is controlled by or is under common control with, such Person; (b) any officer, director or shareholder of such Person; (c) any parent, sibling, descendant or spouse of such Person or of any of the Persons referred to in clauses (a) and (b); and (d) any corporation, limited liability company, general or limited partnership, trust, association or other business or investment entity that directly or indirectly, through one or more intermediaries controls, is controlled by or is under common control with any of the foregoing individuals. For purposes of this definition, the term "control" of a Person shall mean the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies, whether through the ownership of voting securities, by contract or otherwise.

"***Agreement***" has the meaning set forth in the Preamble.

"***Alternative Transaction***" means a sale to a purchaser other than Buyer, and the Bankruptcy Court enters an order approving such sale.

"***Ancillary Agreements***" means, with respect to any Party, all agreements to which such Party is or will become a Party pursuant to this Agreement.

"***Assigned Contracts***" has the meaning set forth in Section 2.1(h).

"***Assignment and Assumption Agreement***" has the meaning set forth in Section 3.2(d).

"***Assumed Cure Amount***" has the meaning set forth in Section 2.3(b).

"***Assumed Liabilities***" has the meaning set forth in Section 2.3(a).

"***Attain Buyer***" has the meaning set forth in Section 2.6(c).

"***Attain Consideration***" has the meaning set forth in Section 2.6(c).

"***Attain Patient Benefits***" has the meaning set forth in the Preliminary Statements.

"***Attain Program***" has the meaning set forth in the Preliminary Statements.

"***Attain Program Agreement***" means the agreement negotiated and entered into between FNC and Buyer for the continued use of the Attain Program, as attached as Exhibit H.

"***Attain Transaction***" has the meaning set forth in Section 2.6(c).

"***Bankruptcy Cases***" has the meaning set forth in the Preliminary Statements.

"***Bankruptcy Court***" has the meaning set forth in the Preliminary Statements.

"***Bidding Procedures***" has the meaning set forth in the Preliminary Statements.

"***Bidding Procedures Order***" has the meaning set forth in the Preliminary Statements.

"***Bill of Sale***" has the meaning set forth in Section 3.2(c).

"***Business Day***" means any day that is not a Saturday, Sunday or any other day on which banks are required or authorized by Law to be closed in New York, New York.

"***Buyer***" has the meaning set forth in the Preamble.

"***Claim***" means any claim, demand, allegation, charge, dispute, complaint, or notice.

"***Closing***" has the meaning set forth in Section 3.1.

"***Closing Date***" has the meaning set forth in Section 3.1.

"***Code***" means the Internal Revenue Code of 1986, as amended, and any applicable rules and regulations thereunder, and any successor to such statute, rules or regulations.

"***Company***" means of IntegraMed Medical Missouri, LLC.

"***Consent***" means, with respect to any Person, any consent, approval, authorization, permission or waiver of, or registration, declaration or other action or filing with or exemption by such Person.

"***Contract***" means any written contract, obligation, understanding, commitment, lease, license, instrument, purchase order, bid or other agreement to which a Person is legally bound.

"***Cure Amounts***" means the amount required to be paid with respect to each Assigned Contract to cure all defaults under such Assigned Contract to the extent required by Section 365 of the Bankruptcy Code and to otherwise satisfy all requirements imposed by Section 365 of the Bankruptcy Code as determined by the Bankruptcy Court, in order to effectuate, pursuant to the Bankruptcy Code, the assumption by Seller and assignment to Buyer of each such Assigned Contract.

"***Dayal***" means Molina Dayal, M.D.

"***Dayal Employment Agreement***" means that certain Employment Agreement dated April 1, 2018, by and between Dayal and Seller or its Affiliate.

"***Debtors***" has the meaning set forth in the Preamble.

"***Deposit***" has the meaning set forth in Section 2.6(a).

"***Designated Contracts***" means any Assigned Contract that Buyer designates as Excluded Liabilities within the Designation Rights Period.

"***Designation Rights Period***" means the period of thirty (30) days after the Closing Date in which Buyer may designate an Assigned Contract to an Excluded Liability and incur no obligation to make any Cure Payments or any other performance obligations related to such designated Assigned Contract.

"***Effective Time***" has the meaning set forth in Section 3.1.

"***Excluded Assets***" has the meaning set forth in Section 2.2.

"***Excluded Liabilities***" has the meaning set forth in Section 2.4.

"***FNC***" has the meaning set forth in the Preliminary Statements.

"*Government Reimbursement Programs*" means any programs funded or administered by a Governmental Authority, or contractor(s) thereof, for the purposes of paying for health care services. Such programs include Medicare, each state Medicaid program, TRICARE, each other federal health care program (as defined in 42 U.S.C. § 1320a-7b(f)), and all similar or successor programs with or for the benefit of designated federal or state residents.

"*Governmental Authority*" means any foreign or domestic federal, state or local government or quasi-governmental authority, political or economic union, or arbitration tribunal or any department, agency, subdivision, court, commission, or other tribunal of any of the foregoing.

"*Intellectual Property*" means all of the following in any jurisdiction throughout the world (a) all inventions (whether patentable or unpatentable and whether or not reduced to practice), all improvements thereto, and all patents, patent applications, and patent disclosures, together with all reissues, divisions, continuations, continuations-in-part, renewals, extensions, and foreign counterparts and equivalents thereof, (b) all trademarks, service marks, logos, trade names, corporate names, and other source identifiers whether registered or unregistered (as the case may be), as well as all goodwill associated therewith, and all applications, registrations, and renewals in connection therewith, (c) registrations for internet domain names, (d) all rights protected by copyright law, including rights in registered and unregistered works of authorship, all rights to copy, distribute, modify, publicly perform, and publicly display such works, and all applications, registrations, and renewals in connection therewith, and (e) trade secrets, technologies, databases, software, and other proprietary information.

"*IP License Agreement*" means that certain perpetual royalty free license between Seller and Buyer to use Practice IP in the form attached hereto as Exhibit I.

"*Inventory*" means all inventories of supplies, drugs, janitorial and office supplies and other disposables and consumables located at the Practice or used in connection with the operation of the Practice.

"*IT License Agreement*" has the meaning set forth in Section 2.2.

"*IT Service Agreement*" means the agreement negotiated and entered into between FNC and Buyer for the IT services as defined in the IT Service Agreement attached as Exhibit G.

"*Law*" means any foreign or domestic federal, state or local law, statute, code, ordinance, regulation, rule, directive, consent agreement, constitution or treaty of any Governmental Authority, including common law.

"*Leased Real Property*" has the meaning set forth in Section 2.1(b).

"*Liability*" means any liability, whether known or unknown, whether asserted or unasserted, whether absolute or contingent, whether accrued or unaccrued, whether liquidated or unliquidated, and whether due or to become due, including, without limitation, any known or unknown payment, claim, pledge, guaranty or other liability between (a) Debtors and Company, (b) Debtors and FNC, and (c) Company and FNC, except solely for those liabilities arising out of the IT Services Agreement and Attain Program Agreement contemplated herein between Company/Buyer and FNC.

"*Lien*" means any lien, mortgage, pledge, encumbrance, charge, security interest, adverse claim, liability, interest, charge, preference, priority, proxy, transfer restriction (other than restrictions under the Securities Act and state securities laws), encroachment, Tax, order, community property interest, equitable interest, option, warrant, right of first refusal, easement, profit, license, servitude, right of way, covenant, zoning restriction, reservations or similar matters (including successor liability to the fullest extent permitted by Law), whether or not of record, or encroachments of any nature whatsoever, or any conditional

sale contracts, title retention contracts or other agreements or arrangements to give or to refrain from giving any of the foregoing, whether secured or unsecured, choate or inchoate, filed or unfiled, scheduled or unscheduled, noticed or unnoticed, contingent or non-contingent, material or non-material, known or unknown.

"*Management Agreement*" means that certain Management Services Agreement dated ____, by and between Company and IntegraMed Management, LLC.

"*Missouri Attain Financial Liabilities*" has the meaning set forth in the Preliminary Statements.

"*Missouri Attain Patients*" has the meaning set forth in the Preliminary Statements.

"*Mutual Release and Covenant Not to Sue*" means an agreement and release, by and between Buyer, Seller, and the Estates, on behalf of the Debtors, in substantially the form attached hereto as Exhibit C.

"*Non-Assignable Asset*" has the meaning set forth in Section 2.5.

"*Order*" means any order, award, decision, injunction, judgment, ruling, decree, charge, writ, subpoena or verdict entered, issued, made or rendered by any Governmental Authority or arbitrator, including the Bankruptcy Court.

"*Organizational Documents*" means (a) any certificate or articles of incorporation, bylaws, certificate or articles of formation, operating agreement or partnership agreement; (b) any documents comparable to those described in clause (a) as may be applicable pursuant to any Law; and (c) any amendment or modification to any of the foregoing.

"*Party*" has the meaning set forth in the Preamble.

"*Person*" means any individual, corporation, partnership, limited liability company, firm, joint venture, association, joint-stock company, estate, trust, unincorporated organization, Governmental Authority or other entity, of whatever nature.

"*Petition Date*" has the meaning set forth in the Preliminary Statements.

"*Practice IP*" means all of the Intellectual Property exclusively used in the operation of the Practice, including Intellectual Property owned by Seller and Intellectual Property which is exclusively used by Seller in the operation of the Practice but owned by a third party.

"*Prepaid Assets*" means all advance payments, prepayments, prepaid expenses and deposits which were made by or on behalf of Seller with respect to the operation of the Practice.

"*Proceeding*" means any action, audit, lawsuit, litigation, proceeding, investigation, complaint, arbitration or mediation (in each case, whether civil, criminal or administrative), filed or initiated with or by, or pending by or before, any Governmental Authority, arbitrator or mediator.

"*Purchase Price*" means an amount equal to Five Hundred Thousand Dollars ($500,000.00).

"*Purchased Assets*" has the meaning set forth in Section 2.1.

"*Qualified Bidder*" has the meaning set forth in the Bidding Procedures.

"*Sale Motion*" has the meaning set forth in the Preliminary Statements.

"*Sale Order*" has the meaning set forth in Section 3.2(b).

"*Securities Act*" means the Securities Act of 1933, as amended, and any applicable rules and regulations thereunder, and any successor to such statute, rules or regulations.

"*Seller*" has the meaning set forth in the Preamble.

"*Seller's Account*" has the meaning set forth in Section 2.6(a).

"*Schulte*" means Maureen Schulte, M.D.

"*Schulte Employment Agreement*" means that certain Employment Agreement dated April 22, 2019, by and between Schulte and Seller or its Affiliate.

"*Stipulation*" has the meaning set forth in the Preliminary Statements.

"*Tax*" or "*Taxes*" means (a) any federal, state, local and foreign net income, alternative or add-on minimum, estimated, gross income, gross receipts, sales, use, ad valorem, value added, transfer, franchise, capital profits, lease, service, license, withholding (including employee's income withholding), payroll, employment, excise, severance, stamp, occupation, premium, property, abandoned property or escheat, environmental or windfall profit tax, customs duty or other tax of any kind whatsoever, governmental fee or other like assessment or charge (and any liability incurred or borne by virtue of the application of Treasury Regulation Section 1.1502-6 (or any similar or corresponding provision of state, local or foreign Law), as a transferee or successor, by contract or otherwise); (b) all interest, penalties, additions to tax and additional amounts with respect thereto whether disputed or not and including any obligations to indemnify or otherwise assume or succeed to the Tax lability of any other Person; and (c) any liability for the payment of amounts described in clauses (a) or (b) as a result of any tax sharing, tax indemnity or tax allocation agreement or any agreement to pay or indemnify any other Person for such matters.

"*Tax Return*" means any return, declaration, report, claim for refund, or information return or statement relating to Taxes, including any Schedule or attachment thereto, and including any amendment thereof.

"*Tenant Lease*" has the meaning set forth in Section 2.1(b).

"*Third Party Payor*" means any Person (other than the beneficiary) that pays for or reimburses at least a portion of the health care expenses of its beneficiaries including each Government Reimbursement Program, any entity authorized to provide health insurance (or property, casualty, or life insurance covering health benefits), any health maintenance organization, preferred provider organization, or other managed care program, and any employer authorized in accordance with applicable Law to self-insure its workers' compensation risk.

## ARTICLE 2
## PURCHASE AND SALE

2.1 <u>Purchase and Sale of Equity Interest and Purchased Assets</u>. On the terms and subject to the conditions set forth in this Agreement, at the Closing, Seller shall sell, transfer, assign, convey and deliver to Buyer, and Buyer shall purchase, acquire, assume and accept from the Estates, all of the Estates' right, title and interest in and to (i) 100% of the issued and outstanding equity of the Company; and (ii) to the extent not held by the Company, the assets owned by Seller and its Affiliates and used in connection with the operation of the Practice, with all of the foregoing being free and clear of all Liens and Liabilities

(except for any Assumed Liabilities) to the extent permitted by the Bankruptcy Code (all such assets other than the Excluded Assets, the "***Purchased Assets***") including:

(a)     Accounts Receivable;

(b)     subject to Section 2.3(b), all leasehold interests (together with any amendments, renewals, guaranties or other agreements with respect thereto, the "***Tenant Lease***") used in connection with the operation of the Practice in and to the real property (the real property that is subject to the Tenant Lease being referred to as the "***Leased Real Property***"), that are described in Schedule 2.1(b);

(c)     all equipment, furniture, furnishings, machinery, tools, supplies, telephones, office equipment, leasehold improvements and other tangible personal property used by Seller in connection with the operation of the Practice including, without limitation, those that are described in Schedule 2.1(c);

(d)     all Inventory used in connection with the operation of the Practice (other than the portions of Inventory disposed of, or expended, as the case may be,  prior to the Closing in the ordinary course of business);

(e)     all Prepaid Assets related to the Practice other than any Prepaid Assets exclusively relating to any of the Excluded Assets;

(f)     all intangible personal property used in connection with the operation of the Practice, including all right, title and interest in and to all Practice IP, including the names and assets set forth on Schedule 2.1(f) but excluding the right to use any names, trade names, trademarks and service marks including the names "IntegraMed" and "SIRM," except as otherwise permitted in the IP License Agreement;

(g)     all financial and personnel records used in connection with the operation of the Practice or the Purchased Assets (including all equipment records, construction plans and specifications, medical and administrative libraries, documents, catalogs, books, records, files, operating manuals and current personnel records) and copies of all patient and medical records used in connection with the operation of the Purchased Assets;

(h)     subject to Section 2.3(b), the Contracts designated in Schedule 2.1(h) as Contracts to be assumed by Buyer (the "***Assigned Contracts***");

(i)     all claims or causes of action relating to or arising from the Practice other than claims that arise under Chapter 5 of Title 11 of the United States Code;

(j)     the goodwill generated by or associated with the Practice;

(k)     all telephone and facsimile numbers, post office boxes and directory listings used in connection with operation of the Practice;

(l)     all manuals, marketing materials, policy and procedure manuals, standard operating procedures and marketing brochures, data and studies or analyses used at the Practice;

(m)     the Company's bank accounts; and

(n)     any other tangible asset located within the Practice as of (i) the Effective Date, or (ii) the Closing Date, in each case not otherwise articulated in the foregoing (a) through (l) and not otherwise an Excluded Asset.

2.2     Excluded Assets.  Buyer acknowledges and agrees that it is currently accessing certain IT software and cloud programs in the operation of the Practice pursuant to a limited license granted by Fertility NewCo, LLC, a Delaware limited liability company (the "*IT License Agreement*"), and that the IT License Agreement and access to the IT discussed there are not included in the Purchased Assets.  Other than the Purchased Assets, the parties expressly agree that Buyer is not purchasing or acquiring any other assets or properties of Debtors and all such other assets and properties shall be excluded from the Purchased Assets (collectively, the "*Excluded Assets*").

2.3     Assumption of Liabilities and Obligations.

(a)     Upon the terms and subject to the conditions of this Agreement, at the Closing and effective as of the Effective Time, Seller agrees to assign to Buyer, and Buyer shall assume and be responsible only for the following liabilities, obligations and duties of Seller to the extent both (i) relating to the ownership of the equity of the Company, and (ii) to operation of the Practice (and not to the extent arising from or related to any Excluded Asset, Excluded Liability or any breach, violation or infringement of Contract, tort or Law) collectively, the "*Assumed Liabilities*" including:

(1)     subject to Sections 2.3(b)-(c), liabilities, obligations and duties of Seller under the Assigned Contracts as and to the extent any such liability, obligation or duty arises on or after, and is related solely to the period on or after, the Effective Time;

(2)     all liabilities and obligations to the extent arising out of the operation and use of the Leased Real Property on or after the Effective Time;

(3)     the Assumed Cure Amounts;

(4)     all liabilities with respect to the Patient Deposits; and

(5)     subject to Section 2.7, all liabilities and obligations with respect to the Attain Patient Benefits.

