**Exhibit A**
**Purchase Agreement**

(See attached.)

ASSET PURCHASE AGREEMENT

by and among

Jeoffrey L. Burtch, as Chapter 7 Trustee

for the Bankruptcy Estates of

IntegraMed Holding Corp. and Affiliates

and

The Center for Reproductive Medicine, PC

Dated July __ 2020

PD.29028619.3

**ASSET PURCHASE AGREEMENT**

This Asset Purchase Agreement (this "<u>Agreement</u>") is entered into on July __, 2020, by and between The Center For Reproductive Medicine, PC, an Alabama professional corporation ("<u>Buyer</u>"), and Jeoffrey L. Burtch as Chapter 7 Trustee for the Bankruptcy Estates (the "<u>Estates</u>") of the Debtors (defined below) ("<u>Seller</u>"). Buyer and Seller are referred to collectively herein as the "<u>Parties</u>" and individually as a "<u>Party</u>." Capitalized terms used and not otherwise defined herein have the meanings set forth in <u>Article 12</u> below.

**PRELIMINARY STATEMENTS**

WHEREAS, on May 20, 2020 (the "<u>Petition Date</u>"), IntegraMed Holding Corp. and various of its Affiliates (each, a "<u>Debtor</u>" and collectively, the "<u>Debtors</u>") each filed a voluntary petition for relief under Chapter 7 of the Bankruptcy Code, as amended (the "<u>Bankruptcy Code</u>"), commencing Chapter 7 cases (each, a "<u>Bankruptcy Case</u>" and, collectively, the "<u>Bankruptcy Cases</u>") in the United States Bankruptcy Court for the District of Delaware (the "<u>Bankruptcy Court</u>"), and the Bankruptcy Cases are being jointly administered under Case No. 20-11169 (LSS);

WHEREAS, shortly after the Petition Date, Seller was appointed as the Chapter 7 Trustee for the Estates of the Debtors, and he continues to serve in such capacity;

WHEREAS, on June 1, 2020, Seller filed a *Motion for Entry of (I) an Order (A) Approving Bidding Procedures in Connection with Sale of Substantially All of the Estates' Assets, (B) Scheduling an Auction and Hearing to Consider the Proposed Sale, and (C) Approving the Form and Manner of Notice Thereof; and (II) an Order (A) Approving the Sale, (B) Authorizing the Assumption and Assignment of Executory Contracts and Unexpired Leases, and (C) Granting Certain Related Relief* (the "<u>Sale Motion</u>") [Docket No. 35];

WHEREAS, on June 8, 2020, the Bankruptcy Court entered the *Order Granting Trustee's Motion for Entry of an Order (A) Approving Bidding Procedures in Connection with Sale of Substantially All of the Estates' Assets, (B) Scheduling an Auction and Hearing to Consider the Proposed Sale, and (C) Approving the Form and Manner of Notice Thereof* (the "<u>Bidding Procedures Order</u>") [Docket No. 72] which, *inter alia*, approved the bid and auction procedures attached as Exhibit 1 thereto (the "<u>Bidding Procedures</u>");

WHEREAS, Buyer, as a Qualified Bidder (as defined in the Bidding Procedures), is a physicians' practice specializing in reproductive medicine that was affiliated with the Debtors pursuant to that certain Stock Purchase Agreement by and between the Buyer, certain Affiliates of Buyer, and IntegraMed America, Inc. dated January 31, 2016 and the documents and transactions referred to therein (collectively, the "<u>IntegraMed Transaction</u>");

WHEREAS, Buyer operates a practice providing medical, gynecological and fertility-related services in Alabama (the "<u>Practice</u>") to individual patients (collectively, such patients the "<u>Practice Patients</u>");

WHEREAS, certain Practice Patients have made cash deposits with certain of the Debtors, entitling the Patients to receive certain services from the Practice (the "<u>Patient Deposits</u>");

WHEREAS, Debtors have operated a program known as the Attain IVF program (the "<u>Attain Program</u>");

WHEREAS, certain Practice Patients have also enrolled in the Attain Program (the "<u>Alabama Attain Patients</u>");

PD.29028619.3

WHEREAS, under the terms of the Attain Program, the Alabama Attain Patients have contracted to receive certain services from the Practice, including but not limited to IVF treatment cycles and, under certain circumstances, cash refunds (the "Attain Patient Benefits");

WHEREAS, under the terms of the Attain Program, Debtors retained certain payment liabilities with respect to the Attain Patient Benefits, including to reimburse Buyer for medical services it provided to the Alabama Attain Patients, and to pay any cash refunds owed to qualifying patients (collectively, the "Alabama Attain Financial Liabilities");

WHEREAS, Buyer desires to purchase and assume and Seller desires to sell, convey, assign and transfer such assets and rights and such liabilities to Buyer used in connection with the Practice such that Buyer's relationship with the Debtors is severed and Buyer is able to operate the Practice independently, as it did prior to the IntegraMed Transaction, all in the manner and subject to the terms and conditions set forth herein and as authorized under, among other things, Sections 105 and 363 of the Bankruptcy Code;

WHEREAS, Seller's ability to consummate the transactions set forth in this Agreement is subject to, among other things, the entry of the Sale Order by the Bankruptcy Court; and

WHEREAS, the Seller has determined that it is advisable and in the Estates' best interests to enter into this Agreement and to consummate the transactions provided for herein, subject to entry of the Sale Order, and has approved the same.

## AGREEMENT

Now, therefore, in consideration of the premises and the mutual promises herein made, and in consideration of the representations, warranties, covenants and other valuable consideration herein contained, the receipt and sufficiency of which are hereby acknowledged, the Parties agree as follows:

## ARTICLE 1
## PURCHASE AND SALE

1.1     Purchase and Sale of Purchased Assets.  On the terms and subject to the conditions set forth in this Agreement, at the Closing, Seller shall sell, transfer, assign, convey and deliver to Buyer, and Buyer shall purchase, acquire, assume and accept from the Estates, all of the Estates' right, title and interest in and to the Purchased Assets, free and clear of all Liens and Liabilities (except for any Assumed Liabilities) to the extent permitted by the Bankruptcy Code.  "Purchased Assets" means all of the assets owned by any Debtor that are located at or used solely in connection with the Practice, including but not limited to those assets set forth on Schedule 1.1.

1.2     Excluded Assets.  The Buyer acknowledges and agrees that it is currently accessing certain IT software and cloud programs in the operation of the Practice pursuant to a limited license granted by Fertility NewCo, LLC, a Delaware limited liability company (the "IT License Agreement") and that the IT License Agreement and access to the IT discussed there are not included in the Purchased Assets. Other than the Purchased Assets, the parties expressly agree that Buyer is not purchasing or acquiring any other assets or properties of Debtors and all such other assets and properties shall be excluded from the Purchased Assets (collectively, the "Excluded Assets").

1.3     Assumption of Liabilities and Obligations.  Upon the terms and subject to the conditions of this Agreement, at the Closing, Seller agrees to assign to Buyer, and Buyer agrees to assume from and after the Closing Date, in accordance with their respective terms, (i) any performance obligations of Debtors under the Assigned Contracts listed on Schedule 1.3(a) first arising after the Closing Date to the extent relating to the period on or after the applicable Closing Date, (ii) the obligation to make the Cure Payments related to such Assigned Contracts, (iii) all liabilities with respect to the Patient Deposits; and (iv) all liabilities and obligations with respect to the Attain Patient Benefits; (collectively, the "Assumed

Liabilities"). Buyer covenants and agrees that it will indemnify Seller for any future claims, losses, or damages incurred by Seller in connection with the Assumed Liabilities.

1.4 Excluded Liabilities. Notwithstanding any provision in this Agreement or any other writing to the contrary, Buyer is not assuming and shall not be responsible for, pay, perform or discharge, and shall not otherwise bear the economic burden of, any Liabilities of Debtors or its Affiliates of any kind or nature whatsoever other than the Assumed Liabilities (all such Liabilities other than the Assumed Liabilities being herein referred to as the "Excluded Liabilities"), which Excluded Liabilities shall be retained by and remain the responsibility of Debtors.

1.5 Non-Assignable Assets. Notwithstanding anything in this Agreement to the contrary, to the extent that the assignment of all or any portion of any Purchased Assets shall be prohibited by Law (including by Order of a Governmental Authority), requires a Consent, or advance notice to, a counterparty (if any) or requires the consent of any other third party that has not been obtained as of the Closing, and which restriction, consent right or right to advance notice cannot be effectively overridden or canceled by any order of the Bankruptcy Court or any provision of the Bankruptcy Code (each, a "Non-Assignable Asset"):

(a) this Agreement shall not constitute an assignment or transfer of title to any such Non-Assignable Asset, unless and until any applicable restrictions described above prohibiting the assignment of such Non-Assignable Asset are satisfied or waived, except to the extent set forth in this Section 1.5;

(b) title to such Non-Assignable Asset shall not be transferred except and until provided in Section 1.5(d), and Debtors shall retain each such Non-Assignable Asset and all of the Liabilities of Debtors related to, or arising from, such Non-Assignable Asset accruing on and after the Closing, and such Liabilities shall not be considered Assumed Liabilities;

(c) Buyer and Seller shall continue to use reasonable best efforts to address the applicable restriction, obtain the consents of the counter parties to the Assigned Contracts set forth on Schedule 1.5(c) or obtain a waiver of the issue impacting the ability of Seller to assign such Non-Assignable Asset hereunder; and

(d) title to each Non-Assignable Asset shall automatically and without further action of the Parties be assigned pursuant to this Agreement to Buyer upon satisfaction or waiver of the applicable restrictions affecting such Non-Assignable Asset, and all of the performance obligations of Debtors arising under such Non-Assignable Asset accruing after the date of such assignment shall constitute Assumed Liabilities as of such date other than any of such Liabilities that constitute Excluded Liabilities.

1.6 Purchase Price. The purchase price shall be ("Purchase Price"):

(a) One Hundred Thousand Dollars ($100,000) in immediately available funds shall be payable to the Seller at the Closing;

(b) In the event that a Qualified Bidder assumes the Alabama Attain Financial Liabilities from the Estates, on terms and conditions reasonably acceptable to the Buyer, the Buyer shall pay an additional One Hundred Fifty Thousand Dollars ($150,000) to the Seller, such amount to be payable within 30 days of the order approving such assumption; and

(c) In the event the Alabama Attain Financial Liabilities are not assumed as described in Section 1.6(b) above, the Purchase Price shall be limited to the amount set forth in Section 1.6(a).

1.7 Deposit. In accordance with the Bidding Procedures, Buyer is delivering via wire transfer of immediately available funds Ten Thousand Dollars ($10,000) to the account set forth on Schedule 1.7 (the "Deposit").

1.8 Attain Program. Regardless of whether a Qualified Bidder assumes the Alabama Attain Financial Liabilities, Buyer covenants and agrees that it will provide the existing Attain Patient Benefits to

-4-

the Practice Patients.  Buyer acknowledges and agrees that if no Qualified Bidder assumes the Alabama Attain Financial Liabilities, Buyer's obligation to honor the Attain Patient Benefits may result in material financial detriment to Buyer.

1.9     Services Related to Patient Deposits.  Buyer covenants and agrees that it will provide, to any of its Practice Patients who made Patient Deposits, all services promised to such patients, regardless of whether the Patient Deposits were reserved or which party made such promises.  Buyer acknowledges and agrees that its obligation to honor these Patient Deposits may result in material financial detriment to Buyer.

1.10    IntegraMed Management of Mobile, LLC.  At the Closing, Seller shall withdraw as a Member of, and shall assign, transfer, and convey any and all Units, Percentage Interest, or any other indicia of ownership in IntegraMed Management of Mobile, LLC, a Delaware limited liability company ("IM Mobile"), back to such company and shall waive and relinquish any and all rights it may have under the Amended and Restated Limited Liability Company Agreement of such company dated January 1, 2016.

1.11    Severance of IntegraMed Relationship.  At the Closing, Seller shall take such actions on behalf of the Estates to reject the following agreements (collectively, the "IntegraMed Contracts") pursuant to Section 365 of the Unites States Bankruptcy Code, rendering them null and void as of the Closing:

(a)     Management Services Agreement dated January 1, 2016 by and between the Buyer and IntegraMed Fertility Holding Corp., a Delaware corporation and a Debtor;

(b)     Strategic Advisory Services Agreement by and between the Buyer and IM Mobile;

(c)     Securities Transfer Restriction Agreement by and between IM Mobile and Lisa Tucker, M.D., dated January 1, 2016;

(d)     Securities Transfer Restriction Agreement by and between IM Mobile and Inge, dated January 1, 2016; and

(e)     Securities Transfer Restriction Agreement by and between IM Mobile and Koulianos, dated January 1, 2016.

