# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re:<br><br>INTEGRAMED HOLDING CORP., *et al*.,[1]<br><br>Debtors. | Chapter 7<br><br>Case No. 20-11169 (LSS)<br><br>(Jointly Administered)<br><br>**Hearing Date: September 30, 2020 at 10:00 am**<br>**Objection Deadline: Sept. 10, 2020 at 4:00 pm**<br><br>**Re: D.I. 315** |

### CERTAIN MEDICAL PRACTICES' OPPOSITION TO FERTILITY NEWCO LLC'S MOTION FOR RELIEF FROM THE AUTOMATIC STAY PURSUANT TO BANKRUPTCY CODE SECTION 362(d) AND BANKRUPTCY RULE 4001

Interested parties Reproductive Partners Medical Group, Inc., Utah Fertility Center, P.C., Coastal Fertility Specialists, LLC, Nevada Reproductive Labs, Foulk & Whitten Nevada Center for Reproductive Medicine, P.C., Seattle Reproductive Medicine, Inc., Reproductive Partners Medical Group – La Jolla, Inc. and Center for Reproductive Medicine, P.A. (collectively, the "Medical Practices"), by and through their undersigned counsel, respectively, hereby submit this opposition (the "Opposition") to Fertility Newco LLC's ("FNC") Motion For Relief From the Automatic Stay Pursuant to Bankruptcy Code Section 362(d) and Bankruptcy Rule 4001 [D.I. 315] (the "Motion"). In support of the Opposition, the Medical Practices respectfully represent as follows:

---

[1] Debtors in these cases are the following entities (the respective case numbers for each estate follows in parentheses): IntegraMed Holding Corp. (20-11169 LSS), IntegraMed America, Inc. (20-11170 LSS), Trellis Health, LLC (20-11171 LSS), IntegraMed Fertility Holding Corp. (20-11172 LSS), Reproductive Partners, Inc. (20-11173 LSS), IntegraMed Management of Bridgeport, LLC (20-11175 LSS), IntegraMed Florida Holdings, LLC (20-11176 LSS), IntegraMed Management of Mobile, LLC (20-11179 LSS), IntegraMed Management, LLC (20-11181 LSS), and IntegraMed Medical Missouri, LLC (20-11184 LSS).

## SUMMARY OF ARGUMENT

1. The Motion fails to specifically identify the property it seeks to foreclose upon, fails to establish that this unidentified property is without equity and incorrectly asserts FNC has a valid and perfected lien on the Alleged Collateral.[2] By and through the use of broad brush strokes, FNC incorrectly asserts an interest in not only the MSAs – but also in the Medical Practices' accounts, instruments, general intangibles, deposit accounts, equipment, fixtures, monies personal property and interests in personal property. To be clear, FNC does not have a perfected security interest in any property located at the Medical Practices' Facilities. In reality, the only perfected security interest FNC held was in the Amounts Owed to Debtors pursuant to the terms of the MSAs. However, FNC's perfected security interest in the Amounts Owed has expired by virtue of the MSAs being terminated as a result of this Court's July 10 Order. Therefore, the Motion must be viewed for what it truly is: FNC's attempt to exact a pound of flesh from the Medical Practices, or in the alternative, FNC's attempt to improperly dissolve a competitor though a phantom-security interest in retribution for the procedural history of this case to date. These are not permissible grounds for granting relief from the automatic stay.

2. For these reasons, as well as those discussed in detail below, the Medical Practices respectfully request that the Court deny the Motion in its entirety.

## BACKGROUND

3. On May 20, 2020 (the "Petition Date") IntegraMed America, Inc. and Reproductive Partners, Inc. (collectively, "Debtors"), along with other affiliates and subsidiaries, filed for Chapter 7 protection in the United States Bankruptcy Court – District of Delaware.

---

[2] All capitalized terms not otherwise defined in this Summary of Argument shall have the meaning ascribed to same below.

4.     Jeoffrey L. Burtch, Chapter 7 trustee was appointed as the duly qualified and acting Chapter 7 trustee for Debtors' bankruptcy estates.

5.     The Medical Practices specialize in gynecological services, treatment of human infertility encompassing the provision of in vitro fertilization and other assisted reproductive services (the "Infertility Services").

6.     At all relevant times prior to the Petition Date, Debtors were in the business of making available to medical providers, such as the Medical Practices, certain assets and support services, primarily consisting of (i) financial management; (ii) administrative systems; (iii) clinical and laboratory organization and function; (iv) marketing; (v) operations management; and (vi) capital or access to capital (the "Services").

