# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re:<br>INTEGRAMED HOLDING CORP., *et al.*,[1]<br>                Debtors. | Chapter 7<br>Case No. 20-11169 (LSS)<br>(Jointly Administered) |

## TRUSTEE'S MOTION FOR APPROVAL OF ASSET PURCHASE AND SETTLEMENT AGREEMENT WITH MEDICAL PRACTICES AND FERTILITY NEWCO, LLC

Jeoffrey L. Burtch, as chapter 7 trustee in the above-captioned cases (the "Trustee") hereby submits this motion (the "Motion"), for entry of an order approving the Asset Purchase and Settlement Agreement (the "Agreement")[2] between the Trustee and Fertility NewCo, LLC ("FNC"), on one hand, and interested parties Reproductive Partners Medical Group, Inc., Utah Fertility Center, P.C., Coastal Fertility Specialists, LLC, Nevada Reproductive Labs, Foulk & Whitten Nevada Center for Reproductive Medicine, P.C., Seattle Reproductive Medicine, Inc., Reproductive Partners Medical Group – La Jolla, Inc., Center for Reproductive Medicine, P.A., Las Vegas – Nevada Fertility Center *fka* IntegraMed Medical – King, PLLC and Idaho Center for Reproductive Medicine LLC (collectively, the "Medical Practices" and, together with FNC and the Trustee, the "Parties"), on the other hand. A copy of the Agreement is attached hereto as **Exhibit A**. In support of the Motion, the Trustee respectfully states as follows:

---

[1] Debtors in these cases are the following entities (the respective case numbers for each estate follows in parentheses): IntegraMed Holding Corp. (20-11169 LSS), IntegraMed America, Inc. (20-11170 LSS), Trellis Health, LLC (20-11171 LSS), IntegraMed Fertility Holding Corp. (20-11172 LSS), Reproductive Partners, Inc. (20-11173 LSS), IntegraMed Management of Bridgeport, LLC (20-11175 LSS), IntegraMed Florida Holdings, LLC (20-11176 LSS), IntegraMed Management of Mobile, LLC (20-11179 LSS), IntegraMed Management, LLC (20-11181 LSS), and IntegraMed Medical Missouri, LLC (20-11184 LSS).

[2] Capitalized terms not otherwise defined in this Motion shall have the meanings given in the Agreement. To the extent of any inconsistency between the Agreement and this Motion, the Agreement shall govern.

**JURISDICTION AND VENUE**

1. The United States Bankruptcy Court for the District of Delaware (the "Court") has jurisdiction to consider this Motion pursuant to 28 U.S.C. § 1334. Consideration of this Motion is a core proceeding pursuant to 28 U.S.C. § 157(b). Venue of this proceeding is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

2. The statutory predicates for the relief requested in this Motion are sections 105(a) and 363(b) of Title 11 of the United States Code (the "Bankruptcy Code") and Rule 9019(a) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").

**BACKGROUND**

3. On May 20, 2020 (the "Petition Date") the above-captioned debtors (collectively, the "Debtors"), commenced the above-captioned bankruptcy cases by filing petitions under chapter 7 of the Bankruptcy Code in this Court.

4. On May 21, 2020, the Trustee was appointed as interim trustee for the Debtors' bankruptcy estates (the "Estates"). A meeting of creditors pursuant to section 341 of the Bankruptcy Code was held and concluded on June 24, 2020.

5. On approximately May 11, 2020, FNC acquired the rights of the Bank of Montreal and other lenders pursuant to a certain Amended and Restated Credit Agreement, dated as of May 9, 2018, by and among IntegraMed America, Inc., as borrower; the remaining Debtors, as guarantors; Bank of Montreal as administrative agent and lender, and certain other lender parties thereto (the "Amended and Restated Credit Agreement").

6. As of the Petition Date, the Debtors were indebted to FNC pursuant to the Amended and Restated Credit Agreement for principal, interest, fees and other costs and

expenses as provided for therein (the "Prepetition Obligations"). The Prepetition Obligations are secured by liens on substantially all of the Debtors' assets.

7. On June 1, 2020, the Trustee filed a *Motion for Entry of (I) an Order (A) Approving Bidding Procedures in Connection with Sale of Substantially All of the Estates' Assets, (B) Scheduling an Auction and Hearing to Consider the Proposed Sale, and (C) Approving the Form and Manner of Notice Thereof; and (II) an Order (A) Approving the Sale, (B) Authorizing the Assumption and Assignment of Executory Contracts and Unexpired Leases, and (C) Granting Certain Related Relief* (the "Sale Motion") [D.I. 35].

