## EXHIBIT A

# ASSET PURCHASE AND SETTLEMENT AGREEMENT

by and among

Jeoffrey L. Burtch, as Chapter 7 Trustee

for the Bankruptcy Estates of

IntegraMed Holding Corp. and Affiliates

and

Fertility NewCo, LLC

and

Reproductive Partners Medical Group, Inc.;

Utah Fertility Center, P.C.;

Coastal Fertility Specialists, LLC;

Nevada Reproductive Labs;

Foulk & Whitten Nevada Center for Reproductive Medicine, P.C.;

Seattle Reproductive Medicine, Inc.;

Center for Reproductive Medicine, P.A.;

Reproductive Partners Medical Group – La Jolla, Inc.;

Las Vegas – Nevada Fertility Center *fka* IntegraMed Medical – King, PLLC;

Idaho Center for Reproductive Medicine LLC

Dated November __, 2020

## ASSET PURCHASE AND SETTLEMENT AGREEMENT

This Asset Purchase and Settlement Agreement (this "Agreement") is entered into on November __, 2020, by and between Reproductive Partners Medical Group, Inc. ("RPMG"), Utah Fertility Center, P.C. ("UFC"), Coastal Fertility Specialists, LLC ("CFS"), Nevada Reproductive Labs, Foulk & Whitten Nevada Center for Reproductive Medicine, P.C. ("NCRM"), Seattle Reproductive Medicine, Inc. ("SRM"), Center for Reproductive Medicine, P.A. ("CRM"), Reproductive Partners Medical Group – La Jolla, Inc., ("RPMG – La Jolla"), Las Vegas – Nevada Fertility Center *fka* IntegraMed Medical – King, PLLC ("Vegas") and Idaho Center for Reproductive Medicine LLC (the "Idaho Clinic" and collectively with RPMG, UFC, CFS, NCRM, SRM, CRM, RPMG – La Jolla, the "Buyers" and individually, a "Buyer"), on one hand, and Jeoffrey L. Burtch as Chapter 7 Trustee for the Bankruptcy Estates (the "Estates") of the Debtors (defined below) ("Seller") and Fertility NewCo, LLC ("FNC").  Buyers, Seller and FNC are referred to collectively herein as the "Parties" and individually as a "Party."  Capitalized terms used and not otherwise defined herein have the meanings set forth in Article 12 below.

## PRELIMINARY STATEMENTS

WHEREAS, on May 20, 2020 (the "Petition Date"), IntegraMed Holding Corp. and various of its Affiliates (each, a "Debtor" and collectively, the "Debtors") each filed a voluntary petition for relief under Chapter 7 of the Bankruptcy Code, as amended (the "Bankruptcy Code"), commencing Chapter 7 cases (each, a "Bankruptcy Case" and, collectively, the "Bankruptcy Cases") in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court"), and the Bankruptcy Cases are being jointly administered under Case No. 20-11169 (LSS);

WHEREAS, shortly after the Petition Date, Seller was appointed as the Chapter 7 Trustee for the Estates of the Debtors, and he continues to serve in such capacity;

WHEREAS, on approximately May 11, 2020, FNC acquired the rights of the Bank of Montreal and other lenders pursuant to a certain Amended and Restated Credit Agreement, dated as of May 9, 2018, by and among IntegraMed America, Inc. ("IM America"), as borrower the remaining Debtors, as guarantors, Bank of Montreal as administrative agent and lender, and certain other lender parties thereto (the "Amended and Restated Credit Agreement");

WHEREAS, as of the Petition Date, the Debtors were indebted to FNC pursuant to the Amended and Restated Credit Agreement for principal, interest, fees and other costs and expenses as provided for therein (the "Prepetition Obligations");

WHEREAS, the Prepetition Obligations are secured by liens on substantially all of the Debtors' assets;

WHEREAS, on June 1, 2020, Seller filed a *Motion for Entry of (I) an Order (A) Approving Bidding Procedures in Connection with Sale of Substantially All of the Estates' Assets, (B) Scheduling an Auction and Hearing to Consider the Proposed Sale, and (C) Approving the Form and Manner of Notice Thereof; and (II) an Order (A) Approving the Sale, (B) Authorizing the Assumption and Assignment of Executory Contracts and Unexpired Leases, and (C) Granting Certain Related Relief* (the "Sale Motion") [Docket No. 35];

WHEREAS, on June 8, 2020, the Bankruptcy Court entered the *Order Granting Trustee's Motion for Entry of an Order (A) Approving Bidding Procedures in Connection with Sale of Substantially All of the Estates' Assets, (B) Scheduling an Auction and Hearing to Consider the Proposed Sale, and (C) Approving the Form and Manner of Notice Thereof* (the "Bidding Procedures Order") [Docket No. 72] which, *inter alia*, approved the bid and auction procedures attached as Exhibit 1 thereto (the "Bidding Procedures");

1

WHEREAS, RPMG has operated a medical practice providing medical, gynecological and fertility-related services to individual patients. On January 1, 2014, RPMG and Debtor Reproductive Partners, Inc. ("RPI") entered into that Certain Second Amended Management, Services and Facility Agreement (the "RPMG MSA"), pursuant to which RPI agreed to provide non-medical, non-professional, administrative services to RPMG including, without limitation, billing, collection, office leasing, equipment leasing, payment of office expenses, provision of human resources for non-professional employees and similar functions as provided in the RPMG MSA;

WHEREAS, UFC has operated a medical practice providing medical, gynecological and fertility-related services to individual patients. On November 1, 2010, UFC and Debtor IM America entered into that certain Amended and Restated Management Agreement (the "Utah MSA"), pursuant to which IM America agreed to provide non-medical, non-professional, administrative services to UFC including, without limitation, billing, collection, office leasing, equipment leasing, payment of office expenses, provision of human resources for non-professional employees and similar functions as provided in the Utah MSA;

WHEREAS, CFS has operated a medical practice providing medical, gynecological and fertility-related services to individual patients. On September 24, 2012, CFS and IM America entered into that certain Business Service Agreement (the "Coastal MSA"), pursuant to which IM America agreed to provide non-medical, non-professional, administrative services to CFS including, without limitation, billing, collection, office leasing, equipment leasing, payment of office expenses, provision of human resources for non-professional employees and similar functions as provided in the Coastal MSA;

WHEREAS, NCRM has operated a medical practice providing medical, gynecological and fertility-related services to individual patients. On December 1, 2009, NCRM and IM America entered into that certain First Amended and Restated Management Agreement (the "Nevada MSA"), pursuant to which IM America agreed to provide non-medical, non-professional, administrative services to NCRM including, without limitation, billing, collection, office leasing, equipment leasing, payment of office expenses, provision of human resources for non-professional employees and similar functions as provided in the Nevada MSA;

WHEREAS, SRM has operated a medical practice providing medical, gynecological and fertility-related services to individual patients. On December 15, 2015, SRM and IM America entered into that certain Amended and Restated Service Agreement (the "Seattle MSA"), pursuant to which IM America agreed to provide non-medical, non-professional, administrative services to SRM including, without limitation, billing, collection, office leasing, equipment leasing, payment of office expenses, provision of human resources for non-professional employees and similar functions as provided in the Seattle MSA;

WHEREAS, CRM has operated a medical practice providing medical, gynecological and fertility-related services to individual patients. On March 15, 2015, CRM and IM America entered into that certain Amended and Restated Business Service Agreement (the "CRM MSA"), pursuant to which IM America agreed to provide non-medical, non-professional, administrative services to CRM including, without limitation, billing, collection, office leasing, equipment leasing, payment of office expenses, provision of human resources for non-professional employees and similar functions as provided in the CRM MSA;

WHEREAS, RPMG – La Jolla has operated a medical practice providing medical, gynecological and fertility-related services to individual patients. On January 1, 2014, RPMG – La Jolla and IM America entered into that certain Management, Services and Facility Agreement (the "La Jolla MSA"), pursuant to which IM America agreed to provide non-medical, non-professional, administrative services to RPMG – La Jolla including, without limitation, billing, collection, office leasing, equipment leasing, payment of office expenses, provision of human resources for non-professional employees and similar functions as provided in the La Jolla MSA;

\49622293\1

WHEREAS, Vegas has operated a medical practice providing medical, gynecological and fertility-related services to individual patients.  On May 1, 2014, Vegas and Debtor IntegraMed Management, LLC ("IM Management") entered into that certain Management, Services Agreement (the "Vegas MSA"), pursuant to which IM Management agreed to provide non-medical, non-professional, administrative services to Vegas including, without limitation, billing, collection, office leasing, equipment leasing, payment of office expenses, provision of human resources for non-professional employees and similar functions as provided in the Vegas MSA;

WHEREAS, the Idaho Clinic has operated a medical practice providing medical, gynecological and fertility-related services to individual patients.  On December 1, 2009, the Idaho Clinic, under a prior name, and IM America entered into that certain First Amended and Restated Management Agreement (the "Idaho MSA"), pursuant to which IM America agreed to provide non-medical, non-professional, administrative services to the Idaho Clinic including, without limitation, billing, collection, equipment leasing, payment of office expenses, provision of human resources for non-professional employees and similar functions;