(b)     Schedule 2.1(h) sets forth the Cure Amount for each Assigned Contracts (each an "*Assumed Cure Amount*").

(c)     Buyer will designate any Assigned Contracts in Schedule 2.1(h)it desires not to assume during the Designation Rights Period as Excluded Liabilities.  Upon designation of any Assigned Contracts as Excluded Liabilities, Buyer will provide notice to Seller of the Designated Contracts prior to the expiration of the Designation Rights Period, and upon such Notice, Buyer will have no further performance or payment obligations under the Designated Contracts.

2.4     Excluded Liabilities.  Notwithstanding any provision in this Agreement or any other writing to the contrary, Buyer is not assuming and shall not be responsible for, pay, perform or discharge, and shall not otherwise bear the economic burden of, (i) any Liabilities of Debtors or their Affiliates of any kind or nature whatsoever other than the Assumed Liabilities, and (ii) any Taxes of Company and/or its Affiliates and any Tax related to the operation of the Practice or the Purchased Assets arising prior to the Effective Time (all such Liabilities other than the Assumed Liabilities being referred to herein as the "*Excluded Liabilities*").

2.5     Non-Assignable Assets.  Notwithstanding anything in this Agreement to the contrary, to the extent that the assignment of all or any portion of any Purchased Assets shall be prohibited by Law (including by Order of a Governmental Authority), requires a consent, or advance notice to, a counterparty (if any) or requires the consent of any other third party that has not been obtained as of the Closing, and

which restriction, consent right or right to advance notice cannot be effectively overridden or canceled by any order of the Bankruptcy Court or any provision of the Bankruptcy Code (each, a "***Non-Assignable Asset***"):

(a)     this Agreement shall not constitute an assignment or transfer of title to any such Non-Assignable Asset, unless and until any applicable restrictions described above prohibiting the assignment of such Non-Assignable Asset are satisfied or waived, except to the extent set forth in this Section 2.5;

(b)     title to such Non-Assignable Asset shall not be transferred except and until provided in this Section 2.5, and Debtors shall retain each such Non-Assignable Asset and all of the Liabilities of Debtors related to, or arising from, such Non-Assignable Asset accruing on and after the Closing, and such Liabilities shall not be considered Assumed Liabilities;

(c)     Seller shall at the request and under the direction of Buyer and at the Buyer's expense, take all reasonable actions (including, without limitation, the appointment of Buyer as attorney-in-fact for Seller) and do or cause to be done all such things as shall in the reasonable judgment of Buyer be necessary or proper (1) to assure that the rights and benefits of Seller under such Non-Assignable Asset shall be preserved for the benefit of Buyer, and (2) to facilitate receipt of the consideration to be received by Seller in and under every such Contract, which consideration shall be held for the benefit of, and shall be delivered to, Buyer; and

(d)     title to each Non-Assignable Asset shall automatically and without further action of the Parties be assigned pursuant to this Agreement to Buyer upon satisfaction or waiver of the applicable restrictions affecting such Non-Assignable Asset, and all of the performance obligations of Debtors arising under such Non-Assignable Asset accruing after the date of such assignment shall constitute Assumed Liabilities as of such date other than any of such Liabilities that constitute Excluded Liabilities.

2.6     Deposit and Purchase Price.

(a)     In accordance with the Bidding Procedures, Buyer delivered via wire transfer of immediately available funds Seven Thousand Five Hundred Dollars ($7,500.00) (the "***Deposit***") to the account set forth on Schedule 2.6(a) (the "***Seller's Account***").  At the Closing, the Deposit shall be credited towards the payment of the Purchase Price and released to Seller.  If the Closing does not occur and this Agreement is terminated, the Deposit shall be released as provided in Section 12.2.

(b)     Within thirty (30) days of Closing and in addition to the Purchase Price, Buyer shall pay all Assumed Cure Amounts for Assigned Contracts in accordance with the Sale Order.

(c)     FNC will assume the Missouri Attain Financial Liabilities from the Estates, on terms and conditions acceptable to Buyer memorialized in the Attain Program Agreement attached as Exhibit H (the "***Attain Transaction***"), and Buyer will pay an additional One Hundred Thousand Dollars ($100,000.00) (the "***Attain Consideration***") to the Estates, such amount to be payable within thirty (30) days of the order approving the Attain Transaction; and

(d)     For the avoidance of doubt, in the event that the Estates and FNC do not consummate the Attain Transaction, the Purchase Price shall be the full consideration paid by Buyer to the Estates for the Purchased Assets, and Buyer shall have no obligation to pay the Attain Consideration to the Estates.

2.7     Attain Program.  Prior to or in the absence of the consummation of the Attain Transaction, Buyer covenants and agrees that it will provide the existing Attain Patient Benefits to the Practice Patients,

which may result in material financial detriment to Buyer. Immediately upon the consummation of the Attain Transaction, the Missouri Attain Financial Liabilities shall be deemed Excluded Liabilities, and such Liabilities shall be the responsibility of and be administered by the Attain Buyer pursuant to the terms of the Attain Transaction.

2.8     Services Related to Patient Deposits. Buyer covenants and agrees that it will provide, to any of its Practice Patients who made Patient Deposits, all services promised to such patients, regardless of whether the Patient Deposits were reserved or which party made such promises. Buyer acknowledges and agrees that its obligation to honor these Patient Deposits may result in material financial detriment to Buyer.

**ARTICLE 3**
**THE CLOSING**

3.1     Closing. The closing of the transactions contemplated by this Agreement (the "*Closing*") shall take place at the offices of Cozen O'Connor in Wilmington, Delaware or electronically by the mutual exchange of facsimile or portable document format (.PDF) signatures, (a) commencing at 10:00 a.m. eastern standard time on the first (1st) Business Day following the satisfaction or waiver of all conditions to Closing set forth in Article 9 (other than those conditions that by their nature are to be satisfied by actions taken at the Closing), or (b) at such other place or time as may be mutually agreed to by the Parties (the date on which the Closing actually occurs, the "*Closing Date*"). All transactions contemplated herein to occur on and as of the Closing Date shall be deemed to have occurred simultaneously and to be effective as of 12:01 a.m. central standard time (the "*Effective Time*") on the Closing Date.

3.2     Closing Deliveries of Seller. At or prior to the Closing, Seller shall deliver to Buyer:

(a)     a certificate, in form and substance reasonably satisfactory to Buyer, confirming that each of the conditions specified below in Sections 9.1(a)-(b) is satisfied;

(b)     a certified copy of the Sale Order entered by the Bankruptcy Court substantially in the form attached hereto as Exhibit D, with any changes being acceptable to Buyer in its reasonable discretion (the "*Sale Order*");

(c)     an Assignment of Membership Interests in the form attached as Exhibit J ("*Membership Assignment*") executed by the Seller;

(d)     Bill of Sale in the form attached as Exhibit E (a "*Bill of Sale*") executed by Seller;

(e)     an Assignment and Assumption Agreement in the form attached as Exhibit F (an "*Assignment and Assumption Agreement*") executed by Seller;

(f)     the IP License Agreement executed by Seller;

(g)     a Mutual Release and Covenant Not to Sue executed by Estates and the Debtors;

(h)     termination and waiver agreements in a form mutually agreeable to the Parties with respect to the Dayal and Schulte Employment Agreements (and or any other employment agreements of an employee of the Company) that effectively terminate the existing employment arrangement and waive any non-competition, non-solicitation, confidentiality and other restrictive covenant that exists for the benefit of Seller or its Affiliates, each executed by Seller and/or its applicable Affiliates;

(i)     a termination and waiver agreement in a form mutually agreeable to the Parties that effectively terminates all existing agreements between Company and Debtors (including without

limitation, the Management Agreement) and waives any Liability that Company may have to any Seller or any Debtor, executed by Seller;

(j)     all other instruments and documents required by this Agreement to be delivered by Seller to Buyer (including, without limitation, those instruments and documents set forth in <u>Section 9.1</u> below), and such other instruments and documents required to effectuate the transactions contemplated hereby;

(k)     the Attain Program Agreement executed by FNC; and

(l)     the IT Services Agreement executed by FNC.

All such agreements, documents and other items shall be in form and substance satisfactory to Buyer.

3.3     <u>Closing Deliveries of Buyer</u>.  At or prior to the Closing, Buyer shall deliver to Seller:

(a)     a certificate, in form and substance reasonably satisfactory to Seller, confirming that each of the conditions specified below in <u>Sections 9.2(a)-(b)</u> is satisfied; and

(b)     an Assignment and Assumption Agreement or other document accomplishing the assignment to, and assumption by, Buyer of the Assumed Liabilities;

(c)     all other instruments and documents required by this Agreement to be delivered by Buyer to Seller, and such other instruments and documents which Seller or its counsel may reasonably request to effectuate the transactions contemplated hereby;

(d)     written instructions authorizing the release of the Deposit to Seller;

(e)     a Mutual Release and Covenant Not to Sue executed by Buyer;

(f)     the  IP License Agreement executed by Buyer;

(g)     the Attain Program Agreement executed by Buyer;

(h)     the IT Services Agreement executed by Buyer; and

(i)     the Purchase Price pursuant to <u>Section 2.6(c)</u>.

All such agreements, documents and other items shall be in form and substance satisfactory to Seller.

**ARTICLE 4**
**REPRESENTATIONS AND WARRANTIES OF BUYER**

Buyer represents and warrants to Seller that the statements contained in this <u>Article 4</u> are correct and complete as of the date of this Agreement and will be correct and complete as of the Closing Date (as though made then and as though the Closing Date were substituted for the date of this Agreement throughout this <u>Article 4</u>).

4.1     <u>Organization of Buyer</u>.  Buyer is professional corporation duly formed, validly existing and in good standing under the Laws of the State of Missouri.

4.2     Authorization of Transaction.  Buyer has full power and authority to execute and deliver this Agreement and the Ancillary Agreements to which Buyer is a party and to perform Buyer's obligations hereunder and thereunder.  The execution and delivery by Buyer of this Agreement and the Ancillary Agreements to which Buyer is a party and the performance by Buyer of the transactions contemplated hereby and thereby have been duly approved by all requisite action of Buyer.  Assuming the due authorization, execution and delivery of this Agreement and the Ancillary Agreements by the other parties thereto, this Agreement and each Ancillary Agreement to which Buyer is a party constitute the valid and legally binding obligation of Buyer, enforceable against Buyer in accordance with their terms, except as such enforceability may be limited by bankruptcy, insolvency, reorganization, moratorium and similar laws affecting creditors generally and by the availability of equitable remedies.  Except as required to comply with applicable federal and state securities Laws, Buyer is not required to give any notice to, make any filing with, or obtain any Consent of any Governmental Authority or any other Person in order to consummate the transactions contemplated by this Agreement or the Ancillary Agreements to which Buyer is a party.

4.3     Non-contravention.  Neither the execution and the delivery of this Agreement nor the Ancillary Agreements to which Buyer is a party, nor the consummation of the transactions contemplated hereby and thereby, will (a) violate or conflict with any Law or Order to which Buyer is subject, (b) violate any provision of the Organizational Documents of Buyer, or (c) conflict with, result in a breach of, constitute a default under, result in the acceleration of, create in any party the right to accelerate, terminate, modify, or cancel, or require any notice under any Contract to which Buyer is a party or by which it is bound or to which any of its assets is subject.

4.4     Ability to Pay Purchase Price.  Buyer has sufficient liquid assets to enter into the transactions contemplated herein and to pay the Purchase Price in full in cash at the Closing.

4.5     No Other Representations.  Except for the representations and warranties set forth in this Article 4, Buyer nor any of its direct or indirect equityholders or their respective officers, directors, managers, or any of their respective representatives or agents, has made or makes any other representations or warranties, written or oral, express or implied, with respect to Buyer.

## ARTICLE 5
## REPRESENTATIONS AND WARRANTIES OF SELLER

5.1     Authority.  Seller is the Chapter 7 Trustee in the Bankruptcy Case.  Subject to entry of the Sale Order, Seller has the authority to enter into this Agreement and to consummate the transactions contemplated hereby.

5.2     No Representations.  EXCEPT AS EXPRESSLY PROVIDED HEREIN OR IN THE SALE ORDER, BUYER AGREES AND ACKNOWLEDGES THAT THE TRANSFER OF THE ASSETS IS MADE PURSUANT TO ORDER OF THE BANKRUPTCY COURT AND IS MADE "AS IS" AND "WHERE IS," AND ACKNOWLEDGES AND AGREES THAT, EXCEPT AS EXPRESSLY PROVIDED HEREIN, SELLER MAKES NO REPRESENTATION OR WARRANTY OF ANY KIND WHATSOEVER WITH RESPECT TO THE ASSETS OR OTHERWISE, EXPRESS OR IMPLIED, INCLUDING BUT NOT LIMITED TO ANY REPRESENTATION OR WARRANTY REGARDING THE TITLE OR CONDITION OF THE ASSETS OR THE FITNESS, DESIRABILITY, OR MERCHANTABILITY THEREOF OR SUITABILITY THEREOF FOR ANY PARTICULAR PURPOSE, OR ANY BUSINESS PROSPECTS, OR VALUATION OF THE ASSETS, OR THE COMPLIANCE OF THE ASSETS IN THEIR CURRENT OR FUTURE STATE WITH APPLICABLE LAWS OR ANY VIOLATIONS THEREOF.  BUYER FURTHER ACKNOWLEDGES THAT SELLER SHALL DELIVER TO BUYER ALL ASSETS IN SELLER'S OR ITS COUNSEL'S POSSESSION; BUT THAT SELLER DOES NOT HAVE POSSESSION OF ALL OF THE ASSETS, AND THAT TO THE

EXTENT SELLER IS NOT IN POSSESSION OF AN ASSET SOLD HEREUNDER, BUYER WILL HAVE SOLE RESPONSIBILITY TO OBTAIN POSSESSION OF THE ASSETS.

## ARTICLE 6
## BANKRUPTCY MATTERS

6.1     <u>Subject to Bankruptcy Court Approval and Higher and Better Offers</u>.  Seller will use their reasonable best efforts to obtain the entry of the sale order substantially in the form attached as <u>Exhibit D</u>, authorizing Seller's entry into this Agreement with Buyer and the transactions contemplated herein. Notwithstanding the foregoing, Buyer acknowledges that this Agreement (including the sale of the Purchased Assets and the assumption and assignment of the Assigned Contracts) is subject to approval by the Bankruptcy Court.

## ARTICLE 7
## PRE-CLOSING COVENANTS

7.1     <u>Closing Efforts</u>.  Each of the Parties agree with respect to the period between the execution of this Agreement and the Closing, that each Party will use commercially reasonable efforts to take all action and to do all things necessary, proper, or advisable in order to consummate and make effective the transactions contemplated by this Agreement (including satisfaction, but not waiver, of the closing conditions set forth in <u>Article 9</u>).

7.2     <u>Access and Cooperation</u>.  From the date hereof through the Closing Date, Seller shall respond to reasonable requests of Buyer and its representatives (including its legal advisors, financing sources, financial advisors and accountants) for access, during normal business hours and upon reasonable advance notice, to the properties, books, records and personnel of such Seller related to the Purchased Assets or the Assumed Liabilities; *provided*, *however*, that in no event shall Seller be obligated to provide (a) access or information that would be in violation of applicable Law; (b) bids, letters of intent, expressions of interest, or other proposals received from others in respect of the business of Debtors or in connection with the transactions contemplated hereby or otherwise, and information and analyses relating to such communications; or (c) any information that constitutes attorney work product or that would violate any legal privilege available to such Seller or any of its Affiliates relating to such information or would cause such Seller or any of its Affiliates to breach a confidentiality obligation to which it is bound; *provided, however,* that such Seller and its Affiliates have used reasonable best efforts to obtain any necessary third party consents to such inspection or disclosure, or personnel records of such Seller or any of its Affiliates relating to individual performance or evaluation records, medical histories or other information the disclosure of which is prohibited by applicable Law.  In connection with such access, Buyer's representatives shall cooperate with Seller's representatives and shall use their reasonable best efforts to minimize any disruption of the Debtors' business.