1.12    Dismissal of Lawsuit.  As soon as practical following entry of the Sale Order, Buyer shall cause the Lawsuit to be dismissed with prejudice against all defendants named in the Lawsuit, including those defendants named in the original complaint filed January 15, 2020, and those defendants named in the amended complaint, dated March 15, 2020 and shall deliver evidence of such dismissal to Seller promptly upon receipt.

## ARTICLE 2
## THE CLOSING

2.1     Closing.  The closing of the transactions contemplated by this Agreement (the "Closing") shall take place at the offices of Cozen O'Connor in Wilmington, Delaware or electronically by the mutual exchange of facsimile or portable document format (.PDF) signatures, (a) commencing at 10:00 a.m. eastern standard time on the first (1st ) Business Day following the satisfaction or waiver of all conditions to Closing set forth in Article 8 (other than those conditions that by their nature are to be satisfied by actions taken at the Closing), or (b) at such other place or time as may be mutually agreed to by the Parties (the date on which the Closing actually occurs, the "Closing Date").  All transactions contemplated herein to occur on and as of the Closing Date shall be deemed to have occurred simultaneously and to be effective as of 12:01 a.m. eastern standard time on the Closing Date.

2.2     Closing Deliveries of Seller.  At or prior to the Closing, Seller shall deliver to Buyer:

PD.29028619.3

(a)     a copy of the Sale Order entered by the Bankruptcy Court; and

(b)     a Bill of Sale or other document accomplishing the transfer of the Purchased Assets to the Buyer free and clear of any and all liens or other encumbrances;

(c)     an Assignment and Assumption Agreement or other document accomplishing the assignment to, and assumption by, the Buyer of the Assumed Liabilities;

(d)     evidence of the withdrawal and assignment described in Section 1.10 hereof.

(e)     a Mutual Release and Covenant Not to Sue;

(f)     all other instruments and documents required by this Agreement to be delivered by Seller to Buyer (including, without limitation, those instruments and documents set forth in Section 8.1 below), and such other instruments and documents required to effectuate the transactions contemplated hereby.

All such agreements, documents and other items shall be in form and substance satisfactory to Buyer.

2.3     Closing Deliveries of Buyer. At or prior to the Closing, Buyer shall deliver to Seller:

(a)     a certificate, in form and substance reasonably satisfactory to Seller, confirming that each of the conditions specified below in Sections 8.2(a)-(b) is satisfied; and

(b)     an Assignment and Assumption Agreement or other document accomplishing the assignment to, and assumption by, the Buyer of the Assumed Liabilities;

(c)     all other instruments and documents required by this Agreement to be delivered by Buyer to Seller, and such other instruments and documents which Seller or their counsel may reasonably request to effectuate the transactions contemplated hereby;

(d)     written instructions authorizing the release of the Deposit to the Seller;

(e)     a Mutual Release and Covenant Not to Sue; and

(f)     the Purchase Price (less the Deposit).

All such agreements, documents and other items shall be in form and substance satisfactory to Seller.

## ARTICLE 3
## REPRESENTATIONS AND WARRANTIES OF BUYER

Buyer represents and warrants to Seller that the statements contained in this Article 3 are correct and complete as of the date of this Agreement and will be correct and complete as of the Closing Date (as though made then and as though the Closing Date were substituted for the date of this Agreement throughout this Article 3).

3.1     Organization of Buyer. Buyer is professional corporation duly formed, validly existing and in good standing under the Laws of the State of Alabama.

3.2     Authorization of Transaction. Buyer has full power and authority to execute and deliver this Agreement and the Ancillary Agreements to which Buyer is a party and to perform Buyer's obligations hereunder and thereunder. The execution and delivery by Buyer of this Agreement and the Ancillary Agreements to which Buyer is a party and the performance by Buyer of the transactions contemplated hereby and thereby have been duly approved by all requisite action of Buyer. Assuming the due authorization, execution and delivery of this Agreement and the Ancillary Agreements by the other parties thereto, this Agreement and each Ancillary Agreement to which Buyer is a party constitute the valid and legally binding obligation of Buyer, enforceable against Buyer in accordance with their terms, except as such enforceability may be limited by bankruptcy, insolvency, reorganization, moratorium and similar laws

affecting creditors generally and by the availability of equitable remedies.  Except as required to comply with applicable federal and state securities Laws, Buyer is not required to give any notice to, make any filing with, or obtain any Consent of any Governmental Authority or any other Person in order to consummate the transactions contemplated by this Agreement or the Ancillary Agreements to which Buyer is a party.

3.3 Non-contravention.  Neither the execution and the delivery of this Agreement nor the Ancillary Agreements to which Buyer is a party, nor the consummation of the transactions contemplated hereby and thereby, will (i) violate or conflict with any Law or Order to which Buyer is subject, (ii) violate any provision of the Organizational Documents of Buyer, or (iii) conflict with, result in a breach of, constitute a default under, result in the acceleration of, create in any party the right to accelerate, terminate, modify, or cancel, or require any notice under any Contract to which Buyer is a party or by which it is bound or to which any of its assets is subject.

3.4 Ability to pay Purchase Price.  Buyer has sufficient liquid assets to enter into the transactions contemplated herein and to pay the Purchase Price in full in cash at the Closing.

3.5 No Other Representations.  Except for the representations and warranties set forth in this Article 3, Buyer nor any of its direct or indirect equityholders or their respective officers, directors, managers, or any of their respective representatives or agents has made or makes any other representations or warranties, written or oral, express or implied, with respect to Buyer.

## ARTICLE 4
### REPRESENTATIONS AND WARRANTIES OF SELLER

4.1 Authority.  Seller is the Chapter 7 Trustee in the Bankruptcy Case. Subject to entry of the Sale Order, Seller has the authority to enter into this Agreement and to consummate the transactions contemplated hereby.

4.2 No Representations.  EXCEPT AS EXPRESSLY PROVIDED HEREIN OR IN THE SALE ORDER, BUYER AGREES AND ACKNOWLEDGES THAT THE TRANSFER OF THE ASSETS IS MADE PURSUANT TO ORDER OF THE BANKRUPTCY COURT AND IS MADE "AS IS" AND "WHERE IS", AND ACKNOWLEDGES AND AGREES THAT, EXCEPT AS EXPRESSLY PROVIDED HEREIN, SELLER MAKES NO REPRESENTATION OR WARRANTY OF ANY KIND WHATSOEVER WITH RESPECT TO THE ASSETS OR OTHERWISE, EXPRESS OR IMPLIED, INCLUDING BUT NOT LIMITED TO ANY REPRESENTATION OR WARRANTY REGARDING THE TITLE OR CONDITION OF THE ASSETS OR THE FITNESS, DESIRABILITY, OR MERCHANTABILITY THEREOF OR SUITABILITY THEREOF FOR ANY PARTICULAR PURPOSE, OR ANY BUSINESS PROSPECTS, OR VALUATION OF THE ASSETS, OR THE COMPLIANCE OF THE ASSETS IN THEIR CURRENT OR FUTURE STATE WITH APPLICABLE LAWS OR ANY VIOLATIONS THEREOF.  BUYER FURTHER ACKNOWLEDGES THAT SELLER SHALL DELIVER TO THE BUYER ALL ASSETS IN SELLER'S OR HIS COUNSEL'S POSSESSION; BUT THAT SELLER DOES NOT HAVE POSSESSION OF ALL OF THE ASSETS, AND THAT TO THE EXTENT THE SELLER IS NOT IN POSSESSION OF AN ASSET SOLD HEREUNDER, BUYER WILL HAVE SOLE RESPONSIBILITY TO OBTAIN POSSESSION OF THE ASSETS.

## ARTICLE 5
### BANKRUPTCY MATTERS

5.1 Subject to Bankruptcy Court Approval and Higher and Better Offers.  Seller will use his reasonable best efforts to obtain the entry of the sale order substantially in the form attached as Exhibit B hereto (the "Sale Order"), authorizing Seller's entry into this Agreement with Buyer and the transactions contemplated herein, and Buyer shall reasonably cooperate with Seller as may be necessary to obtain the Sale Order.  Notwithstanding the foregoing, Buyer acknowledges that this Agreement (including the sale

-7-

of the Purchased Assets and the assumption and assignment of the Assigned Contracts) is subject to approval by the Bankruptcy Court and that this Agreement is subject to termination in the event Seller receives a higher and better offer for the Purchased Assets in accordance with the Bidding Procedures.

## ARTICLE 6
## PRE-CLOSING COVENANTS

6.1     Closing Efforts. Each of the Parties agree with respect to the period between the execution of this Agreement and the Closing. Buyer will use all commercially reasonable efforts to take all action and to do all things necessary, proper, or advisable in order to consummate and make effective the transactions contemplated by this Agreement (including satisfaction, but not waiver, of the closing conditions set forth in Article 8).

6.2     Access and Cooperation. From the date hereof through the Closing Date, Seller shall respond to reasonable requests of Buyer and its representatives (including its legal advisors, financing sources, financial advisors and accountants) for access, during normal business hours and upon reasonable advance notice, to the properties, books, records and personnel of such Seller related to the Purchased Assets or the Assumed Liabilities; provided, however, that in no event shall Seller be obligated to provide (i) access or information that would be in violation of applicable Law, (ii) bids, letters of intent, expressions of interest, or other proposals received from others in respect of the business of Debtors or in connection with the transactions contemplated hereby or otherwise, and information and analyses relating to such communications, (iii) any information that constitutes attorney work product or that would violate any legal privilege available to such Seller or any of its Affiliates relating to such information or would cause such Seller or any of its Affiliates to breach a confidentiality obligation to which it is bound; provided, however, that such Seller and its Affiliates have used reasonable best efforts to obtain any necessary third party consents to such inspection or disclosure, or (iv) personnel records of such Seller or any of its Affiliates relating to individual performance or evaluation records, medical histories or other information the disclosure of which is prohibited by applicable Law. In connection with such access, Buyer's representatives shall cooperate with Seller's representatives and shall use their reasonable best efforts to minimize any disruption of the Debtors' business.

## ARTICLE 7
## POST-CLOSING COVENANTS

7.1     General. In case at any time between the Closing and the closing of the Bankruptcy Cases, any further action is necessary to carry out the purposes of this Agreement, Seller will take such further action, to the extent reasonable and practicable (including the execution and delivery of such further instruments and documents), as Buyer reasonably may request, all at the sole cost and expense of the Buyer. Seller acknowledges and agrees that, from and after the Closing, Buyer will be entitled to possession of all documents, books, records (including Tax records), agreements and financial data of any sort relating to the Practice; provided, however, that Seller shall be permitted to retain copies of all such documents, books, records, agreements and financial data as Seller shall deem are necessary in his administration of the Estates. In case at any time after the Closing, the Estate requires additional information or access to the books and records in the possession of the Buyer, Buyer shall respond to reasonable requests of Seller and its representatives (including its legal advisors, financing sources, financial advisors and accountants) for access, during normal business hours and upon reasonable advance notice, to the properties, books, records and personnel of the Practice.

PD.29028619.3

# ARTICLE 8
## CLOSING CONDITIONS

8.1     <u>Conditions to Obligation of Buyer</u>.  The obligation of Buyer to consummate the transactions to be performed by Buyer in connection with the Closing is subject to satisfaction (or, in the sole discretion of Buyer, waiver in writing) of the following conditions:

(a)     Seller shall have performed and complied in all material respects with all of the covenants and agreements in this Agreement to be performed by Seller prior to or at the Closing;

(b)     the Bankruptcy Court shall have entered the Sale Order;

(c)     The Bankruptcy Court shall have approved and authorized the assumption and assignment of each Assigned Contract, free and clear of all liens, encumbrances, and pre-closing liabilities or obligations of any kind;

(d)     There shall not be any Order in effect preventing consummation of any of the transactions contemplated by this Agreement or any Proceeding seeking to restrain, prevent, change or delay the consummation of any of the transactions contemplated by this Agreement; and

(e)     Seller shall have made all of the deliveries contemplated by <u>Section 2.2</u> of this Agreement.