7.     On or about January 1, 2014, Reproductive Partners Medical Group, Inc. ("RPMG") and Debtor Reproductive Partners, Inc. entered into that Certain Second Amended Management, Services and Facility Agreement (the "RPMG MSA").  Pursuant to Section 11.7 of the RPMG MSA, said agreement "shall be governed by and construed in accordance with the laws of the State of California[.]"

8.     On or about November 1, 2010, Utah Fertility Center, P.C. ("UFC") and Debtor IntegraMed America, Inc. entered into that certain Amended and Restated Management Agreement (the "Utah MSA").  Pursuant to Section 11.7 of the Utah MSA, said agreement "shall be governed by and construed in accordance with the laws of the State of Utah[.]"

9.     On or about September 24, 2012, Coastal Fertility Specialists, LLC ("CFS") and Debtor IntegraMed America, Inc. entered into that certain Business Service Agreement (the "Coastal MSA").  Pursuant to Section 11.7 of the Coastal MSA, said agreement "shall be governed by and construed in accordance with the laws of the State of South Carolina[.]"

10. On or about December 1, 2009, Nevada Reproductive Labs, Foulk & Whitten Nevada Center for Reproductive Medicine, P.C. ("NCRM") and Debtor IntegraMed America, Inc. entered into that certain First Amended and Restated Management Agreement (the "Nevada MSA"). Pursuant to Section 11.7 of the Nevada MSA, said agreement "shall be governed by and construed in accordance with the laws of the State of Nevada[.]"

11. On or about December 15, 2015, Seattle Reproductive Medicine, Inc. ("SRM") and Debtor IntegraMed America, Inc. entered into that certain Amended and Restated Service Agreement (the "Seattle MSA"). Pursuant to Section 12.7 of the Seattle MSA, said agreement "shall be governed by and construed in accordance with the laws of the State of Washington[.]"

12. On or about March 15, 2015, Center for Reproductive Medicine, P.A. ("CRM") and Debtor IntegraMed America, Inc. entered into that certain Amended and Restated Business Service Agreement (the "CRM MSA"). Pursuant to Section 11.7 of the CRM MSA, said agreement "shall be governed by and construed in accordance with the laws of the State of Florida[.]"

13. On or about January 1, 2014, Reproductive Partners Medical Group – La Jolla, Inc. ("RPMG – La Jolla") and Debtor IntegraMed America, Inc. entered into that certain Management, Services and Facility Agreement (the "La Jolla MSA"). Pursuant to Section 11.7 of the La Jolla MSA, said agreement "shall be governed by and construed in accordance with the laws of the State of California[.]"

14. The RPMG MSA, Utah MSA, Coastal MSA, Nevada MSA, Seattle MSA, CRM MSA and La Jolla MSA are hereinafter collectively referred to as the "MSAs".

15. As relevant to this Opposition, and using the La Jolla MSA as an exemplar, the MSAs provide that "'Assets' shall mean those fixed assets utilized in connection with the

operation of [the Medical Practices'] medical practice, including but not limited to, fixed assets and leasehold improvements." [hereinafter, the "Assets"] La Jolla MSA, Section 1.1.3. Furthermore, Section 9.2.1 of the La Jolla MSA provides that upon termination, "[the Medical Practices] shall pay to [Debtors] in immediately available funds, an amount equal to the net book value (in accordance with GAAP) of all [Debtors'] Assets at all Facilities made available to [the Medical Practices] by [Debtors], in the event [the Medical Practices] opt[] to acquire the Assets."

16.     On or about June 1, 2020, the Trustee filed the *Motion For Entry of (I) An Order (A) Approving Bidding Procedures In Connection With Sale of Substantially All of The Estates' Assets, (B) Scheduling An Auction and Hearing To Consider The Proposed Sale, and (C) Approving The Form And Manner Of Notice Thereof; and (II) An Order (A) Approving The Sale, (B) Authorizing The Assumption And Assignment Of Executory Contracts And Unexpired Leases, and (C) Granting Certain Related Relief* [D.I. 35].

17.     On July 8, 2020, based on an agreement among the parties on the best way to proceed, the Court held a hearing on the gating issue of whether the MSAs can be assumed and assigned pursuant to Bankruptcy Code Section 365.