8. On June 8, 2020, the Bankruptcy Court entered the *Order Granting Trustee's Motion for Entry of an Order (A) Approving Bidding Procedures in Connection with Sale of Substantially All of the Estates' Assets, (B) Scheduling an Auction and Hearing to Consider the Proposed Sale, and (C) Approving the Form and Manner of Notice Thereof* [D.I. 72].

9. The Medical Practices specialize in gynecological services, treatment of human infertility encompassing the provision of *in vitro* fertilization, and other assisted reproductive services.

10. At all relevant times prior to the Petition Date, the Debtors were in the business of making available to medical providers, such as the Medical Practices, certain assets and support services, primarily consisting of (i) financial management; (ii) administrative systems; (iii) clinical and laboratory organization and function; (iv) marketing; (v) operations management; and (vi) capital or access to capital, as set out in the MSAs (as defined below).

11. On or about January 1, 2014, Reproductive Partners Medical Group, Inc. ("RPMG") and Debtor Reproductive Partners, Inc. entered into that Certain Second Amended Management, Services and Facility Agreement (the "RPMG MSA").

12. On or about November 1, 2010, Utah Fertility Center, P.C. ("UFC") and Debtor IntegraMed America, Inc. entered into that certain Amended and Restated Management Agreement (the "Utah MSA").

13. On or about September 24, 2012, Coastal Fertility Specialists, LLC ("CFS") and Debtor IntegraMed America, Inc. entered into that certain Business Service Agreement (the "Coastal MSA").

14. On or about December 1, 2009, Nevada Reproductive Labs, Foulk & Whitten Nevada Center for Reproductive Medicine, P.C. ("NCRM") and Debtor IntegraMed America, Inc. entered into that certain First Amended and Restated Management Agreement (the "Nevada MSA").

15. On or about December 15, 2015, Seattle Reproductive Medicine, Inc. ("SRM") and Debtor IntegraMed America, Inc. entered into that certain Amended and Restated Service Agreement (the "Seattle MSA").

16. On or about March 15, 2015, Center for Reproductive Medicine, P.A. ("CRM") and Debtor IntegraMed America, Inc. entered into that certain Amended and Restated Business Service Agreement (the "CRM MSA").

17. On or about January 1, 2014, Reproductive Partners Medical Group – La Jolla, Inc. ("RPMG – La Jolla") and Debtor IntegraMed America, Inc. entered into that certain Management, Services and Facility Agreement (the "La Jolla MSA").

18. On or about May 1, 2014, Las Vegas – Nevada Fertility Center *fka* IntegraMed Medical – King, PLLP ("Vegas") and Debtor IntegraMed Management, LLC entered into that certain Management, Services Agreement (the "Vegas MSA").

19. On or about December 1, 2009, Idaho Center for Reproductive Medicine, P.C., now known as Idaho Center for Reproductive Medicine LLC (the "Idaho Clinic") and Debtor IntegraMed America, Inc. entered into that certain First Amended and Restated Management Agreement (the "Idaho MSA").

20. The RPMG MSA, Utah MSA, Coastal MSA, Nevada MSA, Seattle MSA, CRM MSA, La Jolla MSA, the Vegas MSA, and the Idaho MSA are hereinafter collectively referred to as the "MSAs".

21. On July 8, 2020, the Court held a hearing regarding the whether certain of the MSAs can be assumed and assigned pursuant to Bankruptcy Code Section 365.

22. On July 10, 2020, the Court issued a ruling (the "July 10 Order") stating, *inter alia*, that: (1) "RPMG terminated the RPMG MSA pursuant to section 8.1.2 of the RPMG MSA as of May 5, 2020, and UFC terminated the Utah MSA pursuant to section 8.1.2 of the Utah MSA on May 5, 2020;" (2) "With respect to SRM's MSA, the Trustee may assume and assign that agreement to a third party pursuant to a transaction described in section 12.5 of the SRM MSA;" and (3) with respect to the remaining MSAs other than the Vegas MSA, the Trustee "may not assume or assign the MSAs."