WHEREAS, the RPMG MSA, Utah MSA, Coastal MSA, Nevada MSA, Seattle MSA, CRM MSA, La Jolla MSA and the Idaho MSA are hereinafter collectively referred to as the "MSAs";

WHEREAS, pursuant to the MSAs, Debtors billed and collected all of Buyers' income and receivables, and agreed to deduct its management fee and Buyers' operating expenses from said collection and to return the net income to Buyers as provided in the MSAs;

WHEREAS, FNC's predecessor filed a UCC-1 and FNC asserts a first priority lien against certain assets of Buyers identified in the UCC-1.  Buyers dispute the validity, scope and extent of FNC's lien rights over assets and property kept, held and maintained by Buyers;

WHEREAS, certain patients of Buyers have made cash deposits with certain of the Debtors, entitling the patients to receive certain services from Buyers (the "Patient Deposits");

WHEREAS, Buyers assert that they have fully paid all management fees due to the Debtors and reimbursed all expenses incurred by the Debtors on behalf of Buyers, that the Debtors nevertheless failed to pay various vendor obligations that the Debtors agreed to pay under the MSAs and related contracts, that the Debtors collected and failed to turn over payments made by patients of Buyers, that there is no management fee or other amount due from Buyers to the Debtors or subject to the security interest of FNC, and that the bank accounts, Patient Deposits and accounts receivable of Buyers are the property of Buyers and not subject to FNC's secured lien;

WHEREAS, Debtors have operated a program known as the Attain IVF program (the "Attain Program");

WHEREAS, certain of Buyers' patients have also enrolled in the Attain Program (the "Attain Patients");

WHEREAS, under the terms of the Attain Program, the Attain Patients have contracted with Debtors to receive certain services from Buyers, including but not limited to IVF treatment cycles (the "Attain Patient Benefits");

WHEREAS, under the terms of the Attain Program, Debtors were obligated with respect to the Attain Patient Benefits, including obligations to reimburse Buyers for medical services it provided to the Attain Patients, and to pay any cash refunds owed to qualifying patients (collectively, the "Attain Financial Liabilities");

WHEREAS, Buyers desire to purchase and assume and Seller desires to sell, convey, assign and transfer such assets and rights and such liabilities to Buyers such that Buyers' relationship with the Debtors and FNC is severed and Buyers are able to operate independently, all in the manner and subject to the terms

3

and conditions set forth herein and as authorized under, among other things, Sections 105 and 363 of the Bankruptcy Code;

WHEREAS, Buyers and Seller desire to settle any and all disputes, claims, obligations, liabilities, debts – known or unknown, contingent or liquidated – they have or may have between each other;

WHEREAS, Buyers and FNC desire to settle any and all disputes, claims, obligations, liabilities, debts – known or unknown, contingent or liquidated – they have or may have between each other;

WHEREAS, Seller's ability to consummate the transactions set forth in this Agreement is subject to, among other things, the entry of the Sale Order by the Bankruptcy Court; and

WHEREAS, the Seller has determined that it is advisable and in the Estates' best interests to enter into this Agreement and to consummate the transactions provided for herein, subject to entry of the Sale Order, and has approved the same.

## AGREEMENT

Now, therefore, in consideration of the promises and the mutual promises herein made, and in consideration of the representations, warranties, covenants and other valuable consideration herein contained, the receipt and sufficiency of which are hereby acknowledged, the Parties agree as follows:

## ARTICLE 1
## PURCHASE AND SALE

1.1    Purchase and Sale of Purchased Assets.  On the terms and subject to the conditions set forth in this Agreement, at the Closing, Seller shall sell, transfer, assign, convey and deliver to Buyers, and Buyers shall purchase, acquire, assume and accept from the Estates, all of the Estates' right, title and interest in and to the Purchased Assets, free and clear of all Liens and Liabilities (except for the Assigned Security Interests and any Assumed Liabilities) to the extent permitted by the Bankruptcy Code.  "Purchased Assets" means all of the assets owned by any Debtor in whole or in part, that are located at such Buyer's medical practice or used primarily in connection with such medical practice, including but not limited to the Estates' interest in all accounts receivables, and in inventory, furniture, fixtures and equipment, including without limitation, any and all hard or disposable assets, IVF lab equipment, andrology equipment, operating room equipment, exam room tables, tables, chairs, phones, computers, and those physical assets inventory and equipment, in each case, at the sites of such medical practices or used primarily in such Buyer's medical practice, and any rights in real property leases, equipment leases primarily related to such Buyer's Medical Practice, in each case except for Excluded Assets.

1.2    Purchase and Sale of the Assigned Loans.  On the terms and subject to the conditions set forth in this Agreement, at the Closing, FNC shall sell, transfer, assign, convey and deliver to Buyers, without recourse, and Buyers shall purchase, acquire, assume and accept from FNC, (1) FNC's claims against Debtors as lender under the Amended and Restated Credit Agreement, and related documents, in the amounts and as set forth in Schedule 1.2 (the "Assigned Loans") together with (2) FNC's security interests securing such claims but consisting only of security interests in assets owned by any Debtor in whole or in part, or subject to a security interest in favor of any Debtor, that are located at such Buyer's medical practice or used primarily in connection with such medical practice, including but not limited to the Debtors' interest in all accounts receivables, and in inventory, furniture, fixtures and equipment, including without limitation, any and all hard or disposable assets, IVF lab equipment, andrology equipment, operating room equipment, exam room tables, tables, chairs, phones, computers, and those physical assets inventory and equipment, in each case, at the sites of such medical practices or used primarily in such Buyer's medical practice, and any rights in real property leases, equipment leases

4

primarily related to such Buyer's Medical Practice, in each case except for Excluded Assets (the "Assigned Security Interests").

1.3     Excluded Assets.

(a)     For avoidance of doubt, no assets, rights or licenses purported to be acquired by FNC or any of its Affiliates under (a) the that certain Asset Purchase Agreement by and between IM America and FNC dated as of August 31, 2020, (b) that certain Asset Purchase Agreement dated May 11, 2020, by and between IM America and FNC are "Purchased Assets" (and all such assets are "Excluded Assets").

(b)     Further, all assets, rights and licenses primarily used by (x) FNC to provide management services, technology services or financing, or (y) the medical practices managed by FNC in their medical practices are likewise "Excluded Assets".

(c)     Buyers acknowledge and agree that each Buyer is currently accessing certain IT software and cloud programs, whether owned by FNC or a third party (collectively, the "IP") in the operation of its medical practice of pursuant to a limited licenses granted by FNC (each, an "IT License Agreement") and that the IT License Agreements and access to the IT discussed therein are not included in the Purchased Assets. A copy of each IT License Agreement between Buyers, individually, and FNC is affixed to this Agreement as Exhibit C. Other than the Purchased Assets, the Parties expressly agree that Buyers are not purchasing or acquiring the information technology or any other assets or properties of Debtors and all such other assets and properties shall be excluded from the Purchased Assets. Accordingly, such assets are likewise "Excluded Assets" under this Agreement.

1.4     Assumption of Liabilities and Obligations. Upon the terms and subject to the conditions of this Agreement, the Parties agree that at the Closing:

Seller agrees to assign to Buyers, and Buyers agree to assume, in accordance with their respective terms, (i) all liabilities with respect to the Patient Deposits, (ii) the Attain Financial Liabilities and the obligations to provide the existing Attain Patient Benefits to such Buyer's patients as provided in Section 1.8, and (iii) all liabilities arising after the Petition Date and prior to the rejection date under any executory contract or unexpired lease for real or personal property used in connection with each Buyer's medical practice (collectively, the "Assumed Liabilities"). Each Buyer individually covenants and agrees that it will indemnify Seller for any claims, losses, or damages incurred by Seller in connection with the Assumed Liabilities arising from or related to that Buyer's specific medical practice. For the sake of clarity, each Buyer is only assuming Assumed Liabilities associated with its individual medical practice and is only indemnifying the Seller for claims, losses, or damage arising directly from its individual medical practice.

1.5     Excluded Liabilities. Notwithstanding any provision in this Agreement or any other writing to the contrary, Buyers are not assuming and shall not be responsible for, paying, performing or discharging, and shall not otherwise bear the economic burden of, any Liabilities of Debtors or their Affiliates of any kind or nature whatsoever, other than the Assumed Liabilities (all such Liabilities other than the Assumed Liabilities being herein referred to as the "Excluded Liabilities"), which Excluded Liabilities shall be retained by and remain the responsibility of Debtors or their Affiliates.