## ARTICLE 8
## POST-CLOSING COVENANTS

8.1     <u>General</u>.  In case at any time after the Closing any further action is necessary to carry out the purposes of this Agreement, Seller will take such further action (including the execution and delivery of such further instruments and documents) as Buyer reasonably may request, all at the sole cost and expense of Buyer.  Seller acknowledges and agrees that, from and after the Closing, Buyer will be entitled to possession of all documents, books, records (including Tax records), agreements and financial data of any sort relating to the business of Debtors; *provided, however,* that Seller shall be permitted to retain copies of all such documents, books, records, agreements and financial data as Seller shall deem are necessary in its administration of the Estates.  In case at any time after the Closing, the Estates require additional information or access to the books and records in the possession of Buyer, Buyer shall respond to reasonable

requests of Seller and its representatives (including its legal advisors, financing sources, financial advisors and accountants) for access, during normal business hours and upon reasonable advance notice, to the properties, books, records and personnel of the Practice.

8.2     Access to Patient Records and Information Systems.

(a)     Seller shall, at the Buyer's sole cost and expense, use commercially reasonable efforts to permit transfer of current electronic data (including, without limitation, patient records) in fully operational form for use in Buyer's computer applications.

(b)     Seller shall, at the Buyer's sole cost and expense, cooperate with Buyer and provide Buyer with such assistance as Buyer may reasonably request in order to provide for an orderly, efficient and safe transition of the operations from Seller to Buyer and the continued operation of the Practice after the Closing Date in compliance with applicable Law and in a manner which does not jeopardize the health and welfare of the Practice Patients.

(c)     Seller shall as Buyer's sole cost and expense, (i) deliver to Buyer a downloaded copy of all Practice Patient records contained on Seller's electronic medical records system in a format readable by Buyer, (ii) leave all hardware that comprise the Purchased Assets, (iii) use commercially reasonable efforts to provide to Buyer, upon its request, any information technology vendor contact information, (iv) transfer the Practice web domains that were used by Seller in connection with its operation of the Practice, and (v) maintain operation of its electronic medical records system, for a period of sixty (60) days after the Closing Date, in a manner that shall allow Seller to provide Buyer with the access required under this Section 8.2.

**ARTICLE 9**
**CLOSING CONDITIONS**

9.1     Conditions to Obligation of Buyer.   The obligation of Buyer to consummate the transactions to be performed by Buyer in connection with the Closing is subject to satisfaction (or, in the sole discretion of Buyer, waiver in writing) of the following conditions:

(a)     Seller shall have performed and complied in all material respects with all of the covenants and agreements in this Agreement to be performed by Seller prior to or at the Closing;

(b)     the Bankruptcy Court shall have entered the Sale Order, which shall be unstayed, unappealed, unappealable, and not subject to a pending motion for reconsideration (i.e., the Sale Order shall be final), except to the extent Buyer determines to waive its right to require that the order be final;

(c)     the Bankruptcy Court shall have approved and authorized the assumption and assignment of each Assigned Contract, free and clear of all liens, encumbrances, and pre-closing liabilities or obligations of any kind, except to the extent cures are being handled in subsequent hearings post-closing (in such case, with any assumption to be fully contingent upon the condition subsequent of cure being acceptable);

(d)     there shall not be any Order in effect preventing consummation of any of the transactions contemplated by this Agreement or any Proceeding seeking to restrain, prevent, change or delay the consummation of any of the transactions contemplated by this Agreement;

(e)     Seller shall have made all of the deliveries contemplated by Section 3.2 of this Agreement; and

(f)     Seller shall convey the Purchased Assets free and clear of all Liens and Liabilities with respect to Seller or the Purchased Assets, prior to or contemporaneous with the Closing.

9.2     <u>Conditions to Seller's Obligations</u>.  Seller's obligations to consummate the transactions to be performed by them in connection with the Closing are subject to satisfaction (or, in the sole discretion of Seller, waiver in writing) of the following conditions:

(a)     All of the representations and warranties concerning Buyer contained in <u>Article 4</u> must have been true and correct in all material respects as of the date hereof and must be true and correct in all material respects on the Closing Date as if made on the Closing Date;

(b)     Buyer must have performed and complied in all material respects with all of its covenants and agreements in this Agreement to be performed prior to or at the Closing;

(c)     the Bankruptcy Court shall have entered the Sale Order;

(d)     there shall not be any Order in effect preventing consummation of any of the transactions contemplated by this Agreement or any Proceeding seeking to restrain, prevent, change or delay the consummation of any of the transactions contemplated by this Agreement; and

(e)     Buyer shall have made all of the deliveries contemplated by <u>Section 3.3</u> of this Agreement.

**ARTICLE 10**
**SURVIVAL**

10.1     <u>Survival</u>.     Except as expressly set forth in this Agreement to the contrary, all representations and warranties of Buyer and Seller, respectively, contained in this Agreement or in any document delivered pursuant hereto shall be deemed to be material and to have been relied upon by Buyer and Seller, respectively, for purposes of Closing; *provided, however,* the Parties acknowledge and agree that all such representations and warranties shall expire, and be of no further force or effect upon the Closing, and neither Buyer nor Seller shall have any liability in respect of any breach thereof upon the Closing.

**ARTICLE 11**
**TAX MATTERS**

The following provisions will govern the allocation of responsibility as between Buyer and Seller for certain tax matters following the Closing Date:

11.1     <u>Cooperation on Tax Matters</u>.     Buyer and Seller will cooperate, as and to the extent reasonably requested by the other Party, in connection with the filing and preparation of Tax Returns pursuant to this <u>Article 11</u> and any Proceeding related thereto.  Such cooperation will include the retention and (upon the other Party's request) the provision of records and information that are reasonably relevant to preparation of such Tax Returns and any such Proceeding.  Without limiting the generality of the foregoing, Seller shall retain, until thirty (30) days after the expiration of the applicable statute of limitations (including any extensions) has expired, copies of all Tax Returns relating to, or containing information concerning, the Purchased Assets, supporting work schedules, and other records or information that may be relevant to such Tax Returns for all tax periods or portions thereof ending on or before the Closing Date and shall not destroy or otherwise dispose of any such records without first providing Buyer with a reasonable opportunity to review and copy the same.

11.2    Allocation of Purchase Price.  The Parties agree that the Purchase Price (and other relevant items) shall be allocated among the Purchased Assets in accordance with their relative fair market values as determined by Buyer in its sole discretion.  Buyer shall prepare and deliver to Seller within forty-five (45) Business Days after the Closing Date, a Schedule (the "*Allocation Schedule*") allocating the Purchase Price among the applicable assets as of the beginning of the day after the Closing Date.  The Allocation Schedule shall be binding on the Parties, and the Parties agree not to take (or permit any of their Affiliates to take) any position for any Tax purpose or on any Tax Return (including amended returns and claims for refund) or other information returns that is inconsistent with such Allocation Schedule.

### ARTICLE 12
### TERMINATION

12.1    Termination of Agreement.  Certain of the Parties may terminate this Agreement as provided below:

(a)    Buyer and Seller may terminate this Agreement by mutual written consent at any time prior to the Closing.

(b)    Buyer may terminate this Agreement by giving written notice to Seller at any time prior to the Closing (i) in the event Seller has breached any representation, warranty, or covenant contained in this Agreement which individually, or in the aggregate, would reasonably be expected to result in a failure of the closing conditions set forth in Sections 9.2(a)-9.2(c) of this Agreement, and such breach remains uncured for a period of ten (10) Business Days following delivery of notice thereof by Buyer; *provided, however,* that no cure period will be required for any such breach that by its nature cannot be cured, or (ii) if the Closing shall not have occurred on or before August 15, 2020 (unless the failure results primarily from Buyer breaching any representation, warranty, or covenant contained in this Agreement).

(c)    Seller may terminate this Agreement by giving written notice to Buyer at any time prior to the Closing (i) in the event Buyer has breached any representation, warranty, or covenant contained in this Agreement which individually, or in the aggregate, would reasonably be expected to result in a failure of the closing conditions set forth in Sections 9.2(a)-9.2(c) of this Agreement, and such breach remains uncured for a period of ten (10) Business Days following delivery of notice thereof by Seller; *provided, however,* that no cure period will be required for any such breach that by its nature cannot be cured or (ii) if the Closing shall not have occurred on or before August 15, 2020 (unless the failure results primarily from Seller breaching any representation, warranty, or covenant contained in this Agreement).

(d)    Seller or Buyer may terminate this Agreement by giving written notice to the other Party if (i) all of the conditions set forth in Sections 9.1 and 9.2 have been satisfied (other than those conditions that by their terms are to be satisfied by actions taken at the Closing, but such conditions must be capable of being satisfied if the Closing Date were the date valid notice of termination of this Agreement is delivered by Seller to Buyer), and (ii) the other Party fails to complete Closing within three (3) Business Days of the time set forth in Section 3.1.

(e)    Buyer or Seller may terminate this Agreement by giving written notice to the other Party if the Bankruptcy Court enters an order dismissing the Bankruptcy Cases prior to the approval of the Sale Motion and entry of the Sale Order.

(f)    Buyer or Seller may terminate this Agreement by giving written notice to the other Party if there is in effect a final non-appealable order of a Governmental Authority of competent jurisdiction restraining, enjoining, or otherwise prohibiting the consummation of the transactions described in this Agreement.

(g)    Buyer or Seller may terminate by giving written notice to the other Party, if (i) (1) Seller enters into a definitive agreement with respect to an Alternative Transaction, (2) the Bankruptcy Court enters an order approving an Alternative Transaction, and (3) the Alternative Transaction is consummated; or (ii) the Bankruptcy Court enters an order that precludes the consummation of the transactions contemplated hereby on the terms and conditions set forth in this Agreement.

12.2    Procedure upon Termination.  In the event of termination by Buyer or Seller, or both, pursuant to Section 12.1, written notice thereof will forthwith be given to the other Parties, and this Agreement will terminate, and unless the termination is subject to Section 12.1(c)(i), the Deposit shall be returned to Buyer and the purchase of the Purchased Assets hereunder will be abandoned, without further action by Buyer or Seller.  In the event of a termination pursuant to Section 12.1(c)(i), Seller shall be entitled to keep the Deposit as its sole remedy.

## ARTICLE 13
## MISCELLANEOUS

13.1    No Third-Party Beneficiaries.  Except as specifically provided in this Agreement, this Agreement shall not confer any rights or remedies upon any Person other than the Parties and their respective successors and permitted assigns.

13.2    Entire Agreement.  This Agreement (including the documents referred to herein) constitutes the entire agreement among the Parties and supersedes any prior understandings, agreements, or representations by or among the Parties, written or oral, to the extent they relate in any way to the subject matter hereof.

13.3    Succession and Assignment.  This Agreement shall be binding upon and inure to the benefit of the Parties named herein and their respective successors and permitted assigns.  No Party may assign either this Agreement or any of its rights, interests, or obligations hereunder without the prior written approval of Buyer and Seller; *provided, however,* that Buyer may (a) assign any or all of its rights and interests hereunder to one or more of its Affiliates and designate one or more of its Affiliates to perform its obligations hereunder (in any or all of which cases Buyer nonetheless shall remain responsible for the performance of all of its obligations hereunder), (b) assign its rights under this Agreement for collateral security purposes to any Person providing financing to Buyer, its subsidiaries or Affiliates (including by the granting of Liens in respect of its rights and interests hereunder to any such lenders (and any agent for such lenders)), and the Parties consent to any exercise by such lenders (and such agent) of their rights and remedies with respect to such collateral, or (c) assign its rights under this Agreement to any Person that acquires Buyer or any of its assets.

13.4    Counterparts.  This Agreement may be executed in one or more counterparts, each of which shall be deemed an original but all of which together will constitute one and the same instrument, and shall become effective when one or more such counterparts has been signed by each of the Parties and delivered to the other Parties.  Counterparts may be delivered via facsimile, electronic mail (including portable document format (PDF)) or any electronic signature complying with the U.S. federal ESIGN Act of 2000, e.g., www.docusign.com.

13.5    Titles and Headings.  Titles and section headings contained in this Agreement are inserted for convenience only and shall not affect in any way the meaning or interpretation of this Agreement.

13.6    Notices.  All notices, requests, demands, claims, and other communications hereunder will be in writing.  Any notice, request, demand, claim, or other communication hereunder shall be deemed duly given (a) when delivered personally to the recipient, (b) when sent by electronic mail, on the date of transmission to such recipient, so long as a receipt of such electronic mail or facsimile is requested, (c) one

(1) Business Day after being sent to the recipient by reputable overnight courier service (charges prepaid), or (d) four (4) Business Days after being mailed to the recipient by certified or registered mail, return receipt requested and postage prepaid, and addressed to the intended recipient as set forth below:

| | |
|---|---|
| If to Seller: | Jeoffrey Burtch, Chapter 7 Trustee<br>919 North Market Street, Suite 460<br>P.O. Box 549<br>Wilmington, DE 19801<br>Email: JBurtch@burtchtrustee.com |
| Copy to (which shall not constitute notice): | Mark E. Felger, Esq.<br>Cozen O'Connor<br>1201 N. Market St., Ste. 1001<br>Wilmington, DE 1980<br>Email: mfelger@cozen.com |
| If to Buyer: | Molina Dayal, M.D.<br>Maureen Schulte, M.D.<br>St. Louis Fertility Center<br>555 N. New Ballas Rd., Ste. 150<br>St. Louis, MO 63141<br>Email: molinadayal@yahoo.com<br>Email: maureenschultemd@gmail.com |
| Copy to (which shall not constitute notice): | Andrew J. Voss<br>Matthew S. Layfield<br>Polsinelli PC<br>100 S. Fourth St., Ste. 1000<br>St. Louis, MO 63102<br>Email: avoss@polsinelli.com<br>Email: mlayfield@polsinelli.com |

Any Party may change the address to which notices, requests, demands, claims, and other communications hereunder are to be delivered by giving the other Parties notice in the manner herein set forth.

13.7     Governing Law.  This Agreement and any claim, controversy or dispute arising out of or related to this Agreement, any of the transactions contemplated hereby, the relationship of the Parties, and/or the interpretation and enforcement of the rights and duties of the Parties, whether arising in contract, tort, equity or otherwise, shall be governed by and construed in accordance with the domestic Laws of the State of Delaware (including in respect of the statute of limitations or other limitations period applicable to any such claim, controversy or dispute), without giving effect to any choice or conflict of Law provision or rule (whether of the State of Delaware or any other jurisdiction) that would cause the application of the Laws of any jurisdiction other than the State of Delaware.

13.8     Amendments and Waivers.  No amendment of any provision of this Agreement shall be valid unless the same shall be in writing and signed by Buyer and Seller.  No waiver by any Party of any provision of this Agreement or any default, misrepresentation, or breach of warranty or covenant hereunder, whether intentional or not, shall be valid unless the same shall be in writing and signed by the Party against whom the waiver is to be effective nor shall such waiver be deemed to extend to any prior or subsequent default, misrepresentation, or breach of warranty or covenant hereunder or affect in any way any rights arising by virtue of any prior or subsequent such occurrence.

13.9     Exclusive Remedies.  Each Party agrees that its exclusive remedy for a breach of this Agreement pre-closing shall be to terminate this Agreement subject to Section 9.  Post-Closing the Parties will be entitled to obtain an injunction or injunctions to prevent breaches of the provisions of this Agreement and to enforce specifically this Agreement and its terms and provisions in any action instituted in the Bankruptcy Court without the need to post a bond or other security, subject to Section 13.7 and Section 13.15 in addition to any other remedy to which it may be entitled, at law or in equity.

13.10     Severability.  The provisions of this Agreement will be deemed severable and the invalidity or unenforceability of any provision will not affect the validity or enforceability of the other provisions hereof; *provided, however,* that if any provision of this Agreement, as applied to any Party or to any circumstance, is adjudged by a Governmental Authority or arbitrator not to be enforceable in accordance with its terms, the Parties agree that such Governmental Authority or arbitrator making such determination will have the power to modify the provision in a manner consistent with its objectives such that it is enforceable, or to delete specific words or phrases, and in its reduced form, such provision will then be enforceable and will be enforced.