8.2     <u>Conditions to Seller's Obligations</u>.  Seller's obligations to consummate the transactions to be performed by them in connection with the Closing are subject to satisfaction (or, in the sole discretion of Seller, waiver in writing) of the following conditions:

(a)     All of the representations and warranties concerning Buyer contained in <u>Article 3</u> must have been true and correct in all material respects as of the date hereof and must be true and correct in all material respects on the Closing Date as if made on the Closing Date;

(b)     the Bankruptcy Court shall have entered the Sale Order;

(c)     Buyer must have performed and complied in all material respects with all of its covenants and agreements in this Agreement to be performed prior to or at the Closing;

(d)     There shall not be any Order in effect preventing consummation of any of the transactions contemplated by this Agreement or any Proceeding seeking to restrain, prevent, change or delay the consummation of any of the transactions contemplated by this Agreement; and

(e)     Buyer shall have made all of the deliveries contemplated by <u>Section 2.3</u> of this Agreement.

# ARTICLE 9
## SURVIVAL

9.1     <u>Survival</u>.  Except as expressly set forth in this Agreement to the contrary, all representations and warranties of Buyer and Seller, respectively, contained in this Agreement or in any document delivered pursuant hereto shall be deemed to be material and to have been relied upon by Buyer and Seller, respectively, for purposes of Closing; <u>provided</u>, <u>however</u>, the Parties acknowledge and agree that all such representations and warranties shall expire, and be of no further force or effect upon the Closing, and neither Buyer nor Seller shall have any liability in respect of any breach thereof upon the Closing.

PD.29028619.3

# ARTICLE 10
## TAX MATTERS

The following provisions will govern the allocation of responsibility as between Buyer and Seller for certain tax matters following the Closing Date:

10.1     <u>Cooperation on Tax Matters</u>.  Buyer and Seller will cooperate, as and to the extent reasonably requested by the other Party, in connection with the filing and preparation of Tax Returns pursuant to this <u>Article 10</u> and any Proceeding related thereto.  Such cooperation will include the retention and (upon the other Party's request) the provision of records and information that are reasonably relevant to preparation of such Tax Returns and any such Proceeding and making employees available on a mutually convenient basis to provide additional information and explanation of any material provided hereunder.  Without limiting the generality of the foregoing, Seller shall retain, until thirty (30) days after the expiration of the applicable statute of limitations (including any extensions) has expired, copies of all Tax Returns relating to, or containing information concerning, the Purchased Assets, supporting work schedules, and other records or information that may be relevant to such Tax Returns for all tax periods or portions thereof ending on or before the Closing Date and shall not destroy or otherwise dispose of any such records without first providing the Buyer with a reasonable opportunity to review and copy the same.

10.2     <u>Allocation of Purchase Price</u>.  The parties agree that the Purchase Price (and other relevant items) shall be allocated among the Purchased Assets in accordance with their relative fair market values as determined by Buyer in its sole discretion.  Buyer shall prepare and deliver to Seller within 45 Business Days after the Closing Date a schedule (the "<u>Allocation Schedule</u>") allocating the Purchase Price among the applicable assets as of the beginning of the day after the Closing Date.  The Allocation Schedule shall be binding on the parties hereto, and the parties hereto agree not to take (or permit any of their Affiliates to take) any position for any Tax purpose or on any Tax Return (including amended returns and claims for refund) or other information returns that is inconsistent with such Allocation Schedule.

# ARTICLE 11
## TERMINATION

11.1     <u>Termination of Agreement</u>.  Certain of the Parties may terminate this Agreement as provided below:

(a)     Buyer and Seller may terminate this Agreement by mutual written consent at any time prior to the Closing.

(b)     Seller may terminate this Agreement by giving written notice to Buyer at any time prior to the Closing (i) in the event Buyer has breached any representation, warranty, or covenant contained in this Agreement which individually, or in the aggregate, would reasonably be expected to result in a failure of the closing conditions set forth in <u>Section 8.2(a) or 8.2(b)</u> of this Agreement, and such breach remains uncured for a period of ten (10) Business Days following delivery of notice thereof by Buyer; <u>provided</u>, <u>however</u>, that no cure period will be required for any such breach that by its nature cannot be cured or (ii) if the Closing shall not have occurred on or before August 15, 2020 (unless the failure results primarily from Seller breaching any representation, warranty, or covenant contained in this Agreement).

(c)     Seller may terminate this Agreement by giving written notice to Buyer if (i) all of the conditions set forth in <u>Sections 8.1</u> and <u>8.2</u> have been satisfied (other than those conditions that by their terms are to be satisfied by actions taken at the Closing, but such conditions must be capable of being satisfied if the Closing Date were the date valid notice of termination of this Agreement is delivered by Seller to Buyer), and (ii) Buyer fails to complete Closing within 3 Business Days of the time set forth in <u>Section 2.1</u>.

PD.29028619.3

(d)      Buyer or Seller may terminate this Agreement by giving written notice to the other Party if the Bankruptcy Court enters an order dismissing the Bankruptcy Cases prior to the approval of the Sale Motion and entry of the Sale Order.

(e)      Buyer or Seller may terminate this Agreement by giving written notice to the other Party if there is in effect a final nonappealable order of a Governmental Authority of competent jurisdiction restraining, enjoining, or otherwise prohibiting the consummation of the transactions described in this Agreement.

(f)      Buyer or Seller may terminate by giving written notice to the other party, if (a) (i) Seller enters into a definitive agreement with respect to an Alternative Transaction, (ii) the Bankruptcy Court enters an order approving an Alternative Transaction, and (iii) the Alternative Transaction is consummated, or (b) the Bankruptcy Court enters an order that precludes the consummation of the transactions contemplated hereby on the terms and conditions set forth in this Agreement.

11.2      Procedure upon Termination.  In the event of termination by Buyer or Seller, or both, pursuant to Section 11.1, written notice thereof will forthwith be given to the other Parties, and this Agreement will terminate, the Deposit shall be returned to the Buyer and the purchase of the Purchased Assets hereunder will be abandoned, without further action by Buyer or Seller.

## ARTICLE 12
## DEFINITIONS

"Affiliate" means, with respect to the Person to which it refers, (a) a Person that directly or indirectly, through one or more intermediaries, controls, is controlled by or is under common control with, such Person, (b) any officer, director or shareholder of such Person, (c) any parent, sibling, descendant or spouse of such Person or of any of the Persons referred to in clauses (a) and (b), and (d) any corporation, limited liability company, general or limited partnership, trust, association or other business or investment entity that directly or indirectly, through one or more intermediaries controls, is controlled by or is under common control with any of the foregoing individuals.  For purposes of this definition, the term "control" of a Person shall mean the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies, whether through the ownership of voting securities, by contract or otherwise.

"Agreement" has the meaning set forth in the Preamble.

"Alternative Transaction" a sale to a purchaser other than the Buyer and the Bankruptcy Court enters an order approving such sale.

"Ancillary Agreements" means all of the agreements being executed and delivered pursuant to this Agreement.

"Assigned Contracts" means the Contracts set forth on Schedule 1.3(a)

"Assumed Liabilities" has the meaning set forth in Section 1.2.

"Bankruptcy Cases" has the meaning set forth in the Preliminary Statements.

"Bankruptcy Court" has the meaning set forth in the Preliminary Statements.

"Bidding Procedures" has the meaning set forth in the Preliminary Statements.

"Bidding Procedures Order" has the meaning set forth in the Preliminary Statements.

"Business Day" means any day that is not a Saturday, Sunday or any other day on which banks are required or authorized by Law to be closed in New York, New York.

"Buyer" has the meaning set forth in the Preamble.

"Claim" means any claim, demand, allegation, charge, dispute, complaint, or notice.

-11-

"Closing" has the meaning set forth in Section 2.1.

"Closing Date" has the meaning set forth in Section 2.1.

"Code" means the Internal Revenue Code of 1986, as amended, and any applicable rules and regulations thereunder, and any successor to such statute, rules or regulations.

"Consent" means, with respect to any Person, any consent, approval, authorization, permission or waiver of, or registration, declaration or other action or filing with or exemption by such Person.

"Contract" means any oral or written contract, obligation, understanding, commitment, lease, license, instrument, purchase order, bid or other agreement.

"Cure Payments" means the amount required to be paid with respect to each Assigned Contract to cure all defaults under such Assigned Contract to the extent required by Section 365 of the Bankruptcy Code and to otherwise satisfy all requirements imposed by Section 365 of the Bankruptcy Code as determined by the Bankruptcy Court, in order to effectuate, pursuant to the Bankruptcy Code, the assumption by Seller and assignment to Buyer of each such Assigned Contract.

"Debtors" has the meaning set forth in the Preamble.

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended.

"ERISA Affiliate" means any Person that, together with a Debtor, would be treated as a single employer under Section 414 of the Code or Section 4001 of ERISA and the regulations thereunder.

"Excluded Assets" has the meaning set forth in Section 1.2.

"Governmental Authority" means any foreign or domestic federal, state or local government or quasi-governmental authority, political or economic union, or arbitration tribunal or any department, agency, subdivision, court, commission, or other tribunal of any of the foregoing.

"Inge" means George B. Inge, M.D.

"Koulianos" means George T. Koulianos, M.D.

"Law" means any foreign or domestic federal, state or local law, statute, code, ordinance, regulation, rule, directive, consent agreement, constitution or treaty of any Governmental Authority, including common law.

"Lawsuit" means the civil case pending in the Circuit Court of Mobile County, Alabama, filed by Koulianos and Inge, as plaintiffs, bearing civil action number CV-2020-900108.

"Liability" means any liability, whether known or unknown, whether asserted or unasserted, whether absolute or contingent, whether accrued or unaccrued, whether liquidated or unliquidated, and whether due or to become due.

"Lien" means any lien, mortgage, pledge, encumbrance, charge, security interest, adverse claim, liability, interest, charge, preference, priority, proxy, transfer restriction (other than restrictions under the Securities Act and state securities laws), encroachment, Tax, order, community property interest, equitable interest, option, warrant, right of first refusal, easement, profit, license, servitude, right of way, covenant or zoning restriction.

"Mutual Release and Covenant Not to Sue" means an agreement and release, by and between the Buyer, the Seller, and the Estates, on behalf of the Debtors, in substantially the form attached hereto as Exhibit A.

"Non-Assignable Asset" has the meaning set forth in Section 1.5.

PD.29028619.3

"Order" means any order, award, decision, injunction, judgment, ruling, decree, charge, writ, subpoena or verdict entered, issued, made or rendered by any Governmental Authority or arbitrator, including the Bankruptcy Court.

"Organizational Documents" means (a) any certificate or articles of incorporation, bylaws, certificate or articles of formation, operating agreement or partnership agreement, (b) any documents comparable to those described in clause (a) as may be applicable pursuant to any Law and (c) any amendment or modification to any of the foregoing.

"Party" has the meaning set forth in the Preamble.

"Person" means any individual, corporation, partnership, limited liability company, firm, joint venture, association, joint-stock company, estate, trust, unincorporated organization, Governmental Authority or other entity, of whatever nature.

"Petition Date" has the meaning set forth in the Preliminary Statements.

"Proceeding" means any action, audit, lawsuit, litigation, proceeding, investigation, complaint, arbitration or mediation (in each case, whether civil, criminal or administrative), filed or initiated with or by, or pending by or before, any Governmental Authority, arbitrator or mediator.

"Purchase Price" has the meaning set forth in Section 1.6.

"Sale Motion" has the meaning set forth in the Preliminary Statements.

"Sale Order" has the meaning set forth in Section 5.1.

"Securities Act" means the Securities Act of 1933, as amended, and any applicable rules and regulations thereunder, and any successor to such statute, rules or regulations.

"Seller" or "Seller" has the meaning set forth in the Preamble.

"Tax" or "Taxes" means any federal, state, local and foreign net income, alternative or add-on minimum, estimated, gross income, gross receipts, sales, use, ad valorem, value added, transfer, franchise, capital profits, lease, service, license, withholding, payroll, employment, excise, severance, stamp, occupation, premium, property, abandoned property or escheat, environmental or windfall profit tax, customs duty or other tax of any kind whatsoever, governmental fee or other like assessment or charge (and any liability incurred or borne by virtue of the application of Treasury Regulation Section 1.1502-6 (or any similar or corresponding provision of state, local or foreign Law), as a transferee or successor, by contract or otherwise), together with all interest, penalties, additions to tax and additional amounts with respect thereto whether disputed or not and including any obligations to indemnify or otherwise assume or succeed to the Tax lability of any other Person.

"Tax Return" means any return, declaration, report, claim for refund, or information return or statement relating to Taxes, including any schedule or attachment thereto, and including any amendment thereof.

"Transfer Taxes" means any transfer, documentary, sales, use, stamp, registration, value added, excise, or other such similar Taxes (including all applicable real estate transfer Taxes) and related conveyance fees, recording charges and other fees or charges (including any penalties and interest and expenses attributable thereto).