18.     On July 10, 2020, the Court issued a ruling (the "July 10 Order") that: (1) the RPMG MSA and the Utah MSA (the "Terminated MSAs") were terminated pursuant to Section 8.1.2 (material breach) of said agreements; (2) the Coastal MSA, Nevada MSA, CRM MSA and La Jolla MSA (the "Non-Consenting MSAs") could not be assumed or assigned pursuant to Bankruptcy Code Section 365(c); and the Seattle MSA could not be assumed or assigned unless the trustee enters into "a sale to a third-party as part of a sale of substantially all of debtor's business."

19. On August 27, 2020, FNC filed the Motion seeking relief from stay, pursuant to Section 362(d)(1) and 362(d)(2), to foreclose upon:

a. The "Seattle MP [Alleged] Collateral…including, but not limited to, the following assets (all as defined in the Security Agreement): Accounts (including Health-Care Insurance Receivables); Instruments; General Intangibles; Deposit Accounts; Equipment; Fixtures; Monies, personal property and interests in personal property, and the Defaulted MSAs" which is "related to or located at" SRM's business premises. Motion ¶ 22.

b. The "Defaulted MP [Alleged] Collateral [of RPMG and UFC]…the following, among other, assets (all as defined in the Security Agreement): Accounts (including Health-Care Insurance Receivables); Instruments; General Intangibles; Deposit Accounts; Equipment; Fixtures; Monies, personal property and interests in personal property; and the Defaulted MSAs" which is "related to or located at" RPMG's and UFC's business premises. Motion ¶ 25.

c. The "Non-Assignable MP [Alleged] Collateral [of RPMG – La Jolla, CFS, NCRM and CRM]…the following, among other, assets (all as defined in the Security Agreement): Accounts (including Health-Care Insurance Receivables); Instruments; General Intangibles; Deposit Accounts; Equipment; Fixtures; Monies, personal property and interests in personal property; and the Non-Assignable MSAs" which is "related to or located at" RPMG – La Jolla's, CFS', NCRM's and CRM's business premises. Motion ¶ 28. Hereinafter, the Seattle MP Alleged Collateral, the Defaulted MP Alleged Collateral and the Non-Assignable MP Alleged Collateral, collectively the "Alleged Collateral".

20. The Motion asserts that FNC's purported ability to foreclose on the Alleged Collateral is based upon "valid, properly perfected, and fully enforceable liens that were granted to FNC's predecessor-in-interest pursuant to a Security Agreement dated as of December 17,

6

2015 (the "Security Agreement")[.]" Motion pg. 1, prefatory statement. Importantly, the Security Agreement is to be "governed by, and construed in accordance with, the laws of the State of New York." Security Agreement, Section 14(g).

21.     While FNC provided a copy of the Security Agreement in support of the Motion, surprisingly it did not submit any evidence of pre-petition perfection of its alleged liens. The Medical Practices found FNC's omission of such evidence curious, especially in light of the Motion's representation that "perfection of [FNC's] liens and claims has been established in this Court under the Cash Collateral Orders." Motion pg. 15, heading C.

22.     Shortly after the Motion was filed, counsel for the Medical Practices made an informal discovery request upon counsel for FNC, seeking production of all UCC-1 statements supporting perfection of FNC's alleged liens (the "Request for Production"). Concurrently with this informal discovery request, counsel for the Medical Practices conducted UCC-1 searches in Delaware (where Debtors were formed) and each of the states where the Medical Practices operate (*i.e.* California, Utah, Washington, Nevada, South Carolina, Georgia and Florida) (the "Independent Search").

23.     As reflected by the accompanying Request for Judicial Notice ("RJN"), the Independent Search yielded interesting and dispositive information – specifically: (1) FNC's (and its predecessor, the Bank of Montreal) failure to file UCC-1 statements against Debtors in the states where the Medical Practices held the Assets; and (2) Debtors previously filed UCC-1 statements against each Medical Practices in the states the Medical Practices operate, but the asserted collateral within these UCC-1 statements was limited to the income-stream for the "term" of each MSA (the "IntegraMed UCC-1 Statements"). The IntegraMed UCC-1 Statements were subsequently assigned to Bank of Montreal without changing the asserted collateral (the

"Bank of Montreal UCC-1 Statements"), which were subsequently assigned, without change of the collateral, to an entity apparently related to FNC (the "FNC UCC-1 Statements").

24.     Shortly after the Medical Practices' counsel concluded its Independent Search, FNC produced documents in connection with the Request for Production ("FNC's Production"). Absent from FNC's Production were the IntegraMed UCC-1 Statements evidencing that FNC's lien rights were limited to the income-stream from the MSAs generated during the "term" of said MSAs. See Declaration of Ryan D. O'Dea and exhibits affixed thereto.