23. On July 17, 2020, the Trustee held an auction (the "Auction") for substantially all of the assets of the Debtors' Estates, in connection with which certain parties, including FNC, submitted bids. The Trustee found none of the bids acceptable, but continued to engage in discussions with interested parties, and eventually entered into a series of asset sales pursuant to which he sold substantially all of the Estates' assets related to practices other than the Medical Practices, including a sale of certain assets to FNC. At present, with one exception, out of the original pool of twenty clinics with whom the Debtors had management services agreements, the

Medical Practices are the only ones remaining that have not yet been the subject of an asset sale by the Trustee.[3]

24. On August 4, 2020, the Medical Practices, with the exception of the Idaho Clinic and Vegas, filed a *Motion: (1) to Enforce Termination Rights Under Their Management and Services Agreements with Debtors; (2) Exercise Rights of Recoupment; (3) in the Alternative, Exercise Rights to Setoff; and (4) for an Order Compelling Unrestricted Access to Patient and Medical Records* [D.I. 295] (the "Motion to Enforce"). As of the filing of the instant Motion, a hearing on the Motion to Enforce has not been held.

25. On August 11, 2020, the Trustee filed a *Motion to Extend (Further) Time to Assume Executory Contracts and Unexpired Leases; Extending Time to Assume Unexpired Leases of Nonresidential Real Property and Approving Procedures Regarding Rejection of Executory Contracts and Unexpired Leases* [D.I. 300] (the "Motion to Extend"). On October 1, 2020, the Court entered an order denying in part the Motion to Extend [D.I. 389].

26. On August 18, 2020, FNC filed a *Motion Pursuant to Bankruptcy Rule 9023 to Alter or Amend July 10 Orders* [D.I. 304] (the "Motion for Reconsideration"). On October 1, 2020, the Court entered an order denying the Motion for Reconsideration [D.I. 390].

27. On August 27, 2020, FNC filed a *Motion for Relief from the Automatic Stay Pursuant to Bankruptcy Code Section 362(d) and Bankruptcy Rule 4001* [D.I. 315] (the "RFS Motion"). As of the filing of the instant Motion, a hearing on the RFS Motion has not been held.

28. On September 28, 2020, FNC filed an *Emergency Motion to Stay the July 10 Orders Pending Appeal* [D.I. 373].

29. On October 8, 2020, FNC filed *Notices of Appeal* in connection with the July 10 Orders and the Court's order denying the Motion for Reconsideration [D.I. 394 through 397]

---

[3] The exception is CT Fertility, P.C., which has no assets, operations, or employees, and is defunct.

(collectively, the "Appeal").  As of the filing of this Motion, the Appeal is still pending.

30. On October 30, 2020, the Idaho Clinic filed a *Motion for a Determination that the Automatic Stay Does not Apply and for Relief from the Automatic Stay Pursuant to Bankruptcy Code Section 362(d) and Bankruptcy Rule 4001* [D.I. 447] (the "Idaho Motion").  As of the filing of the instant Motion, a hearing on the Idaho Motion has not been held.

31. The Parties have engaged in arm's length negotiations regarding: (i) the potential resolution of disputes between them, including without limitation these motions and appeals, and (ii) the potential sale of substantially all of the Estates' assets related to the Medical Practices, with the buyers being the Medical Practices themselves.  The Parties recently reached an agreement, the terms of which are set out in the Agreement attached hereto as "Exhibit "A," pursuant to which, *inter alia*: (i) the Trustee and FNC, on one hand, and the Medical Practices on the other, will enter into a global settlement of all disputes between them; and (ii) the Trustee will sell to each Medical Practice the "Purchased Assets," which include substantially all of the assets owned by the Estates that are located at that Medical Practices' premises, and/or used primarily in connection with that Medical Practice, including without limitation the Estates' interest in all accounts receivables, and in inventory, furniture, fixtures and equipment.

## SUMMARY OF THE AGREEMENT'S PRINCIPAL TERMS

32. The Agreement is structured similarly to the asset purchase agreements that the Trustee has reached with the other medical practices/buyers in these cases, all of which the Court has approved previously.  The Trustee is selling substantially all of the Estates' assets related to each Medical Practice, with each respective buyer being the entity that is presently operating the practice.  In essence, the Trustee is "selling back" the Estates' assets with respect to each

practice. The Agreement contains the following provisions regarding the consideration to be paid:

> Consideration for Purchase and Settlement. The following consideration will be exchanged by the Parties:
>
> (a) The purchase price ("Purchase Price") payable by Buyers for the Purchased Assets shall be Six Million Nine Hundred Twenty-Five Thousand Dollars ($6,925,000.00), as follows: (i) One Hundred Seventy-Five Thousand Dollars ($175,000) from the Idaho Clinic in immediately available funds shall be payable to FNC at the Closing; and (ii) Six Million Seven Hundred and Fifty Thousand Dollars ($6,750,000.00) collectively from RPMG, RPMG – La Jolla, SRM, CRM, NCRM, Vegas and CFS in immediately available funds shall be payable to FNC at the Closing.
>
> (b) Two Hundred Thousand Dollars ($200,000.00) of the Purchase Price shall be allocated to Seller, on behalf of the Estates, and Six Million Seven Hundred and Twenty-Five Thousand Dollars ($6,725,000.00) shall be allocated to FNC as secured creditor. The $200,000.00 allocation to the Seller shall result in a $200,000.00 reduction in the amounts Seller would have otherwise been required to remit to FNC in connection with the remaining Fixed Cash Collateral as set forth in Seller's counsel's email dated October 27, 2020. This allocation of the Purchase Price shall supersede any and all prior agreements between Seller and FNC regarding the division and entitlement of proceeds resulting from the sale of the Purchased Assets.
>
> (c) FNC shall provide Buyers access to certain IT systems and services pursuant to the terms and conditions of the License Agreements affixed to this Agreement as Exhibit C.
>
> (d) FNC and the Seller agree that their respective remaining obligations under paragraphs 5 and 6 of the Fourth Amended Sharing and Cash Collateral Agreement between Chapter 7 Trustee and Fertility Newco, LLC are satisfied in full by the following: (i) Seller remitting to FNC an amount equal to $275,600 which represents 80% of the sale proceeds from the sales relating to the Dallas and UNC practices (provided however, that Seller's obligation to remit such funds only arises once, and/or to the extent that, Seller has received such funds from the purchasers in such sales); (ii) Seller remitting to FNC 80% of the deferred purchase price due from the sale of the Missouri practice, once received, and (iii) Seller remitting to FNC $2,612,899.32 (i.e. $2,812,899.32 minus $200,000.00 pursuant to Section 1.6(b) of this Agreement), representing FNC's 50% share of the remaining Fixed Cash Collateral as set forth in Seller's counsel's email dated October 27, 2020. After the payments hereunder, FNC's sole remaining claim against the Estates shall be its general unsecured claim, which it must file within 60 days after Closing.

Agreement at section 1.7.

33. In addition, the Buyers are assuming, *inter alia*, all liabilities with respect to the Patient Deposits, and all liabilities and obligations with respect to the Attain Financial Liabilities, and the Attain Patient Benefits. The Agreement does not provide for the assumption and assignment of any contracts.

34. The Trustee notes also that pursuant to the Agreement FNC will transfer to the Buyers: (i) FNC's claims against the Debtors under the Amended and Restated Credit Agreement in the amounts set forth in Schedule 1.2 to the Agreement; and (ii) FNC's liens securing those claims, but, with respect to each practice, only to the extent that those liens encumber assets located at such Buyer's medical practice or used primarily in connection with such medical practice.

35. As descried above, the Agreement also contains a "settlement" component, which is what prompted the Trustee to seek approval of the Agreement by Motion, instead of simply submitting the Agreement under a notice or a certification of counsel as he has done with the previous asset purchase agreements.

36. The settlement is essentially a global resolution all disputes between the Trustee and FNC, on one hand, and the Medical Practices on the other, including without limitation: (1) potential avoidance actions against the Medical Practices; (2) the Sale Motion as it pertains to the MSAs; (3) the Motion to Enforce; (4) the Stay Motion; (5) the RFS Motion; (6) the Appeal; and (7) the Idaho Motion (collectively, the "Disputes").

37. Under the Agreement, the Trustee and FNC, on one hand, and the Medical Practices on the other, will grant one another full releases, subject to the terms and conditions of the APA. The consideration to be given by the Medical Practices under the Agreement,

including principally the payment and assumption of liabilities described above, is being given by the Medical Practices not only as consideration for the Purchased Assets, but also in consideration for the releases that will be given by the Trustee and FNC. In other words, the releases being given to the Medical Practices by the Trustee and FNC are part of what the Medical Practices are "purchasing" under the Agreement.