1.6     Non-Assignable Assets. Notwithstanding anything in this Agreement to the contrary, to the extent that the assignment of all or any portion of any Purchased Assets shall be prohibited by Law (including by Order of a Governmental Authority with jurisdiction), requires a Consent of, or advance notice to, a counterparty (if any) or requires the consent of any other third party that has not been obtained as of the Closing, and which restriction, consent right or right to advance notice cannot be effectively overridden or canceled by any order of the Bankruptcy Court or any provision of the Bankruptcy Code (each, a "Non-Assignable Asset"):

5

(a)     This Agreement shall not constitute an assignment or transfer of title to any such Non-Assignable Asset, unless and until any applicable restrictions described above prohibiting the assignment of such Non-Assignable Asset are satisfied or waived, except to the extent set forth in this Section 1.6;

(b)     Title to such Non-Assignable Asset shall not be transferred except and until provided in Section 1.6(d), and Debtors shall retain each such Non-Assignable Asset and all of the Liabilities of Debtors related to, or arising from, such Non-Assignable Asset accruing on and after the Closing, and such Liabilities shall not be considered Assumed Liabilities;

(c)     The respective Buyer, Seller, and to the extent it has any rights therein, FNC, shall continue to use commercially reasonable efforts to address the applicable restriction, or obtain a waiver of the issue impacting the ability of Seller to assign such Non-Assignable Asset hereunder; and

(d)     Title to each Non-Assignable Asset shall automatically and without further action of the Parties be assigned pursuant to this Agreement to the respective Buyers upon satisfaction or waiver of the applicable restrictions affecting such Non-Assignable Asset, and all of the performance obligations of Debtors arising under such Non-Assignable Asset accruing after the date of such assignment shall constitute Assumed Liabilities as of such date other than any of such Liabilities that constitute Excluded Liabilities.

1.7     Consideration for Purchase and Settlement.  The following consideration will be exchanged by the Parties:

(a) The purchase price ("Purchase Price") payable by Buyers for the Purchased Assets shall be Six Million Nine Hundred Twenty-Five Thousand Dollars ($6,925,000.00), as follows:  (i) One Hundred Seventy-Five Thousand Dollars ($175,000) from the Idaho Clinic in immediately available funds shall be payable to FNC at the Closing; and (ii) Six Million Seven Hundred and Fifty Thousand Dollars ($6,750,000.00) collectively from RPMG, RPMG – La Jolla, SRM, CRM, NCRM, Vegas and CFS in immediately available funds shall be payable to FNC at the Closing.

(b) Two Hundred Thousand Dollars ($200,000.00) of the Purchase Price shall be allocated to Seller, on behalf of the Estates, and Six Million Seven Hundred and Twenty-Five Thousand Dollars ($6,725,000.00) shall be allocated to FNC as secured creditor.  The $200,000.00 allocation to the Seller shall result in a $200,000.00 reduction in the amounts Seller would have otherwise been required to remit to FNC in connection with the remaining Fixed Cash Collateral as set forth in Seller's counsel's email dated October 27, 2020.  This allocation of the Purchase Price shall supersede any and all prior agreements between Seller and FNC regarding the division and entitlement of proceeds resulting from the sale of the Purchased Assets.

(c)  FNC shall provide Buyers access to certain IT systems and services pursuant to the terms and conditions of the License Agreements affixed to this Agreement as Exhibit C.

(d)  Pursuant to this Agreement, the MSAs are hereby terminated.  The Buyers are entitled to exercise any and all rights upon termination under the MSAs, except against the Estates or property of the Estates that are not Purchased Assets, and so long as such rights do not conflict with the terms and provisions of this Agreement.

(e) FNC and the Seller agree that their respective remaining obligations under paragraphs 5 and 6 of the Fourth Amended Sharing and Cash Collateral Agreement between Chapter 7 Trustee and Fertility Newco, LLC are satisfied in full by the following: (i) Seller remitting to FNC an amount equal to $275,600 which represents 80% of the sale proceeds from the sales relating to the Dallas and UNC practices (provided however, that Seller's obligation to remit such funds only arises once, and/or to the extent that, Seller has received such funds from the purchasers in such sales); (ii) Seller remitting to FNC 80% of the deferred purchase price due from the sale of the Missouri practice, once received, and (iii) Seller remitting to FNC

6

$2,612,899.32 (*i.e.* $2,812,899.32 minus $200,000.00 pursuant to Section 1.6(b) of this Agreement), representing FNC's 50% share of the remaining Fixed Cash Collateral as set forth in Seller's counsel's email dated October 27, 2020.  After the payments hereunder, FNC's sole remaining claim against the Estates shall be its general unsecured claim, which it must file within 60 days after Closing.

(e)  Buyers shall have no obligation in respect of Section 1.7(b) or Section 1.7(d).

1.8    Attain Program.  Prior to the Closing (and as a condition to such Closing), each Buyer, individually, shall assume the Attain Financial Liabilities associated with its individual medical practice. Each Buyer covenants and agrees that it will provide the Attain Patient Benefits to its patients. Each Buyer acknowledges that FNC owns the intellectual property associated with the Attain Program and agrees that it will not use the name "Attain" or any of the intellectual property associated with the Attain Program after the Closing Date.

1.9    Services Related to Patient Deposits.  Each Buyer, individually, covenants and agrees that it will provide, to any of the patients who made Patient Deposits in connection with medical services to be rendered by its specific medical practice, all services promised to such patients and not already provided by it. Each Buyer acknowledges and agrees that its obligation to honor these Patient Deposits may result in material financial detriment to Buyers.  For the sake of clarity, an individual Buyer's covenant and agreement to provide services to patients who made Patient Deposits is limited to those patients who originally sought medical treatment from that specific Buyer.

1.10    Release and Covenant Not to Sue.  In consideration of the promises and agreements set forth herein, and each of their performance and delivery of Agreement, the sufficiency of which consideration is hereby acknowledged, the Parties agree as follows, effective as of the Closing Date:

(a)    **GENERAL RELEASE BETWEEN BUYERS AND SELLER**.  Each Buyer individually, on the one hand, and Seller, on behalf of all of the Estates, on the other hand, hereby unconditionally, irrevocably and absolutely release and discharge one another and its (his) respective officers, directors, managers, employees, agents, representatives, heirs, successors, and permitted assigns from the Released Claims. "Released Claims" for the purposes of this Section 1.10(a) means, other than the Excluded Claims set forth in Section 1.10(d) hereof, any and all claims that exist or may exist as of the Closing, related in any way to the prior dealings, agreements, transactions or occurrences between Buyers, on the one hand, and Seller, on behalf of all of the Estates, on the other hand, to the fullest extent permitted by law, including, but not limited to, any and all losses, liabilities, claims, charges, demands, complaints, actions, causes of action, costs and expenses known or unknown, suspected or unsuspected, arising in any way directly or indirectly out of, or in connection with, the prior dealings, agreements, transactions, or occurrences between them. Without limitation, the Released Claims released by Seller, on behalf of the Estates, includes all claims of the Estates under Sections 506(c), 544, 547, 548, 549 and 550 of the Bankruptcy Code.  For avoidance of doubt, the Released Claims include all claims that exist or may exist as of the Closing, related in any way to the prior dealings, agreements, transactions or occurrences between Buyers, on the one hand, and the Estates, on the other hand, to the fullest extent permitted by law, including, but not limited to, any and all losses, liabilities, claims, charges, demands, complaints, actions, causes of action, costs and expenses known or unknown, suspected or unsuspected, arising in any way directly or indirectly out of, or in connection with, the prior dealings, agreements, transactions, or occurrences between them.  For avoidance of doubt, the Released Claims released by each Buyer do not include any claims of Buyer against Debtors or their Affiliates insofar as those persons own assets that are not assets of the Estates.  For avoidance of doubt, each Buyer agrees that it will not file or prosecute a proof of claim against the Estates, either in respect of its own prepetition claims or in respect of the Assigned Loans.

(b)    **GENERAL RELEASE BETWEEN BUYERS AND FNC**.  Each Buyer individually, on the one hand, and FNC, on the other hand, hereby unconditionally, irrevocably and absolutely releases and

7

discharges one another and its respective officers, directors, managers, owners, shareholders, members, employees, agents, representatives, heirs, successors, and permitted assigns from the Released Claims. "Released Claims" for the purposes of this Section 1.10(b) means, other than the Excluded Claims set forth in Section 1.10(d) hereof, any and all claims that exist or may exist as of the Closing, related in any way to the prior dealings, agreements, transactions or occurrences between each Buyer, on the one hand, and FNC (either directly or in its position as a Lender pursuant to the Amended and Restated Credit Agreement), on the other hand, to the fullest extent permitted by law, including, but not limited to, any and all losses, liabilities, claims, charges, demands, complaints, actions, causes of action, costs and expenses known or unknown, suspected or unsuspected, arising in any way directly or indirectly out of, or in connection with, the prior dealings, agreements, transactions, or occurrences between them.

(c)      **SECTION 1542 WAIVER.**  Each Buyer, the Seller, and FNC acknowledge that: (1) they may have sustained damages, expenses and losses in connection with the subject matter of this Agreement, which are presently unknown or not suspected and that such damages, expenses and  losses, if any, may give rise to additional damages, expenses and losses in the future which are not now anticipated by them, and (2) this Agreement and the foregoing releases have been negotiated and agreed upon despite this realization and, being fully advised, the Parties expressly waive any and all rights they may have with respect to the claims being release under any statute, including but not limited to *California Civil Code §1542*, or any common law principle that would limit the effect of the foregoing release to those claims actually known or suspected to exist at the time of the effectiveness of the foregoing release.  California Civil Code §1542 states:  **A general release does not extend to claims that the creditor or releasing party does not know or suspect to exist in his or her favor at the time of executing the release and that, if known by him or her, would have materially affected his or her settlement with the debtor or released party.**

(d)      For the sake of clarity, the releases contained in Section 1.10(a) and/or Section 1.10(b) are not intended, and shall not be interpreted, to be a release among or between individual Buyers.  Furthermore, the releases contained in Section 1.10(a) and/or Section 1.10(b) are not intended, and shall not be interpreted, to be releases among or between Seller and FNC.