13.11     Expenses.  Except as otherwise expressly provided in this Agreement, each Party will bear its own costs and expenses (including legal fees and expenses) incurred in connection with this Agreement and the transactions contemplated hereby.

13.12     Construction.  The Parties have participated jointly in the negotiation and drafting of this Agreement.  In the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as if drafted jointly by the Parties and no presumption or burden of proof shall arise favoring or disfavoring any Party by virtue of the authorship of any of the provisions of this Agreement.  Any reference to any Law shall be deemed also to refer to all rules and regulations promulgated thereunder, unless the context requires otherwise.  References in this Agreement to any gender include references to all genders, and references to the singular include references to the plural and vice versa.  The words "include," "includes" and "including" when used in this Agreement shall be deemed to be followed by the phrase "without limitation" or "but not limited to."  Unless the context otherwise requires, references in this Agreement to Articles, Sections, Schedules and Exhibits shall be deemed references to Articles and Sections of, and Schedules and Exhibits to, this Agreement.  Unless the context otherwise requires, the words "hereof," "hereby" and "herein" and words of similar meaning when used in this Agreement refer to this Agreement in its entirety and not to any particular Article, Section or provision of this Agreement. When calculating the period of time before which, within which or following which any act is to be done or any step taken pursuant to this Agreement, the date that is the reference date in calculating such period shall not be calculated as the first day of such period of time.  If the last day of such period is a non-Business Day, the period in question shall end on the next succeeding Business Day.

13.13     Incorporation of Exhibits.  The Exhibits and Schedules identified in this Agreement are incorporated herein by reference and made a part hereof.

13.14     Waiver of Jury Trial.  EACH OF THE PARTIES WAIVES THEIR RESPECTIVE RIGHTS TO A TRIAL BY JURY OF ANY CLAIM OR CAUSE OF ACTION BASED UPON OR ARISING OUT OR RELATED TO THIS AGREEMENT, OR THE TRANSACTIONS CONTEMPLATED HEREBY OR IN ANY ACTION, PROCEEDING OR OTHER LITIGATION OF ANY TYPE BROUGHT BY ANY OF THE PARTIES AGAINST ANY OTHER PARTY OR ANY AFFILIATE OF ANY OTHER SUCH PARTY, WHETHER WITH RESPECT TO CONTRACT CLAIMS, TORT CLAIMS OR OTHERWISE.  THE PARTIES AGREE THAT ANY SUCH CLAIM OR CAUSE OF ACTION SHALL BE TRIED BY A COURT TRIAL WITHOUT A JURY.  WITHOUT LIMITING THE FOREGOING, THE PARTIES FURTHER AGREE THAT THEIR RESPECTIVE RIGHT TO A TRIAL BY JURY IS WAIVED BY OPERATION OF THIS SECTION AS TO ANY ACTION, COUNTERCLAIM OR OTHER PROCEEDING WHICH SEEKS, IN WHOLE OR IN PART,

TO CHALLENGE THE VALIDITY OR ENFORCEABILITY OF THIS AGREEMENT OR ANY PROVISION HEREOF. THIS WAIVER SHALL APPLY TO ANY SUBSEQUENT AMENDMENTS, RENEWALS, SUPPLEMENTS OR MODIFICATIONS TO THIS AGREEMENT.

13.15 Exclusive Venue. THE PARTIES AGREE THAT ALL DISPUTES, LEGAL ACTIONS, SUITS AND PROCEEDINGS ARISING OUT OF OR RELATING TO THIS AGREEMENT MUST BE BROUGHT EXCLUSIVELY IN THE BANKRUPTCY COURT. EACH PARTY HEREBY CONSENTS AND SUBMITS TO THE EXCLUSIVE JURISDICTION OF THE BANKRUPTCY COURT. NO LEGAL ACTION, SUIT OR PROCEEDING WITH RESPECT TO THIS AGREEMENT MAY BE BROUGHT IN ANY OTHER FORUM. EACH PARTY HEREBY IRREVOCABLY WAIVES ALL CLAIMS OF IMMUNITY FROM JURISDICTION AND ANY OBJECTION WHICH SUCH PARTY MAY NOW OR HEREAFTER HAVE TO THE LAYING OF VENUE OF ANY SUIT, ACTION OR PROCEEDING IN THE BANKRUPTCY COURT, INCLUDING ANY RIGHT TO OBJECT ON THE BASIS THAT ANY DISPUTE, ACTION, SUIT OR PROCEEDING BROUGHT IN THE BANKRUPTCY COURT HAS BEEN BROUGHT IN AN IMPROPER OR INCONVENIENT FORUM OR VENUE. EACH OF THE PARTIES ALSO AGREES THAT DELIVERY OF ANY PROCESS, SUMMONS, NOTICE OR OTHER DOCUMENT TO A PARTY HEREOF IN COMPLIANCE WITH SECTION 13.6 OF THIS AGREEMENT SHALL BE EFFECTIVE SERVICE OF PROCESS FOR ANY ACTION, SUIT OR PROCEEDING IN THE BANKRUPTCY COURT WITH RESPECT TO ANY MATTERS TO WHICH THE PARTIES HAVE SUBMITTED TO JURISDICTION AS SET FORTH ABOVE.

*[Remainder of Page Intentionally Left Blank]*

IN WITNESS WHEREOF, the Parties hereto have executed this Asset Purchase Agreement as of the date first above written.

BUYER:

**STLFertility, LLC**

By:_____

Name:_____

Title:_____

SELLER:

_____

Jeoffrey L. Burtch, in his capacity as Chapter 7 Trustee for the Estates of IntegraMed Holding Corp., IntegraMed America, Inc., Trellis Health, LLC, IntegraMed Fertility Holding Corp., Reproductive Partners, Inc., IntegraMed Management of Bridgeport, LLC, IntegraMed Florida Holdings, LLC, IntegraMed Management of Mobile, LLC, IntegraMed Management, LLC, and IntegraMed Medical Missouri, LLC

**Schedule 2.1(b)**

**LEASEHOLD INTERESTS**

Office Lease between Plaza Members III, L.L.C and Sher Institute for Reproductive Medicine St. Louis, LLC, dated July 23, 2010, as amended and assigned pursuant to that certain Assignment and Assumption of Lease among Sher Institute for Reproductive Medicine St. Louis, LLC, IntegraMed Management, LLC and IntegraMed America, Inc.; and as assigned pursuant to that certain Assignment and Assumption of Lease between IntegraMed Management, LLC and IntegraMed America, Inc., dated December 17, 2018.

**Schedule 2.1(c)**

**TANGIBLE PERSONAL PROPERTY**

| Date Placed in Service | Asset Name |
|---|---|
| 3/1/2016 | Lifeline inv. 17580 annual service contract  2/1/16 - 2/1/17 |
| 1/1/2017 | MISYS Maintenance 11/2016 - 10/2017 |
| 3/1/2017 | COLLEGE OF AMERICAN PATHOLOGISTS LAB ACCREDITATION 3/17-2/18 |
| 5/1/2017 | Medallia subscription 05/17-12/17 |
| 6/1/2017 | Medallia implementation |
| 9/1/2017 | Microstrategy licenses 07/17-06/18 |
| 9/1/2017 | Lifeline biomedical annual service contract through 7/18 |
| 10/1/2017 | DR Witten Tail Policy (10/17-12/17) |
| 12/1/2017 | Salesforce licenses 10/17-9/18 |
| 1/1/2018 | Medallia annual subscription fee 1/18-12/18 |
| 3/1/2018 | Service contract for MRI machines - 2018 |
| 4/1/2018 | COLLEGE OF AMERICAN PATHOLIGISTS |
| 4/1/2018 | LIEBERMAN RESEARCH WORLDWIDE |
| 6/1/2018 | Data Innovations IT Allocation |
| 6/1/2018 | Stericycle Medical waste |
| 7/1/2018 | MicroStrategy License 7/18-6/19 |
| 7/1/2018 | Brighthouse Life Ins. 7/18-7/19 |
| 8/1/2018 | St. Louis Magazine 8/2018 |
| 11/1/2018 | CLIA Lab Fees 9/26/18-9/25/20 |
| 1/1/2019 | College of American Pathologists 1/19 - 12/19 |
| 1/1/2019 | Compliance Control 04/01/2018 - 03/31/2019 |
| 2/1/2019 | Lifeline Biomedical annual service 1/1/19 - 12/31/19 |
| 4/1/2019 | College of American Pathologists 3/19 - 2/20 |
| 4/1/2019 | Stericycle - 04.19 |
| 4/1/2019 | TIAA Commercial - 04.19 |
| 5/1/2019 | Barry Witten Disability Insurance 4/19 - 6/19 |
| 5/1/2019 | Stericycle - 05.19 |
| 6/1/2019 | Stericycle - 06.19 |
| 7/1/2019 | Barry Witten Disability Insurance 7/19 - 9/19 |
| 7/1/2019 | Stericycle - 07.19 |
| 8/1/2019 | Brighthouse Life Ins. 7/19 - 6/20 |
| 8/1/2019 | St. Louis Magazine annual ad 7/19 - 7/20 |
| 8/1/2019 | Stericycle - 08.19 |
| 10/1/2019 | Barry Witten Disability Insurance 10/19-12/19 |
| 1/1/2020 | CLIA Lab Fees 1/15/20-1/14/22 |
| 2/1/2020 | Barry Witten Disability Insurance 01/2020 - 03/2020 |
| 2/1/2020 | Prudential Life Ins. 1/2020 - 12/2020 |
| 3/1/2020 | College of American Pathologists 3/2020 - 2/2021 |
| 3/1/2020 | Lifeline Biomedical annual PM 1/2020 - 12/2020 |
| 4/1/2020 | Barry Witten Disability Insurance 04/2020 - 06/2020 |

| | | |
|---|---|---|
| 11/1/2016 | Licenses inv. 09046737 10/12/16 - 10/11/17 | |
| 10/1/2017 | Dr. Witten Salary Advance Per Contract | |

| | | |
|---|---|---|
| 5/1/2014 | 000001 Furnishings and Equipment - Purchase Price at NBV 2 | |
| 12/1/2015 | 000015 Vonage Business - 19 Polycom VVX 410 phones and 3 Expansion Modules | |
| 5/1/2018 | Office Furniture-AMEX | |

| | | |
|---|---|---|
| 5/1/2014 | 000002 Medical Equipment - Purchase Price at NBV | |
| 3/1/2015 | 000010 Esco - 4 Miri Multi-Room incubators and one CO2 & O2 Analyzer | |
| 3/1/2015 | 000011 Esco - Stacking Frames for Miri incubators | |
| 9/1/2015 | 000012 ZAND-AIR - 100C Air Purifier, photo-catalytic oxidation system | |
| 9/1/2015 | 000013 LifeGlobal - One ProPump Single 115V Aspiration Pump | |
| 7/1/2016 | 000021 Nikon Instruments inv. 97830068 | |
| 7/1/2016 | 000022 COMPLIANCE CONTROL inv. 42508 - CRYO MONITORING SYSTEM | |
| 11/1/2016 | 000023 ORIGIO inv. 42285 | |
| 2/1/2017 | IMMUNOASSAY ANALYZER CREDIT | |
| 4/1/2017 | Canisters / Med Equip | |
| 9/1/2017 | Anexeon medical equipment | |
| 10/1/2017 | Anexeon Credit | |
| 11/1/2017 | Procedure Chair | |
| 2/1/2018 | 000017 Origio inv. 4090437 Gas switching device | |
| 2/1/2018 | Ventilator and monitor | |
| 1/1/2019 | Hologic Inc Hysteroscopy Equipment - SIRM IL Asset Transfer | |
| 1/1/2019 | LifeLine Biomedical Procedure Table/Chair - SIRM IL Asset Transfer | |
| 1/1/2019 | McKesson Equipment - SIRM IL Asset Transfer | |
| 1/1/2019 | Vitrolife Embryo Scope | |

| | | |
|---|---|---|
| 5/1/2014 | 000003 Computer Equipment - Purchase Price at NBV | |
| 7/1/2014 | 000004 Anexeon - 10 computers / 10 Monitors | |
| 7/1/2014 | 000006 1 Optiplex 390 desktop computer w/23" ACER monitor | |
| 12/1/2014 | 000007 iCORE Networks - computer network equipment | |
| 12/1/2014 | 000008 Anexeon - one Optiplex 3020 3GHz desktop computer | |
| 2/1/2015 | 000009 iCORE Networks - computer equipment | |
| 10/1/2015 | 000014 Anexeon - One Lenovo ThinkPad X1 Carbon 14" LED Ultrabook computer | |
| 4/1/2016 | 000020 Dell Latitude notebook (Anexeon inv. 22650) | |
| 11/1/2016 | 000024 Anexeon, LLC inv. | |
| 1/1/2017 | 000025 Anexeon, LLC inv. | |
| 10/1/2018 | Anexeon Notebook | |
| 1/1/2019 | Anexeon Dell Latitude - SIRM IL Asset Transfer | |

| | | |
|---|---|---|
| 3/1/2020 | Vitrolife Guided Annotation Software | |

| | | |
|---|---|---|
| 5/1/2014 | 000005 Leasehold Improvements - Purchase Price at NBV | |
| 6/1/2018 | Land Dynamics Construction Work | |

**Schedule 2.1(f)**

**INTANGIBLE PROPERTY**

https://stlouisfertilitycenter.com

https://www.facebook.com/sirmstl/

Practice's Instagram page



**Schedule 2.1(h)**

**ASSIGNED CONTRACTS**

| | Contract | Assumed Cure Amount |
|---|---|---|
| 1. | Office Lease between Plaza Members III, L.L.C and Sher Institute for Reproductive Medicine St. Louis, LLC, dated July 23, 2010, as amended and assigned pursuant to that certain Assignment and Assumption of Lease among Sher Institute for Reproductive Medicine St. Louis, LLC, IntegraMed Management, LLC and IntegraMed America, Inc.; and as assigned pursuant to that certain Assignment and Assumption of Lease between IntegraMed Management, LLC and IntegraMed America, Inc., dated December 17, 2018. | Outstanding work orders (2) - $28.75, $35.43<br><br>Rent – May, $,9,322.92; April, $9,322.92; March<br><br>Operating expenses – $0 |
| 2. | Provider Group Services Agreement between Cigna HealthCare of St. Louis, Inc. and IntegraMed Medical Missouri, LLC, dated August 1, 2017. | $0 |
| 3. | Coventry Health Care Participating Physician Agreement between Coventry Health Care of Missouri, Inc. and Molina Dayal, dated August 6, 2013. | $0 |
| 4. | Mercy PHO Contract Update Aetna/Coventry between Molina Dayal and Mercy PHO, dated May 3, 2018. | $0 |
| 5. | Physician Agreement between Aetna Health, Inc. and Molina Dayal, M.D., dated March 1, 2013. | $0 |
| 6. | Provider Agreement between RightCHOICE Managed Care, Inc. and Molina Dayal, dated March 26, 2013. | $0 |
| 7. | Provider Agreement between RightCHOICE Managed Care, Inc. and Molina Dayal, dated April 11, 2014. | $0 |
| 8. | Provider Services Agreement between Cigna HealthCare of St. Louis, Inc. and Molina Dayal, dated 2013. | $0 |
| 9. | Participating Group Agreement between HealthLink, Inc. and Sher Institute for Reproductive Medicine St. Louis, dated May 23, 2013, as assigned to IntegraMed Medical Missouri, LLC per that certain Letter Agreement, dated March 26, 2014. | $0 |
| 10. | Provider Agreement between RightCHOICE Managed Care, Inc. and Barry Witten, dated May 13, 2015. | $0 |
| 11. | Provider Agreement between RightCHOICE Managed Care, Inc. and Barry Witten, dated April 15, 2014. | $0 |
| 12. | Provider Agreement between RightCHOICE Managed Care, Inc. and Berold I Witten, MD, dated May 15, 2014. | $0 |
| 13. | Participating Group Agreement between HealthLink, Inc. and Sher Institute for Reproductive Medicine St. Louis, dated May 23, 2013. | $0 |
| 15. | Equipment Lease between IntegraMed America, Inc. and GE HFS, LLC, dated September 23, 2016. | Feb – $842.49<br>Mar – $858.51<br>April – $858.81 |
| 16. | Equipment Lease between IntegraMed America, Inc. and GE HFS, LLC, dated March 20, 2018. | May – $302.64<br>April – $302.64<br>Mar – $1,969.51<br>Mar – $3,781.47 |
| 17. | Equipment Lease between IntegraMed Medical Missouri, LLC and Block Imaging International, Inc., dated July 9, 2019. | May - $1,529.00<br>April - $1,529.00 |
| 18. | Service Contract w/ Anexeon LLC | May – $2,582.19<br>April – $2,582.19 |
| 19. | Service Contract between Sher Institute and Faultless Linen, dated August 8, 2017. | $503.10 |