## ARTICLE 13
## MISCELLANEOUS

13.1    No Third-Party Beneficiaries.  Except as specifically provided in this Agreement, this Agreement shall not confer any rights or remedies upon any Person other than the Parties and their respective successors and permitted assigns.

-13-

13.2    Entire Agreement.  This Agreement (including the documents referred to herein) constitutes the entire agreement among the Parties and supersedes any prior understandings, agreements, or representations by or among the Parties, written or oral, to the extent they relate in any way to the subject matter hereof.

13.3    Succession and Assignment.  This Agreement shall be binding upon and inure to the benefit of the Parties named herein and their respective successors and permitted assigns.  No Party may assign either this Agreement or any of its rights, interests, or obligations hereunder without the prior written approval of Buyer and Seller; provided, however, that Buyer may (a) assign any or all of its rights and interests hereunder to one or more of its Affiliates and designate one or more of its Affiliates to perform its obligations hereunder (in any or all of which cases Buyer nonetheless shall remain responsible for the performance of all of its obligations hereunder), (b) assign its rights under this Agreement for collateral security purposes to any Person providing financing to Buyer, its subsidiaries or Affiliates (including by the granting of Liens in respect of its rights and interests hereunder to any such lenders (and any agent for such lenders)), and the Parties consent to any exercise by such lenders (and such agent) of their rights and remedies with respect to such collateral, or (c) assign its rights under this Agreement to any Person that acquires the Buyer or any of its assets.

13.4    Counterparts.  This Agreement may be executed in one or more counterparts, each of which shall be deemed an original but all of which together will constitute one and the same instrument, and shall become effective when one or more such counterparts has been signed by each of the Parties and delivered to the other Parties.  Counterparts may be delivered via facsimile, electronic mail (including portable document format (PDF)) or any electronic signature complying with the U.S. federal ESIGN Act of 2000, e.g., www.docusign.com.

13.5    Titles and Headings.  Titles and section headings contained in this Agreement are inserted for convenience only and shall not affect in any way the meaning or interpretation of this Agreement.

13.6    Notices.  All notices, requests, demands, claims, and other communications hereunder will be in writing.  Any notice, request, demand, claim, or other communication hereunder shall be deemed duly given (a) when delivered personally to the recipient, (b) when sent by electronic mail, on the date of transmission to such recipient, so long as a receipt of such electronic mail or facsimile is requested, (c) one Business Day after being sent to the recipient by reputable overnight courier service (charges prepaid), or (d) four Business Days after being mailed to the recipient by certified or registered mail, return receipt requested and postage prepaid, and addressed to the intended recipient as set forth below:

| | |
|---|---|
| If to Seller: | Jeoffrey Burtch, Chapter 7 Trustee<br>919 North Market Street, Suite 460<br>P.O. Box 549<br>Wilmington, DE 19801<br>Email: JBurtch@burtchtrustee.com |
| Copy to (which shall not constitute notice): | Mark E. Felger, Esq.<br>Cozen O'Connor<br>1201 N. Market St., Ste. 1001<br>Wilmington, DE 1980<br>Email: mfelger@cozen.com |
| If to Buyer: | The Center For Reproductive Medicine, PC,<br>Attn: George T. Koulianos, M.D.<br>3 Mobile Infirmary Circle<br>Mobile, AL 36607 |

-14-

Email: georgetkoulianos@gmail.com

| Copy to (which shall not constitute notice): | Thomas F. Garth, Esq.<br>William Gamble, Esq.<br>Phelps Dunbar, LLP<br>101 Dauphin St., Ste. 1000<br>Mobile, AL 36652<br>Email: tom.garth@phelps.com<br>will.gamble@phelps.com |

Any Party may change the address to which notices, requests, demands, claims, and other communications hereunder are to be delivered by giving the other Parties notice in the manner herein set forth.

13.7    Governing Law.  This Agreement and any claim, controversy or dispute arising out of or related to this Agreement, any of the transactions contemplated hereby, the relationship of the parties, and/or the interpretation and enforcement of the rights and duties of the parties, whether arising in contract, tort, equity or otherwise, shall be governed by and construed in accordance with the domestic Laws of the State of Delaware (including in respect of the statute of limitations or other limitations period applicable to any such claim, controversy or dispute), without giving effect to any choice or conflict of Law provision or rule (whether of the State of Delaware or any other jurisdiction) that would cause the application of the Laws of any jurisdiction other than the State of Delaware.

13.8    Amendments and Waivers.  No amendment of any provision of this Agreement shall be valid unless the same shall be in writing and signed by Buyer and Seller.  No waiver by any Party of any provision of this Agreement or any default, misrepresentation, or breach of warranty or covenant hereunder, whether intentional or not, shall be valid unless the same shall be in writing and signed by the Party against whom the waiver is to be effective nor shall such waiver be deemed to extend to any prior or subsequent default, misrepresentation, or breach of warranty or covenant hereunder or affect in any way any rights arising by virtue of any prior or subsequent such occurrence.

13.9    Specific Performance.  Each Party agrees that the other Parties will be entitled to obtain an injunction or injunctions to prevent breaches of the provisions of this Agreement and to enforce specifically this Agreement and its terms and provisions in any action instituted in the Bankruptcy Court without the need to post a bond or other security, subject to Section 13.7 and Section 13.15 in addition to any other remedy to which it may be entitled, at law or in equity.

13.10    Severability. The provisions of this Agreement will be deemed severable and the invalidity or unenforceability of any provision will not affect the validity or enforceability of the other provisions hereof; provided, however, that if any provision of this Agreement, as applied to any Party or to any circumstance, is adjudged by a Governmental Authority or arbitrator not to be enforceable in accordance with its terms, the Parties agree that such Governmental Authority or arbitrator making such determination will have the power to modify the provision in a manner consistent with its objectives such that it is enforceable, or to delete specific words or phrases, and in its reduced form, such provision will then be enforceable and will be enforced.

13.11    Expenses.  Except as otherwise expressly provided in this Agreement, each Party will bear its own costs and expenses (including legal fees and expenses) incurred in connection with this Agreement and the transactions contemplated hereby.

13.12    Construction.  The Parties have participated jointly in the negotiation and drafting of this Agreement.  In the event an ambiguity or question of intent or interpretation arises, this Agreement shall

be construed as if drafted jointly by the Parties and no presumption or burden of proof shall arise favoring or disfavoring any Party by virtue of the authorship of any of the provisions of this Agreement. Any reference to any Law shall be deemed also to refer to all rules and regulations promulgated thereunder, unless the context requires otherwise. References in this Agreement to any gender include references to all genders, and references to the singular include references to the plural and vice versa. The words "include", "includes" and "including" when used in this Agreement shall be deemed to be followed by the phrase "without limitation" or "but not limited to". Unless the context otherwise requires, references in this Agreement to Articles, Sections, Schedules and Exhibits shall be deemed references to Articles and Sections of, and Schedules and Exhibits to, this Agreement. Unless the context otherwise requires, the words "hereof", "hereby" and "herein" and words of similar meaning when used in this Agreement refer to this Agreement in its entirety and not to any particular Article, Section or provision of this Agreement. When calculating the period of time before which, within which or following which any act is to be done or any step taken pursuant to this Agreement, the date that is the reference date in calculating such period shall not be calculated as the first day of such period of time. If the last day of such period is a non-Business Day, the period in question shall end on the next succeeding Business Day.

13.13    <u>Incorporation of Exhibits</u>. The Exhibits and Schedules identified in this Agreement are incorporated herein by reference and made a part hereof.

13.14    <u>Schedules</u>. Nothing in the schedules hereto shall be deemed adequate to disclose an exception to a representation or warranty made herein unless the schedule identifies the exception with reasonable particularity and describes the relevant facts in reasonable detail. Without limiting the generality of the foregoing, the mere listing (or inclusion of a copy) of a document or other item shall not be deemed adequate to disclose an exception to a representation or warranty made herein (unless the representation or warranty has to do with the existence of the document or other item itself). The Parties intend that each representation, warranty, and covenant contained herein shall have independent significance. If any Party has breached any representation, warranty or covenant contained herein in any respect, the fact that there exists another representation, warranty or covenant relating to the same subject matter (regardless of the relative levels of specificity) which the Party has not breached shall not detract from or mitigate the fact that the Party is in breach of the first representation, warranty, or covenant.

13.15    <u>Waiver of Jury Trial</u>. EACH OF THE PARTIES WAIVES THEIR RESPECTIVE RIGHTS TO A TRIAL BY JURY OF ANY CLAIM OR CAUSE OF ACTION BASED UPON OR ARISING OUT OR RELATED TO THIS AGREEMENT, OR THE TRANSACTIONS CONTEMPLATED HEREBY OR IN ANY ACTION, PROCEEDING OR OTHER LITIGATION OF ANY TYPE BROUGHT BY ANY OF THE PARTIES AGAINST ANY OTHER PARTY OR ANY AFFILIATE OF ANY OTHER SUCH PARTY, WHETHER WITH RESPECT TO CONTRACT CLAIMS, TORT CLAIMS OR OTHERWISE. THE PARTIES AGREE THAT ANY SUCH CLAIM OR CAUSE OF ACTION SHALL BE TRIED BY A COURT TRIAL WITHOUT A JURY. WITHOUT LIMITING THE FOREGOING, THE PARTIES FURTHER AGREE THAT THEIR RESPECTIVE RIGHT TO A TRIAL BY JURY IS WAIVED BY OPERATION OF THIS SECTION AS TO ANY ACTION, COUNTERCLAIM OR OTHER PROCEEDING WHICH SEEKS, IN WHOLE OR IN PART, TO CHALLENGE THE VALIDITY OR ENFORCEABILITY OF THIS AGREEMENT OR ANY PROVISION HEREOF. THIS WAIVER SHALL APPLY TO ANY SUBSEQUENT AMENDMENTS, RENEWALS, SUPPLEMENTS OR MODIFICATIONS TO THIS AGREEMENT.

13.16    <u>Exclusive Venue</u>. THE PARTIES AGREE THAT ALL DISPUTES, LEGAL ACTIONS, SUITS AND PROCEEDINGS ARISING OUT OF OR RELATING TO THIS AGREEMENT MUST BE BROUGHT EXCLUSIVELY IN THE BANKRUPTCY COURT. EACH PARTY HEREBY CONSENTS AND SUBMITS TO THE EXCLUSIVE JURISDICTION OF THE BANKRUPTCY COURT. NO LEGAL ACTION, SUIT OR PROCEEDING WITH RESPECT TO THIS AGREEMENT MAY BE BROUGHT IN ANY OTHER FORUM. EACH PARTY HEREBY IRREVOCABLY WAIVES ALL CLAIMS OF IMMUNITY FROM JURISDICTION AND ANY OBJECTION WHICH SUCH PARTY

MAY NOW OR HEREAFTER HAVE TO THE LAYING OF VENUE OF ANY SUIT, ACTION OR PROCEEDING IN THE BANKRUPTCY COURT, INCLUDING ANY RIGHT TO OBJECT ON THE BASIS THAT ANY DISPUTE, ACTION, SUIT OR PROCEEDING BROUGHT IN THE BANKRUPTCY COURT HAS BEEN BROUGHT IN AN IMPROPER OR INCONVENIENT FORUM OR VENUE. EACH OF THE PARTIES ALSO AGREES THAT DELIVERY OF ANY PROCESS, SUMMONS, NOTICE OR OTHER DOCUMENT TO A PARTY HEREOF IN COMPLIANCE WITH SECTION 13.6 OF THIS AGREEMENT SHALL BE EFFECTIVE SERVICE OF PROCESS FOR ANY ACTION, SUIT OR PROCEEDING IN THE BANKRUPTCY COURT WITH RESPECT TO ANY MATTERS TO WHICH THE PARTIES HAVE SUBMITTED TO JURISDICTION AS SET FORTH ABOVE.

*[Remainder of Page Intentionally Left Blank]*

PD.29028619.3

IN WITNESS WHEREOF, the Parties hereto have executed this Asset Purchase Agreement as of the date first above written.

BUYER:

THE CENTER FOR REPRODUCTIVE MEDICINE, PC

By:_____

Name:_____

Title:_____

SELLER:

_____

Jeoffrey L. Burtch, in his capacity as Chapter 7 Trustee for the Estates of IntegraMed Holding Corp., IntegraMed America, Inc., Trellis Health, LLC, IntegraMed Fertility Holding Corp., Reproductive Partners, Inc., IntegraMed Management of Bridgeport, LLC, IntegraMed Florida Holdings, LLC, IntegraMed Management of Mobile, LLC, IntegraMed Management, LLC, and IntegraMed Medical Missouri, LLC.