## ARGUMENT

### Law Applicable to FNC's Request for Relief from Stay

25.     As stated in the Motion, "the party seeking relief under section 362(d)(2) of the Bankruptcy Code has the burden of proving that the debtor does not have **equity in the property**. Motion ¶ 31, citing 11 U.S.C. § 362(g)(emphasis added). As further acknowledged in the Motion, "[a] debtor lacks equity in property **if the aggregate amount of claims secured by such property is greater than the value of the property**." See *In re Indian Palms Assocs., Ltd.*, 61 F.3d 197, 206-07 (3d Cir. 1995) ("The classic test for determining equity under section 362(d)(2) focuses on a comparison between the total liens against the property and the property's current value")." Motion ¶ 33. As such, it is incumbent upon FNC, as the moving party, to establish a perfected lien, on identified property, that exceeds the value of such identified property.

26.     Furthermore, if FNC cannot establish it holds a perfected security interest in the property it seeks relief from stay to foreclose upon, the Motion must be denied. See *In re Covenant at South Hills, Inc.*, 410 B.R. 426, 430 (Bankr. W.D. Pa. 2009) ("As the entity asserting a perfected security interest, Madison has the burden of proof to a preponderance.

8

Madison also has the burden of proof to a preponderance of the validity, priority and extent of its asserted lien)(citations omitted); See also *In re DBSI, Inc*., 432 B.R. 126, 132, 2010 Bankr. LEXIS 1376, *14-16; *In re Davadick*, 82 B.R. 391, 394, 1988 Bankr. LEXIS 130, *10.

### **FNC Has Not Met Its Burden to Establish That the "Property" Lacks Equity**

27. Implicit in the requirement that FNC establish a "lack of equity" is actually identifying the subject property. Rather than specifically identifying the property it believes it has a lien upon, FNC vaguely references that the alleged property is "related to or located at [the Medical Practices' Facilities]" and it "seeks to foreclose on the interests granted to it under the Security Agreement the following, among other, assets (all as defined in the Security Agreement): Accounts (including Health-Care Insurance Receivables); Instruments; General Intangibles; Deposit Accounts; Equipment; Fixtures; Monies, personal property and interests in personal property; and the [] MSAs." Motion ¶ 25.

28. Without specifically identifying the property it seeks to foreclose upon, this Court and the Medical Practices have no way of knowing if said property is actually FNC's collateral. Furthermore, without providing evidence of the value of this unidentified property, it is factually impossible for FNC to establish a "lack of equity." The Motion fails to provide a valuation of the property it seeks to foreclose upon, and as such, FNC has not met its burden to establish that relief from stay is justified. For this reason alone, the Motion must be denied.

### **Cause Does Not Exist to Grant Relief from Stay Because FNC Does Not Have a Perfected Lien on the Assets**

29. Without explanation or evidence of any kind, FNC asserts it holds valid and duly perfected liens against the Assets. Despite FNC's protestations to the contrary, and pursuant to the Medical Practices' Independent Search and FNC's Production, FNC does not hold a perfected

lien against the Assets or the Alleged Collateral. The starting point of the analysis begins with the applicable law governing the Security Agreement.

30. The Security Agreement is to be governed by New York law. Pursuant to New York UCC Law Section 9-301(b):

> Except as otherwise provided in Sections 9-303 through 9-306 [inapplicable], the following rules determine the law governing perfection, the effect of perfection or nonperfection, and the priority of a security interest in collateral:
>
> (a) <u>Except as otherwise provided in this section</u>, while a debtor is located in a jurisdiction, the local law of that jurisdiction governs perfection, the effect of perfection or nonperfection, and the priority of a security interest in collateral.
>
> (b) <u>While collateral is located in a jurisdiction, the local law of that jurisdiction governs perfection, the effect of perfection or nonperfection, and the priority of a possessory security interest in that collateral</u>. (emphasis added).

31. FNC does not dispute that the Alleged Collateral and Assets are held by the Medical Practices at their Facilities. <u>See</u> <u>Motion</u> ¶ 25 (FNC seeks "relief from stay to commence foreclosure proceedings on [the Alleged Collateral] related to or located at [the Medical Practices' Facilities].). Therefore, New York UCC Law Section 9-301(b) applies to the Alleged Collateral and Assets.