## RELIEF REQUESTED

38. By this Motion, the Trustee seeks the entry of an Order, substantially in the form attached hereto: (i) approving the Agreement; (ii) approving the sale of assets of the Estates embodied in the Agreement pursuant to sections 363(b) and 105(a) of the Bankruptcy Code; (iii) approving the settlements embodied in the Agreement pursuant to Bankruptcy Rule 9019 and section 105(a) of the Bankruptcy Code; and (iv) providing any further relief that may be appropriate.

## BASIS FOR RELIEF

### I. Approval of Sale

39. In the Sale Motion, the Trustee sought authority to sell substantially all of the Estates' assets, including the "Purchased Assets," under the Agreement. The Trustee submits that the sale of Estate assets set out in the Agreement is within the scope of the Sale Motion, which has been pending since June 1, 2020, and on which the Trustee has previously relied in obtaining Court approval of separate asset sales related to, respectively, the St. Louis medical practice (approved by Order at docket No. 282), the Alabama medical practice (approved by Order at docket No. 283), a group of five practices whose related assets the Trustee sold to FNC (approved by Order at docket No. 285), the New York medical practice (approved by Order at

docket No. 329), the Dallas medical practice (approved by Order at docket No. 387), and the University of North Carolina medical practice (approved by Order at docket No. 413).

40. Objections to the Sale Motion were previously filed by several parties. The attached form of order includes language addressing concerns previously expressed by objecting party Messiahic Inc. d/b/a PayJunction ("PayJunction"). This language is identical to language included in prior sale orders entered in these cases to which PayJunction expressly agreed. Accordingly, the Trustee expects that PayJunction will not oppose the approval of the Agreement and entry of the attached proposed order.

41. The Trustee does not believe that any other objections are pertinent to the transaction set out in the Agreement. FNC, as the Debtors' secured creditor with liens on substantially all of the Estates' assets, is itself a party to the Agreement, and has expressly approved of the attached form of order.

42. The Trustee submits that the consideration to be paid by the Buyers is certainly fair, especially considering the Buyers' commitment to assume the Attain liabilities and the liabilities related to the Patient Deposits.

43. Accordingly, the Trustee respectfully requests that the Court approve the Agreement, including the sales of the Purchased Assets proposed therein, pursuant to sections 363(b) and 105(a) of the Bankruptcy Code.

## II.    Approval of the Settlements in the Agreement

44. Bankruptcy Rule 9019(a) provides, in relevant part, that "[o]n motion by the trustee and after notice and a hearing, the court may approve a compromise or settlement." Fed. R. Bankr. P 9019(a). Compromises and settlements are "a normal part of the process of reorganization." *Protective Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc. v.*

*Anderson*, 390 U.S. 414, 424 (1968) *quoting Case v. Los Angeles Lumber Prods. Co.*, 308 U.S. 106, 130 (1939)).  The settlement of time-consuming and burdensome litigation, especially in the bankruptcy context, is encouraged and "generally favored in bankruptcy." *In re World Health Alternatives, Inc.*, 344 B.R. 291, 296 (Bankr. D. Del. 2006); see also *In re Penn Cent. Transp. Co.*, 596 F.2d 1102 (3d Cir. 1979).

45.  Further, pursuant to section 105(a) of the Bankruptcy Code, the "court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title."

46.  The decision to approve a compromise or settlement is in the discretion of the court. *Id*. at 296. The court may consider the opinion of the Trustee that the settlement is fair and reasonable.  See *In re Purofied Down Prods. Corp.*, 150 B.R. 519, 522 (S.D.N.Y. 1993).

47.  Courts should not substitute their judgment for that of the Trustee, but instead canvas the issues to see whether the settlement falls below the lowest point in the range of reasonableness.  See *In re Neshaminy Office Bldg. Assoc.*, 62 B.R. 798, 803 (E.D. Pa. 1986); *In re W.T. Grant & Co.*, 699 F.2d 599, 608 (2d Cir. 1983), cert. denied, 464 U.S. 22 (1983); see also *In re World Health Alternatives, Inc.*, 344 B.R. at 296 ("The court does not have to be convinced that the settlement is the best possible compromise. Rather, the court must conclude that the settlement is within the reasonable range of litigation possibilities.") (internal citations and quotations omitted).