(e)      **EXCLUDED CLAIMS; PURCHASE AGREEMENT**.  The Released Claims shall not include any claims, obligations, covenants or responsibilities that the Parties may have under this Agreement or the documents referenced as being entered in connection herewith, including the IT License Agreements solely in accordance with the IT License Agreements (collectively, the "Excluded Claims").

(f)      **COVENANT NOT TO SUE**.  The Parties acknowledge that the releases contained in Sections 1.10(a) and 1.10(b) are intended to end all divisions or disagreements between Buyers and Seller, and between Buyers and FNC, and accordingly, the Parties covenant that they will not, hereafter, bring or continue to prosecute any claim, action, appeal, cause of action of any kind in law, equity, or by arbitration against any other party for any Released Claims.

## ARTICLE 2
## THE CLOSING

2.1      Closing.  The closing of the transactions contemplated by this Agreement (the "Closing") shall take place at the offices of Cozen O'Connor in Wilmington, Delaware or electronically by the mutual exchange of facsimile or portable document format (.PDF) signatures, (a) commencing at 10:00 a.m. eastern standard time on the first (1st) Business Day following the satisfaction or waiver of all conditions to Closing set forth in Article 8 (other than those conditions that by their nature are to be satisfied by actions taken at the Closing), or (b) at such other place or time as may be mutually agreed to by the Parties (the date on which the Closing actually occurs, the "Closing Date").  All transactions contemplated herein to occur on

\49622293\1

and as of the Closing Date shall be deemed to have occurred simultaneously and to be effective as of 12:01 a.m. central standard time on the Closing Date.

2.2 <u>Closing Deliveries of Seller</u>. At or prior to the Closing, Seller shall deliver to Buyers:

(a) a copy of the Sale Order entered by the Bankruptcy Court;

(b) a Bill of Sale or other document accomplishing the transfer of the Purchased Assets to the appropriate Buyer;

(c) an Assignment and Assumption Agreement or other document accomplishing the assignment to, and assumption by, each individual Buyer of the Assumed Liabilities;

(d) all other instruments and documents required by this Agreement to be delivered by Seller to Buyers (including, without limitation, those instruments and documents set forth in <u>Section 8.1</u> below), and such other instruments and documents reasonably required to effectuate the transactions contemplated hereby; and

(e) the amounts previously collected by Seller on accounts receivable of Buyers whether attributable to pre-Petition Date or post-Petition Date services rendered by Buyers, that are or have been collected post-Petition Date, but prior to the Closing Date, and have been retained by Seller, which the Buyers and Seller agree are limited to $483,543.89 to SRM (to be delivered to SRM) and $59,906.74 to CRM (to be delivered to CRM).

All such agreements, documents and other items shall be in form and substance satisfactory to Buyers.

2.3 <u>Closing Deliveries of FNC</u>. At or prior to the Closing, FNC shall deliver to Buyers:

(a) documentation assigning the Assigned Loans to the respective Buyer without recourse and all liens against Debtors' property identified in Section 1.2 held by FNC (or by the Agent pursuant to the Amended and Restated Credit Agreement), including a UCC-3 (as applicable) in recordable form assigning any UCC-1 currently filed against Debtors' property identified in Section 1.2;

(b) the IT License Agreements, each executed by FNC or one of its Affiliates; and

( c) Dismissal, with prejudice, any and all appeals initiated by FNC associated with the Debtors' bankruptcies;

All such agreements, documents and other items shall be in form and substance reasonably satisfactory to Buyers.

2.4 <u>Closing Deliveries of Buyers</u>. At or prior to the Closing, each Buyer shall deliver to Seller:

(a) a certificate, in form and substance reasonably satisfactory to Seller, confirming that each of the conditions specified below in <u>Sections 8.2(a)-(b)</u> is satisfied; and

(b) an Assignment and Assumption Agreement or other document accomplishing the assignment to, and assumption by, each Buyer of the Assumed Liabilities;

(c) all other instruments and documents required by this Agreement to be delivered by Buyers to Seller and/or FNC, and such other instruments and documents that Seller or their counsel may reasonably request to effectuate the transactions contemplated hereby; and

(d) the IT License Agreements, to the extent applicable, executed by each Buyer.

All such agreements, documents and other items shall be in form and substance satisfactory to Seller.

9

2.5    Closing Payments to FNC.  At or prior to the Closing, the Buyers and Seller shall make the following payments in accordance with Section 1.7 and this Agreement via wire transfer of immediately available funds to an account designated by FNC:

(a)    RPMG, RPMG – La Jolla, SRM, CRM, NCRM, Vegas and CFS shall collectively pay the amount of Six Million Seven Hundred and Fifty Thousand Dollars ($6,750,000.00) to FNC in the amounts broken down on Schedule 2.5 attached hereto[1];

(b)    The Idaho Clinic shall pay the amount of One Hundred Seventy-Five Thousand Dollars ($175,000) to FNC; and

(c)    Seller shall pay the amount of Two Million Six Hundred and Twelve Thousand Eight Hundred and Ninety-Nine Dollars and Thirty-Two Cents ($2,612,899.32) to FNC, in full satisfaction of FNC's claim to the remaining Fixed Cash Collateral under the Fourth Amended Sharing and Cash Collateral Agreement.

## ARTICLE 3
## REPRESENTATIONS AND WARRANTIES OF BUYERS

Each Buyer represents and warrants to Seller and FNC that the statements contained in this Article 3 are correct and complete as of the date of this Agreement and will be correct and complete as of the Closing Date (as though made then and as though the Closing Date were substituted for the date of this Agreement throughout this Article 3).

3.1    Organization of Buyer.  Buyer is a professional limited liability company, corporation, or professional corporation duly formed, validly existing and in good standing under the state law governing its respective MSA.

3.2    Authorization of Transaction.  Buyer has full power and authority to execute and deliver this Agreement and the Ancillary Agreements to which Buyer is a party and to perform Buyer's obligations hereunder and thereunder.  The execution and delivery by Buyer of this Agreement and the Ancillary Agreements to which Buyer is a party and the performance by Buyer of the transactions contemplated hereby and thereby have been duly approved by all requisite action of Buyer.  Assuming the due authorization, execution and delivery of this Agreement and the Ancillary Agreements by the other parties thereto, this Agreement and each Ancillary Agreement to which Buyer is a party constitute the valid and legally binding obligation of Buyer, enforceable against Buyer in accordance with their terms, except as such enforceability may be limited by bankruptcy, insolvency, reorganization, moratorium and similar laws affecting creditors generally and by the availability of equitable remedies.  Except as required to comply with applicable federal and state securities Laws, Buyer is not required to give any notice to, make any filing with, or obtain any Consent of any Governmental Authority or any other Person in order to consummate the transactions contemplated by this Agreement or the Ancillary Agreements to which Buyer is a party.

3.3    Non-contravention.  Neither the execution and the delivery of this Agreement nor the Ancillary Agreements to which Buyer is a party, nor the consummation of the transactions contemplated hereby and thereby, will (i) violate or conflict with any Law or Order to which Buyer is subject, (ii) violate any provision of the Organizational Documents of Buyer, or (iii) conflict with, result in a breach of, constitute a default under, result in the acceleration of, create in any party the right to accelerate, terminate, modify, or cancel, or require any notice under any Contract to which Buyer is a party or by which it is bound or to which any of its assets is subject.

---

[1] Note to Draft: Schedule 2.5 to contain a schedule of payments from each practice to FNC.

\49622293\1

3.4     Ability to pay Purchase Price.  Buyer has sufficient liquid assets to pay its agreed-upon portion of the Purchase Price, and enter into the transactions contemplated herein, at the Closing.

3.5     No Other Representations.  Except for the representations and warranties set forth in this Article 3, neither Buyer nor any of its direct or indirect equityholders or their respective officers, directors, managers, or any of their respective representatives or agents has made or makes any other representations or warranties, written or oral, express or implied, with respect to Buyer.

## ARTICLE 4
## REPRESENTATIONS AND WARRANTIES OF SELLER AND FNC

4.1     Seller's Authority.  Seller is the Chapter 7 Trustee in the Bankruptcy Cases. Subject to entry of the Sale Order, Seller has the authority to enter into this Agreement and to consummate the transactions contemplated hereby.