| | Contract | Assumed Cure Amount |
|---|---|---|
| 20. | Equipment lease between IntegraMed America Inc. and Konica Minolta Premier Finance, dated December 26, 2017. | Oct – $1,246.10 <br> Mar – $825.43 <br> Apr – $380.70 |
| 21. | Equipment/Reagent Lease between Sher Institute of Reproductive Medicine and Roche Diagnostics Corporation, amendment dated January 20, 2017, original dated February 11, 2015. | Mar – $752.00 <br> Mar – $6,579.57 <br> April - $752.00 |
| 22. | Equipment lease between SIRM St. Louis and Pitney Bowes, dated October 10, 2016. (?) | Mar - $369.00 |
| 23. | Equipment/Service Lease between Sher Institute and Griesedeck Vending Services, dated January 17, 2011. | April – $37.70 <br> May (2) – $37.70, $37.70 |
| 24. | Maintenance Agreement between Sher Institute and Mike's Inc. (generator service), dated November 5, 2010. | $0 |
| 25. | Medical Waste Disposal Agreement between IntegraMed and Stericycle, dated January 11, 2017. | $1,564.79 |
| 26. | Service Agreement between TempGenius (wireless environmental monitoring) and Sher Fertility Institute, dated January 11, 2016. | $0 |
| 27. | Equipment lease with Vitrolife (embryoscope) | Mar – $2,936.60 <br> Apr – $2,291.70 <br> May – $1,179.80 |
| 28. | Service Contract between Sher Institute for Reproductive Medicine and Pipe Systems Mechanical, dated February 4, 2014. | $0 |
| 29. | Participating Group Agreement between SIRM St. Louis and Progyny, with effective date of February 20, 2020. | $0 |
| 30. | Physician Contract between UnitedHealthcare Insurance Company and Maureen Schulte, MD, dated July, 2019. | $0 |
| 31. | Provider Agreement between Anthem BCBS and Molina Dayal, MD. | $0 |
| 32. | Provider Agreement between Anthem BCBS and Maureen Schulte, MD. | $0 |
| 33. | Physician Contract between UnitedHealthcare Insurance Company and Molina Dayal, MD. | $0 |
| 34. | Pharmaceutical Contract Alliance | $0 |

# Exhibit A

## PATIENT DEPOSITS

**Sher**
**Month End Credit Bal Line Item**
**Line Item**

6/02/20 12:16 PM                                                      As of 5/20/2020

| | 0-30 | 31-60 | 61-90 | 91-120 | 121-150 | 151-180 | 181-up | Ln Itm Amt |
|---|---|---|---|---|---|---|---|---|
| Totals for Accounts Receivable | -$57,794.47 | -$9,111.47 | -$92,004.95 | -$33,685.96 | -$27,397.44 | -$24,289.70 | -$48,036.43 | ($292,320.42) |
| TOTALS | -$57,794.47 | -$9,111.47 | -$92,004.95 | -$33,685.96 | -$27,397.44 | -$24,289.70 | -$48,036.43 | ($292,320.42) |

**Exhibit B**

**MISSOURI ATTAIN FINANCIAL LIABILITIES**

See attached.

| LATEST TREATMENT PERFORMED | LATEST OUTCOME | EMBRYOS REMAINING | LATEST OUTCOME DATE | PROGRAM_FEES | MEDICATION PROGRAM FEES | TOTAL PRACTICE PAYMENTS | RECOG_REV | DEFERRED REVENUE | REVENUE CATEGORY |
|---|---|---|---|---|---|---|---|---|---|
| FET with Assist | Not Pregnant | 1 | 5/18/2018 | 17050 | 0 | 9489.6 | 8507.95 | 8542.05 | ASC 605 |
| IVF with IVF Assist | Not Pregnant - No Transfer | 0 | 1/30/2018 | 17050 | 0 | 6559.2 | 6427.85 | 10622.15 | ASC 605 |
| IVF with IVF Assist | Not Pregnant - Miscarried | 3 | 1/23/2019 | 23000 | 0 | 14634.85 | 17342 | 5658 | ASC 605 |
| IVF with IVF Assist | Not Pregnant - Freeze All | 3 | 5/14/2018 | 17800 | 0 | 12638.7 | 13403.4 | 4396.6 | ASC 605 |
| FET | Not Pregnant | 2 | 4/25/2019 | 18950 | 0 | 18500.5 | 18950 | 0 | ASC 605 |
| IVF with IVF Assist | Not Pregnant - Freeze All | 8 | 4/21/2020 | 18000 | 0 | 19052.55 | 18000 | 0 | ASC 605 |
| FET | Not Pregnant | 2 | 3/6/2019 | 22100 | 0 | 11672 | 0 | 22100 | ASC 605 |
| FET with Assist | Pregnant | 6 | 3/4/2019 | 22300 | 0 | 14976.15 | 16265.62 | 6034.38 | ASC 605 |
| FET | Not Pregnant | 5 | 9/12/2019 | 18900 | 0 | 15855 | 16575.3 | 2324.7 | ASC 605 |
| IVF/Freeze All | Not Pregnant - Freeze All | 8 | 3/4/2020 | 20200 | 0 | 8088 | 7405.32 | 12794.68 | ASC606 |
| NA | NA | NA | NA | 18400 | 0 | 0 | 13420.96 | 4979.04 | ASC606 |
| IVF with IVF Assist | Not Pregnant - No Transfer | 1 | 12/3/2019 | 29800 | 0 | 13809.35 | 23279.76 | 22620.24 | ASC606 |
| IVF with PGD/PGS Biopsy | Not Pregnant - Freeze All | 3 | 3/5/2020 | 25500 | 0 | 16834.5 | 18599.7 | 6900.3 | ASC606 |
| IVF with PGD/PGS Biopsy with IVF Assist | Not Pregnant - Freeze All | 0 | 5/23/2019 | 23400 | 0 | 15370 | 22113 | 1287 | ASC606 |
| IVF with PGD/PGS Biopsy | Not Pregnant - Freeze All | 9 | 11/25/2019 | 24505.5 | 0 | 20090.5 | 20770.86 | 3734.6382 | ASC606 |
| IVF with PGD/PGS Biopsy | Not Pregnant - Freeze All | 1 | 2/25/2020 | 25500 | 0 | 9288 | 14976.15 | 10523.85 | ASC606 |
| IVF | Not Pregnant - No Transfer | 0 | 3/4/2020 | 25500 | 16000 | 15209.5 | 18599.7 | 6900.3 | ASC606 |
| FET | Not Pregnant | 0 | 10/2/2019 | 23005 | 0 | 19480 | 21090.98 | 1914.016 | ASC606 |
| FET | Pregnant | 1 | 10/2/2019 | 25500 | 0 | 22616 | 23804.25 | 1695.75 | ASC606 |
| IVF | Not Pregnant - No Transfer | 0 | 2/19/2019 | 21022.2 | 0 | 8088 | 10260.94 | 25261.26418 | ASC606 |
| IVF with PGD/PGS Biopsy with IVF Assist | Not Pregnant - Freeze All | 10 | 3/4/2020 | 21300 | 14500 | 15370 | 12509.49 | 8790.51 | ASC606 |
| IVF with PGD/PGS Biopsy | Not Pregnant - Freeze All | 2 | 1/13/2020 | 25500 | 0 | 16834.5 | 19920.6 | 5579.4 | ASC606 |
| FET | Pregnant | 3 | 11/25/2019 | 22100 | 0 | 15816 | 18104.32 | 3995.68 | ASC606 |
| NA | NA | NA | NA | 24505.5 | 0 | 0 | 22466.64 | 2038.8576 | ASC606 |
| IVF with PGD/PGS Biopsy with IVF Assist | Not Pregnant - Freeze All | 6 | 3/9/2020 | 21300 | 0 | 8480 | 7808.58 | 13491.42 | ASC606 |
| IVF with PGD/PGS Biopsy with IVF Assist | Not Pregnant - Freeze All | 3 | 2/25/2020 | 21300 | 0 | 8480 | 12509.49 | 8790.51 | ASC606 |
| FET | Pregnant | 1 | 2/25/2020 | 23200 | 0 | 16464 | 18123.84 | 5076.16 | ASC606 |
| IVF with IVF Assist | Pregnant | 5 | 12/18/2019 | 19123.9 | 0 | 17538.25 | 17532.79 | 1591.10848 | ASC606 |
| FET | Pregnant | 12 | 12/18/2019 | 23300 | 0 | 17016 | 19087.36 | 4212.64 | ASC606 |
| FET | Not Pregnant | 6 | 4/21/2020 | 20200 | 0 | 21972.5 | 18856.7 | 1343.3 | ASC606 |
| FET | Pregnant | 8 | 4/21/2020 | 23200 | 0 | 25872 | 19664.32 | 3535.68 | ASC606 |
| FET | Not Pregnant - Biochemical | 1 | 10/2/2019 | 20000 | 0 | 13800 | 17924 | 2076 | ASC606 |
| NA | NA | NA | NA | 32500 | 0 | 0 | 30712.5 | 17887.5 | ASC606 |
| FET with Assist | Not Pregnant | 7 | 4/21/2020 | 21300 | 0 | 11410.4 | 15536.22 | 5763.78 | ASC606 |
| IVF with PGD/PGS Biopsy | Not Pregnant - Freeze All | 21 | 10/18/2019 | 22295.2 | 0 | 9288 | 16262.12 | 6033.08112 | ASC606 |
| FET | Pregnant | 12 | 4/21/2020 | 18900 | 0 | 13839 | 12570.39 | 6329.61 | ASC606 |
| NA | NA | NA | NA | 22100 | 0 | 0 | 16119.74 | 5980.26 | ASC606 |
| IVF/Freeze All | Not Pregnant - Freeze All | 14 | 4/21/2020 | 23300 | 0 | 8088 | 5321.72 | 17978.28 | ASC606 |
| FET | Pregnant | 10 | 4/21/2020 | 18900 | 0 | 13839 | 11099.97 | 7800.03 | ASC606 |
| NA | NA | NA | NA | 21200 | 0 | 0 | 19436.16 | 1763.84 | ASC606 |
| IVF with PGD/PGS Biopsy | Not Pregnant - Freeze All | 0 | 7/2/2019 | 24798 | 0 | 16834.5 | 22734.81 | 2063.1936 | ASC606 |
| FET | Not Pregnant | 5 | 1/6/2020 | 18900 | 0 | 10544 | 13785.66 | 5114.34 | ASC606 |
| IVF | Not Pregnant - No Transfer | 1 | 4/28/2020 | 23200 | 0 | 9288 | 13625.36 | 9574.64 | ASC606 |
| FET | Pregnant | 9 | 3/4/2020 | 22420 | 0 | 16464 | 13167.27 | 9252.734 | ASC606 |
| IVF with PGD/PGS Biopsy | Not Pregnant - Freeze All | 5 | 4/21/2020 | 24400 | 0 | 9288 | 5572.96 | 18827.04 | ASC606 |
| IVF with PGD/PGS Biopsy with IVF Assist | Not Pregnant - Freeze All | 3 | 4/21/2020 | 23400 | 0 | 15370 | 8578.44 | 14821.56 | ASC606 |
| NA | NA | NA | NA | 26700 | 0 | 0 | 17758.17 | 8941.83 | ASC606 |
| IVF with IVF Assist | Not Pregnant | 4 | 10/2/2019 | 17000 | 0 | 8878.4 | 13280.4 | 3719.6 | ASC606 |
| IVF | Not Pregnant - No Transfer | 0 | 10/2/2019 | 22200 | 0 | 13209.5 | 18921.06 | 3278.94 | ASC606 |
| FET | Pregnant | 4 | 7/2/2019 | 23200 | 0 | 16464 | 21269.76 | 1930.24 | ASC606 |
| FET | Pregnant | 1 | 4/21/2020 | 23200 | 0 | 16464 | 16922.08 | 6277.92 | ASC606 |
| IVF with PGD/PGS Biopsy | Not Pregnant - Freeze All | 13 | 11/25/2019 | 25500 | 0 | 9288 | 16960.05 | 8539.95 | ASC606 |
| NA | NA | NA | NA | 23200 | 0 | 0 | 5298.88 | 17901.12 | ASC606 |
| IVF with PGD/PGS Biopsy | Not Pregnant - Freeze All | 10 | 4/21/2020 | 24505.5 | 0 | 22639.5 | 19143.7 | 5361.8034 | ASC606 |
| IVF with PGD/PGS Biopsy with IVF Assist | Not Pregnant - Freeze All | 17 | 1/31/2020 | 21300 | 0 | 8480 | 10396.53 | 10903.47 | ASC606 |
| IVF/Freeze All | Not Pregnant - Freeze All | 1 | 5/23/2019 | 22200 | 0 | 8088 | 20352.96 | 1847.04 | ASC606 |
| FET | Not Pregnant | 0 | 2/18/2020 | 22420 | 9500 | 12544 | 19108.57 | 3311.434 | ASC606 |
| IVF with PGD/PGS Biopsy with IVF Assist | Not Pregnant - Freeze All | 2 | 4/21/2020 | 23400 | 0 | 8480 | 5344.56 | 18055.44 | ASC606 |
| FET | Pregnant | 3 | 2/25/2020 | 18162.9 | 0 | 13839 | 12080.14 | 6082.75521 | ASC606 |
| IVF with PGD/PGS Biopsy | Not Pregnant - Freeze All | 7 | 2/3/2020 | 23200 | 0 | 16834.5 | 13625.36 | 9574.64 | ASC606 |

**Exhibit C**

## MUTUAL RELEASE AND COVENANT NOT TO SUE

This Mutual Release and Covenant Not to Sue (the "Release") is made by and among Jeoffrey L. Burtch, in his capacity as Chapter 7 Trustee for the Estates of IntegraMed Holding Corp., IntegraMed America, Inc., Trellis Health, LLC, IntegraMed Fertility Holding Corp., Reproductive Partners, Inc., IntegraMed Management of Bridgeport, LLC, IntegraMed Florida Holdings, LLC, IntegraMed Management of Mobile, LLC, IntegraMed Management, LLC, and IntegraMed Medical Missouri, LLC (collectively, "Seller"), and Molina Dayal, M.D., Maureen Schulte, M.D., and STLFertility, LLC (collectively, "Buyer") (collectively, the "Parties").

## PRELIMINARY STATEMENTS

WHEREAS, as of the ___ day of July, 2020, Buyer and Seller have entered into that certain Asset and Equity Purchase Agreement (the "Purchase Agreement");

WHEREAS, a condition precedent of the Purchase Agreement is the full execution and delivery of this Release;

WHEREAS, the Parties desire to settle all claims and issues that have, or could have been raised, in relation to their prior dealings, transactions and occurrences, on the terms set forth below.

THEREFORE, in consideration of the promises and agreements set forth below, and each of their performance and delivery of the Purchase Agreement, the sufficiency of which consideration is hereby acknowledged, the Parties agree as follows:

1. GENERAL RELEASE. The Parties hereby unconditionally, irrevocably and absolutely release and discharge one another from the Released Claims. "Released Claims" means, other than the Excluded Claims set forth in Section 2 hereof, any and all claims that exist or may exist as of the Closing, related in any way to the transactions or occurrences or prior relationships (whether employment, ownership or otherwise) between the Parties including, without limitation, any claims related to the Stipulation as defined in the Purchase Agreement, all to the fullest extent permitted by law, including, but not limited to, any and all other losses, liabilities, claims, charges, demands and causes of action, known or unknown, suspected or unsuspected, arising directly or indirectly out of or in any way connected with the transactions or occurrences or prior relationships between them.

2. RELEASE BY AND AMONG SELLERS AND INTEGRAMED MEDICAL MISSOURI, LLC. All of the Sellers except IntegraMed Medical Missouri, LLC (collectively, excluding IntegraMed Medical Missouri, LLC, the "Other Sellers"), on the one hand, and IntegraMed Medical Missouri, LLC ("IMM"), on the other, hereby unconditionally, irrevocably and absolutely release and discharge one another from the Released Claims.