**Schedule 1.1**
**Purchased Assets**

All accounts receivable related to the Practice up to and including the Closing Date;

Assigned Contracts; and

Those physical assets listed on the depreciation schedule on the following page.

| Class | Date Placed in Serv | Asset Name | Sum of Asset Cost Numeric | Sum of Accumulated Depreciation Numeric | Sum of Remaining Depreciation Numeric |
|---|---|---|---|---|---|
| PPD | 2/1/2016 000001 | 2016 Fertilitynetwork.com renewal | 2,287.09 | 2,287.09 | 0.00 |
| PPD | 4/1/2016 000021 | CITRIX LICENSES 03/16/03/17 | 1,014.69 | 1,014.69 | 0.00 |
| PPD | 4/1/2016 000022 | COLLEGE OF AMERICAN PATHOLOGISTS MEMBERSHIP THROUGH 03/17 | 4,917.00 | 4,917.00 | 0.00 |
| PPD | 4/1/2016 000023 | D+O Tail Policy | 15,300.00 | 11,087.00 | 4,213.00 |
| PPD | 5/1/2016 000032 | KASPERSKY LICENSES THROUGH 1/31/19 | 741.98 | 741.98 | 0.00 |
| PPD | 6/1/2016 000035 | MICROSOFT LICENSES 01/16-12/18 | 2,777.65 | 2,777.65 | 0.00 |
| PPD | 7/1/2016 000038 | FERTILITYINC 07/01/16-06/30-17 | 2,499.00 | 2,499.00 | 0.00 |
| PPD | 7/1/2016 000039 | SERVICE DESK MAINTENANCE 06/16/06/17 | 324.77 | 324.77 | 0.00 |
| PPD | 7/1/2016 000040 | WC INSURANCE THROUGH 10/16 | 5,438.00 | 5,438.00 | 0.00 |
| PPD | 7/1/2016 000041 | WC INSURANCE THROUGH 10/16 | 5,176.00 | 5,176.00 | 0.00 |
| PPD | 7/1/2016 000042 | DR. INGE KEY MAN LIFE INSURANCE | 6,779.00 | 6,779.00 | 0.00 |
| PPD | 12/1/2016 46 | SALESFORCE LICENSE THROUGH 10/17 | 2,880.41 | 2,880.41 | 0.00 |
| PPD | 1/1/2017 48 | Misys maintenance 11/16-10/17 | 3,595.64 | 3,595.64 | 0.00 |
| PPD | 2/1/2017 | Mobile Business License - Dr. K | 5,418.48 | 5,418.48 | 0.00 |
| PPD | 2/1/2017 | Mobile Business License Dr. Inge | 5,418.48 | 5,418.48 | 0.00 |
| PPD | 3/1/2017 | FertilityNetwork.com advertising - 2017 | 2,080.00 | 2,080.00 | 0.00 |
| PPD | 4/1/2017 | Citrix Licenses through 2/18 | 1,063.60 | 1,063.60 | 0.00 |
| PPD | 4/1/2017 | Key Man Life Insurance - Dr. Inge | 5,649.17 | 5,649.17 | 0.00 |
| PPD | 5/1/2017 | college of american pathologists annual lab fee through 03/18 | 5,152.00 | 5,152.00 | 0.00 |
| PPD | 5/1/2017 | Medallia subscription May-Dec 2017 | 2,688.32 | 2,688.32 | 0.00 |
| PPD | 6/1/2017 | Medallia implementation | 1,731.00 | 1,731.00 | 0.00 |
| PPD | 9/1/2017 | Microstrategy licenses 07/17-06/18 | 396.64 | 396.64 | 0.00 |
| PPD | 9/1/2017 | John Hancock - Dr. K life insurance policy through 06/18 | 1,801.00 | 1,801.00 | 0.00 |
| PPD | 12/1/2017 | Salesforce licenses 10/17-9/18 | 1,736.75 | 1,736.75 | 0.00 |
| PPD | 1/1/2018 | Medallia annual subscription fee 1/18-12/18 | 3,024.39 | 3,024.39 | 0.00 |
| PPD | 3/1/2018 | Dr. Koulianos Business taxes - imprest check | 4,826.91 | 4,826.91 | 0.00 |
| PPD | 3/1/2018 | Dr. Inge Business taxes - imprest check | 4,826.91 | 4,826.91 | 0.00 |
| PPD | 4/1/2018 | Lieberman managed services through 1/19 | 1,791.67 | 1,791.67 | 0.00 |
| PPD | 6/1/2018 | Data Innovations 6/1/18-5/31/19 | 2,228.36 | 2,228.36 | 0.00 |
| PPD | 7/1/2018 | MicroStrategy License 7/18-6/19 | 242.94 | 242.94 | 0.00 |
| PPD | 8/1/2018 | John Hancock Ins. 7/18-7/19 | 2,161.00 | 2,161.00 | 0.00 |
| PPD | 1/1/2019 | Medical Insurance - Q1 2019 | 65,503.00 | 65,503.00 | 0.00 |
| PPD | 3/1/2019 | Brighthouse Life Ins. 3/19 - 2/20 | 6,779.00 | 6,779.00 | 0.00 |
| PPD | 3/1/2019 | City of Mobile license - Dr. Inge | 6,116.35 | 6,116.35 | 0.00 |
| PPD | 3/1/2019 | City of Mobile license - Dr. Koulianos | 6,116.35 | 6,116.35 | 0.00 |
| PPD | 4/1/2019 | College of American Pathologists 4/19 - 3/20 | 6,170.00 | 6,170.00 | 0.00 |
| PPD | 4/1/2019 | Medical Insurance - Q2 2019 | 65,247.00 | 65,247.00 | 0.00 |
| PPD | 4/1/2019 | Jan-Pro Janitorial | 419.25 | 419.25 | 0.00 |
| PPD | 7/1/2019 | Medical Insurance - Q3 2019 | 63,342.00 | 63,342.00 | 0.00 |
| PPD | 8/1/2019 | John Hancock Life insurance policy 7/19-7/20 | 1,980.92 | 1,800.83 | 180.09 |
| PPD | 9/1/2019 | Beecher Carlson WC 10/18 - 10/19 | 1,060.51 | 1,060.51 | 0.00 |
| PPD | 10/1/2019 | Medical insurance - Q4 2019 | 73,017.00 | 73,017.00 | 0.00 |
| PPD | 1/1/2020 | ACOG 2020 Membership - Emmi | 820.00 | 341.66 | 478.34 |
| PPD | 1/1/2020 | ACOG 2020 Membership - Inge | 820.00 | 341.66 | 478.34 |
| PPD | 1/1/2020 | ACOG 2020 Membership - Koulianos | 820.00 | 341.66 | 478.34 |
| PPD | 1/1/2020 | Endocrine Society 2020 Membership | 349.00 | 145.40 | 203.60 |
| PPD | 1/1/2020 | Medical Insurance - Q1 2020 | 64,602.00 | 64,602.00 | 0.00 |
| PPD | 2/1/2020 | City of Mobile 2020 annual dues - Dr. Inge | 5,753.19 | 2,092.08 | 3,661.11 |
| PPD | 2/1/2020 | City of Mobile 2020 annual dues - Dr. Koulianos | 5,753.19 | 2,092.08 | 3,661.11 |
| PPD | 2/1/2020 | Garden Park Medical 2020 annual dues - Dr. Koulianos | 137.50 | 50.00 | 87.50 |
| PPD | 2/1/2020 | Medical Assoc. of Alabama 2020 annual dues - Dr. Inge | 673.75 | 245.00 | 428.75 |
| PPD | 2/1/2020 | Medical Assoc. of Alabama 2020 annual dues - Dr. Koulianos | 673.75 | 245.00 | 428.75 |
| PPD | 2/1/2020 | Mobile Infirmary 2020 annual dues - Dr. Emmi | 137.50 | 50.00 | 87.50 |
| PPD | 2/1/2020 | Mobile Infirmary 2020 annual dues - Dr. Inge | 137.50 | 50.00 | 87.50 |
| PPD | 2/1/2020 | Mobile Infirmary 2020 annual dues - Dr. Koulianos | 137.50 | 50.00 | 87.50 |
| PPD | 2/1/2020 | MPCN 2020 annual dues - Dr. Koulianos | 68.75 | 25.00 | 43.75 |
| PPD | 4/1/2020 | ASRM membership - Dr. Koulianos 4/2020 - 3/2021 | 350.00 | 58.34 | 291.66 |
| PPD | 4/1/2020 | AHI annual membership 3/2020 - 2/2021 | 916.67 | 166.66 | 750.01 |
| PPD | 4/1/2020 | Brighthouse Life insurance policy 3/2020 - 2/2021 | 6,779.00 | 1,232.54 | 5,546.46 |
| PPD | 4/1/2020 | College of American Pathologists 4/2020 - 3/2021 | 6,466.00 | 1,077.66 | 5,388.34 |
| PPD | 4/1/2020 | Medical Assoc. of Alabama - 2020 annual dues | 150.00 | 33.34 | 116.66 |
| PPD | 4/1/2020 | Medical insurance - Q2 2020 | 61,789.00 | 41,192.67 | 20,596.33 |
| PPD | 5/1/2020 | CLIA Lab Fees 5/2020 - 5/2022 | 360.00 | 15.00 | 345.00 |
| PPD | 5/1/2020 | ASRM membership - 5/2020 - 4/2021 | 440.00 | 36.67 | 403.33 |
| PPD | 6/1/2020 | ASRM membership - 6/2020 - 5/2021 | 425.00 | 0.00 | 425.00 |
| **PPD Total** | | | **560,279.03** | **511,811.06** | **48,467.97** |
| FF_ | 12/1/2016 | Opening Balance Sheet Adjustment | 4,004.00 | 4,004.00 | 0.00 |
| FF_ | 1/1/2017 51 | PPA adjustments per Empire - Fixed Assets | 16,016.00 | 13,680.34 | 2,335.66 |
| **FF_ Total** | | | **20,020.00** | **17,684.34** | **2,335.66** |
| CE_ | 2/1/2016 000003 | Workstations | 20,041.95 | 20,041.95 | 0.00 |
| CE_ | 2/1/2016 000004 | iCore phone systems | 8,962.00 | 7,767.06 | 1,194.94 |
| CE_ | 2/1/2016 000005 | iCore phone systems - shipping | 17.65 | 15.32 | 2.33 |
| CE_ | 2/1/2016 000007 | Vonage credit for WAN ports | (719.00) | (719.00) | 0.00 |
| CE_ | 2/1/2016 000008 | Vonage credit for WAN ports | (719.00) | (719.00) | 0.00 |
| CE_ | 2/1/2016 000009 | 4 polycom VX410 phones | 2,351.00 | 2,037.54 | 313.46 |
| CE_ | 2/1/2016 000010 | 5 polycom VX410 phones | 2,709.00 | 2,347.80 | 361.20 |
| CE_ | 2/1/2016 000011 | 28 polycom VX410 phones/power supply/color expansion module | 14,962.70 | 12,967.69 | 1,995.01 |
| CE_ | 2/1/2016 000012 | switch ports | 1,890.00 | 1,638.00 | 252.00 |
| CE_ | 2/1/2016 000013 | shipping fee | 39.79 | 34.49 | 5.30 |
| CE_ | 2/1/2016 000014 | 5 LED monitors | 809.48 | 809.48 | 0.00 |
| CE_ | 2/1/2016 000015 | 5 printers | 3,934.75 | 3,934.75 | 0.00 |
| CE_ | 2/1/2016 000016 | 1st PC image hardware | 1,007.76 | 1,007.76 | 0.00 |
| CE_ | 2/1/2016 000017 | wireless devices | 1,117.32 | 1,117.32 | 0.00 |
| CE_ | 2/1/2016 000018 | PC setup | 1,033.37 | 1,033.37 | 0.00 |
| CE_ | 2/1/2016 000019 | switch ports | 1,890.00 | 1,638.00 | 252.00 |
| CE_ | 2/1/2016 000002 | Workstations | 1,078.47 | 1,078.47 | 0.00 |
| CE_ | 3/1/2016 000020 | shipping fee | 14.46 | 12.26 | 2.20 |
| CE_ | 4/1/2016 000024 | INSIGHT CONTROL LICENSE | 327.55 | 327.55 | 0.00 |
| CE_ | 4/1/2016 000025 | WORKSTATION HARDWARES | 10,564.08 | 10,564.08 | 0.00 |
| CE_ | 4/1/2016 000026 | REMOTE POWER STRIPS | 846.54 | 846.54 | 0.00 |
| CE_ | 4/1/2016 000027 | SCANNERS | 1,018.37 | 1,018.37 | 0.00 |
| CE_ | 4/1/2016 000028 | PRINTERS | 1,570.52 | 1,570.52 | 0.00 |
| CE_ | 4/1/2016 000030 | MONITORS/DOCKING STATION | 419.62 | 419.62 | 0.00 |
| CE_ | 4/1/2016 000031 | MS OFFICE LICENSE | 363.68 | 363.68 | 0.00 |
| CE_ | 5/1/2016 000033 | HDD REPLACEMENT | 441.08 | 441.08 | 0.00 |
| CE_ | 5/1/2016 000034 | 4 SSD HD | 4,330.49 | 4,330.49 | 0.00 |
| CE_ | 6/1/2016 000036 | VONAGE SET UP FEES | 1,106.25 | 885.02 | 221.23 |
| CE_ | 6/1/2016 000037 | WEBSITE DESIGN | 2,748.40 | 2,748.40 | 0.00 |
| CE_ | 7/1/2016 000043 | COMP EQUIP | 187.66 | 187.66 | 0.00 |
| CE_ | 7/1/2016 000044 | ICORE | 2,407.50 | 1,885.88 | 521.62 |
| CE_ | 7/1/2016 000045 | COMP EQUIP | 8,423.36 | 8,423.36 | 0.00 |
| CE_ | 2/1/2017 | Laptops | 2,772.03 | 2,772.03 | 0.00 |
| CE_ | 11/1/2019 | Boyd Pugh - Office Supplies/Computers | 4,356.98 | 847.21 | 3,509.77 |
| **CE_ Total** | | | **102,305.81** | **93,674.75** | **8,631.06** |
| LHI | 10/1/2017 | Outdoor Office Sign | 4,200.00 | 4,200.00 | 0.00 |
| **LHI Total** | | | **4,200.00** | **4,200.00** | **0.00** |
| Tra | 12/1/2016 47 | PPA adjustments per Empire - Fixed Assets | 4,004.00 | 4,004.00 | 0.00 |
| Tra | 1/1/2017 49 | PPA adjustments per Empire - Trademark | 39,750.00 | 39,750.00 | 0.00 |
| **Tra Total** | | | **43,754.00** | **43,754.00** | **0.00** |
| Oth | 1/1/2017 50 | PPA adjustments per Empire - CNC | 268,800.00 | 229,600.00 | 39,200.00 |
| **Oth Total** | | | **268,800.00** | **229,600.00** | **39,200.00** |
| **Grand Total** | | | **999,358.84** | **900,724.15** | **98,634.69** |