32. The Medical Practices operate their business in California,[3] Utah,[4] Washington,[5] Nevada,[6] South Carolina,[7] Georgia and Florida,[8] which are the states in which the Assets are located. Importantly, each state where the Medical Practices hold Assets require a creditor to do the following in order to perfect a UCC-1 lien for fixtures and equipment:

---

[3] RPMG and RPMG – La Jolla.
[4] UFC.
[5] SRM.
[6] NCRM.
[7] CRM.
[8] CFS.

a. <u>California Code, Commercial Code - COM § 9501 provides, in relevant part</u>:

(a) Except as otherwise provided in subdivision (b), <u>if the local law of this state governs perfection of a security interest</u> or agricultural lien, the office in which to file a financing statement to perfect the security interest or agricultural lien is either of the following:

(1) The office designated for the filing or recording of a record of a mortgage on the related real property, if either of the following conditions is satisfied:

(A) The collateral is as-extracted collateral or timber to be cut.

(B) <u>The financing statement is filed as a fixture filing and the collateral is goods that are or are to become fixtures</u>.

(2) <u>The office of the Secretary of State</u> **in all other cases**, including a case in which the collateral is goods that are or are to become fixtures and the financing statement is not filed as a fixture filing.

b. <u>Utah Uniform Commercial Code § 70A-9a-501 provides in relevant part</u>:

(1) Except as otherwise provided in Subsection (2), <u>if the local law of this state governs perfection of a security interest</u> or agricultural lien, the office in which to file a financing statement to perfect the security interest or agricultural lien is:

(a) the office designated for the filing or recording of a record of a mortgage on the related real property, if:

(i) the collateral is as-extracted collateral or timber to be cut; or

(ii) <u>the financing statement is filed as a fixture filing and the collateral is goods that are or are to become fixtures</u>; or

(b) the Division of Corporations and Commercial Code, **in all other cases**, including a case in which the collateral is goods that are or are to become fixtures and the financing statement is not filed as a fixture filing.

c. <u>Washington Uniform Commercial Code § 62A.9A-501 provides in relevant part</u>:

(a) Filing offices. Except as otherwise provided in subsection (b) of this section, <u>if the local law of this state governs perfection of a security interest</u>

11

or agricultural lien, the office in which to file a financing statement to perfect the security interest or agricultural lien is:

(1) The office designated for the filing or recording of a record of a mortgage on the related real property, if:

(A) The collateral is as-extracted collateral or timber to be cut; or

(B) <u>The financing statement is filed as a fixture filing and the collateral is goods that are or are to become fixtures</u>; or

(2) <u>The department of licensing,</u> **in all other cases**, including a case in which the collateral is goods that are or are to become fixtures and the financing statement is not filed as a fixture filing.

d.  <u>Nevada Commercial Instruments and Transactions § 104.9501 provides:</u>

1. Except as otherwise provided in subsection 2, <u>if the law of this State governs perfection of a security interest</u> or agricultural lien, the office in which to file a financing statement to perfect the security interest or agricultural lien is:

(a) The office designated for the filing or recording of a mortgage on the real property, if:

(1) The collateral is as-extracted collateral or timber to be cut; or

(2) <u>The financing statement is filed as a fixture filing and the collateral is goods that are or are to become fixtures</u>; or

(b) <u>The Office of the Secretary of State</u> **in all other cases**, including a case in which the collateral is goods that are or are to become fixtures and the financing statement is not filed as a fixture filing.

e.  <u>South Carolina Commercial Code § 36-9-501 provides in relevant part:</u>

(a) Except as otherwise provided in subsection (b), <u>if the local law of this State governs perfection of a security interest</u> or agricultural lien, the office in which to file a financing statement to perfect the security interest or agricultural lien is:

(1) the office designated for the filing or recording of a record of a mortgage on the related real property, if:

(A) the collateral is as-extracted collateral or timber to be cut; or

    (B) <u>the financing statement is filed as a fixture filing and the collateral is goods that are or are to become fixtures</u>; or

  (2) <u>the office of the Secretary of State or any office duly authorized by the Secretary of State</u>, **in all other cases**, including a case in which the collateral is goods that are or are to become fixtures and the financing statement is not filed as a fixture filing.

f. <u>Georgia Commercial Code § 11-9-501 provides in relevant part</u>:

(a) Filing offices. Except as otherwise provided in subsection (b) of this Code section, <u>if the law of this state governs perfection of a security interest</u> or agricultural lien, the office in which to file a financing statement to perfect the security interest or agricultural lien is:

 (1) The office designated for the filing or recording of a record of a mortgage on the related real property, if:

  (A) The collateral is as-extracted collateral, growing crops, or timber to be cut; or

  (B) <u>The financing statement is filed as a fixture filing and the collateral is goods that are or are to become fixtures</u>; or

 (2) <u>The office of the clerk of the superior court of any county of this state</u>, **in all other cases**, including a case in which the collateral is goods that are or are to become fixtures and the financing statement is not filed as a fixture filing.

g. <u>Florida Commercial Relations § 679.5011 provides in relevant part</u>:

(1) Except as otherwise provided in subsection (2), the office in which to file a financing statement to perfect a security interest or agricultural lien is:

 (a) The office of the clerk of the circuit court, if:

  1. The collateral is as-extracted collateral or timber to be cut; or

  2. <u>The collateral is goods that are or are to become fixtures and the financing statement is filed as a fixture filing</u>.