48.  The United States Court of Appeals for the Third Circuit has enumerated four factors that should be considered in determining whether a settlement should be approved: "(1) the probability of success in litigation; (2) the likely difficulties in collection; (3) the complexity of the litigation involved, and the expense, inconvenience and delay necessarily attending it; and

(4) the paramount interest of the creditors." *Meyers v. Martin (In re Martin)*, 91 F.3d 389, 393 (3d Cir. 1996); accord *Will v. Nw. Univ. (In re Nutraquest, Inc.)*, 434 F.3d 639, 644 (3d Cir. 2006).

49.     The Agreement is in the best interests of the Estates and all creditors, is fair and reasonable, is within the Trustee's sound business judgment, and falls well above the lowest rung of reasonableness.

### A.     The "Probability of Success" Element Favors Settlement

50.     Here, the Disputes include without limitation: (1) potential avoidance actions against the Medical Practices; (2) the Sale Motion as it pertains to the MSAs; (3) the Motion to Enforce; (4) the Stay Motion; (5) the RFS Motion; (6) the Appeal; and (7) the Idaho Motion. Although the Trustee believes in the merits of his claims and defenses in the Disputes, the Trustee also understands that there is risk inherent in any litigation regardless of the perceived merits. Notwithstanding the Trustee's perceived merits, there are numerous issues bearing upon the Trustee's likelihood of success.

51.     By virtue of the passage of the applicable deadline, the MSAs and all related ancillary executory contracts have been rejected. Furthermore, the Trustee filed a *Notice of Proposed Abandonment of Property of the Estate* [D.I. 432] on October 19, 2020, seeking to abandon the Estates' interest in the MSAs and related property. It is FNC's position that the MSAs and related assets are its collateral, and due to the aforementioned rejection and abandonment, any proceeds flowing from same belong exclusively to FNC. While the Trustee believes he may withdraw the abandonment and unwind the impact of rejection should the Appeal be successful, the Medical Practices assert the legal consequences of rejection cannot be unwound regardless of the Appeal's final disposition.

52. Regarding the Appeal, the likelihood of success is uncertain. On one hand, the Medical Practices assert that the hypothetical test employed in the Third Circuit precludes assumption and assignment of the MSAs pursuant to Bankruptcy Code section 365(c)(1). On the other hand, FNC asserts: (1) the MSAs are executory contracts that may be assumed and assigned under Bankruptcy Code section 365; and (2) there is no controlling law specifically addressing assumption and assignment of contracts similar to MSAs. The Trustee believes success on the Appeal is questionable and supports approval of the Agreement.

53. Regarding the Motion to Enforce, the Idaho Motion, the RFS Motion, and the prospective avoidance claims against the Medical Practices, the Trustee believes the intertwined nature of these disputes supports approval of the Agreement. By and through the Motion to Enforce, the Medical Practices seek to exercise their setoff and/or recoupment rights against the Estates pursuant to the terms of the MSAs, ultimately resulting in substantial general unsecured claims held by the Medical Practices. At the same time, and through the RFS Motion, FNC seeks relief from the automatic stay to foreclose on the very same property that the Medical Practices seek to acquire through the Motion to Enforce and the Idaho Motion. The Medical Practices dispute the validity and extent of FNC's liens and assert that FNC cannot foreclose upon the subject property. Lastly, the Trustee's prospective avoidance actions involve, *inter alia*, proceeds derived from the Medical Practices' accounts receivable that appear to have been diverted from the Debtors. However, the Medical Practices assert that: (1) each have the right to setoff and/or recoupment absolving any alleged amounts owed to the Estates; and (2) the accounts receivable were to be assigned to the Debtors on a month-to-month basis under the MSAs, and at the time of the alleged diversion, the Debtors were in default and not performing under the MSAs.

54. In sum, given the myriad issues between the Parties and the factual complexity of the Disputes, the probability of success is uncertain and contains significant risk. Furthermore, the purpose of a compromise agreement is to allow the Trustee to avoid the expenses and burdens associated with litigating hotly contested and uncertain claims. As such, these factors weigh in favor of settling.

**B.     The Likely Difficulties in Collection**

55. The difficulty of collection weighs clearly in favor of settling. To collect on the Sale Motion, FNC would need to prevail on the Appeal, the Trustee would need to withdraw his notice of abandonment and then successfully unwind rejection of the MSAs. Even at that point, the Trustee's Sale Motion would need to be supported by a prospective buyer's showing of adequate assurance of future performance under the MSAs, which the Medical Practices strenuously assert is simply not possible. To collect on the Estates' prospective avoidance claims against the Medical Practices, the Medical Practices assert that the Trustee would need to overcome the Medical Practices' defenses of setoff, recoupment and the Debtors' material breach of the MSAs. At the same time, in order for the Trustee to collect against the Medical Practices, the RFS Motion and FNC's attempt to foreclose upon the property held by the Medical Practices would need to be unsuccessful, as the Medical Practices assert that FNC's threatened foreclosure would effectively end their ability to conduct business and render each judgment proof.