4.2     No Representations by Seller.  EXCEPT AS EXPRESSLY PROVIDED HEREIN OR IN THE SALE ORDER, BUYER AGREES AND ACKNOWLEDGES THAT THE TRANSFER OF THE ASSETS IS MADE PURSUANT TO ORDER OF THE BANKRUPTCY COURT AND IS MADE "AS IS" AND "WHERE IS", AND ACKNOWLEDGES AND AGREES THAT, EXCEPT AS EXPRESSLY PROVIDED HEREIN, SELLER MAKES NO REPRESENTATION OR WARRANTY OF ANY KIND WHATSOEVER WITH RESPECT TO THE ASSETS OR OTHERWISE, EXPRESS OR IMPLIED, INCLUDING BUT NOT LIMITED TO ANY REPRESENTATION OR WARRANTY REGARDING THE TITLE OR CONDITION OF THE ASSETS OR THE FITNESS, DESIRABILITY, OR MERCHANTABILITY THEREOF OR SUITABILITY THEREOF FOR ANY PARTICULAR PURPOSE, OR ANY BUSINESS PROSPECTS, OR VALUATION OF THE ASSETS, OR THE COMPLIANCE OF THE ASSETS IN THEIR CURRENT OR FUTURE STATE WITH APPLICABLE LAWS OR ANY VIOLATIONS THEREOF.  BUYER FURTHER ACKNOWLEDGES THAT SELLER SHALL DELIVER TO THE BUYER ALL ASSETS IN SELLER'S OR HIS COUNSEL'S POSSESSION; BUT THAT SELLER DOES NOT HAVE POSSESSION OF ALL OF THE ASSETS, AND THAT TO THE EXTENT THE SELLER IS NOT IN POSSESSION OF AN ASSET SOLD HEREUNDER, BUYER WILL HAVE SOLE RESPONSIBILITY TO OBTAIN POSSESSION OF THE ASSETS.

4.3     Organization of FNC.  FNC is a limited liability company duly formed, validly existing and in good standing under the Laws of the State of Delaware.

4.4     FNC's Authorization of Transaction.  FNC has full power and authority to execute and deliver this Agreement and the Ancillary Agreements to which FNC is a party and to perform FNC's obligations hereunder and thereunder.  The execution and delivery by FNC of this Agreement and the Ancillary Agreements to which FNC is a party and the performance by FNC of the transactions contemplated hereby and thereby have been duly approved by all requisite action of FNC.  Assuming the due authorization, execution and delivery of this Agreement and the Ancillary Agreements by the other parties thereto, this Agreement and each Ancillary Agreement to which FNC is a party constitute the valid and legally binding obligation of FNC, enforceable against FNC in accordance with their terms, except as such enforceability may be limited by bankruptcy, insolvency, reorganization, moratorium and similar laws affecting creditors generally and by the availability of equitable remedies.  Except as required to comply with applicable federal and state securities Laws, FNC is not required to give any notice to, make any filing with, or obtain any Consent of any Governmental Authority or any other Person in order to consummate the transactions contemplated by this Agreement or the Ancillary Agreements to which FNC is a party.

4.5     FNC Non-contravention.  Neither the execution and the delivery of this Agreement nor the Ancillary Agreements to which FNC is a party, nor the consummation of the transactions contemplated hereby and thereby, will (i) violate or conflict with any Law or Order to which FNC is subject, (ii) violate any provision of the Organizational Documents of FNC, or (iii) conflict with, result in a breach of, constitute a default under, result in the acceleration of, create in any party the right to accelerate, terminate, modify,

11

or cancel, or require any notice under any Contract to which FNC is a party or by which it is bound or to which any of its assets is subject.

4.6     FNC's Ownership of the Loans.  FNC owns the rights of the lender under the Amended and Restated Credit Agreement.

4.7     No Other Representations by FNC.  Except for the representations and warranties set forth in this Article 4, neither FNC nor any of its direct or indirect equityholders or their respective officers, directors, managers, or any of their respective representatives or agents has made or makes any other representations or warranties, written or oral, express or implied, with respect to FNC.

## ARTICLE 5
## BANKRUPTCY MATTERS

5.1     Subject to Bankruptcy Court Approval.  Seller will use his reasonable best efforts to obtain the entry of the sale order substantially in the form attached as Exhibit B hereto (the "Sale Order"), authorizing Seller's entry into this Agreement and the transactions contemplated herein, and FNC and each Buyer shall reasonably cooperate with Seller as may be necessary to obtain the Sale Order.

## ARTICLE 6
## PRE-CLOSING COVENANTS

6.1     Closing Efforts.  Each of the Parties agree with respect to the period between the execution of this Agreement and the Closing, Buyers and FNC will use all commercially reasonable efforts to take all action and to do all things necessary, proper, or advisable in order to consummate and make effective the transactions contemplated by this Agreement (including satisfaction, but not waiver, of the closing conditions set forth in Article 8).

## ARTICLE 7
## POST-CLOSING COVENANTS

7.1     General.  In case at any time between the Closing and the closing of the Bankruptcy Cases any further action is necessary to carry out the purposes of this Agreement, Seller will take such further action, to the extent reasonable and practicable (including the execution and delivery of such further instruments and documents), as a Buyer reasonably may request, all at the sole cost and expense of that Buyer.  The Buyers each acknowledge and agree that the Buyers have been provided access to all documents, books, records (including Tax records), agreements and financial data of any sort relating to their medical practice (such documents, the "Practice Information") and the sole access to Practice Information that either the Seller or FNC shall be obligated to provide following the Closing shall be such Practice Information that is made available to each Buyer pursuant to the IT License Agreements in accordance with the terms and conditions of the IT License Agreements.  In case at any time after the Closing, the Estates require additional information or access to the Practice Information in the possession of a Buyer, that Buyer shall respond to reasonable requests of Seller and its representatives (including its legal advisors, financing sources, financial advisors and accountants) for access, during normal business hours and upon reasonable advance notice, to the Practice Information. For the sake of clarity, Seller's obligations pursuant to this paragraph shall terminate upon the closing of the Bankruptcy Cases.

7.2     Non-Disparagement. From and after the Closing Date, each Buyer and FNC agrees to not to make and cause its Affiliates not to make any statement that is intended to become public, or that should reasonably be expected to become public, and that calls into question the integrity, disparages or is otherwise derogatory of any of the Parties hereto or their Affiliates.  This Non-Disparagement section shall not apply to statements made:   (a) as necessary to comply with valid subpoena (any Party receiving a subpoena shall provide prompt notice to the other Parties, including a copy of the subpoena, and in no event more than three (3) business days after receiving such, to allow for an opportunity to quash; any Party

12

receiving a subpoena shall also immediately inform in writing the party who caused the subpoena to issue that some or all material covered by the subpoena is the subject of a non-disparagement agreement); (b) as necessary to enforce the terms of this Agreement; (c) as necessary to advise the Parties' Affiliates or the Parties' or their Affiliates' respective legal, accounting, financial advisers, shareholders, or lenders; provided each party agrees to abide by this non-disparagement covenant; or (d) pursuant to a valid order of any court or tribunal.  For the sake of clarity, the terms "Party" and "the Parties" in this Section 7.2 shall include only FNC and Buyers.

## ARTICLE 8
## CLOSING CONDITIONS

8.1    <u>Conditions to Obligation of Buyers</u>.  The obligation of Buyers to consummate the transactions to be performed by Buyers in connection with the Closing is subject to satisfaction (or, in the sole discretion of Buyers, waiver in writing) of the following conditions:

(a)    Seller shall have performed and complied in all material respects with all of the covenants and agreements in this Agreement to be performed by Seller prior to or at the Closing;

(b)    FNC shall have performed and complied in all material respects with all of the covenants and agreements in this Agreement to be performed by FNC prior to or at the Closing;

(c)    The Bankruptcy Court shall have entered the Sale Order;

(d)    There shall not be any Order in effect preventing consummation of any of the transactions contemplated by this Agreement or any Proceeding seeking to restrain, prevent, change or delay the consummation of any of the transactions contemplated by this Agreement; and

(e)    Seller shall have made all of the deliveries contemplated by <u>Section 2.2</u> of this Agreement.

8.2    <u>Conditions to Seller's and FNC's Obligations</u>.  Seller's and FNC's obligations to consummate the transactions to be performed by them in connection with the Closing are subject to satisfaction (or, in the sole discretion of Seller, waiver in writing) of the following conditions:

(a)    All of the representations and warranties concerning Buyers contained in <u>Article 3</u> must have been true and correct in all material respects as of the date hereof and must be true and correct in all material respects on the Closing Date as if made on the Closing Date;

(b)    The Bankruptcy Court shall have entered the Sale Order;

(c)    Buyers must have performed and complied in all material respects with all of their covenants and agreements in this Agreement to be performed prior to or at the Closing;

(d)    There shall not be any Order in effect preventing consummation of any of the transactions contemplated by this Agreement or any Proceeding seeking to restrain, prevent, change or delay the consummation of any of the transactions contemplated by this Agreement; and

(e)    Buyers shall have made all of the deliveries contemplated by <u>Section 2.4</u> of this Agreement.

## ARTICLE 9
## SURVIVAL

9.1    <u>Survival</u>.  Except as expressly set forth in this Agreement to the contrary, all representations and warranties of Buyers, Seller and FNC, respectively, contained in this Agreement or in any document delivered pursuant hereto shall be deemed to be material and to have been relied upon by Buyers, Seller and FNC, respectively, for purposes of Closing; <u>provided</u>, <u>however</u>, the Parties acknowledge and agree that all such representations and warranties shall expire, and be of no further force or effect upon the Closing, and neither Buyers, nor Seller, nor FNC shall have any Liability in respect of any breach thereof upon the Closing.