3. EXCLUDED CLAIMS; PURCHASE AGREEMENT. The Released Claims shall not include any claims, obligations, covenants or responsibilities that the Parties may have under the Purchase Agreement, including without limitation, any rights of the Practice or the Company which are related to the rights of Buyer under the Purchase Agreement or necessary to give effect to the rights of Buyer under the Purchase Agreement (collectively, all of the foregoing being the "Excluded Claims").

4. COVENANT NOT TO SUE. The Parties acknowledge that this Release is intended to end all divisions or disagreements between them, and accordingly, the Parties covenant that they will not, hereafter, bring any claim, action, cause of action of any kind in law, equity, or by arbitration against any other party for the Released Claims.

IN WITNESS WHEREOF, the Parties have entered into this Release as of the date first set forth above.

BUYER:

By:_____ _____
Name:_____
Title:_____

SELLER:

_____ _____
Jeoffrey L. Burtch, in his capacity as Chapter 7 Trustee for the Estates of IntegraMed Holding Corp., IntegraMed America, Inc., Trellis Health, LLC, IntegraMed Fertility Holding Corp., Reproductive Partners, Inc., IntegraMed Management of Bridgeport, LLC, IntegraMed Florida Holdings, LLC, IntegraMed Management of Mobile, LLC, IntegraMed Management, LLC, and IntegraMed Medical Missouri, LLC

**Exhibit D**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 7 |
| | ) | |
| INTEGRAMED HOLDING CORP., *et al.*,[1] | ) | Case No. 20-11169 (LSS) |
| | ) | |
| | ) | (Jointly Administered) |
| Debtors. | ) | |
| | ) | RE: Docket No. 35 |

## ORDER (A) APPROVING THE SALE OF CERTAIN OF THE ESTATES' ASSETS, (B) AUTHORIZING THE ASSUMPTION AND ASSIGNMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES, AND (C) GRANTING CERTAIN RELATED RELIEF

This matter is before the Court on the *Trustee's Motion for Entry of (I) an Order (A) Approving Bidding Procedures in Connection With Sale of Substantially all of the Estates' Assets, (B) Scheduling an Auction and Hearing to Consider the Proposed Sale, and (C) Approving the Form and Manner of Notice Thereof; and (II) an Order (A) Approving the Sale, (B) Authorizing the Assumption and Assignment of Executory Contracts and Unexpired Leases, and (C) Granting Certain Related Relief* (the "Sale Motion") [D.I. 35],[2] seeking, among other things: (a) approval of the asset and equity purchase agreement (the "Purchase Agreement"), attached hereto as Exhibit A; (b) authority to sell the Purchased Assets as defined and set forth in the Purchase Agreement free and clear of Liens (as defined below), Claims (as defined below), and other interests, (c)

---

[1] The Debtors in these cases are the following entities (the respective case numbers for each estate follows in parentheses): IntegraMed Holding Corp. (20-11169 LSS), IntegraMed America, Inc. (20-11170 LSS), Trellis Health, LLC (20-11171 LSS), IntegraMed Fertility Holding Corp. (20-11172 LSS), Reproductive Partners, Inc. (20-11173 LSS), IntegraMed Management of Bridgeport, LLC (20-11175 LSS), IntegraMed Florida Holdings, LLC (20-11176 LSS), IntegraMed Management of Mobile, LLC (20-11179 LSS), IntegraMed Management, LLC (20-11181 LSS), and IntegraMed Medical Missouri, LLC (20-11184 LSS).

[2] Unless otherwise defined in this Order, all capitalized terms shall have the meanings provided in the Purchase Agreement and the Sale Motion (as, and only to the extent, applicable to the Purchase Agreement and the transactions set out therein), and to the extent of any inconsistency, the Purchase Agreement shall govern. References to the Sale Motion in this Order shall be interpreted to mean the Sale Motion as, and only to the extent, that it relates to the Purchase Agreement and the transactions set out therein.

authority to assume and assign the Contracts identified as Purchased Assets in the Purchase Agreement (the "Assigned Contracts") to the Purchaser, and (d) related relief; and the Trustee having determined, after an extensive marketing process, that STLFertility, LLC (the "Purchaser") has submitted the highest and best bid for the Purchased Assets (as defined in the Purchase Agreement); and adequate and sufficient notice of the Purchase Agreement and all transactions contemplated thereunder and in this Order having been given and all interested parties having been afforded an opportunity to be heard with respect to the Sale Motion and all relief related thereto; and the Court having reviewed and considered the Sale Motion and all relief related thereto, and having held a hearing regarding the Sale Motion on July 23, 2020 (the "Sale Hearing"); and it appearing that the Court has jurisdiction over this matter; and it further appearing that the legal and factual bases set forth in the Sale Motion and at the Sale Hearing establish just cause for the relief granted herein; and after due deliberation; and good and sufficient cause appearing,

**THE COURT HEREBY FINDS AND DETERMINES THAT:**[3]

**Jurisdiction, Final Order, and Statutory Predicates**

A.      This Court has jurisdiction to hear and determine the Sale Motion pursuant to 28 U.S.C. § 1334(a).  This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A), (N), and (O). Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

B.      The statutory predicates for the relief requested in the Sale Motion are sections 105(a), 363, and 365 of the Bankruptcy Code, and Bankruptcy Rules 2002(a)(2), 6004, 6006, 9007, and 9014.

---

[3]These findings and conclusions constitute the Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to this proceeding pursuant to Bankruptcy Rule 9014. All findings of fact and conclusions of law announced by the Court at the Sale Hearing in relation to the Sale Motion are hereby incorporated herein to the extent not inconsistent herewith. To the extent that any of the following findings of fact constitute conclusions of law, they are adopted as such. To the extent any of the following conclusions of law constitute findings of fact, they are adopted as such.

C.      This Order constitutes a final order within the meaning of 28 U.S.C. § 158(a). Notwithstanding Bankruptcy Rules 6004(h) and 6006(d), and to any extent necessary under Bankruptcy Rule 9014 and Federal Rule of Civil Procedure 54(b), as made applicable by Bankruptcy Rule 7054, the Court expressly finds that there is no just reason for delay in the implementation of this Order.

## Notice of the Sale

D.      Actual written notice of the Sale Motion was provided to the Notice Parties.

E.      As evidenced by the certificate of service previously filed with the Court, proper, timely, adequate, and sufficient notice of the Sale Motion, Sale Hearing, Sale, and the transactions contemplated thereby have been provided in accordance with sections 105(a), 363, and 365 of the Bankruptcy Code, and Bankruptcy Rules 2002, 6004, 6006, and 9007.  The notices described above were good, sufficient, and appropriate under the circumstances, and no other or further notice of the Sale Motion, Sale Hearing, Sale, and assumption and assignment of the Assigned Contracts is or shall be required.

F.      The disclosures made by the Trustee concerning the Sale Motion, Purchase Agreement, Sale, assumption and assignment of the Assigned Contracts, and Sale Hearing were good, complete, and adequate.

G.      A reasonable opportunity to object and be heard with respect to the Sale and the Sale Motion and the relief requested therein (including the assumption and assignment of the Assigned Contracts), has been afforded to all interested persons and entities, including but not necessarily limited to the Notice Parties.

## Good Faith of Purchaser

H.      The Purchase Agreement was negotiated, proposed, and entered into by the Trustee and the Purchaser without collusion, in good faith, and from arm's-length bargaining positions.

I.        Neither the Trustee nor the Purchaser has engaged in any conduct that would cause or permit the Purchase Agreement to be avoided under section 363(n) of the Bankruptcy Code. Specifically, the Purchaser has not acted in a collusive manner with any person and the Purchase Price was not controlled by any agreement among bidders.

J.        The Purchaser is purchasing the Purchased Assets in good faith and is a good faith buyer within the meaning of section 363(m) of the Bankruptcy Code, and is therefore entitled to all of the protections afforded by that provision, and otherwise has proceeded in good faith in all respects in connection with this proceeding in that, *inter alia*: (a) the Purchaser recognized that the Trustee was free to deal with any other party interested in acquiring the Purchased Assets; (b) the Purchaser in no way induced or caused the filing of the Bankruptcy Cases; and (c) all payments to be made by the Purchaser in connection with the Sale have been disclosed.

### Highest and Best Offer

K.        A reasonable opportunity was given to any interested party to make a higher and better offer for the Purchased Assets.

L.        The Purchase Agreement constitutes the highest and best offer for the Purchased Assets, and will provide a greater recovery for the Estates than would be provided by any other available alternative. The Trustee's determination that the Purchase Agreement constitutes the highest and best offer for the Purchased Assets constitutes a valid and sound exercise of the Trustee's business judgment.

### No Fraudulent Transfer

M.       The consideration provided by the Purchaser pursuant to the Purchase Agreement (i) is fair and reasonable, (ii) is the highest and/or best offer for the Purchased Assets, and (iii) constitutes reasonably equivalent value and fair consideration. No other person or entity or group of entities has offered to purchase the Purchased Assets for greater economic value to the Estates

than the Purchaser. Approval of the Sale Motion and the Purchase Agreement and the consummation of the transactions contemplated thereby are in the best interests of the Estates.

N. The Purchaser is not a mere continuation of the Debtors or the Estates and no continuity of enterprise exists between the Purchaser and the Debtors or the Estates. The Purchaser is not holding itself out to the public as a continuation of the Debtors or the Estates. The Purchaser is not a successor to the Debtors or the Estates and the Sale does not amount to a consolidation, merger, or de facto merger of the Purchaser and the Debtors or the Estates.

**Validity of Transfer**

O. The Purchase Agreement was not entered into for the purpose of hindering, delaying, or defrauding creditors. Neither the Trustee nor the Purchaser is entering into the transactions contemplated by the Purchase Agreement fraudulently for purposes of statutory and/or common law fraudulent conveyance and fraudulent transfer laws.

P. The Estates are the sole and lawful owners of the Purchased Assets. Subject to section 363(f) of the Bankruptcy Code, the transfer of the Purchased Assets to the Purchaser will be, as of the Closing Date, a legal, valid, and effective transfer of the Purchased Assets, which transfer vests or will vest the Purchaser with all right, title, and interest of the Estates to the Purchased Assets free and clear of: (a) all liens and encumbrances relating to, accruing or arising any time prior to the Closing Date (collectively, including any Liens as defined in the Purchase Agreement, "Liens"), and (b) all claims (as that term is defined in section 101(5) of the Bankruptcy Code), liabilities, obligations, demands, guaranties, options, rights, contractual commitments, restrictions, interests, and matters of any kind and nature, whether arising prior to or subsequent to the Petition Date, and whether imposed by agreement, understanding, law, equity, or otherwise (including, without limitation, rights with respect to Claims and Liens (i) that purport to give to any party a right of setoff against, or a right or option to effect any forfeiture, modification, profit

sharing interest, right of first refusal, purchase or repurchase right or option, or termination of, any of the Estates' or the Purchaser's interests in the Purchased Assets, or any similar rights, or (ii) in respect of taxes, restrictions, rights of first refusal, charges of interests of any kind or nature, if any, including, without limitation, any restriction of use, voting, transfer, receipt of income, or other exercise of any attributes of ownership) (collectively, as defined in this clause (b), "Claims"), relating to, accruing, or arising any time prior to the Closing Date.

### Section 363(f) is Satisfied

Q. The conditions of section 363(f) of the Bankruptcy Code have been satisfied in full; therefore, the Trustee may sell the Purchased Assets free and clear of any interest in the property.

R. The Purchaser would not have entered into the Purchase Agreement, and would not consummate the transactions contemplated thereby, if the sale of the Purchased Assets to the Purchaser were not free and clear of all Liens and Claims. The Purchaser shall not be responsible for any Liens or Claims other than Liabilities which have been expressly assumed by the Purchaser pursuant to the Purchase Agreement.

S. The Trustee may sell the Purchased Assets free and clear of all Liens and Claims against the Estates and/or any of the Purchased Assets because, in each case, one or more of the standards set forth in section 363(f)(1)-(5) of the Bankruptcy Code have been satisfied. Those holders of Liens or Claims against the Estates or any of the Purchased Assets who did not file an objection with the Court, or who withdrew their objections, to the Sale or the Sale Motion are deemed to have consented pursuant to section 363(f)(2) of the Bankruptcy Code. All other holders of Liens or Claims are adequately protected by having their Liens or Claims, if any, in each instance against the Estates or any of the Purchased Assets, attach to the net cash proceeds of the Sale ultimately attributable to the particular Purchased Assets in which such creditor alleges a Lien or Claim, in the same order of priority, with the same validity, force and effect that such Lien or

Claim had prior to the Sale, subject to any claims and defenses that the Estates may possess with respect thereto.

**Cure/Adequate Protection**

T. The assumption and assignment of the Assigned Contracts is integral to the Purchase Agreement, is in the best interests of the Estates, and represents a reasonable exercise of sound and prudent judgment by the Trustee. The Purchaser's promise to perform the obligations under the Assigned Contracts as set forth in the Purchase Agreement after the Closing Date shall constitute adequate assurance of future performance within the meaning of section 365(b)(1)(C) and (f)(2)(B) of the Bankruptcy Code, except as provided below.

U. With the exception of the objection filed by TIAA Commercial Finance, Inc ("TIAA"), any objections to the assumption and assignment of the Assigned Contracts are hereby overruled. The Purchaser agrees that the TIAA leases sought to be assumed and assigned will not be assumed and assigned until TIAA is provided with financial documentation to verify future performance. The determination of the assumption and assignment of TIAA's leases will be transacted between the Purchaser and TIAA. If an agreement cannot be reached, then either the Purchaser or TIAA can request a hearing before this Court to obtain a ruling as to adequate assurance of future performance.

**Compelling Circumstances for an Immediate Sale**

V. Good and sufficient reasons for approval of the Purchase Agreement and the Sale have been articulated. The relief requested in the Sale Motion is in the best interests of the Estates. The Trustee has demonstrated both (i) good, sufficient, and sound business purposes and justifications, and (ii) compelling circumstances for the Sale other than in the ordinary course of business, pursuant to section 363(b) of the Bankruptcy Code in that, among other things, the

immediate consummation of the Sale to the Purchaser is necessary and appropriate to maximize the value of the Estates. Time is of the essence in consummating the Sale.

W. Given all of the circumstances of the Bankruptcy Cases and the adequacy and fair value of the Purchase Price under the Purchase Agreement, the proposed Sale of the Purchased Assets to the Purchaser constitutes a reasonable and sound exercise of the Trustee's business judgment and should be approved.

X. The consummation of the Sale and the assumption and assignment of the Assigned Contracts is legal, valid, and properly authorized under all applicable provisions of the Bankruptcy Code, including, without limitation, sections 105(a), 363(b), 363(f), 363(m), and 365, and all of the applicable requirements of such sections have been complied with in respect of the transaction.

**NOW, THEREFORE, IT IS HEREBY ORDERED:**

**General Provisions**

1. The relief requested in the Sale Motion is granted and approved as set forth herein, and the Sale contemplated in the Sale Motion is approved.

2. All objections to the Sale Motion or the relief requested therein that have not been withdrawn, waived, or settled as announced to the Court at the Sale Hearing or by stipulation filed with the Court, and all reservations of rights included therein, are hereby denied and overruled with prejudice.

**Approval of the Purchase Agreement**

3. The Purchase Agreement (and all schedules and exhibits affixed thereto) and all other ancillary documents, all of the terms and conditions thereof, and the transactions contemplated therein are hereby approved and authorized.

4. Pursuant to sections 363(b) and (f) of the Bankruptcy Code, the Trustee is authorized and empowered to take any and all actions necessary or appropriate to: (i) consummate

the Sale of the Purchased Assets to the Purchaser pursuant to and in accordance with the terms and conditions of the Purchase Agreement and this Order; (ii) close the Sale as contemplated in the Purchase Agreement and this Order; and (iii) execute and deliver, perform under, consummate, implement, and close fully the Purchase Agreement, including the assumption and assignment to the Purchaser of the Assigned Contracts, together with all additional instruments and documents that may be reasonably necessary or desirable to implement the Purchase Agreement and the Sale.