PD-29028619.3

**Schedule 1.3 (Sale)**
**Assigned Contracts**

1. Equipment Lease between IntegraMed America, Inc. and GE HFS, LLC, dated February 8, 2016.

2. Equipment Lease between IntegraMed America, Inc. and GE HFS, LLC, dated September 26, 2016.

3. Lease Agreement between The Center for Reproductive Medicine, P.C. and Infirmary Health System, Inc., dated August 1, 2012.

4. Lease Agreements between The Center for Reproductive Medicine, P.C. and Infirmary Health System, Inc., dated March 23, 2010 and February 26, 2019.

5. Lease Agreement between IntegraMed America, Inc. and Straight Eight Properties, LLC, dated September 18, 2018, as amended.

6. Lease Agreement (The Center for Reproductive Medicine, P.C.) between Baptist Hospital, Inc. and IntegraMed Fertility Holding Corp, dated July 1, 2016.

7. Shopping Center Lease between IntegraMed Fertility Holding Corp. and Encore Retail Lakeview VI, LLC, dated August 1, 2016.

8. Temporary Lease Agreement between Encore Retail Lakeview VI, LLC and IntegraMed Fertility Holding Corp., dated May 2, 2016.

9. Amendment to Medical Group Contract between Center for Reproductive Medicine and UnitedHealthcare Insurance Company, dated October 1, 2014, amending that certain Medical Group Contract between the parties, dated May 13, 2009.

10. Agreement for Bundled Infertility Services between Winfertility, Inc. and Center for Reproductive Medicine, dated January 18, 2013.

**Schedule 1.7**
**Deposit Wiring Instructions**

(See attached.)

**Exhibit A to Purchase Agreement**
**Mutual Release and Covenant Not to Sue**

This Mutual Release and Covenant Not to Sue (the "Release") is made by and between The Center for Reproductive Medicine, PC ("Buyer") Jeoffrey L. Burtch, in his capacity as Chapter 7 Trustee for the Estates of IntegraMed Holding Corp., IntegraMed America, Inc., Trellis Health, LLC, IntegraMed Fertility Holding Corp., Reproductive Partners, Inc., IntegraMed Management of Bridgeport, LLC, IntegraMed Florida Holdings, LLC, IntegraMed Management of Mobile, LLC, IntegraMed Management, LLC, and IntegraMed Medical Missouri, LLC ("Seller"), George T. Koulianos, M.D. ("Koulianos") and George B. Inge, M.D. ("Inge") (collectively, the "Parties").

**PRELIMINARY STATEMENTS**

WHEREAS, as of the ___ day of July, 2020, Buyer and Seller have entered into that certain Asset Purchase Agreement (the "Purchase Agreement");

WHEREAS, a condition precedent of the Purchase Agreement is the full execution and delivery of this Release;

WHEREAS, the Parties desire to settle all claims and issues that have, or could have been raised, in relation to their prior dealings, transactions and occurrences, on the terms set forth below.

THEREFORE, in consideration of the promises and agreements set forth below, and each of their performance and delivery of the Purchase Agreement, the sufficiency of which consideration is hereby acknowledged, the Parties agree as follows:

1. GENERAL RELEASE.  The Parties hereby unconditionally, irrevocably and absolutely release and discharge one another from the Released Claims.  "Released Claims" means, other than the Excluded Claims set forth in <u>Section 2</u> hereof, any and all claims that exist or may exist as of the Closing, related in any way to the transactions or occurrences between the Parties, to the fullest extent permitted by law, including, but not limited to, any and all other losses, liabilities, claims, charges, demands and causes of action, known or unknown, suspected or unsuspected, arising directly or indirectly out of or in any way connected with the transactions or occurrences between them.

2. EXCLUDED CLAIMS; PURCHASE AGREEMENT.  The Released Claims shall not include any claims, obligations, covenants or responsibilities that the Parties may have under the Purchase Agreement or that Buyer, Inge, or Koulianos may have against any party that assumes the Alabama Attain Financial Liabilities, as descried in Section 1.6(b) of the Purchase Agreement (collectively, the "<u>Excluded Claims</u>").

3. COVENANT NOT TO SUE.  The Parties acknowledge that this Release is intended to end all divisions or disagreements between them, and accordingly, the Parties covenant that they will not, hereafter, bring any claim, action, cause of action of any kind in law, equity, or by arbitration against any other party for any claims or potential claims existing as of the time of Closing.

[Remainder of page intentionally left blank; signature page follows.]

PD.29028619.3

**IN WITNESS WHEREOF**, the Parties have entered into this Release as of the date first set forth above.

**BUYER:**

THE CENTER FOR REPRODUCTIVE MEDICINE, PC

By:_____
Name:_____
Title:_____

**KOULIANOS:**

_____

George T. Koulianos, M.D.

**SELLER:**

_____

Jeoffrey L. Burtch, in his capacity as Chapter 7 Trustee for the Estates of IntegraMed Holding Corp., IntegraMed America, Inc., Trellis Health, LLC, IntegraMed Fertility Holding Corp., Reproductive Partners, Inc., IntegraMed Management of Bridgeport, LLC, IntegraMed Florida Holdings, LLC, IntegraMed Management of Mobile, LLC, IntegraMed Management, LLC, and IntegraMed Medical Missouri, LLC.

**INGE:**

_____

George B. Inge, M.D.

**Exhibit B to Purchase Agreement**
**Sale Order**

| | | |
|---|---|---|
| In re: | ) | Chapter 7 |
| | ) | |
| INTEGRAMED HOLDING CORP., *et al.*,[1] | ) | Case No. 20-11169 (LSS) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |
| | ) | RE: Docket No. 35 |

**ORDER (A) APPROVING THE SALE OF CERTAIN
OF THE ESTATES' ASSETS, (B) AUTHORIZING THE ASSUMPTION
AND ASSIGNMENT OF EXECUTORY CONTRACTS AND UNEXPIRED
LEASES, AND (C) GRANTING CERTAIN RELATED RELIEF**

This matter is before the Court on the *Trustee's Motion for Entry of (I) an Order (A)*

*Approving Bidding Procedures in Connection With Sale of Substantially all of the Estates'*

*Assets, (B) Scheduling an Auction and Hearing to Consider the Proposed Sale, and (C)*

*Approving the Form and Manner of Notice Thereof; and (II) an Order (A) Approving the Sale,*

*(B) Authorizing the Assumption and Assignment of Executory Contracts and Unexpired Leases,*

*and (C) Granting Certain Related Relief* (the "Sale Motion") [D.I. 35],[2] seeking, among other

things: (a) approval of the asset purchase agreement (the "Purchase Agreement"), attached hereto

as Exhibit A; (b) authority to sell the Purchased Assets as defined and set forth in the Purchase

Agreement free and clear of Liens (as defined below), Claims (as defined below), and other

interests, (c) authority to assume and assign the Contracts identified as Purchased Assets in the

---

[1] The Debtors in these cases are the following entities (the respective case numbers for each estate follows in parentheses): IntegraMed Holding Corp. (20-11169 LSS), IntegraMed America, Inc. (20-11170 LSS), Trellis Health, LLC (20-11171 LSS), IntegraMed Fertility Holding Corp. (20-11172 LSS), Reproductive Partners, Inc. (20-11173 LSS), IntegraMed Management of Bridgeport, LLC (20-11175 LSS), IntegraMed Florida Holdings, LLC (20-11176 LSS), IntegraMed Management of Mobile, LLC (20-11179 LSS), IntegraMed Management, LLC (20-11181 LSS), and IntegraMed Medical Missouri, LLC (20-11184 LSS).

[2] Unless otherwise defined in this Order, all capitalized terms shall have the meanings provided in the Purchase Agreement and the Sale Motion (as, and only to the extent, applicable to the Purchase Agreement and the transactions set out therein), and to the extent of any inconsistency, the Purchase Agreement shall govern. References to the Sale Motion in this Order shall be interpreted to mean the Sale Motion as, and only to the extent, that it relates to the Purchase Agreement and the transactions set out therein.

Purchase Agreement (the "Assigned Contracts") to the Purchaser, and (d) related relief; and the Trustee having determined, after an extensive marketing process, that The Center For Reproductive Medicine, PC, an Alabama professional corporation (the "Purchaser") has submitted the highest and best bid for the Purchased Assets (as defined in the Purchase Agreement); and adequate and sufficient notice of the Purchase Agreement and all transactions contemplated thereunder and in this Order having been given and all interested parties having been afforded an opportunity to be heard with respect to the Sale Motion and all relief related thereto; and the Court having reviewed and considered the Sale Motion and all relief related thereto, and having held a hearing regarding the Sale Motion on July 23, 2020 (the "Sale Hearing"); and it appearing that the Court has jurisdiction over this matter; and it further appearing that the legal and factual bases set forth in the Sale Motion and at the Sale Hearing establish just cause for the relief granted herein; and after due deliberation; and good and sufficient cause appearing,

**THE COURT HEREBY FINDS AND DETERMINES THAT:**[3]

**Jurisdiction, Final Order, and Statutory Predicates**

A. This Court has jurisdiction to hear and determine the Sale Motion pursuant to 28 U.S.C. § 1334(a). This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A), (N), and (O). Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

---

[3] These findings and conclusions constitute the Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to this proceeding pursuant to Bankruptcy Rule 9014. All findings of fact and conclusions of law announced by the Court at the Sale Hearing in relation to the Sale Motion are hereby incorporated herein to the extent not inconsistent herewith. To the extent that any of the following findings of fact constitute conclusions of law, they are adopted as such. To the extent any of the following conclusions of law constitute findings of fact, they are adopted as such.

2

B.	The statutory predicates for the relief requested in the Sale Motion are sections 105(a), 363, and 365 of the Bankruptcy Code, and Bankruptcy Rules 2002(a)(2), 6004, 6006, 9007, and 9014.

C.	This Order constitutes a final order within the meaning of 28 U.S.C. § 158(a). Notwithstanding Bankruptcy Rules 6004(h) and 6006(d), and to any extent necessary under Bankruptcy Rule 9014 and Federal Rule of Civil Procedure 54(b), as made applicable by Bankruptcy Rule 7054, the Court expressly finds that there is no just reason for delay in the implementation of this Order.