 (b) <u>The Florida Secured Transaction Registry, in accordance with ss. 679.3011 - 679.3071</u>, **in all other cases**, including cases in which the collateral is goods that are or are to become fixtures and the financing statement is not filed as a fixture filing.

33. Based upon the aforementioned applicable state law, in order for a creditor to perfect a lien on a fixture, it must file a UCC-1 statement in the applicable county/state office (generally in the county where the fixtures are located). Furthermore, in order for a creditor to perfect a lien on the non-fixture Assets, it would need to file a UCC-1 statement with the aforementioned designated state offices.

34. Due to the fact that FNC and its predecessor failed to file a UCC-1 against Debtors or the Medical Practices in the county/state where the Alleged Collateral or Assets are located, FNC does not have a perfected lien against the Alleged Collateral or Assets (both fixture and non-fixture Assets). For these reasons, FNC has: (1) failed to establish a lack of equity in the Assets and/or the Alleged Collateral; and (2) has failed to establish cause to grant relief from stay. Therefore, the Motion must be denied in its entirety.

### **Cause Does Not Exist to Grant Relief from Stay Because FNC's Lien on the MSAs has Expired**

35. In addition to FNC's inaccurate claim that it holds a perfected lien against the Assets and Alleged Collateral, FNC also incorrectly asserts it holds a valid and fully enforceable lien on the MSAs. The starting point of the analysis is the MSAs themselves. Using the La Jolla MSA as an exemplar, Section 6.3.3 provides:

> [The Medical Practices] acknowledge[] that from time to time [Debtors] may negotiate and enter into financing arrangements with financial institutions and as a result [Medical Practices] will be asked to enter into amended and/or restated security agreements in favor of such financial institutions. [The Medical Practices] agree[] to cooperate with [Debtors] by executing such amended and/or restated security agreements or other documents as such financial institutions may <u>require granting such financial institution a security agreement in [the Medical Practices']</u> **Receivables**. (emphasis added).

36. Further, Section 1.1.16 of the La Jolla MSA provides:

14

> "Receivables" shall mean and include all <u>rights to payment</u> for services rendered or goods sold, including, without limitation, accounts receivables, contract rights, chattel paper, documents, instruments and other evidence of patient indebtedness to [the Medical Practices], policies and certificates of insurance relating to any of the foregoing, and all rights to payment, reimbursement or settlement or insurance or other medical benefit payments assigned to [the Medical Practices] by patients or pursuant to any Preferred Provider, HMO, capitated payment agreements or other agreements between [the Medical Practices] and a payer, recorded each month (net of Adjustments). (emphasis added).

37. As unambiguously provided by the MSAs, a security agreement was held in favor of Debtors in connection with the Medical Practices' Receivables – a security interest that Debtors were contractually entitled to provide to a financial institution as collateral.

38. The next step in determining FNC's lien rights in the MSAs is an analysis of relevant UCC-1 statements filed against the Medical Practices. First-in-time are the IntegraMed UCC-1 Statements, which provide[9] that Debtors' "collateral" is exclusively: "Any and <u>all accounts receivable and proceeds of the accounts receivable</u> of the [Medical Practices] arising **during the term** of the Management, Service and Facility Agreement between [the Medical Practices] and Secured Party dated January 1, 2014, as amended, restated, supplemented or otherwise modified from time to time, and all proceeds thereof" (emphasis added).

39. Importantly, each of the MSAs are for a term of years unless terminated sooner. Using the La Jolla MSA as an exemplar, Section 7.1 provides: "This Agreement shall begin on the Effective Date and shall expire on December 31, 2029, with automatic successive twenty-five year terms, <u>unless sooner terminated as herein provided</u>." (emphasis added).

40. Second-in-time are the Bank of Montreal UCC-1 Statements, which were filed as amendments to the IntegraMed UCC-1 Statements without modifying the collateral. Attached as

---

[9] Aside from the stated dates of the MSA, the description of "collateral" in each IntegraMed UCC-1 Statement is the same. Therefore, the IntegraMed UCC-1 statement filed against RPMG – La Jolla shall be used as an exemplar.