56. However, even if the stars aligned and all of the Disputes were adjudicated in the Trustee's favor, enforcement and collection against the Medical Practices would likely be a long and drawn-out process – including judgment debtor examinations and levying on other assets discovered through the judgment debtor examinations, if any. All of these efforts will result in

substantial and concomitant delays at a significant cost to the Estates. Accordingly, this factor weighs in favor of settling.

C.   **The Complexity, Expense and Delay of Litigation Supports Settlement**

57.   As detailed above, the Disputes are both legally and factually complex. If the Trustee continued to litigate the Disputes, the Estates would incur significant legal expenses from such efforts, including but not limited to, costs resulting from engaging in discovery, motion practice, trial and possibly responding to additional appeals. Furthermore, the Trustee believes that litigating the Disputes would likely be a very lengthy process. In light of these facts, the Trustee believes that litigating the Disputes will be exceedingly expensive for the Estates, and that the costs may actually exceed any prospective recovery that the Trustee may obtain. Accordingly, the Trustee believes that the proposed settlement and compromise is the most expedient and cost-effective method for resolving the Disputes. As such, this factor also weighs in favor of settling.

D.   **The Agreement is in the Best Interests of Creditors and Should be Approved**

58.   The Agreement should be approved as a means of preserving assets and enhancing the value of the Estates. The Agreement allows a resolution of the Disputes and ceases costly and risky activities related to litigation. Furthermore, the Agreement provides the Estates with $200,000.00 in conjunction with the Medical Practices' assumption of certain liabilities associated with the Debtors' pre-petition "Attain Program" and patient deposits collected and exhausted by the Debtors. Unless the Trustee is able to obtain a favorable result on all Disputes, the Estates will receive no proceeds. Additionally, and even if the Trustee is somehow successful on all Disputes, the Estates will likely have many millions of dollars of

claims filed in connection with the Debtors' "Attain Program" and patient deposit liabilities. Settlement therefore results in certainty and substantial benefit to the Estates and the creditors.

59. In addition, as mentioned above, with the exception of the defunct CT Fertility clinic, the Medical Practices are the only clinics remaining out of the original pool of twenty that have not yet been the subject of an asset sale by the Trustee. Consummation of the transaction embodied in the Agreement will bring the first phase of these cases to a close by concluding the transition of all of the formerly associated medical practices away from the Estates, and concluding the Parties' respective obligations under the cash collateral and sharing agreement and the medical practices stipulations.

60. The Agreement is based on the Trustee's business judgment. Rather than delay administration and incur expenses or resources litigating the Disputes, the Trustee has determined that the Agreement reached is fair and reasonable. In summary, the Agreement reached is based on the Trustee's good business judgment that it will benefit the Estates and creditors. Based on this, approval of the Motion is proper.

## **NOTICE**

61. Notice of this Motion has been provided to: (i) the Office of the United States Trustee; (ii) all parties that filed requests for service pursuant to Rule 2002; (iii) counsel for FNC; and (iv) counsel for the Medical Practices. In light of the nature of the relief requested, the Trustee submits that no further notice is necessary.

## **CONCLUSION**

**WHEREFORE**, the Trustee respectfully requests that the Court enter an order substantially in the form attached hereto: (i) approving the Agreement; (ii) approving the settlements embodied in the Agreement pursuant to Bankruptcy Rule 9019 and section 105(a) of the Bankruptcy Code; (iii) approving the sale of assets of the Estates embodied in the Agreement pursuant to sections 363(b) and 105(a) of the Bankruptcy Code; and (iv) providing any further relief that may be appropriate.

Dated: November 16, 2020                COZEN O'CONNOR

*/s/ Simon E. Fraser*
Mark E. Felger (No. 3919)
Simon E. Fraser (No. 5335)
1201 N. Market Street, Suite 1001
Wilmington, DE 19801-1147
Telephone: (302) 295-2000
Facsimile: (302) 295-2013
Email: mfelger@cozen.com
         sfraser@cozen.com

*Counsel to Jeoffrey L. Burtch, Chapter 7 Trustee*