13

# ARTICLE 10
# TAX MATTERS

The following provisions will govern the allocation of responsibility as between Buyers, Seller and FNC for certain tax matters following the Closing Date:

10.1    <u>Cooperation on Tax Matters</u>.  Each Buyer will cooperate, as and to the extent reasonably requested by the other Party, in connection with the filing and preparation of Tax Returns pursuant to this <u>Article 10</u> and any Proceeding related thereto.  Such cooperation will include the retention and (upon such other Party's request) the provision of records and information that are reasonably relevant to preparation of such Tax Returns and any such Proceeding and making employees available on a mutually convenient basis to provide additional information and explanation of any material provided hereunder.

10.2    <u>Allocation of Purchase Price</u>.  The Parties agree that the Purchase Price (and other relevant items) shall be allocated among the Purchased Assets in accordance with their relative fair market values as determined by each Buyer in its sole discretion.  Buyers shall prepare and deliver to Seller within forty-five (45) Business Days after the Closing Date a schedule (the "<u>Allocation Schedule</u>") allocating the Purchase Price among the applicable assets as of the beginning of the day after the Closing Date.  The Allocation Schedule shall be binding on the Parties hereto, and the Parties hereto agree not to take (or permit any of their Affiliates to take) any position for any Tax purpose or on any Tax Return (including amended returns and claims for refund) or other information returns that is inconsistent with such Allocation Schedule.

# ARTICLE 11
# TERMINATION

11.1    <u>Termination of Agreement</u>.  Certain of the Parties may terminate this Agreement as provided below:

(a)    Buyers, FNC and Seller may terminate this Agreement by mutual written consent at any time prior to the Closing.

(b)    Seller may terminate this Agreement by giving written notice to Buyers at any time prior to the Closing (i) in the event Buyers have breached any representation, warranty, or covenant contained in this Agreement which individually, or in the aggregate, would reasonably be expected to result in a failure of the closing conditions set forth in <u>Section 8.2(a) or 8.2(b)</u> of this Agreement, and such breach remains uncured for a period of ten (10) Business Days following delivery of notice thereof by Buyer; <u>provided</u>, <u>however</u>, that no cure period will be required for any such breach that by its nature cannot be cured or (ii) if the Closing shall not have occurred on or before December 31, 2020 (unless the failure results primarily from Seller breaching any representation, warranty, or covenant contained in this Agreement).

(c)    Seller may terminate this Agreement by giving written notice to Buyers if (i) all of the conditions set forth in <u>Sections 8.1</u> and <u>8.2</u> have been satisfied (other than those conditions that by their terms are to be satisfied by actions taken at the Closing, but such conditions must be capable of being satisfied if the Closing Date were the date valid notice of termination of this Agreement is delivered by Seller to Buyers), and (ii) Buyers fail to complete Closing within three (3) Business Days of the time set forth in <u>Section 2.1</u>.

(d)    Either Buyers, FNC, or Seller may terminate this Agreement by giving written notice to the other Parties if the Bankruptcy Court enters an order dismissing the Bankruptcy Cases prior to the approval of the Sale Motion and entry of the Sale Order.

(e)    Either Buyers, FNC, or Seller may terminate this Agreement by giving written notice to the other Parties if there is in effect a final nonappealable order of a Governmental Authority of competent jurisdiction restraining, enjoining, or otherwise prohibiting the consummation of the transactions described in this Agreement.

14

(f)     Either Buyers, FNC, or Seller may terminate by giving written notice to the other Parties if the Bankruptcy Court enters an order that precludes the consummation of the transactions contemplated hereby on the terms and conditions set forth in this Agreement.

11.2    <u>Procedure upon Termination</u>.  In the event of termination by Buyer, FNC, and/or Seller, pursuant to <u>Section 11.1</u>, written notice thereof will forthwith be given to the other Parties, and this Agreement will terminate and the purchase of the Purchased Assets hereunder will be abandoned, without further action by Buyer or Seller.

## ARTICLE 12
## DEFINITIONS

"<u>Affiliate</u>" means, with respect to the Person to which it refers, (a) a Person that directly or indirectly, through one or more intermediaries, controls, is controlled by or is under common control with, such Person, (b) any officer, director or shareholder of such Person, (c) any parent, sibling, descendant or spouse of such Person or of any of the Persons referred to in clauses (a) and (b), and (d) any corporation, limited liability company, general or limited partnership, trust, association or other business or investment entity that directly or indirectly, through one or more intermediaries controls, is controlled by or is under common control with any of the foregoing individuals.  For purposes of this definition, the term "control" of a Person shall mean the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies, whether through the ownership of voting securities, by contract or otherwise.

"<u>Agreement</u>" has the meaning set forth in the Preamble.

"<u>Ancillary Agreements</u>" means all of the agreements being executed and delivered pursuant to this Agreement.

"<u>Assigned Loans</u>" has the meaning set forth in <u>Section 1.2</u>.

"<u>Assigned Security Interests</u>" has the meaning set forth in <u>Section 1.2</u>.

"<u>Assumed Liabilities</u>" has the meaning set forth in <u>Section 1.4(b)</u>.

"<u>Attain Financial Liabilities</u>" has the meaning set forth in the Preliminary Statements.

"<u>Attain Patient Benefits</u>" has the meaning set forth in the Preliminary Statements.

"<u>Attain Patients</u>" has the meaning set forth in the Preliminary Statements.

"<u>Attain Program</u>" has the meaning set forth in the Preliminary Statements.

"<u>Bankruptcy Cases</u>" has the meaning set forth in the Preliminary Statements.

"<u>Bankruptcy Code</u>" has the meaning set forth in the Preliminary Statements.

"<u>Bankruptcy Court</u>" has the meaning set forth in the Preliminary Statements.

"<u>Bidding Procedures</u>" has the meaning set forth in the Preliminary Statements.

"<u>Bidding Procedures Order</u>" has the meaning set forth in the Preliminary Statements.

"<u>Business Day</u>" means any day that is not a Saturday, Sunday or any other day on which banks are required or authorized by Law to be closed in the state in which a Buyer practices Medicine.

"<u>Buyer</u>" has the meaning set forth in the Preamble.

"<u>CFS</u>" has the meaning set forth in the Preamble.

"<u>Claim</u>" means any claim, demand, allegation, charge, dispute, complaint, or notice.

"<u>Closing</u>" has the meaning set forth in <u>Section 2.1</u>.

"Closing Date" has the meaning set forth in Section 2.1.

"Consent" means, with respect to any Person, any consent, approval, authorization, permission or waiver of, or registration, declaration or other action or filing with or exemption by such Person.

"Contract" means any oral or written contract, obligation, understanding, commitment, lease, license, instrument, purchase order, bid or other agreement.

"CRM" has the meaning set forth in the Preamble.

"Debtors" has the meaning set forth in the Preamble.

"Excluded Assets" has the meaning set forth in Section 1.3.

"Excluded Claims" has the meaning set forth in Section 1.10.

"Excluded Liabilities" has the meaning set forth in Section 1.4.

"Governmental Authority" means any foreign or domestic federal, state or local government or quasi-governmental authority, political or economic union, or arbitration tribunal or any department, agency, subdivision, court, commission, or other tribunal of any of the foregoing.

"Idaho Clinic" has the meaning set forth in the Preamble.

"IM America" has the meaning set forth in the Preliminary Statements.

"IP" has the meaning set forth in Section 1.3(c).

"IT License Agreement" has the meaning set forth in Section 1.3(c).

"Law" means any foreign or domestic federal, state or local law, statute, code, ordinance, regulation, rule, directive, consent agreement, constitution or treaty of any Governmental Authority, including common law.

"Liability" means any liability, whether known or unknown, whether asserted or unasserted, whether absolute or contingent, whether accrued or unaccrued, whether liquidated or unliquidated, and whether due or to become due.

"Lien" means any lien, mortgage, pledge, encumbrance, charge, security interest, adverse claim, liability, interest, charge, preference, priority, proxy, transfer restriction (other than restrictions under the Securities Act and state securities laws), encroachment, Tax, order, community property interest, equitable interest, option, warrant, right of first refusal, easement, profit, license, servitude, right of way, covenant or zoning restriction.

"MSAs" has the meaning set forth in the Preliminary Statements.

"NCRM" has the meaning set forth in the Preamble.

"Non-Assignable Asset" has the meaning set forth in Section 1.6.

"Order" means any order, award, decision, injunction, judgment, ruling, decree, charge, writ, subpoena or verdict entered, issued, made or rendered by any Governmental Authority or arbitrator, including the Bankruptcy Court.

"Organizational Documents" means (a) any certificate or articles of incorporation, bylaws, certificate or articles of formation, operating agreement or partnership agreement, (b) any documents comparable to those described in clause (a) as may be applicable pursuant to any Law and (c) any amendment or modification to any of the foregoing.

"Party" has the meaning set forth in the Preamble.

16

"<u>Patient Deposits</u>" has the meaning set forth in the Preliminary Statements.

"<u>Person</u>" means any individual, corporation, partnership, limited liability company, firm, joint venture, association, joint-stock company, estate, trust, unincorporated organization, Governmental Authority or other entity, of whatever nature.

"<u>Petition Date</u>" has the meaning set forth in the Preliminary Statements.