5.     This Order shall be binding in all respects upon the Trustee, the Estates, the Debtors, all creditors of, and holders of equity interests in, the Debtors, any holders of Liens, Claims, or other interests in, against, or on all or any portion of the Purchased Assets (whether known or unknown), the Purchaser and all successors and assigns of the Purchaser, and the Purchased Assets.  This Order and the Purchase Agreement shall inure to the benefit of the Estates and their creditors, the Purchaser, and the respective successors and assigns of each of the foregoing.

### Transfer of the Purchased Assets

6.     Pursuant to sections 105(a), 363(b), and 363(f) of the Bankruptcy Code, the Trustee is authorized to transfer the Purchased Assets to the Purchaser on the Closing Date and, upon the Closing under the Purchase Agreement, such transfer shall constitute a legal, valid, binding, and effective transfer of such Purchased Assets and shall vest the Purchaser with title to the Purchased Assets and, upon the Trustee's receipt of the full Purchase Price, shall be free and clear of all Liens, Claims, and other interests of any kind or nature whatsoever, including but not limited to, successor or successor-in-interest liability and Claims, with all such Liens, Claims or other interests to attach to the net cash proceeds ultimately attributable to the property against or in which such Liens, Claims, or interests are asserted, subject to the terms thereof, with the same validity, force and effect, and in the same order of priority, that such Liens, Claims, or interests now have against the

Purchased Assets.  Upon the Closing, the Purchaser shall take title to and possession of the Purchased Assets.

7.  All persons and entities in possession of some or all of the Purchased Assets on the Closing Date are directed to surrender possession of such Purchased Assets to the Purchaser or its assignee at the Closing.  On the Closing Date, each of the Estates' creditors is authorized and directed to execute such documents and take all other actions as may be reasonably necessary to release its Liens, Claims, or other interests in the Purchased Assets, if any, as such Liens, Claims, or interests may have been recorded or may otherwise exist.

8.  On the Closing Date, this Order shall be construed and shall constitute for any and all purposes a full and complete general assignment, conveyance, and transfer of the Estates' interests in the Purchased Assets.  Each and every federal, state, and local governmental agency or department is hereby authorized to accept any and all documents and instruments necessary and appropriate to consummate the transactions contemplated by the Purchase Agreement.

9.  A certified copy of this Order may be filed with the appropriate clerk and/or recorded with the recorder to act to cancel any liens and other encumbrances of record.

10.  If any person or entity that has filed statements or other documents or agreements evidencing Liens on, or interests in, all or any portion of the Purchased Assets shall not have delivered to the Trustee prior to the Closing, in proper form for filing and executed by the appropriate parties, termination statements, instruments of satisfaction, releases of liens and easements, and any other documents necessary for the purpose of documenting the release of all Liens, Claims, or other interests that the person or entity has or may assert with respect to all or any portion of the Purchased Assets, the Trustee and/or the Purchaser are hereby authorized to execute and file such statements, instruments, releases, and other documents on behalf of such person or entity with respect to the Purchased Assets.

11. This Order is and shall be effective as a determination that, on the Closing Date, all Liens, Claims, or other interests of any kind or nature whatsoever existing as to the Purchased Assets prior to the Closing Date, shall have been unconditionally released, discharged, and terminated, and that the conveyances described herein have been effected. This Order is and shall be binding upon and govern the acts of all persons and entities, including, without limitation, all filing agents, filing officers, title agents, title companies, recorders of mortgages, recorders of deeds, registrars of deeds, administrative agencies, governmental departments, secretaries of state, federal, state and local officials, and all other persons and entities who may be required by operation of law, the duties of their office, or contract, to accept, file, register, or otherwise record or release any documents or instruments, or who may be required to report or insure any title or state of title in or to any lease; and each of the foregoing persons and entities is hereby directed to accept for filing any and all of the documents and instruments necessary and appropriate to consummate the transactions contemplated by the Purchase Agreement.

**Assumption and Assignment of Assigned Contracts**

12. Subject to the carveout applicable to TIAA as stated herein, the Trustee is hereby authorized in accordance with sections 105(a) and 365 of the Bankruptcy Code to (a) assume and assign to the Purchaser, effective upon the Closing of the Sale, the Assigned Contracts free and clear of all Liens, Claims, and other interests of any kind or nature whatsoever, and (b) execute and deliver to the Purchaser such documents or other instruments as the Purchaser reasonably deems necessary to assign and transfer the Assigned Contracts.

13. The counterparties to the Assigned Contracts (the "Counterparties") shall look solely to the Purchaser for any amounts payable under the Assigned Contracts from and after the Closing Date.

14.     The Assigned Contracts are executory contracts under section 365 of the Bankruptcy Code.  The Trustee may assume the Assigned Contracts in accordance with section 365 of the Bankruptcy Code.  The Trustee may assign the Assigned Contracts in accordance with sections 363 and 365 of the Bankruptcy Code.  Any provisions in the Assigned Contracts that purport to prohibit or condition the assignment of the Assigned Contracts or allow the Counterparties to terminate, recapture, impose any penalty, or modify any term or condition upon the assignment of the Assigned Contracts, constitute unenforceable anti-assignment provisions that are void and of no force and effect; all other requirements and conditions under sections 363 and 365 of the Bankruptcy Code for the assumption by the Trustee and assignment to the Purchaser of the Assigned Contracts have been satisfied.  The Assigned Contracts shall be transferred and assigned to, and following the closing of the Sale remain in full force and effect for the benefit of the Purchaser, notwithstanding any provision in the Assigned Contracts (including those of the type described in sections 365(b)(2) and (f) of the Bankruptcy Code) that purports to prohibit, restrict, or condition such assignment or transfer and, pursuant to section 365(k) of the Bankruptcy Code, the Estates shall be relieved from any further liability with respect to the Assigned Contracts after such assignment to and assumption by the Purchaser, except for any Assigned Contract designated as Designated Contract during the Designation Rights Period.  Upon Closing, and after the expiration of the Designation Rights Period, in accordance with sections 363 and 365 of the Bankruptcy Code, the Purchaser shall be fully and irrevocably vested in all rights and title to the Assigned Contracts.  Notwithstanding anything to the contrary in this Order or otherwise, no agreements between Oracle America, Inc., including any of its predecessors-in-interest, ("Oracle") and Debtors are being assigned or transferred to the Purchaser as part of this sale and no Oracle software is being transferred to the Purchaser as part of the Purchased Assets.

15. The amounts necessary to cure any defaults existing as of the Closing Date under the Assigned Contracts are the amounts listed on the Trustee's Notice of Executory Contracts and Unexpired Leases that may be Assumed and Assigned, Pursuant to Section 365 of the Bankruptcy Code, in Connection with the Sale of Substantially All of the Debtors' Assets, and the Proposed Cure Amounts, dated June 12, 2020 [docket No. 83], as supplemented on July 9, 2020 [docket No. 221], and as may be further supplemented, or, if applicable, such other amount(s) upon which the Trustee and any of the Counterparties may have agreed (the "Cure Amounts"). The Purchaser shall pay the Cure Amounts within thirty (30) days of Closing, or at such later time as may be mutually agreed upon by the Purchaser and any of the Counterparties, except for any Assigned Contracts designated as a Designated Contract. No other defaults exist under the Assigned Contracts. The Counterparties waive, release, and are hereby precluded from asserting any claims against the Debtors, the Trustee or the Estates for any claims arising out of or in connection with the Assigned Contracts, except for any Counterparties of Assigned Contracts designated as a Designated Contract. The Purchaser shall pay the Cure Amounts to the Counterparties in full satisfaction of the Counterparties' claims for defaults that may have arisen under the Assigned Contracts, except for any Assigned Contracts designated as a Designated Contract. Notwithstanding any other provisions in this Order, or the APA, in addition to the Cure Amounts, the Purchaser assumes the obligations of the Debtors and/or Estates owed to non-Debtor counterparties to Assigned Contracts, except for any Assigned Contracts designated as a Designated Contract, that have accrued or arisen under the Assigned Contracts before the Closing Date but that have not yet become due and/or defaults as of the Closing Date.

16. Purchaser, Seller, and FNC have reached an agreement in principle pursuant to which FNC intends to assume the Missouri Attain Financial Liabilities including, but not limited to, the Patient Deposits and refund Liabilities on terms and conditions acceptable to Purchaser and

FNC which will be memorialized in the Attain Program Agreement, whether arising prior to or after the Closing Date. In the event that the Attain Transaction does not timely close as contemplated under Section 2.6 of the Purchase Agreement, the Purchaser shall and hereby does assume the Missouri Attain Financial Liabilities including, but not limited to, all obligations and Liabilities related to Patient Deposits and refunds owed to Practice Patients, whether arising prior to or after the Closing Date.

<strong><u>Prohibition of Actions against the Purchaser</u></strong>

17. Except as otherwise provided in this Order or the Purchase Agreement, the Purchaser shall not have any liability or other obligation to the Estates arising under or related to any of the Purchased Assets or related to that certain Stipulation for Limited Relief for Medical Practices Pending Consummation for Prospective Sale Process (the "<u>Stipulation</u>") for the interim operations of Medical Practice, as defined in the Stipulation. Without limiting the generality of the foregoing, and except as otherwise provided herein or in the Purchase Agreement, the Purchaser shall not be liable for any Claims against the Estates, and the Purchaser shall have no successor or vicarious liabilities of any kind or character including, but not limited to, under any theory of antitrust, environmental, successor or transferee liability, labor law, de facto merger, mere continuation, or substantial continuity, whether known or unknown as of the Closing Date, now existing or hereafter arising, whether fixed or contingent, whether asserted or unasserted, whether legal or equitable, whether liquidated or unliquidated.

18. All persons and entities holding Liens, Claims, or other interests of any kind or nature whatsoever against or in all or any portion of the Purchased Assets (whether legal or equitable, secured or unsecured, matured or unmatured, contingent or non-contingent, liquidated or unliquidated, senior or subordinate), hereby are forever barred, estopped, and permanently enjoined from asserting against the Purchaser, its Affiliates, its successors or assigns, their

property, or the Purchased Assets, such persons' or entities' Liens, Claims, or interests in and to the Purchased Assets, including, without limitation, the following actions: (i) commencing or continuing in any manner any action or other proceeding against the Purchaser, its Affiliates, its successors, assets or properties; (ii) enforcing, attaching, collecting, or recovering in any manner any judgment, award, decree, or order against the Purchaser, its Affiliates, its successors, assets or properties; (iii) creating, perfecting, or enforcing any Lien or other Claim against the Purchaser, its Affiliates, its successors, assets, or properties; (iv) asserting any setoff or right of subrogation of any kind against any obligation due the Purchaser, its Affiliates, or its successors; or (v) commencing or continuing any action, in any manner or place, that does not comply or is inconsistent with the provisions of this Order or other orders of the Court, or the agreements or actions contemplated or taken in respect thereof. On the Closing Date, each creditor is authorized and directed to execute such documents and take all other actions as may be necessary to release Liens, Claims, and other interests in or on the Purchased Assets, if any, as provided for herein, as such Liens, Claims, or interests may have been recorded or may otherwise exist.

19.     All persons and entities are hereby forever prohibited and enjoined from taking any action that would adversely affect or interfere with the ability of the Trustee to sell and transfer the Purchased Assets to the Purchaser in accordance with the terms of the Purchase Agreement and this Order.

20.     The Purchaser has given substantial consideration under the Purchase Agreement for the benefit of the Estates. The consideration given by the Purchaser shall constitute valid and valuable consideration for the releases of any potential Claims and Liens pursuant to this Order, which releases shall be deemed to have been given in favor of the Purchaser by all holders of Liens against or interests in, or Claims against, the Estates or any of the Purchased Assets. The

consideration provided by the Purchaser for the Purchased Assets under the Purchase Agreement is fair and reasonable and may not be avoided under section 363(n) of the Bankruptcy Code.

21. With respect to any and all executory contracts or other agreements (collectively the "RDC Agreements") between any of the Debtors and Roche Diagnostics Corporation ("RDC") which otherwise are or may be a subject of the Purchase Agreement, RDC's Limited Objection and Reservation of Rights filed on June 26, 2020 [Docket No. 127] (the "Objection") is hereby sustained, and none of the RDC Agreements shall constitute Assigned Contracts unless RDC expressly consents in writing to such treatment on terms and conditions within its sole and absolute discretion. Without the necessity of further notice, hearing or order of this Court, the Trustee, Purchaser and RDC are hereby authorized, but not required, to negotiate, develop and enter into (a) one or more definitive agreements (each a "Substitution Agreement") providing for the Trustee's assumption and assignment to Purchaser of all or any portions of the RDC Agreements pertaining to the Practice (as defined in the Purchase Agreement) and (b) interim arrangements enabling the continued availability and supply of RDC's Products (as defined in the RDC Agreements) to the Practice before the parties possibly enter into a Substitution Agreement; provided, however, that the Cure Amount set forth in the Purchase Agreement, or any other Cure Amounts negotiated and agreed to by Purchaser and RDC associated with any such assumption and assignment transaction shall be paid to RDC by Purchaser (and not paid by the Trustee from the Debtors' estates). For the avoidance of doubt, this Order is without prejudice to all other aspects of RDC's Objection, which shall be and remain pending and unresolved until further order of this Court.

22. Nothing in this Order or the Purchase Agreement releases, nullifies, or enjoins the enforcement of any liability to a governmental unit under police and regulatory statutes or regulations that any entity would be subject to as the owner or operator of property after the date

of entry of this Order. Nothing in this Order or the Purchase Agreement authorizes the transfer or assignment to the Purchaser of any license, permit, registration, authorization, or approval of or with respect to a governmental unit without the Purchaser's complying with all applicable legal requirements under non-bankruptcy law governing such transfers or assignments.

**Other Provisions**

23. Purchaser shall cooperate with Messiahic Inc. d/b/a PayJunction ("PayJunction") and promptly provide documents, information and assistance reasonably required by PayJunction to enable PayJunction to investigate and, if appropriate, timely challenge any chargeback claims asserted by any Practice Patients.

24. Nothing contained herein or in the Purchase Agreement is intended to be, nor shall be construed as, a waiver, release, modification or discharge of any rights, remedies or claims that may be asserted by PayJunction or any other counterparty to any credit card processing agreements or related documents executed by the Debtors against any medical practices or other non-debtor parties.

25. The transactions contemplated by the Purchase Agreement are undertaken by the Purchaser without collusion and in good faith, and accordingly, the reversal or modification on appeal of the authorization provided herein to consummate the Sale shall not affect the validity of the Sale, unless such authorization and the Sale are duly stayed pending such appeal. The Purchaser is a good faith buyer and, as such, shall have the full protections of section 363(m) of the Bankruptcy Code.

26. Pursuant to Federal Rules of Bankruptcy Procedure 7062, 9014, 6004(h), and 6006(d), this Order shall be effective immediately upon entry and the Trustee and the Purchaser are authorized to close the Sale immediately upon entry of this Order.

27. Nothing in this Order or the Purchase Agreement approves or provides for the transfer to the Purchaser of any avoidance claims (whether under chapter 5 of the Bankruptcy Code or otherwise) of the Estates.

28. No bulk sales law or any similar law of any state or other jurisdiction applies in any way to the Sale.

29. The failure specifically to reference any particular provision of the Purchase Agreement in this Order shall not diminish or impair the effectiveness of such provision, it being the intent of the Court that the Purchase Agreement is authorized and approved in its entirety; provided, however, that this Order shall govern if any inconsistency exists between the Purchase Agreement (including all ancillary documents executed in connection therewith) and this Order. Likewise, all of the provisions of this Order are nonseverable and mutually dependent.

30. The Purchase Agreement and any related agreements, documents, or other instruments may be modified, amended, or supplemented by the parties thereto and in accordance with the terms thereof, without further order of the Court, provided that any such modification, amendment, or supplement does not have a material adverse effect on the Estates.

31. The Court shall retain jurisdiction to, among other things, interpret, implement, and enforce the terms and provisions of this Order and the Purchase Agreement, all amendments thereto and any waivers and consents thereunder and each of the agreements executed in connection therewith to which the Trustee is party or which has been assigned by the Trustee to the Purchaser, and to adjudicate, if necessary, any and all disputes concerning or relating in any way to the Sale, including, but not limited to, retaining jurisdiction to: (a) compel delivery of the Purchased Assets to the Purchaser; (b) interpret, implement, and enforce the provisions of this Order; (c) protect the Purchaser against any alleged Liens, Claims, or other interests in or against

the Purchased Assets of any kind or nature whatsoever; and (d) enter any orders under sections 363 and/or 365 of the Bankruptcy Code with respect to the Assigned Contracts.