### Notice of the Sale

D.	Actual written notice of the Sale Motion was provided to the Notice Parties.

E.	As evidenced by the certificate of service previously filed with the Court, proper, timely, adequate, and sufficient notice of the Sale Motion, Sale Hearing, Sale, and the transactions contemplated thereby have been provided in accordance with sections 105(a), 363, and 365 of the Bankruptcy Code, and Bankruptcy Rules 2002, 6004, 6006, and 9007.  The notices described above were good, sufficient, and appropriate under the circumstances, and no other or further notice of the Sale Motion, Sale Hearing, Sale, and assumption and assignment of the Assigned Contracts is or shall be required.

F.	The disclosures made by the Trustee concerning the Sale Motion, Purchase Agreement, Sale, assumption and assignment of the Assigned Contracts, and Sale Hearing were good, complete, and adequate.

G.	A reasonable opportunity to object and be heard with respect to the Sale and the Sale Motion and the relief requested therein (including the assumption and assignment of the

Assigned Contracts), has been afforded to all interested persons and entities, including but not necessarily limited to the Notice Parties.

### Good Faith of Purchaser

H. The Purchase Agreement was negotiated, proposed, and entered into by the Trustee and the Purchaser without collusion, in good faith, and from arm's-length bargaining positions.

I. Neither the Trustee nor the Purchaser has engaged in any conduct that would cause or permit the Purchase Agreement to be avoided under section 363(n) of the Bankruptcy Code. Specifically, the Purchaser has not acted in a collusive manner with any person and the Purchase Price was not controlled by any agreement among bidders.

J. The Purchaser is purchasing the Purchased Assets in good faith and is a good faith buyer within the meaning of section 363(m) of the Bankruptcy Code, and is therefore entitled to all of the protections afforded by that provision, and otherwise has proceeded in good faith in all respects in connection with this proceeding in that, *inter alia*: (a) the Purchaser recognized that the Trustee was free to deal with any other party interested in acquiring the Purchased Assets; (b) the Purchaser in no way induced or caused the filing of the Bankruptcy Cases; and (c) all payments to be made by the Purchaser in connection with the Sale have been disclosed.

### Highest and Best Offer

K. A reasonable opportunity was given to any interested party to make a higher and better offer for the Purchased Assets.

L. The Purchase Agreement constitutes the highest and best offer for the Purchased Assets, and will provide a greater recovery for the Estates than would be provided by any other available alternative. The Trustee's determination that the Purchase Agreement constitutes the

highest and best offer for the Purchased Assets constitutes a valid and sound exercise of the

Trustee's business judgment.

### No Fraudulent Transfer

M.      The consideration provided by the Purchaser pursuant to the Purchase Agreement

(i) is fair and reasonable, (ii) is the highest and/or best offer for the Purchased Assets, and (iii)

constitutes reasonably equivalent value and fair consideration.  No other person or entity or

group of entities has offered to purchase the Purchased Assets for greater economic value to the

Estates than the Purchaser.  Approval of the Sale Motion and the Purchase Agreement and the

consummation of the transactions contemplated thereby are in the best interests of the Estates.

N.      The Purchaser is not a mere continuation of the Debtors or the Estates and no

continuity of enterprise exists between the Purchaser and the Debtors or the Estates.  The

Purchaser is not holding itself out to the public as a continuation of the Debtors or the Estates.

The Purchaser is not a successor to the Debtors or the Estates and the Sale does not amount to a

consolidation, merger, or de facto merger of the Purchaser and the Debtors or the Estates.

### Validity of Transfer

O.      The Purchase Agreement was not entered into for the purpose of hindering,

delaying, or defrauding creditors.  Neither the Trustee nor the Purchaser is entering into the

transactions contemplated by the Purchase Agreement fraudulently for purposes of statutory

and/or common law fraudulent conveyance and fraudulent transfer laws.

P.      The Estates are the sole and lawful owners of the Purchased Assets.  Subject to

section 363(f) of the Bankruptcy Code, the transfer of the Purchased Assets to the Purchaser will

be, as of the Closing Date, a legal, valid, and effective transfer of the Purchased Assets, which

transfer vests or will vest the Purchaser with all right, title, and interest of the Estates to the

Purchased Assets free and clear of: (a) all liens and encumbrances relating to, accruing or arising any time prior to the Closing Date (collectively, "Liens"), and (b) all claims (as that term is defined in section 101(5) of the Bankruptcy Code), liabilities, obligations, demands, guaranties, options, rights, contractual commitments, restrictions, interests, and matters of any kind and nature, whether arising prior to or subsequent to the Petition Date, and whether imposed by agreement, understanding, law, equity, or otherwise (including, without limitation, rights with respect to Claims and Liens (i) that purport to give to any party a right of setoff against, or a right or option to effect any forfeiture, modification, profit sharing interest, right of first refusal, purchase or repurchase right or option, or termination of, any of the Estates' or the Purchaser's interests in the Purchased Assets, or any similar rights, or (ii) in respect of taxes, restrictions, rights of first refusal, charges of interests of any kind or nature, if any, including, without limitation, any restriction of use, voting, transfer, receipt of income, or other exercise of any attributes of ownership) (collectively, as defined in this clause (b), "Claims"), relating to, accruing, or arising any time prior to the Closing Date.

## Section 363(f) is Satisfied

Q.      The conditions of section 363(f) of the Bankruptcy Code have been satisfied in full; therefore, the Trustee may sell the Purchased Assets free and clear of any interest in the property.

R.      The Purchaser would not have entered into the Purchase Agreement, and would not consummate the transactions contemplated thereby, if the sale of the Purchased Assets to the Purchaser were not free and clear of all Liens and Claims.  The Purchaser shall not be responsible for any Liens or Claims other than Liabilities which have been expressly assumed by the Purchaser pursuant to the Purchase Agreement.

S.	The Trustee may sell the Purchased Assets free and clear of all Liens and Claims against the Estates and/or any of the Purchased Assets because, in each case, one or more of the standards set forth in section 363(f)(1)-(5) of the Bankruptcy Code have been satisfied.  Those holders of Liens or Claims against the Estates or any of the Purchased Assets who did not object, or who withdrew their objections, to the Sale or the Sale Motion are deemed to have consented pursuant to section 363(f)(2) of the Bankruptcy Code.  All other holders of Liens or Claims are adequately protected by having their Liens or Claims, if any, in each instance against the Estates or any of the Purchased Assets, attach to the net cash proceeds of the Sale ultimately attributable to the particular Purchased Assets in which such creditor alleges a Lien or Claim, in the same order of priority, with the same validity, force and effect that such Lien or Claim had prior to the Sale, subject to any claims and defenses that the Estates may possess with respect thereto.

### Cure/Adequate Protection

T.	The assumption and assignment of the Assigned Contracts is integral to the Purchase Agreement, is in the best interests of the Estates, and represents a reasonable exercise of sound and prudent judgment by the Trustee.  The Purchaser's promise to perform the obligations under the Assigned Contracts after the Closing Date shall constitute adequate assurance of future performance within the meaning of section 365(b)(1)(C) and (f)(2)(B) of the Bankruptcy Code, except as provided below.

U.	With the exception of the objection filed by TIAA Commercial Finance, Inc ("TIAA"), any objections to the assumption and assignment of the Assigned Contracts are hereby overruled.  The Purchaser agrees that the TIAA leases sought to be assumed and assigned will not be assumed and assigned until TIAA is provided with financial documentation to verify future performance.  The determination of the assumption and assignment of TIAA's leases will

be transacted between the Purchaser and TIAA.  If an agreement cannot be reached, then either the Purchaser or TIAA can request a hearing before this Court to obtain a ruling as to adequate assurance of future performance.

**Compelling Circumstances for an Immediate Sale**

V.      Good and sufficient reasons for approval of the Purchase Agreement and the Sale have been articulated.  The relief requested in the Sale Motion is in the best interests of the Estates.  The Trustee has demonstrated both (i) good, sufficient, and sound business purposes and justifications, and (ii) compelling circumstances for the Sale other than in the ordinary course of business, pursuant to section 363(b) of the Bankruptcy Code in that, among other things, the immediate consummation of the Sale to the Purchaser is necessary and appropriate to maximize the value of the Estates.  Time is of the essence in consummating the Sale.

W.      Given all of the circumstances of the Bankruptcy Cases and the adequacy and fair value of the Purchase Price under the Purchase Agreement, the proposed Sale of the Purchased Assets to the Purchaser constitutes a reasonable and sound exercise of the Trustee's business judgment and should be approved.

X.      The consummation of the Sale and the assumption and assignment of the Assigned Contracts is legal, valid, and properly authorized under all applicable provisions of the Bankruptcy Code, including, without limitation, sections 105(a), 363(b), 363(f), 363(m), and 365, and all of the applicable requirements of such sections have been complied with in respect of the transaction.

**NOW, THEREFORE, IT IS HEREBY ORDERED:**

**General Provisions**

1. The relief requested in the Sale Motion is granted and approved as set forth herein, and the Sale contemplated in the Sale Motion is approved.

2. All objections to the Sale Motion or the relief requested therein that have not been withdrawn, waived, or settled as announced to the Court at the Sale Hearing or by stipulation filed with the Court, and all reservations of rights included therein, are hereby denied and overruled with prejudice.

**Approval of the Purchase Agreement**

3. The Purchase Agreement (and all schedules and exhibits affixed thereto) and all other ancillary documents, all of the terms and conditions thereof, and the transactions contemplated therein are hereby approved and authorized.

4. Pursuant to sections 363(b) and (f) of the Bankruptcy Code, the Trustee is authorized and empowered to take any and all actions necessary or appropriate to: (i) consummate the Sale of the Purchased Assets to the Purchaser pursuant to and in accordance with the terms and conditions of the Purchase Agreement and this Order; (ii) close the Sale as contemplated in the Purchase Agreement and this Order; and (iii) execute and deliver, perform under, consummate, implement, and close fully the Purchase Agreement, including the assumption and assignment to the Purchaser of the Assigned Contracts, together with all additional instruments and documents that may be reasonably necessary or desirable to implement the Purchase Agreement and the Sale.

5. This Order shall be binding in all respects upon the Trustee, the Estates, the Debtors, all creditors of, and holders of equity interests in, the Debtors, any holders of Liens,

Claims, or other interests in, against, or on all or any portion of the Purchased Assets (whether known or unknown), the Purchaser and all successors and assigns of the Purchaser, and the Purchased Assets. This Order and the Purchase Agreement shall inure to the benefit of the Estates and their creditors, the Purchaser, and the respective successors and assigns of each of the foregoing.

**<u>Transfer of the Purchased Assets</u>**

6. Pursuant to sections 105(a), 363(b), and 363(f) of the Bankruptcy Code, the Trustee is authorized to transfer the Purchased Assets to the Purchaser on the Closing Date and, upon the Closing under the Purchase Agreement, such transfer shall constitute a legal, valid, binding, and effective transfer of such Purchased Assets and shall vest the Purchaser with title to the Purchased Assets and, upon the Trustee's receipt of the full Purchase Price, shall be free and clear of all Liens, Claims, and other interests of any kind or nature whatsoever, including but not limited to, successor or successor-in-interest liability and Claims, with all such Liens, Claims or other interests to attach to the net cash proceeds ultimately attributable to the property against or in which such Liens, Claims, or interests are asserted, subject to the terms thereof, with the same validity, force and effect, and in the same order of priority, that such Liens, Claims, or interests now have against the Purchased Assets. Upon the Closing, the Purchaser shall take title to and possession of the Purchased Assets.

7. All persons and entities in possession of some or all of the Purchased Assets on the Closing Date are directed to surrender possession of such Purchased Assets to the Purchaser or its assignee at the Closing. On the Closing Date, each of the Estates' creditors is authorized and directed to execute such documents and take all other actions as may be reasonably

necessary to release its Liens, Claims, or other interests in the Purchased Assets, if any, as such Liens, Claims, or interests may have been recorded or may otherwise exist.

8. On the Closing Date, this Order shall be construed and shall constitute for any and all purposes a full and complete general assignment, conveyance, and transfer of the Estates' interests in the Purchased Assets. Each and every federal, state, and local governmental agency or department is hereby authorized to accept any and all documents and instruments necessary and appropriate to consummate the transactions contemplated by the Purchase Agreement.

9. A certified copy of this Order may be filed with the appropriate clerk and/or recorded with the recorder to act to cancel any liens and other encumbrances of record.