"Exhibit A" to each of the Bank of Montreal UCC-1 Statements is the following "Miscellaneous Information:"

> [Debtors] ("Assignor") has assigned to bank of Montreal, as Administrative Agent ("Assignee"), as part of the collateral security for certain obligations owing by Assignor, <u>all of **Assignor's right, title and interest** in (i) certain amounts at any time owing (the "Owed Amounts") by medical practice groups to Assignor and (ii) all collateral securing the Owed Amounts, including without limitation, the collateral covered by the initial financing statement [*i.e.* the IntegraMed UCC-1 Statements] set forth above</u> (including the power of Assignor to authorize an amendment to, or terminate such initial financing statement), pursuant to the terms of that certain Credit Agreement [*i.e.* the Security Agreement] dated as of December 17, 2015, as same may be amended, restated, supplemented or otherwise modified from time to time, by and among Assignor, certain affiliates of Assignor, Assignee, and the lenders party thereto, and/or the other loan documents executed in connection therewith.  This Amendment evidences the collateral assignment of Assignor's right to authorize an amendment to, or terminate, such initial financing statement.  As a result of such assignment and the filing of this Amendment, and in accordance with the Uniform Commercial Code, Assignee shall be deemed the secured party of record with respect to the financing statement set fourth above, and any amendment to, or termination of the initial financing statement set forth above must be authorized by Assignee. (emphasis added).

41.     The "Miscellaneous Information" affixed as Exhibit A to the Bank of Montreal UCC-1 Statements did not change, alter, or enlarge the collateral covered by said statements.  To the contrary, the Bank of Montreal UCC-1 Statements merely gave FNC's predecessor the same right to payment under the MSAs that Debtors were entitled to (*i.e.* the "Owed Amounts"), which was secured by the same collateral as the IntegraMed UCC-1 Statements (*i.e.* the Medical Practices' Receivables).  Therefore, FNC's predecessor was not provided the Assets as collateral, was not provided the Alleged Collateral as collateral and was not provided the MSAs themselves as collateral.  Rather, the collateral provided to the Bank of Montreal was merely the Medical Practices' Receivables for the "term" of the MSAs.

42. Then, on or about July 31, 2020 the FNC UCC-1 Statements were filed as an amendment to the Bank of Montreal UCC-1 Statements without change to the asserted collateral. As such, the lien rights of FNC are the same as those under the Bank of Montreal UCC-1 Statements – and by extension, IntegraMed UCC-1 Statements. Therefore, FNC does not have the ability to foreclose on the "MSAs" as stated in the Motion. Rather, FNC merely has the right to the "Owed Amounts" (*i.e*. amounts owed to Debtors under the MSAs) for the "term" of the MSAs.

43. The final step in the determination of FNC's lien rights is an analysis of the "term" of each of the MSAs. As held by this Court in the July 10 Order, the RPMG MSA and the Utah MSA were terminated for material breach on May 5, 2020 pursuant to Section 8.1.2 of said agreements. Furthermore, and as established in the Medical Practices' motion to enforce termination rights, the La Jolla MSA was terminated for material breach. Additionally, this Court held that the Non-Consenting MSAs could not be assumed or assigned pursuant to Section 365(c)(1), thus making the *ipso facto* provisions of each agreement applicable pursuant to Section 365(e)(2). Finally, this Court held that the Seattle MSA could only be assumed or assigned if the Trustee could get Court approval of a sale of "substantially all" of Debtors' business – an event that is a factual impossibility. Because the Seattle MSA cannot be assumed or assigned pursuant to Section 365(c)(1), its *ipso facto* provision is enforceable pursuant to Section 365(e)(2). Therefore, the terms of each of the MSAs have expired due to said agreements being terminated on or before the Petition Date.

44. Additionally, it should be noted that the FNC UCC-1 Statements merely create a claim to the Owed Amounts due to Debtors under the MSAs. However, it is undisputed that Debtors failed to perform the Services under the MSAs months before Petition Date. It is further

undisputed that Debtors and/or the Trustee failed to perform under the MSAs post-petition. Therefore, there have been no "Amounts Owed" to Debtors – and by extension, to FNC – for approximately nine (9) months, if not longer.[10]

45.    For these reasons, FNC has: (1) failed to establish a lack of equity in the Alleged Collateral; and (2) has failed to establish cause to grant relief from stay.  Therefore, the Motion must be denied in its entirety.