"<u>Prepetition Obligations</u>" has the meaning set forth in the Preliminary Statements.

"<u>Proceeding</u>" means any action, audit, lawsuit, litigation, proceeding, investigation, complaint, arbitration or mediation (in each case, whether civil, criminal or administrative), filed or initiated with or by, or pending by or before, any Governmental Authority, arbitrator or mediator.

"<u>Purchase Price</u>" has the meaning set forth in <u>Section 1.7</u>.

"<u>Purchased Assets</u>" has the meaning set forth in <u>Section 1.1</u>.

"<u>Released Claims</u>" has the meaning set forth in <u>Section 1.10</u>.

"<u>RPMG</u>" has the meaning set forth in the Preamble.

"<u>RPMG – La Jolla</u>" has the meaning set forth in the Preamble.

"<u>Sale Motion</u>" has the meaning set forth in the Preliminary Statements.

"<u>Sale Order</u>" has the meaning set forth in <u>Section 5.1</u>.

"<u>Securities Act</u>" means the Securities Act of 1933, as amended, and any applicable rules and regulations thereunder, and any successor to such statute, rules or regulations.

"<u>Seller</u>" has the meaning set forth in the Preamble.

"<u>SRM</u>" has the meaning set forth in the Preamble.

"<u>Tax</u>" or "<u>Taxes</u>" means any federal, state, local and foreign net income, alternative or add-on minimum, estimated, gross income, gross receipts, sales, use, ad valorem, value added, transfer, franchise, capital profits, lease, service, license, withholding, payroll, employment, excise, severance, stamp, occupation, premium, property, abandoned property or escheat, environmental or windfall profit tax, customs duty or other tax of any kind whatsoever, governmental fee or other like assessment or charge (and any liability incurred or borne by virtue of the application of Treasury Regulation Section 1.1502-6 (or any similar or corresponding provision of state, local or foreign Law), as a transferee or successor, by contract or otherwise), together with all interest, penalties, additions to tax and additional amounts with respect thereto whether disputed or not and including any obligations to indemnify or otherwise assume or succeed to the Tax liability of any other Person.

"<u>Tax Return</u>" means any return, declaration, report, claim for refund, or information return or statement relating to Taxes, including any schedule or attachment thereto, and including any amendment thereof.

"<u>UFC</u>" has the meaning set forth in the Preamble.

"<u>Vegas</u>" has the meaning set forth in the Preamble.

\49622293\1

# ARTICLE 13
## MISCELLANEOUS

13.1    No Third-Party Beneficiaries.  Except as specifically provided in this Agreement, this Agreement shall not confer any rights or remedies upon any Person other than the Parties and their respective successors and permitted assigns.

13.2    No Assignment of Claims.  Each Party warrants and affirms that such Party has not previously assigned, transferred, or encumbered, or purported to assign, transfer, or encumber, any of the rights or claims that they are compromising, transferring, selling, or assigning hereunder.

13.3    Entire Agreement.  This Agreement (including the documents referred to herein) constitutes the entire agreement among the Parties and supersedes any prior understandings, agreements, or representations by or among the Parties, written or oral, to the extent they relate in any way to the subject matter hereof.

13.4    Succession and Assignment.  This Agreement shall be binding upon and inure to the benefit of the Parties named herein and their respective successors and permitted assigns.  No Party may assign either this Agreement or any of its rights, interests, or obligations hereunder without the prior written approval of Buyers, Seller and FNC; provided, however, that a Buyer or FNC may (a) assign any or all of its respective rights and interests hereunder to one or more of its Affiliates and designate one or more of its Affiliates to perform its obligations hereunder (in any or all of which cases such Buyer or FNC, as applicable, nonetheless shall remain responsible for the performance of all of its obligations hereunder), (b) assign its respective rights under this Agreement for collateral security purposes to any Person providing financing to such Buyer or FNC, as applicable, its subsidiaries or Affiliates (including by the granting of Liens in respect of its respective rights and interests hereunder to any such lenders (and any agent for such lenders)), and the Parties consent to any exercise by such lenders (and such agent) of their rights and remedies with respect to such collateral, or (c) assign its rights under this Agreement to any Person that acquires such Buyer, FNC or any of its respective assets.

13.5    Counterparts.  This Agreement may be executed in one or more counterparts, each of which shall be deemed an original but all of which together will constitute one and the same instrument, and shall become effective when one or more such counterparts has been signed by each of the Parties and delivered to the other Parties.  Counterparts may be delivered via facsimile, electronic mail (including portable document format (.PDF)) or any electronic signature complying with the U.S. federal ESIGN Act of 2000, e.g., www.docusign.com.

13.6    Titles and Headings.  Titles and section headings contained in this Agreement are inserted for convenience only and shall not affect in any way the meaning or interpretation of this Agreement.

13.7    Notices.  All notices, requests, demands, claims, and other communications hereunder will be in writing.  Any notice, request, demand, claim, or other communication hereunder shall be deemed duly given (a) when delivered personally to the recipient, (b) when sent by electronic mail, on the date of transmission to such recipient, so long as a receipt of such electronic mail or facsimile is requested, (c) one (1) Business Day after being sent to the recipient by reputable overnight courier service (charges prepaid), or (d) four (4) Business Days after being mailed to the recipient by certified or registered mail, return receipt requested and postage prepaid, and addressed to the intended recipient as set forth below:

> If to Seller:        Jeoffrey Burtch, Chapter 7 Trustee
> 919 North Market Street, Suite 460
> P.O. Box 549
> Wilmington, DE 19801
> Email: JBurtch@burtchtrustee.com

\49622293\1

| | |
|---|---|
| Copy to (which shall not constitute notice): | Mark E. Felger, Esq.<br>Cozen O'Connor<br>1201 N. Market St., Ste. 1001<br>Wilmington, DE 1980<br>Email: mfelger@cozen.com |
| If to Buyers: | James C. Bastian, Jr., Esq.<br>Shulman Bastian Friedman & Bui LLP<br>100 Spectrum Center Drive, Suite 600<br>Irvine California, 92618<br>Email: jbastian@shulmanbastian.com |
| | and |
| | Robert A. Faucher, Esq.<br>Holland & Hart LLP<br>800 W. Main St., Suite 1750<br>Boise, Idaho 83702<br>Email: rfaucher@hollandhart.com |
| If to FNC: | Gregg M. Galardi, Esq.<br>Ropes & Gray LLP<br>1211 Avenue of the Americas<br>New York, New York 10036<br>Email: gregg.galardi@ropesgray.com |
| | and |
| | Andrew B. Kratenstein<br>McDermott Will and Emery LLP<br>340 Madison Avenue<br>New York, NY 10173-1922<br>Email: akratenstein@mwe.com |
| | and |
| | Kristian Werling<br>McDermott Will & Emery LLP<br>444 W. Lake Street, Suite 4000<br>Chicago, IL 60606<br>Email: kwerling@mwe.com |

Any Party may change the address to which notices, requests, demands, claims, and other communications hereunder are to be delivered by giving the other Parties notice in the manner herein set forth.

13.8    <u>Governing Law</u>.  This Agreement and any claim, controversy or dispute arising out of or related to this Agreement, any of the transactions contemplated hereby, the relationship of the parties, and/or the interpretation and enforcement of the rights and duties of the parties, whether arising in contract, tort, equity or otherwise, shall be governed by and construed in accordance with the domestic Laws of the State of Delaware (including in respect of the statute of limitations or other limitations period applicable to

19

any such claim, controversy or dispute), without giving effect to any choice or conflict of Law provision or rule (whether of the State of Delaware or any other jurisdiction) that would cause the application of the Laws of any jurisdiction other than the State of Delaware, except to the extent that any issue or claim arising out of, or related to any professional obligation of any licensed medical professional shall be solely determined in accordance with the choice of law and governing law provisions of the MSAs.

13.9     Amendments and Waivers.  No amendment of any provision of this Agreement shall be valid unless the same shall be in writing and signed by Buyers, FNC and Seller, provided, however, that if such amendment only would not impact all Buyers then only such Buyer or Buyers impacted shall be required to sign such amendment.  No waiver by any Party of any provision of this Agreement or any default, misrepresentation, or breach of warranty or covenant hereunder, whether intentional or not, shall be valid unless the same shall be in writing and signed by the Party against whom the waiver is to be effective nor shall such waiver be deemed to extend to any prior or subsequent default, misrepresentation, or breach of warranty or covenant hereunder or affect in any way any rights arising by virtue of any prior or subsequent such occurrence.

13.10     Specific Performance.  Each Party agrees that the other Parties will be entitled to obtain an injunction or injunctions to prevent breaches of the provisions of this Agreement and to enforce specifically this Agreement and its terms and provisions in any action instituted in the Bankruptcy Court without the need to post a bond or other security, subject to Section 13.7 and Section 13.15 in addition to any other remedy to which it may be entitled, at law or in equity.

13.11     Severability.  The provisions of this Agreement will be deemed severable and the invalidity or unenforceability of any provision will not affect the validity or enforceability of the other provisions hereof; provided, however, that if any provision of this Agreement, as applied to any Party or to any circumstance, is adjudged by a Governmental Authority or arbitrator not to be enforceable in accordance with its terms, the Parties agree that such Governmental Authority or arbitrator making such determination will have the power to modify the provision in a manner consistent with its objectives such that it is enforceable, or to delete specific words or phrases, and in its reduced form, such provision will then be enforceable and will be enforced.