32. All time periods set forth in this Order shall be calculated in accordance with Bankruptcy Rule 9006(a).

33. To the extent that this Order is inconsistent with any prior order or pleading with respect to the Sale Motion, the terms of this Order shall govern.

**Exhibit E**

**FORM OF BILL OF SALE**

As of this ___ day of July, 2020, for good and valuable consideration, the receipt and adequacy of which are hereby acknowledged, Jeoffrey L. Burtch, in his capacity as Chapter 7 Trustee in the bankruptcy cases being jointly administered as Case No. 20-11169 (LSS) in the U.S. Bankruptcy Court for the District of Delaware for the Estates of IntegraMed Holding Corp., IntegraMed America, Inc., Trellis Health, LLC, IntegraMed Fertility Holding Corp., Reproductive Partners, Inc., IntegraMed Management of Bridgeport, LLC, IntegraMed Florida Holdings, LLC, IntegraMed Management of Mobile, LLC, IntegraMed Management, LLC, and IntegraMed Medical Missouri, LLC ("**Seller**"), does hereby grant, bargain, transfer, sell, assign, convey and deliver to STLFertility, LLC, a Missouri limited liability company ("**Buyer**"), all of its right, title, and interest in and to the Purchased Assets free and clear of all Liens and Liabilities, to have and to hold the same unto Buyer, its successors and assigns, forever. All capitalized terms used herein but not otherwise defined herein shall have the meanings given to them in that certain Asset and Equity Purchase Agreement, dated of even date herewith by and between Seller and Buyer (the "**Purchase Agreement**"),.

Buyer acknowledges that Seller makes no representation or warranty with respect to the assets being conveyed hereby except as specifically set forth in the Purchase Agreement.

Seller for itself, its successors and assigns, hereby covenants and agrees that, at any time and from time to time upon the written request of Buyer, Seller will do, execute, acknowledge, and deliver or cause to be done, executed, acknowledged, and delivered, all such further acts, deeds, assignments, transfers, conveyances, powers of attorney, and assurances as may be reasonably required by Buyer in order to assign, transfer, set over, convey, assure, and confirm unto and vest in Buyer, its successors and assigns, title to the assets sold, conveyed, and transferred by this Bill of Sale

IN WITNESS WHEREOF, the parties have executed this Bill of Sale to be effective as of the date first above written.

_____

Jeoffrey L. Burtch, in his capacity as Chapter 7 Trustee for the Estates of IntegraMed Holding Corp., IntegraMed America, Inc., Trellis Health, LLC, IntegraMed Fertility Holding Corp., Reproductive Partners, Inc., IntegraMed Management of Bridgeport, LLC, IntegraMed Florida Holdings, LLC, IntegraMed Management of Mobile, LLC, IntegraMed Management, LLC, and IntegraMed Medical Missouri, LLC.

**Exhibit F**

**FORM OF ASSIGNMENT AND ASSUMPTION AGREEMENT**

**Assignment and Assumption Agreement**

This Assignment and Assumption Agreement (the "**Agreement**"), effective as of this \_\_\_ day of July, 2020 (the "**Effective Date**"), is by and between Jeoffrey L. Burtch, in his capacity as Chapter 7 Trustee in the bankruptcy cases being jointly administered as Case No. 20-11169 (LSS) in the U.S. Bankruptcy Court for the District of Delaware for the Estates of IntegraMed Holding Corp., IntegraMed America, Inc., Trellis Health, LLC, IntegraMed Fertility Holding Corp., Reproductive Partners, Inc., IntegraMed Management of Bridgeport, LLC, IntegraMed Florida Holdings, LLC, IntegraMed Management of Mobile, LLC, IntegraMed Management, LLC, and IntegraMed Medical Missouri, LLC ("**Seller**"), and STLFertility, LLC, a Missouri limited liability company ("**Buyer**").

**WHEREAS**, Seller and Buyer have entered into that certain Asset and Equity Purchase Agreement, dated of even date herewith (the "**Purchase Agreement**"), pursuant to which, among other things, Seller has agreed to assign all of its rights, title and interests in, and Buyer has agreed to assume all of Seller's duties and obligations under, the Assumed Liabilities (as defined in the Purchase Agreement).

**NOW, THEREFORE**, in consideration of the mutual covenants, terms, and conditions set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties agree as follows:

1. Definitions. All capitalized terms used in this Agreement but not otherwise defined herein are given the meanings set forth in the Purchase Agreement.

2. Assignment and Assumption. Seller hereby sells, assigns, grants, conveys and transfers to Buyer all of Seller's right, title and interest in and to the Assumed Liabilities. Buyer hereby accepts such assignment and assumes all of Seller's duties and obligations under the Assumed Liabilities and agrees to pay, perform and discharge, as and when due, all of the obligations of Seller under the Assumed Liabilities accruing on and after the Effective Date.

3. Terms of the Purchase Agreement. The terms of the Purchase Agreement, including, but not limited to, the representations, warranties, covenants, agreements and indemnities relating to the Assumed Liabilities are incorporated herein by this reference. The parties hereto acknowledge and agree that the representations, warranties, covenants, agreements and indemnities contained in the Purchase Agreement shall not be superseded hereby but shall remain in full force and effect to the full extent provided therein. In the event of any conflict or inconsistency between the terms of the Purchase Agreement and the terms hereof, the terms of the Purchase Agreement shall govern.

4. Governing Law. This Agreement shall be governed by and construed in accordance with the internal laws of the State of Delaware.

5. Counterparts. This Agreement may be executed in counterparts, each of which shall be deemed an original, but all of which together shall be deemed to be one and the same agreement. A signed copy of this Agreement delivered by facsimile, email or other means of electronic transmission shall be deemed to have the same legal effect as delivery of an original signed copy of this Agreement.

6.      <u>Further Assurances</u>. Each of the parties hereto shall execute and deliver, at the reasonable request of the other party hereto, such additional documents, instruments, conveyances and assurances and take such further actions as such other party may reasonably request to carry out the provisions hereof and give effect to the transactions contemplated by this Agreement.

IN WITNESS WHEREOF, the parties have executed this Agreement to be effective as of the date first above written.

BUYER:

STLFertility, LLC

By:_____
Name:_____
Title:_____

SELLER:

_____

Jeoffrey L. Burtch, in his capacity as Chapter 7 Trustee for the Estates of IntegraMed Holding Corp., IntegraMed America, Inc., Trellis Health, LLC, IntegraMed Fertility Holding Corp., Reproductive Partners, Inc., IntegraMed Management of Bridgeport, LLC, IntegraMed Florida Holdings, LLC, IntegraMed Management of Mobile, LLC, IntegraMed Management, LLC, and IntegraMed Medical Missouri, LLC.

**Exhibit G**

**IT SERVICES AGREEMENT**

[To be negotiated on terms mutually acceptable to both Buyer and FNC.]

**Exhibit H**

**ATTAIN PROGRAM AGREEMENT**

[To be negotiated on terms mutually acceptable to both Buyer and FNC.]

Exhibit I

**IP License Agreement**

# ROYALTY FREE PERPETUAL LICENSE AGREEMENT

THIS ROYALTY FREE PERPETUAL LICENSE AGREEMENT (this "***Agreement***") is entered into on July __, 2020, by and between STLFertility, LLC, a Missouri limited liability company ("***Licensee***") and Jeoffrey L. Burtch ("***Licensor"***) as Chapter 7 Trustee for the Bankruptcy Estates (the "***Estates***"). Licensee and Licensor are referred to collectively herein as the "***Parties***" and individually as a "***Party***." Capitalized terms used and not otherwise defined herein have the meanings set forth in the Purchase Agreement.

## W I T N E S S E T H :

WHEREAS, the Licensee and the Licensor are parties to that Asset and Equity Purchase Agreement dated as of July __, 2020 (the "Asset Purchase  Agreement").

WHEREAS, it is a condition to closing the transactions contemplated by the Asset Purchase Agreement that the parties enter into this License Agreement.

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged by the parties, IT IS AGREED:

1.      **Asset Purchase Agreement**.  Terms used but not defined herein shall have the meaning set for in the Asset Purchase Agreement.

2.      **License Gra**nt.  Licensor hereby grants to Licensee, and Licensee hereby accepts from Licensor, a perpetual, non-exclusive, worldwide, revocable, royalty-free, fully paid-up, sublicensable right and license, to each of the marks set forth on Exhibit A hereto  (the "Marks") in connection with the operation of the Practice by the Licensee.

3.      **Reservation of Rights**.  Notwithstanding anything to the contrary in this Agreement, Licensee retains all rights, title, and interests including, without limitation, all intellectual property rights in and to the Marks and all goodwill associated therewith, and nothing herein shall assign, transfer, or convey to any Licensor any rights, title, or interests in and to any of the Marks, all rights in which are expressly reserved.

4.      **Ownership of the Marks**.  Licensee shall acquire no ownership rights to the Marks by virtue of this Agreement or otherwise and all use of the  Marks by Licensee or its sublicensees shall inure to the benefit of the Licensor.

5.      **Severability**.  If one or more provisions of this Agreement are held to be unenforceable, invalid, or unlawful under applicable law, the Parties agree to renegotiate such provision in good faith, in order to maintain the economic position enjoyed by each Party as close as possible to that under the provision deemed unenforceable, invalid, or unlawful.

6.      **Entire Agreement**.  This Agreement constitutes the entire agreement between the Parties regarding the use of any Marks and merges and supersedes all terms of prior and contemporaneous agreements and understandings between the Parties, whether oral or written, relating to the use of the Marks.

7.     **Modification/Waiver**.  No modification or waiver of any of the provisions of this Agreement shall be valid unless in writing and signed by the Parties hereto.  Failure by either Party to enforce any rights or provisions under this Agreement shall not be construed as a waiver of such rights or provisions, and a waiver by either Party of a default in one or more instances shall not be construed as a continuing waiver or as a waiver in other instances of default.

8.     **Assignment to FNC / Assignment**.  The Parties acknowledge that Licensor's obligations shall be assumed by and assigned to Fertility Newco, LLC ("FNC") upon FNC's acquisition of the Marks pursuant to the terms of that Asset Purchase Agreement dated as of July __, 2020 between the Licensor and FNC (the "FNC Agreement").  This Agreement shall be assigned to Either Party may assign or otherwise transfer this Agreement, or any rights or obligations hereunder, upon the prior written consent of the other Party, not to be unreasonably withheld, conditioned, or delayed, or to a successor by consolidation or merger or operation of law or to a purchaser of all or substantially all of such Party's assets or business.  Any assignment in contravention of this Section shall be null and void ab initio.  This Agreement is binding upon and inures to the benefit of the Parties hereto and their respective permitted successors and assigns.

9.     **Further Assurances**.  Each Party shall, upon the request of the other Party, promptly execute such documents and perform such acts as may be necessary to give full effect to the terms of this Agreement.

10.    **Counterparts**.  This Agreement may be executed in counterparts, each of which will be deemed an original, but all of which together will be deemed to be one and the same agreement.  A signed copy of this Agreement delivered by facsimile, email, or other means of electronic transmission (to which a signed PDF copy is attached) will be deemed to have the same legal effect as delivery of an original signed copy of this Agreement.

[Signature Page Follows]

IN WITNESS WHEREOF, the parties have executed this Royalty Free Perpetual License Agreement as of the date first set forth above.

LICENSEE

**STLFertility, LLC**

By:_____
Name:_____
Title:_____

**LICENSOR**

_____

Jeoffrey L. Burtch, in his capacity as Chapter 7 Trustee for the Estates of IntegraMed Holding Corp., IntegraMed America, Inc., Trellis Health, LLC, IntegraMed Fertility Holding Corp., Reproductive Partners, Inc., IntegraMed Management of Bridgeport, LLC, IntegraMed Florida Holdings, LLC, IntegraMed Management of Mobile, LLC, IntegraMed Management, LLC, and IntegraMed Medical Missouri, LLC

**EXHIBIT A**

**MARKS**

SIRM St. Louis

Sher institute for Reproductive Medicine St. Louis



**Exhibit J**
**Membership Assignment**

**ASSIGNMENT OF MEMBERSHIP INTERESTS**

This Assignment of Membership Interests (this "**Assignment**") is entered into on July ___, 2020, between Jeoffrey L. Burtch ("**Assignor**") as Chapter 7 Trustee for the Bankruptcy Estates, and STLFertility, LLC, a Missouri limited liability company ("**Assignee**" and together with Assignor collectively the "**Parties**" and each a "**Party**"). Capitalized terms used and not otherwise defined herein have the meanings set forth in the Purchase Agreement (defined below).

WHEREAS, Assignor is the holder of one hundred percent (100%) of the issued and outstanding equity interests (the "**Membership Interests**") of IntegraMed Medical Missouri, LLC, a Missouri limited liability company (the "**Company**");

WHEREAS, the Parties entered into that certain Asset and Equity Purchase Agreement dated July __, 2020 (the "**Purchase Agreement**") whereby Assignor agreed to, inter alia, transfer to Assignee certain Purchased Assets and Assumed Liabilities; and

WHEREAS, in accordance with the terms of the Purchase Agreement, Assignee desires to acquire and take assignment from Assignor, and Assignor desires to sell, convey, assign, and transfer to Assignee, all rights, title, and interest in and to the Membership Interests.

NOW, THEREFORE, in consideration of the premises and the mutual promises herein made, and in consideration of the representations, warranties, covenants, and other valuable consideration herein, contained, the receipt and sufficiency of which are hereby acknowledged, the Parties agree as follows:

1.      Recitals.  The foregoing recitals are hereby incorporated into and made a part of this Assignment by this reference.

2.      Assignment of Membership Interest.  Effective as of the date first written above, in consideration of the terms and conditions of the Purchase Agreement, Assignor hereby assigns, transfers, and conveys to Assignee all of Assignor's rights, title, and interest in and to the Membership Interests (collectively the "**Transferred Interest**") free and clear of any and all Liens and Liabilities. Contemporaneously with the assignment set forth in this Section 2, Assignor hereby withdraws as a member of the Company, shall thereupon cease to be a member of the Company, and shall thereupon cease to have or exercise any right or power as a member of the Company. Assignee hereby acquires and accepts from the Assignor all of the Transferred Interest.

3.      Further Assurances.  Each Party shall do and perform, or cause to be done and performed, all such further acts and things, and shall execute and deliver all such other agreements, certificates, instruments, and documents, as the other Party may reasonably request in order to carry out the intent and accomplish the purposes of this Assignment and the consummation of the transactions contemplated hereby.

4.      Amendments.  This Assignment may not be amended, changed, or otherwise modified except by a written instrument executed by each of the Parties.

74310383.2

5.	Governing Law.  This Agreement shall in all respects be governed by and construed in accordance with the laws of the State of Delaware applicable to contracts executed and wholly performed within the State of Delaware without giving effect to any choice or conflict of law provision or rule that would cause the application of the laws of any jurisdiction other than the State of Delaware. The parties hereto irrevocably consent to the jurisdiction of the United States federal and state courts located in the State of Delaware in any suit or proceeding based on or arising under this Agreement and irrevocably agree that all claims in respect of such suit or proceeding may be determined in such courts.

6.	Binding Effect.  This Assignment shall be binding upon, and shall inure to the benefit of, the Parties and their respective successors and assigns.

7.	Counterparts.  This Assignment may be executed by facsimile, email .pdf or other electronic means and in one or more counterparts, each of which shall be deemed an original, but all of which shall constitute one and the same instrument.

[*Signature page follows*]

74310383.2

IN WITNESS WHEREOF, the undersigned have caused this Assignment of Membership Interests to be executed as of the date first above written.

**ASSIGNOR:**

_____

Jeoffrey L. Burtch, in his capacity as Chapter 7 Trustee for the Estates of IntegraMed Holding Corp., IntegraMed America, Inc., Trellis Health, LLC, IntegraMed Fertility Holding Corp., Reproductive Partners, Inc., IntegraMed Management of Bridgeport, LLC, IntegraMed Florida Holdings, LLC, IntegraMed Management of Mobile, LLC, IntegraMed Management, LLC, and IntegraMed Medical Missouri, LLC

**ASSIGNEE:**

**STLFertility, LLC**
a Missouri limited liability company

By:_____
Name: _____
Title: _____