10. If any person or entity that has filed statements or other documents or agreements evidencing Liens on, or interests in, all or any portion of the Purchased Assets shall not have delivered to the Trustee prior to the Closing, in proper form for filing and executed by the appropriate parties, termination statements, instruments of satisfaction, releases of liens and easements, and any other documents necessary for the purpose of documenting the release of all Liens, Claims, or other interests that the person or entity has or may assert with respect to all or any portion of the Purchased Assets, the Trustee and/or the Purchaser are hereby authorized to execute and file such statements, instruments, releases, and other documents on behalf of such person or entity with respect to the Purchased Assets.

11. This Order is and shall be effective as a determination that, on the Closing Date, all Liens, Claims, or other interests of any kind or nature whatsoever existing as to the Purchased Assets prior to the Closing Date, shall have been unconditionally released, discharged, and terminated, and that the conveyances described herein have been effected. This Order is and shall be binding upon and govern the acts of all persons and entities, including, without

limitation, all filing agents, filing officers, title agents, title companies, recorders of mortgages, recorders of deeds, registrars of deeds, administrative agencies, governmental departments, secretaries of state, federal, state and local officials, and all other persons and entities who may be required by operation of law, the duties of their office, or contract, to accept, file, register, or otherwise record or release any documents or instruments, or who may be required to report or insure any title or state of title in or to any lease; and each of the foregoing persons and entities is hereby directed to accept for filing any and all of the documents and instruments necessary and appropriate to consummate the transactions contemplated by the Purchase Agreement.

**Assumption and Assignment of Assigned Contracts**

12. Subject to the carveout applicable to TIAA as stated herein, the Trustee is hereby authorized in accordance with sections 105(a) and 365 of the Bankruptcy Code to (a) assume and assign to the Purchaser, effective upon the Closing of the Sale, the Assigned Contracts free and clear of all Liens, Claims, and other interests of any kind or nature whatsoever, and (b) execute and deliver to the Purchaser such documents or other instruments as the Purchaser reasonably deems necessary to assign and transfer the Assigned Contracts.

13. The counterparties to the Assigned Contracts (the "Counterparties") shall look solely to the Purchaser for any amounts payable under the Assigned Contracts from and after the Closing Date.

14. The Assigned Contracts are executory contracts under section 365 of the Bankruptcy Code. The Trustee may assume the Assigned Contracts in accordance with section 365 of the Bankruptcy Code. The Trustee may assign the Assigned Contracts in accordance with sections 363 and 365 of the Bankruptcy Code. Any provisions in the Assigned Contracts that purport to prohibit or condition the assignment of the Assigned Contracts or allow the

Counterparties to terminate, recapture, impose any penalty, or modify any term or condition upon the assignment of the Assigned Contracts, constitute unenforceable anti-assignment provisions that are void and of no force and effect; all other requirements and conditions under sections 363 and 365 of the Bankruptcy Code for the assumption by the Trustee and assignment to the Purchaser of the Assigned Contracts have been satisfied. The Assigned Contracts shall be transferred and assigned to, and following the closing of the Sale remain in full force and effect for the benefit of the Purchaser, notwithstanding any provision in the Assigned Contracts (including those of the type described in sections 365(b)(2) and (f) of the Bankruptcy Code) that purports to prohibit, restrict, or condition such assignment or transfer and, pursuant to section 365(k) of the Bankruptcy Code, the Estates shall be relieved from any further liability with respect to the Assigned Contracts after such assignment to and assumption by the Purchaser. Upon Closing, in accordance with sections 363 and 365 of the Bankruptcy Code, the Purchaser shall be fully and irrevocably vested in all rights and title to the Assigned Contracts. Notwithstanding anything to the contrary in this Order or otherwise, no agreements between Oracle America, Inc., including any of its affiliates or predecessors-in-interest, ("Oracle") and Debtors are being assigned or transferred to the Purchaser as part of this sale and no Oracle software is being transferred to Purchaser as part of the Purchased Assets. All of Oracle's rights are specifically reserved with respect to any ongoing use by any parties of any of the licensed Oracle software.

15. The amounts necessary to cure any defaults existing as of the Closing Date under the Assigned Contracts are the amounts listed on the Trustee's Notice of Executory Contracts and Unexpired Leases that may be Assumed and Assigned, Pursuant to Section 365 of the Bankruptcy Code, in Connection with the Sale of Substantially All of the Debtors' Assets, and

the Proposed Cure Amounts, dated June 12, 2020 [docket No. 83], as supplemented on July 9, 2020 [docket No. 221], and as may be further supplemented, or, if applicable, such other amount(s) upon which the Trustee and any of the Counterparties may have agreed (the "Cure Amounts").  The Purchaser shall pay the Cure Amounts at Closing, or at such later time as may be mutually agreed upon by the Purchaser and any of the Counterparties.  No other defaults exist under the Assigned Contracts.  The Counterparties waive, release, and are hereby precluded from asserting any claims against the Debtors, the Trustee or the Estates for any claims arising out of or in connection with the Assigned Contracts.  The Purchaser shall pay the Cure Amounts to the Counterparties in full satisfaction of the Counterparties' claims for defaults that may have arisen under the Assigned Contracts.  Notwithstanding any other provisions in this Order, or the APA, in addition to the Cure Amounts, the Purchaser assumes the obligations of the Debtors and/or Estates owed to non-Debtor counterparties to Assigned Contracts that have accrued or arisen under the Assigned Contracts before the Closing Date but that have not yet become due and/or defaults as of the Closing Date.

**Rejection of IntegraMed Contracts**

16.     Pursuant to Section 1.11 of the Purchase Agreement, and Section 365 of the Bankruptcy Code, the Court authorizes the Trustee to reject the IntegraMed Contracts (as defined in the Purchase Agreement) and such contracts are hereby rejected and are terminated, null and void, and of no further effect as of the date of this Order, and Buyer and Buyer's shareholders, directors, and officers are each hereby released and discharged from any obligations whatsoever arising from or under the IntegraMed Contracts.

### Prohibition of Actions against the Purchaser

17. Except as otherwise provided in this Order or the Purchase Agreement, the Purchaser shall not have any liability or other obligation to the Estates arising under or related to any of the Purchased Assets. Without limiting the generality of the foregoing, and except as otherwise provided herein or in the Purchase Agreement, the Purchaser shall not be liable for any Claims against the Estates, and the Purchaser shall have no successor or vicarious liabilities of any kind or character, including, but not limited to, under any theory of antitrust, environmental, successor or transferee liability, labor law, de facto merger, mere continuation, or substantial continuity, whether known or unknown as of the Closing Date, now existing or hereafter arising, whether fixed or contingent, whether asserted or unasserted, whether legal or equitable, whether liquidated or unliquidated.

18. All persons and entities holding Liens, Claims, or other interests of any kind or nature whatsoever against or in all or any portion of the Purchased Assets (whether legal or equitable, secured or unsecured, matured or unmatured, contingent or non-contingent, liquidated or unliquidated, senior or subordinate), hereby are forever barred, estopped, and permanently enjoined from asserting against the Purchaser, its Affiliates, its successors or assigns, their property, or the Purchased Assets, such persons' or entities' Liens, Claims, or interests in and to the Purchased Assets, including, without limitation, the following actions: (i) commencing or continuing in any manner any action or other proceeding against the Purchaser, its Affiliates, its successors, assets or properties; (ii) enforcing, attaching, collecting, or recovering in any manner any judgment, award, decree, or order against the Purchaser, its Affiliates, its successors, assets or properties; (iii) creating, perfecting, or enforcing any Lien or other Claim against the Purchaser, its Affiliates, its successors, assets, or properties; (iv) asserting any setoff or right of

subrogation of any kind against any obligation due the Purchaser, its Affiliates, or its successors; or (v) commencing or continuing any action, in any manner or place, that does not comply or is inconsistent with the provisions of this Order or other orders of the Court, or the agreements or actions contemplated or taken in respect thereof. On the Closing Date, each creditor is authorized and directed to execute such documents and take all other actions as may be necessary to release Liens, Claims, and other interests in or on the Purchased Assets, if any, as provided for herein, as such Liens, Claims, or interests may have been recorded or may otherwise exist.

19. Notwithstanding anything to the contrary in the Purchase Agreement, the Attain Patient Benefits shall include Attain Program refund liabilities owed to Alabama Attain Patients, whether or not such refund liabilities become payable before or after the Closing Date.

20. All persons and entities are hereby forever prohibited and enjoined from taking any action that would adversely affect or interfere with the ability of the Trustee to sell and transfer the Purchased Assets to the Purchaser in accordance with the terms of the Purchase Agreement and this Order.

21. The Purchaser has given substantial consideration under the Purchase Agreement for the benefit of the Estates. The consideration given by the Purchaser shall constitute valid and valuable consideration for the releases of any potential Claims and Liens pursuant to this Order, which releases shall be deemed to have been given in favor of the Purchaser by all holders of Liens against or interests in, or Claims against, the Estates or any of the Purchased Assets. The consideration provided by the Purchaser for the Purchased Assets under the Purchase Agreement is fair and reasonable and may not be avoided under section 363(n) of the Bankruptcy Code.

22. Nothing in this Order or the Purchase Agreement releases, nullifies, or enjoins the enforcement of any liability to a governmental unit under police and regulatory statutes or regulations that any entity would be subject to as the owner or operator of property after the date of entry of this Order. Nothing in this Order or the Purchase Agreement authorizes the transfer or assignment to the Purchaser of any license, permit, registration, authorization, or approval of or with respect to a governmental unit without the Purchaser's complying with all applicable legal requirements under non-bankruptcy law governing such transfers or assignments.

**Other Provisions**

23. Purchaser shall cooperate with Messiahic Inc. d/b/a PayJunction ("PayJunction") and promptly provide documents, information and assistance reasonably required by PayJunction to enable PayJunction to investigate and, if appropriate, timely challenge any chargeback claims asserted by any Practice Patients.

24. Nothing contained herein or in the Purchase Agreement is intended to be, nor shall be construed as, a waiver, release, modification or discharge of any rights, remedies or claims that may be asserted by PayJunction or any other counterparty to any credit card processing agreements or related documents executed by the Debtors against any medical practices or other non-debtor parties.

25. The transactions contemplated by the Purchase Agreement are undertaken by the Purchaser without collusion and in good faith, and accordingly, the reversal or modification on appeal of the authorization provided herein to consummate the Sale shall not affect the validity of the Sale, unless such authorization and the Sale are duly stayed pending such appeal. The Purchaser is a good faith buyer and, as such, shall have the full protections of section 363(m) of the Bankruptcy Code.

26. Pursuant to Federal Rules of Bankruptcy Procedure 7062, 9014, 6004(h), and 6006(d), this Order shall be effective immediately upon entry and the Trustee and the Purchaser are authorized to close the Sale immediately upon entry of this Order.

27. Nothing in this Order or the Purchase Agreement approves or provides for the transfer to the Purchaser of any avoidance claims (whether under chapter 5 of the Bankruptcy Code or otherwise) of the Estates.

28. No bulk sales law or any similar law of any state or other jurisdiction applies in any way to the Sale.

29. The failure specifically to reference any particular provision of the Purchase Agreement in this Order shall not diminish or impair the effectiveness of such provision, it being the intent of the Court that the Purchase Agreement is authorized and approved in its entirety; provided, however, that this Order shall govern if any inconsistency exists between the Purchase Agreement (including all ancillary documents executed in connection therewith) and this Order. Likewise, all of the provisions of this Order are nonseverable and mutually dependent.

30. The Purchase Agreement and any related agreements, documents, or other instruments may be modified, amended, or supplemented by the parties thereto and in accordance with the terms thereof, without further order of the Court, provided that any such modification, amendment, or supplement does not have a material adverse effect on the Estates.

31. The Court shall retain jurisdiction to, among other things, interpret, implement, and enforce the terms and provisions of this Order and the Purchase Agreement, all amendments thereto and any waivers and consents thereunder and each of the agreements executed in connection therewith to which the Trustee is party or which has been assigned by the Trustee to the Purchaser, and to adjudicate, if necessary, any and all disputes concerning or relating in any

way to the Sale, including, but not limited to, retaining jurisdiction to: (a) compel delivery of the Purchased Assets to the Purchaser; (b) interpret, implement, and enforce the provisions of this Order; (c) protect the Purchaser against any alleged Liens, Claims, or other interests in or against the Purchased Assets of any kind or nature whatsoever; and (d) enter any orders under sections 363 and/or 365 of the Bankruptcy Code with respect to the Assigned Contracts.

32. All time periods set forth in this Order shall be calculated in accordance with Bankruptcy Rule 9006(a).

33. To the extent that this Order is inconsistent with any prior order or pleading with respect to the Sale Motion, the terms of this Order shall govern.