### The Cash Collateral Orders Do Not Perfect FNC's Alleged Security Interest

46.    The Motion seems to take the position that the Cash Collateral Orders somehow perfect FNC's alleged security interest.  Rather than reference the specific docket numbers of the Cash Collateral Orders themselves, FNC references the docket numbers for the Cash Collateral Stipulations [D.I. 41, 85, and 212]. Motion ¶ 6.

47.    As made clear by the "Final Order Granting the Trustee's Motion for Entry of Interim and Final Orders…Approving Sharing and Cash Collateral Agreement with [FNC],"

> Except as explicitly provided in this order, the Medical Practices Stipulation, and the Sharing Agreement, nothing contained herein shall prejudice the substantive rights of any creditor or party in interest, or the Trustee, under the Bankruptcy Code or applicable non-bankruptcy law, and all such rights are expressly preserved.

D.I. 89, ¶ 10.

48.    Importantly, the Second Amended Cash Collateral Agreement was the final iteration ultimately approved by this Court, which provided, in relevant part:

> WHEREAS, the Prepetition Obligations are secured by liens (the "Prepetition Liens") on substantially all of the Debtors' assets (collectively, the "Prepetition Collateral") including, without limitation, Cash Collateral (as defined herein)[.]

---

[10] As it pertains to amounts owed to the Medical Practices and the dates upon which Debtors ceased performance under the MSAs, the Medical Practices incorporate by reference their motion to enforce termination rights currently set for hearing on September 30, 2020.

[D.I. 85, Recital F]. Making an assertion in a recital does not change the fact that FNC's lien rights – as it pertains to the Medical Practices – were exclusively limited to the prospective income streams from the MSAs during the term of the MSAs. This is made clear by the Cash Collateral Stipulation's use of the defined term "Prepetition Collateral." The Cash Collateral Stipulation neither enlarged FNC's lien rights nor perfected its purported security interests.

49.  FNC's current attempt to "foreclose" upon lien rights far in excess of those actually held evidences the very utility of the "reservation of rights" language built into this Court's final order approving the Cash Collateral Stipulation. Based upon FNC's failure to perfect a lien on the Assets or the Alleged Collateral, and due to the fact that its liens on the Receivables under the MSAs have expired, the Cash Collateral Order does not somehow revitalize a non-existent lien. Therefore, and for the reasons stated above FNC has: (1) failed to establish a lack of equity in the Alleged Collateral; and (2) has failed to establish cause to grant relief from stay. Therefore, the Motion must be denied in its entirety.

## **CONCLUSION**

50.  At the end of the day, this Court should view FNC's Motion as nothing more than an end-run around the July 10 Order prohibiting assumption and assignment of the MSAs. As made clear in the MSAs, the Medical Practices have the right to purchase the Assets and the Alleged Collateral. When the Medical Practices entered into the MSAs with Debtors, it was

never contemplated or intended that Debtors' insolvency or prospective bankruptcy would lead to anything besides the Medical Practices' right to purchase the Assets. Clearly, the collateral pledged to the Bank of Montreal could only include the rights and interests possessed by Debtors. Because Debtors' interests in the Assets were limited by the Medical Practices' rights to purchase same, relief from stay should be denied. The equities at issue in this instant matter dictate a denial of the Motion due to FNC's failure to establish cause.

51. For the reasons stated above, the Medical Practices respectfully request that the Court deny the Motion in its entirety due to: (1) FNC's failure to specifically identify the property it seeks to foreclose upon; (2) FNC's failure to establish that this unidentified property is without equity; (3) FNC's failure to establish that it holds a valid, perfected and enforceable lien; and (4) FNC's failure to establish cause justifying relief from the automatic stay.

Dated: September 10, 2020
Wilmington, Delaware

**THE ROSNER LAW GROUP LLC**

By: */s/ Scott James Leonhardt*
Scott James Leonhardt (DE #4885)
824 N. Market Street, Suite 810
Wilmington, DE 19801
Telephone: (302) 319-6301
E-mail: leonhardt@teamrosner.com

-and-

**SHULMAN BASTIAN FRIEDMAN & BUI LLP**
James C. Bastian, Jr. (*Pro Hac Vice*)
Ryan D. O'Dea (*Pro Hac Vice*)
100 Spectrum Center Drive, Suite 600
Irvine, CA 92618
Telephone: (949) 427-1654
Facsimile: (949) 340-3000
E-mail: jbastian@shulmanbastian.com
E-mail: rodea@shulmanbastian.com

*Counsel to the Medical Practices*