13.12     Expenses.  Except as otherwise expressly provided in this Agreement, each Party will bear its own costs and expenses (including legal fees and expenses) incurred in connection with this Agreement and the transactions contemplated hereby.

13.13     Construction.  The Parties have participated jointly in the negotiation and drafting of this Agreement.  In the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as if drafted jointly by the Parties and no presumption or burden of proof shall arise favoring or disfavoring any Party by virtue of the authorship of any of the provisions of this Agreement.  Any reference to any Law shall be deemed also to refer to all rules and regulations promulgated thereunder, unless the context requires otherwise.  References in this Agreement to any gender include references to all genders, and references to the singular include references to the plural and vice versa.  The words "include", "includes" and "including" when used in this Agreement shall be deemed to be followed by the phrase "without limitation" or "but not limited to".  Unless the context otherwise requires, references in this Agreement to Articles, Sections, Schedules and Exhibits shall be deemed references to Articles and Sections of, and Schedules and Exhibits to, this Agreement.  Unless the context otherwise requires, the words "hereof", "hereby" and "herein" and words of similar meaning when used in this Agreement refer to this Agreement in its entirety and not to any particular Article, Section or provision of this Agreement. When calculating the period of time before which, within which or following which any act is to be done or any step taken pursuant to this Agreement, the date that is the reference date in calculating such period shall not be calculated as the first day of such period of time.  If the last day of such period is a non-Business Day, the period in question shall end on the next succeeding Business Day.

20

13.14   Incorporation of Exhibits.  The Exhibits and Schedules identified in this Agreement are incorporated herein by reference and made a part hereof.

13.15   Schedules.  Nothing in the Schedules hereto shall be deemed adequate to disclose an exception to a representation or warranty made herein unless the Schedule identifies the exception with reasonable particularity and describes the relevant facts in reasonable detail.  Without limiting the generality of the foregoing, the mere listing (or inclusion of a copy) of a document or other item shall not be deemed adequate to disclose an exception to a representation or warranty made herein (unless the representation or warranty has to do with the existence of the document or other item itself).  The Parties intend that each representation, warranty, and covenant contained herein shall have independent significance.  If any Party has breached any representation, warranty or covenant contained herein in any respect, the fact that there exists another representation, warranty or covenant relating to the same subject matter (regardless of the relative levels of specificity) which the Party has not breached shall not detract from or mitigate the fact that the Party is in breach of the first representation, warranty, or covenant.

13.16   Waiver of Jury Trial.  EACH OF THE PARTIES WAIVES THEIR RESPECTIVE RIGHTS TO A TRIAL BY JURY OF ANY CLAIM OR CAUSE OF ACTION BASED UPON OR ARISING OUT OR RELATED TO THIS AGREEMENT, OR THE TRANSACTIONS CONTEMPLATED HEREBY OR IN ANY ACTION, PROCEEDING OR OTHER LITIGATION OF ANY TYPE BROUGHT BY ANY OF THE PARTIES AGAINST ANY OTHER PARTY OR ANY AFFILIATE OF ANY OTHER SUCH PARTY, WHETHER WITH RESPECT TO CONTRACT CLAIMS, TORT CLAIMS OR OTHERWISE.  THE PARTIES AGREE THAT ANY SUCH CLAIM OR CAUSE OF ACTION SHALL BE TRIED BY A COURT TRIAL WITHOUT A JURY.  WITHOUT LIMITING THE FOREGOING, THE PARTIES FURTHER AGREE THAT THEIR RESPECTIVE RIGHT TO A TRIAL BY JURY IS WAIVED BY OPERATION OF THIS SECTION AS TO ANY ACTION, COUNTERCLAIM OR OTHER PROCEEDING WHICH SEEKS, IN WHOLE OR IN PART, TO CHALLENGE THE VALIDITY OR ENFORCEABILITY OF THIS AGREEMENT OR ANY PROVISION HEREOF.  THIS WAIVER SHALL APPLY TO ANY SUBSEQUENT AMENDMENTS, RENEWALS, SUPPLEMENTS OR MODIFICATIONS TO THIS AGREEMENT.

13.17   Exclusive Venue.  THE PARTIES AGREE THAT ALL DISPUTES, LEGAL ACTIONS, SUITS AND PROCEEDINGS ARISING OUT OF OR RELATING TO THIS AGREEMENT MUST BE BROUGHT EXCLUSIVELY IN THE BANKRUPTCY COURT.  EACH PARTY HEREBY CONSENTS AND SUBMITS TO THE EXCLUSIVE JURISDICTION OF THE BANKRUPTCY COURT.  NO LEGAL ACTION, SUIT OR PROCEEDING WITH RESPECT TO THIS AGREEMENT MAY BE BROUGHT IN ANY OTHER FORUM.  EACH PARTY HEREBY IRREVOCABLY WAIVES ALL CLAIMS OF IMMUNITY FROM JURISDICTION AND ANY OBJECTION WHICH SUCH PARTY MAY NOW OR HEREAFTER HAVE TO THE LAYING OF VENUE OF ANY SUIT, ACTION OR PROCEEDING IN THE BANKRUPTCY COURT, INCLUDING ANY RIGHT TO OBJECT ON THE BASIS THAT ANY DISPUTE, ACTION, SUIT OR PROCEEDING BROUGHT IN THE BANKRUPTCY COURT HAS BEEN BROUGHT IN AN IMPROPER OR INCONVENIENT FORUM OR VENUE.  EACH OF THE PARTIES ALSO AGREES THAT DELIVERY OF ANY PROCESS, SUMMONS, NOTICE OR OTHER DOCUMENT TO A PARTY HEREOF IN COMPLIANCE WITH SECTION 13.6 OF THIS AGREEMENT SHALL BE EFFECTIVE SERVICE OF PROCESS FOR ANY ACTION, SUIT OR PROCEEDING IN THE BANKRUPTCY COURT WITH RESPECT TO ANY MATTERS TO WHICH THE PARTIES HAVE SUBMITTED TO JURISDICTION AS SET FORTH ABOVE.

*[Remainder of Page Intentionally Left Blank]*

\49622293\1

IN WITNESS WHEREOF, the Parties hereto have executed this Asset Purchase Agreement as of the date first above written.

**BUYER**:

REPRODUCTIVE    PARTNERS    MEDICAL GROUP, INC.

By:_____
Name: _____
Title: _____

**BUYER**:

UTAH FERTILITY CENTER, P.C.

By:_____
Name:_____
Title: _____

**BUYER**:

COASTAL FERTILITY SPECIALISTS, LLC

By:_____
Name:_____
Title: _____

**BUYER**:

NEVADA    REPRODUCTIVE    LABS    and FOULK & WHITTEN NEVADA CENTER FOR REPRODUCTIVE MEDICINE, P.C.

By:_____
Name:_____
Title: _____

[SIGNATURE PAGE TO ASSET PURCHASE AGREEMENT]

**BUYER**:

SEATTLE REPRODUCTIVE MEDICINE, INC.

By:_____
Name:_____
Title: _____

**BUYER**:

CENTER FOR REPRODUCTIVE MEDICINE, P.A.

By:_____
Name:_____
Title: _____

**BUYER**:

REPRODUCTIVE PARTNERS MEDICAL GROUP – LA JOLLA, INC.

By:_____
Name:_____
Title: _____

**BUYER**:

LAS VEGAS – NEVADA FERTILITY CENTER FKA INTEGRAMED MEDICAL – KING, PLLC.

By:_____
Name:                         _____
Title: _____

**BUYER**:

IDAHO CENTER FOR REPRODUCTIVE MEDICINE LLC

By:_____

[SIGNATURE PAGE TO ASSET PURCHASE AGREEMENT]

Name:_Cristin C. Slater, M.D._____
Title:  Manager

**FNC**:

FERTILITY NEWCO, LLC


By:_____
Name:_____
Title: _____


**SELLER**:


_____

JEOFFREY L. BURTCH, in his capacity as Chapter 7 Trustee for the Estates of IntegraMed Holding Corp., IntegraMed America, Inc., Trellis Health, LLC, IntegraMed Fertility Holding Corp., Reproductive Partners, Inc., IntegraMed Management of Bridgeport, LLC, IntegraMed Florida Holdings, LLC, IntegraMed Management of Mobile, LLC, IntegraMed Management, LLC, and IntegraMed Medical Missouri, LLC.

DM_US 174448020-7.104127.0023

\49622293\1

**Schedule 1.2**

| Assignee | Amount of Assigned Loans |
|---|---|
| RPMG | $2,900,000.00 |
| UFC | $1,950,000.00 |
| CFS | $1,790,000.00 |
| NCRM | $845,000.00 |
| SRM | $5,500,000.00 |
| CRM | $1,800,000.00 |
| RPMG – La Jolla | $1,900,000.00 |
| Vegas | $750,000.00 |
| Idaho Clinic | $1,000,000.00 |

**Exhibit B to Purchase Agreement**
**Sale Order**